ORAL ARGUMENT NOT YET SCHEDULED

No. 24-5173

---

# In the United States Court of Appeals for the District of Columbia Circuit

---

HON. PAULINE NEWMAN,

*Plaintiff-Appellant*,

*v.*

HON. KIMBERLY A. MOORE, IN HER OFFICIAL CAPACITIES AS CHIEF JUDGE OF THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, CHAIR OF THE JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT, AND CHAIR OF THE SPECIAL COMMITTEE OF THE JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT; HON. SHARON PROST, IN HER OFFICIAL CAPACITY AS MEMBER OF THE SPECIAL COMMITTEE OF THE JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT; HON. RICHARD G. TARANTO, IN HIS OFFICIAL CAPACITY AS MEMBER OF THE SPECIAL COMMITTEE OF THE JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT; AND JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, IN THEIR OFFICIAL CAPACITIES,

*Defendants-Appellees*.

---

On Appeal from the United States District Court for the District of Columbia, No. 23-cv-01334-CRC; Hon. Christopher R. Cooper, Presiding

---

## APPELLANT'S OPENING BRIEF

## PUBLIC COPY—SEALED MATERIALS REDACTED

---

December 5, 2024

Gregory Dolin
*Counsel of Record*
John J. Vecchione
Andrew Morris
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210

*Counsel for Appellant*

Greg.Dolin@ncla.legal

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)

**A. <u>Parties</u>**:

The parties in the district court include the Honorable Pauline Newman, United States Circuit Judge of the United States Court of Appeals for the Federal Circuit, the Honorable Kimberly A. Moore, in her official capacities as Chief Judge of the United States Court of Appeals for the Federal Circuit, Chair of the Judicial Council of the Federal Circuit, and Chair of the Special Committee of the Judicial Council of the Federal Circuit; the Honorable Sharon Prost, in her official capacity as Member of the Special Committee of the Judicial Council of the Federal Circuit; the Honorable Richard G. Taranto, in his official capacity as Member of the Special Committee of the Judicial Council of the Federal Circuit; and the Judicial Council of the Federal Circuit and all Members thereof, in their official capacities.

***Disclosure Statement***:     No Disclosure Statement under Federal Rule of Appellate Procedure 26.1 nor under Circuit Rule

i

26.1 is necessary, as Plaintiff-Appellant is neither a corporation nor similar entity.

## B. Ruling Under Review:

The parties are before this Court on appeal from the February 12, 2024 and July 9, 2024 Memorandum Opinions and Orders of the district court issued by the Hon. Christopher R. Cooper, ECF 43, 49, and 50 in *Newman v. Moore*, No. 23-cv-01334-CRC. The February 12, 2024 Opinion is reported at 717 F.Supp.3d 43 (D.D.C. 2024), and is reproduced at Joint Appendix pp. 147-182. The July 9, 2024 Opinion does not yet appear in the Federal Supplement, but can be found at 2024 WL 3338858 (D.D.C. 2024), and is reproduced at Joint Appendix pp. 209-215. The District Court's final order dismissing the action is reproduced at Joint Appendix p. 200.

## C. Related Cases:

There are no related cases pending in this or any other court. The disciplinary proceedings under the Judicial Conduct and Disability Act, 28 U.S.C. §§ 351-364 remain pending before the Judicial Council of the Federal Circuit and the Committee on

Judicial Conduct and Disability of the Judicial Conference of the

United States.

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES
PURSUANT TO CIRCUIT RULE 28(a)(1) ................................................i

TABLE OF CONTENTS ...................................................................iv

TABLE OF AUTHORITIES...................................................................vii

GLOSSARY ......................................................................................xiv

INTRODUCTION................................................................................1

STATEMENT OF JURISDICTION...........................................................3

STATEMENT OF THE ISSUES..............................................................4

STATEMENT OF THE CASE ................................................................4

    I. THE JUDICIAL CONDUCT AND DISABILITY ACT ...................................4

    II. THE ALLEGATIONS AGAINST AND INVESTIGATION INTO JUDGE
       NEWMAN ..................................................................................7

    III. PROCEEDINGS BELOW ..................................................................16

SUMMARY OF THE ARGUMENT ........................................................19

ARGUMENT ....................................................................................23

    I. SUSPENDING AN ARTICLE III JUDGE FROM ALL JUDICIAL FUNCTIONS
       OF HER OFFICE IS UNCONSTITUTIONAL.........................................23

       A.   The Nature of Judicial Office..............................................23

       B.   Historical and Modern Practice Confirm That
           Administrative Suspensions from Judicial Office Are
           Impermissible..................................................................27

1.   Judge Newman Is Not Exercising Any Judicial
     Functions ..................................................... 27

2.   Historically, Judges Were Not Divested of the Power
     to Adjudicate Cases Even When Disabled or
     Engaged in Misconduct ................................. 28

3.   Prior "Suspensions" Merely Memorialized a Judge's
     Own Decision to Temporarily Forgo Powers of His
     Office ........................................................... 34

4.   Even Where Prior Suspensions Were Imposed, They
     Never Deprived a Judge from All Functions of the
     Office ........................................................... 37

C.   The Court Can Avoid a Constitutional Question by
     Giving the Disability Act a Narrowing Construction .......... 41

D.   If the Court Is Unable to Construe the Disability Act
     Narrowly, the Court Must Hold It Unconstitutional .......... 43

II.   TO THE EXTENT THE DISABILITY ACT'S SUSPENSION PROVISION IS
      CONSTITUTIONAL, IT AUTHORIZES ONLY TIME-LIMITED
      SUSPENSIONS THAT HAVE A DEFINITE END DATE ......................... 44

III.  THIS COURT HAS JURISDICTION TO ENTERTAIN "AS APPLIED"
      CHALLENGES TO THE DISABILITY ACT ............................................ 50

A.   Courts Retain Jurisdiction to Ensure That Agencies Do
     Not Transgress the Bounds of Their Statutory Authority .. 50

B.   McBryde, by Its Own Terms, Does Not Bar Judge
     Newman's "As Applied" Challenge ................................... 55

C.   McBryde Has Been Overtaken by Subsequent Legal
     Developments ................................................................ 60

CONCLUSION ............................................................................ 65

POSITION ON ORAL ARGUMENT ...................................................... 66

v

CERTIFICATE OF COMPLIANCE........................................................67

CERTIFICATE OF SERVICE................................................................68

# TABLE OF AUTHORITIES

## Cases

*Axon Enter., Inc. v. FTC* and *SEC v. Cochran*,
598 U.S. 175 (2023) .......................................................... 22, 61, 62, 63

*Boos v. Barry*,
485 U.S. 312 (1988) ................................................................43

*BP Am. Prod. Co. v. Burton*,
549 U.S. 84 (2006) .................................................................45

*Califano v. Sanders*,
430 U.S. 99 (1977) .................................................................61

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979) ...............................................................46

*Carr v. Saul*,
593 U.S. 83 (2021) .................................................................61

*Chandler v. Jud. Council of Tenth Cir. of U.S.*,
398 U.S. 74 (1970) ...................................................... 33, 34, 38

*Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) ...............................................................62

*Commc'ns Workers of Am. v. Beck*,
487 U.S. 735 (1988) ...............................................................41

*Connecticut v. EPA*,
656 F.2d 902 (2d Cir. 1981)............................................... 48, 50

*Crowell v. Benson*,
285 U.S. 22 (1932) .................................................................41

*Cuozzo Speed Techs. v. Lee*,
579 U.S. 261 (2016) ...............................................................51

*Danos v. Jones*,
652 F.3d 577 (5th Cir. 2011) ..................................................36

*Dimmitt v. City of Clearwater*,
985 F.2d 1565 (11th Cir. 1993) ..............................................41

*Farkas v. United States,*
   744 F.2d 37 (6th Cir. 1984) ................................................................. 51

*FBI v. Fikre,*
   601 U.S. 234 (2024) ........................................................................... 62

*First Fed. Sav. & Loan Ass'n of Rochester v. United States,*
   88 Fed. Cl. 572 (2009) ....................................................................... 45

*Free Enter. Fund v. PCAOB,*
   561 U.S. 477 (2010) ........................................................................... 62

*FTC v. Bunte Brothers, Inc.,*
   312 U.S. 349 (1941) ........................................................................... 41

*Griffith v. FLRA,*
   842 F.2d 487 (D.C. Cir. 1988) ............................................................ 54

*Harmon v. Brucker,*
   355 U.S. 579 (1958) ........................................................................... 43

*Lamie v. U.S. Tr.,*
   540 U.S. 526 (2004) ........................................................................... 47

*Leedom v. Kyne,*
   358 U.S. 184 (1958) ........................................................................... 54

*Lucia v. SEC,*
   585 U.S. 237 (2018) ..................................................................... 25, 27

*Manchester Env't Coal. v. EPA,*
   612 F.2d 56 (2d Cir. 1979) ................................................................. 48

*Marbury v. Madison,*
   5 U.S. 137 (1803) ............................................................................... 26

*McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords.
   of Jud. Conf. of U.S.,*
   264 F.3d 52 (D.C. Cir. 2001) ........... 18, 21, 22, 40, 44, 55, 56, 58, 64, 65

*Mistretta v. United States,*
   488 U.S. 361 (1989) ........................................................................... 27

*Newman v. Moore,*
   __ F.Supp.3d__ 2024 WL 3338858 (D.D.C. July 9, 2024) .................... 19

*Newman v. Moore,*
    717 F.Supp.3d 43 (D.D.C. 2024) ................................................ 18, 50

*Prasad v. Holder,*
    776 F.3d 222 (4th Cir. 2015) ............................................................ 45

*Rudisill v. McDonough,*
    55 F.4th 879 (Fed. Cir. 2022) ............................................................ 8

*Rudisill v. McDonough,*
    601 U.S. 294 (2024) ............................................................................ 8

*SAS Inst. v. Iancu,*
    584 U.S. 357 (2018) ........................................... 22, 51, 52, 53

*Scanwell Lab'ys, Inc. v. Shaffer,*
    424 F.2d 859 (D.C. Cir. 1970) ........................................................ 51

*Sebelius v. Cloer,*
    569 U.S. 369 (2013) .......................................................................... 45

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) .......................................................................... 54

*United States v. Germaine,*
    99 U.S. 508 (1878) ............................................................................ 25

*United States v. Hartwell,*
    73 U.S. 385 (1867) ............................................................................ 25

*United States v. Maurice,*
    26 F. Cas. 1211 (C.C.D. Va. 1823) ............................................... 25

*United States v. McHugh,*
    583 F.Supp.3d 1 (D.D.C. 2022) ..................................................... 46

*United States v. Salerno,*
    481 U.S. 739 (1987) .......................................................................... 44

*United States v. United Steelworkers of Am.,*
    271 F.2d 676 (3d Cir. 1959) ............................................................ 24

*United States v. United Steelworkers of Am.,*
    361 U.S. 39 (1959) ............................................................................ 24

*Wallace v. Christensen,*
    802 F.2d 1539 (9th Cir. 1986) ....................................................... 51

ix

*Weddel v. HHS,*
   23 F.3d 388 (Fed. Cir. 1994) ................................................................ 48

*Weinberger v. Salfi,*
   422 U.S. 749 (1975) ...................................................................... 58, 60

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ............................................................................ 41

## Constitutional Provisions

U.S. Const. amend. XIV ........................................................................ 54

U.S. Const. art. II, § 4 .......................................................................... 30

U.S. Const. art. III, § 1 ......................................................................... 23

## Statutes

21st Century Department of Justice Appropriations Authorization
   Act,
   Pub. L. No. 107-273, 116 Stat. 1758 (Nov. 2, 2002) ........................... 60

28 U.S.C. § 132 ...................................................................................... 26

28 U.S.C. § 353 ........................................................................................ 6

28 U.S.C. § 354 .......................... 6, 11, 17, 19, 42, 44, 46, 48, 49, 53

28 U.S.C. § 355 ...................................................................................... 48

28 U.S.C. § 357 ................................................................................. 7, 53

28 U.S.C. § 371 ........................................................................................ 2

28 U.S.C. § 372 ...................................................................................... 49

28 U.S.C. § 46 ........................................................................................ 27

35 U.S.C. § 314 ...................................................................................... 52

5 U.S.C. § 706 ......................................................................... 51, 52, 55

Judicial Conduct and Disability Act,
   Pub. L. 96-458, 94 Stat. 2035 (Oct. 15, 1980) ...................................... 4

Judiciary Act of 1801,
   2 Stat. 89 (Feb. 13, 1801) ................................................................... 29

Judiciary Act of 1802,
   2 Stat. 156 (April 29, 1802) ................................................................ 29

## Rules

Fed. R. App. P. 4 ...................................................................................... 19

Rules for Judicial-Conduct and Judicial-Disability Proceedings
  Rule 11 ........................................................................................... 5

Rules for Judicial-Conduct and Judicial-Disability Proceedings
  Rule 13 ........................................................................................... 5

Rules for Judicial-Conduct and Judicial-Disability Proceedings
  Rule 13 cmt ..................................................................................... 6

Rules for Judicial-Conduct and Judicial-Disability Proceedings
  Rule 17 ........................................................................................... 6

Rules for Judicial-Conduct and Judicial-Disability Proceedings
  Rule 20 ...................................................................................... 6, 11

Rules for Judicial-Conduct and Judicial-Disability Proceedings
  Rule 26 ...................................................................................... 7, 59

Rules for Judicial-Conduct and Judicial-Disability Proceedings
  Rule 26 cmt ..................................................................................... 7

Rules for Judicial-Conduct and Judicial-Disability Proceedings
  Rule 5 ............................................................................................. 5

## Other Authorities

Andrew Michaels,
  *Judge Newman's Recent Dissents Show She Is Fit For Service*,
  Law360.com (June 6, 2023) ................................................................ 9

Black's Law Dictionary (8th ed. 2004) ......................................... 45, 46

Expert Report of Aaron G. Filler, MD, PhD, JD ............................. 2, 15

History of the New Hampshire Federal Courts .................................. 29

House Practice: A Guide to the Rules, Precedents and Procedures of
  the House ..................................................................................... 45

Implementation of the Judicial Conduct and Disability Act of 1980,
  Report to the Chief Justice of the Judicial Conduct and Disability
  Act Study Committee,
  239 F.R.D. 116 (Sept. 2006) ....................................................... 31, 37

*In re Complaint of Judicial Misconduct Against United States*
     *District Judge G. Thomas Porteous, Jr.*,
     No. 07-05-351-0085 (5th Cir. Judicial Council Dec. 20, 2007) ............ 35

*In re Complaint of Judicial Misconduct Against United States*
     *District Judge G. Thomas Porteous, Jr.*,
     No. 07-05-351-0085 (5th Cir. Judicial Council Sept. 10, 2008) ........... 36

*In re Complaint of Judicial Misconduct Against United States*
     *District Judge Samuel B. Kent*,
     No. 07-05-351-0086 (5th Cir. Judicial Council Sept. 28, 2007) ........... 37

*In re Complaint of Judicial Misconduct Against United States*
     *District Judge Walter S. Smith, Jr.*,
     No. 05-14-90120 (5th Cir. Judicial Council Dec. 3, 2015) ............. 38, 39

*In re Complaint of Judicial Misconduct*,
     No. 12-90026 and 12-90032 (9th Cir. Judicial Council Mar. 15,
     2013) ...................................................................... 40

*In re Complaint of Judicial Misconduct*, C.C.D. 09-01 (Jud. Conf.
     Oct. 26, 2009) .......................................................... 7

*In re Complaint of Judicial Misconduct*, C.C.D. 23-01 (Jud. Conf.
     Feb. 7, 2024) ....................................................... 7, 14

*In re Complaints Against District Judge Colin S. Bruce*,
     Nos. 07-18-90053, 07-18-90067 (7th Cir. Judicial Council May 14,
     2019) ...................................................................... 39

*In re: Complaints of Judicial Misconduct or Disability*,
     No. 98-372-001 (U.S. Jud. Conf. Sept. 18, 1998) .......................... 64, 65

Joseph Story,
     2 Commentaries on the Constitution of the United States (Hilliard,
     Gray 1833) (Fred B. Rothman & Co reprint ed. 1991) ....................... 30

Kimberly Moore,
     *Anniversaries and Observations*, 50 AIPLA Q. J. 521 (2022) .............. 8

Lee R. West,
     *Biographical Sketch for the Historical Society of the Tenth Circuit
     on Judge Stephen S. Chandler, Jr* ....................................... 33

xii

Nat'l Comm'n on Judicial Discipline and Removal, Report,
  152 F.R.D. 265 (1993)..............................................................24

*Officers of the United States Within the Meaning of the Appointments
  Clause,*
  31 Op. O.L.C. 73 (2007)..........................................................26

Ron D. Katznelson, Ph.D.,
  *Is There a Campaign to Silence Dissent at the Federal Circuit?*...........8

S. Rep. 88-1017 (1964)................................................................30

The Federalist No. 79 (Alexander Hamilton) (Cooke ed., 1961) ...........30

U.S. House of Rep.,
  Comm. on Judiciary, *Report on Investigation of Judicial Behavior
  in the Tenth Circuit United States Court of Appeals* (1968)...............32

United States Court of Appeals for the Federal Circuit,
  Judicial Council....................................................................4, 5

Walter F. Pratt,
  *Judicial Disability and the Good Behavior Clause*, 85 Yale. L.J.
  706 (1976) ..........................................................................4

William Baude,
  *The Judgment Power*, 96 Geo. L.J. 1807 (2008) ..................................26

# GLOSSARY

| | |
|---|---|
| The Act or Disability Act: | Judicial Conduct and Disability Act, 28 U.S.C. §§ 351-364, Pub. L. 96-458, 94 Stat. 2036 (96th Cong. 1980) |
| JA___: | Joint Appendix (page number[s]) |
| JC&D: | Judicial Conduct and Disability Committee of the Judicial Conference |
| R.___: | Rules for Judicial-Conduct and Judicial-Disability Proceedings (rule number[s]) |
| SA___: | Supplemental Appendix (page number[s]) |

## INTRODUCTION

For over six decades, the Hon. Pauline Newman has been an intellectual leader in American intellectual property law and industrial policy. In the 1960s, she worked for the United Nations Educational, Scientific and Cultural Organization as a science policy specialist in the Department of Natural Resources. She served on the State Department Advisory Committee on International Intellectual Property from 1974 to 1984 and on the advisory committee to the Domestic Policy Review of Industrial Innovation from 1978 to 1979. From 1982 to 1984, she was Special Adviser to the United States Delegation to the Diplomatic Conference on the Revision of the Paris Convention for the Protection of Industrial Property. She was one of the main advocates for the creation of a unified court for patent law issues—advocacy that resulted in the creation of the United States Court of Appeals for the Federal Circuit on which she now sits. In 1984, President Ronald Reagan, with the unanimous advice and consent of the United States Senate, appointed Judge Newman to that newly created court. Judge Newman was the first judge appointed directly to the Federal Circuit. She has continued to honorably serve in her position as a Circuit Judge ever since. She has

1

published over 2,000 majority, concurring, and dissenting opinions. Her dissents have been routinely vindicated by the United States Supreme Court, including as recently as this year. Judge Newman has received wide recognition and numerous awards for her myriad contributions to the law.

Though advanced in age, Judge Newman retains her sharp intellect, and both lay and expert witnesses have described her as an "unusually cognitively intact … woman" whose cognitive and physical abilities make her appear "20 or more years younger than her stated age." Expert Report of Aaron G. Filler, MD, PhD, JD at 28, https://tinyurl.com/5eczych9. Her written opinions and oral presentations show no signs of deterioration. Because she has chosen not to retire or take senior status, *see* 28 U.S.C. § 371, she continues to hold office as a duly confirmed United States Circuit Judge in active service.

Despite her constitutional status, Defendants-Appellees, relying on the Judicial Conduct and Disability Act ("the Disability Act" or "the Act"), for the last year-and-a-half, have precluded Judge Newman from exercising *any* functions of her office, including hearing cases, writing opinions, ruling on motions, voting on petitions to hear cases *en banc*, and

the like.  Though she draws a salary, Judge Newman has been prevented from acting as a judge.  Defendants-Appellees admit that under their issued orders, Judge Newman may never again be permitted to hear any cases, *see* ECF 36 at 3-4, yet, at no point have Defendants-Appellees suggested that Judge Newman be impeached.  Nevertheless, Judge Newman has been functionally removed from office.  Removal without impeachment is wholly inconsistent with the Framers' carefully calibrated system of checks and balances.  If the Disability Act authorizes such an outcome, it is unconstitutional.

## STATEMENT OF JURISDICTION

The District Court exercised jurisdiction in this matter pursuant to 28 U.S.C. § 1331.  It issued a final order dismissing the case on July 9, 2024.  JA200.  Judge Newman filed a timely Notice of Appeal on July 10, 2024.  JA216.  *See* Fed. R. Civ. P. 4(a)(1)(B).

Because the decision of the District Court is a "final decision" within the meaning of 28 U.S.C. § 1291, this Court has jurisdiction over the appeal.

## STATEMENT OF THE ISSUES

1.    Is an Act that authorizes suspensions of a duly confirmed Article III judge from all judicial duties unconstitutional?

2.    Do recurrent suspensions violate the Disability Act's (to the extent that it is constitutional) strictures that any suspension must be for "temporary basis [and] time certain"?

3.    Do federal courts have jurisdiction over "as applied" constitutional challenges to the Disability Act?

## STATEMENT OF THE CASE

### I.    THE JUDICIAL CONDUCT AND DISABILITY ACT

In 1980, following years of debate, *see generally* Walter F. Pratt, *Judicial Disability and the Good Behavior Clause*, 85 Yale. L.J. 706, 706-07 (1976), Congress enacted the Disability Act.  Pub. L. 96-458, 94 Stat. 2035, 2036-41 (Oct 15, 1980), *codified in* 28 U.S.C. §§ 351-364.  The Act authorizes the Judicial Council of the relevant circuit [1] to conduct investigations into alleged misconduct or disability of circuit and district

---

[1] Unlike other judicial councils, the Judicial Council for the Federal Circuitis composed of only the active judges of the Federal Circuit. *See* United States Court of Appeals for the Federal Circuit, Judicial Council, https://perma.cc/2AF4-LG8R.

judges within that circuit's jurisdiction. *See* 28 U.S.C. §§ 353, 354, 356, 363. The Judicial Conference of the United States promulgated Rules for Judicial-Conduct and Judicial-Disability Proceedings ("Conduct Rules") which govern the processing of disciplinary and disability complaints against federal judges.[2]

Under the Conduct Rules, the chief judge can "identify a complaint" whenever "a chief judge has information constituting reasonable grounds for inquiry into whether a covered judge has engaged in misconduct or has a disability … even if no related complaint has been filed." R. 5. If the chief judge does so, she must conduct a review and either dismiss the complaint or refer it to a "special committee" of the Judicial Council. R. 11(a). Such a committee is charged with "determin[ing] the appropriate extent and methods of its investigation in light of the allegations in the complaint and the committee's preliminary inquiry," R. 13(a), including by "request[ing] the judge to undergo a medical or psychological

---

[2] The rules can be found on the United States Courts' website. *See* https://tinyurl.com/4x4xpnxt.

5

examination," and "review[ing] existing records, including medical records." R. 13(a), cmt.

Once the special committee concludes its investigation, it "must file with the judicial council a comprehensive report of its investigation, including findings and recommendations for council action." R. 17; *see also* 28 U.S.C. § 353(c). Following the subject judge's response, the Judicial Council may "take remedial action." R. 20(b)(1)(D). One such "remedial action" that the Disability Act and the Conduct Rules purport to authorize is an issuance of an "order[] that no new cases be assigned to the subject judge for a limited, fixed period." R. 20(b)(1)(D)(ii). *See also* 28 U.S.C. § 354(a)(2)(A)(i).

Any decision by the Judicial Council is appealable to the Committee on Judicial Conduct and Disability and potentially, the Judicial Conference of the United States. R. 20. Finally, in order to deal with situations "where there are multiple disqualifications among the original judicial council, [or] where the issues are highly visible and a local disposition may weaken public confidence in the process," the Conduct Rules authorize the "chief judge or [the] judicial council [to] ask the Chief

6

Justice to transfer a proceeding based on a complaint identified under Rule 5 … to the judicial council of another circuit." R. 26 and cmt.

Although conducted by federal judges, such proceedings "are administrative, and not judicial, in nature." *In re Complaint of Judicial Misconduct*, C.C.D. 23-01, at 16 (Jud. Conf. Feb. 7, 2024) (quoting *In re Complaint of Judicial Misconduct*, C.C.D. 09-01, at 20-21 (Jud. Conf. Oct. 26, 2009)). The Disability Act also limits judicial review of the orders issued pursuant to the Act. *See* 28 U.S.C. § 357(c).

## II.   THE ALLEGATIONS AGAINST AND INVESTIGATION INTO JUDGE NEWMAN

As noted, Pauline Newman, is Judge of the Federal Circuit. At all relevant times, Judge Newman has been and is in sound physical and mental health, has been willing and able to fully participate in the work of the Court, and, consistent with the Court's internal practice and procedures for active-status judges, has requested to be assigned to the regular panel sittings of the Court. She has authored majority and dissenting opinions in the whole range of cases before her Court, has voted on petitions for rehearing *en banc*, and has joined in the *en banc* decisions of the Court. She is noted for her frequent, incisive dissents

7

and has been referred to as the Federal Circuit's Great Dissenter. As
Chief Judge Kimberly A. Moore herself noted, "[a]mong patent
practitioners, Judge Newman is particularly well-known for her
insightful dissents, which have often been vindicated by the Supreme
Court." On more than one occasion the Supreme Court "adopt[ed]
essentially the reasoning of Judge Newman's dissent." Kimberly Moore,
*Anniversaries and Observations*, 50 AIPLA Q. J. 521, 524-25 (2022). *See
also Rudisill v. McDonough*, 601 U.S. 294 (2024), *reversing* 55 F.4th 879
(Fed. Cir. 2022) (*en banc*) (adopting Judge Newman's view of the law).

In part because Judge Newman frequently writes separate
opinions, and in part because she takes extraordinary pains to ensure
that her opinions fully reflect her views and remain consistent from case
to case and year to year, Judge Newman is and has been well-known for
being "slow" to issue her decisions.[3]   But Judge Newman's decisions

---

[3] Independent analysis of the data from the Federal Circuit strongly
suggests that Judge Newman's speed of opinion production is fully in line
with that of her colleagues. *See* Ron D. Katznelson, Ph.D., *Is There a
Campaign to Silence Dissent at the Federal Circuit?* at 18, *available at*
https://ssrn.com/abstract=4489143.   Nor does the quantity of opinions
Judge Newman produces deviate from that of her colleagues. *Id.*

have never been criticized for being poorly argued or written, and indeed, have been universally praised for their clarity and insight.

Judge Newman continued to write opinions through 2023. These recent opinions were praised by various members of the bar, and nothing therein suggests any mental disability. Andrew Michaels, *Judge Newman's Recent Dissents Show She Is Fit For Service*, Law360.com (June 6, 2023).

On March 24, 2023, Kimberly Moore, the Chief Judge of the Federal Circuit, "identified a complaint" against Judge Newman alleging that "there is probable cause to believe that Judge Newman's health has left her without the capacity to perform the work of an active judge," and issued an order launching an investigation into Judge Newman. Chief Judge Moore relied on several unfounded predicates. First, Judge Moore alleged (without providing any basis or source for this allegation) that "in the summer of 2021, Judge Newman, at the age of 94, was hospitalized after suffering a heart attack and having to undergo coronary stent surgery," and that (again without providing any evidence or source for the allegation) "on May 3, 2022, Judge Newman fainted following an argument and was unable to walk without assistance." March 24, 2023

9

Chief Judge Order at 1, https://tinyurl.com/3rpvcev3.  Second, the Order alleged that Judge Newman has been inordinately slow in resolving cases and that she has published significantly fewer opinions than her colleagues.[4]  *Id.* at 2-3.  Third, according to the Order, "[i]t has been stated that Judge Newman routinely makes statements in open court and during deliberative proceedings that demonstrate a clear lack of awareness over the issues in the cases."  *Id.* at 2.  Finally, in passing, the Order mentioned "allegations that Judge Newman has inappropriate behavior in managing staff by permitting one of her law clerks to exhibit unprofessional and inappropriate behavior."  *Id.* at 5.  Judge Moore appointed a "Special Committee" consisting of herself and Circuit Judges Sharon Prost and Richard G. Taranto and charged it with investigating the allegations leveled against Judge Newman.

This was the first time in the history of the Disability Act that a complaint against a circuit judge which proceeded to the committee investigation stage was kept within the same circuit.  In all previous

---

[4] While the data on this point are hotly disputed, *see* Katznelson, *supra* n.3, this Court need not decide whether Judge Newman's view of these data or the Judicial Council's is the correct one.

instances, complaints against circuit judges which were not dismissed after preliminary review by the relevant circuit's chief judge were, pursuant to Rule 26 of the Conduct Rules, transferred to another circuit's judicial council. Despite Judge Newman's requests, Appellees repeatedly refused to transfer this matter. *See* May 3, 2023 Judicial Council Order, https://tinyurl.com/3u88unm3; May 3, 2023 Special Committee Order at 9-13, https://tinyurl.com/yc7ayhnu.

Before the investigation even began, the Chief Judge removed Judge Newman from normal panel assignments. On several occasions Judge Moore stated that Judge Newman "will not be assigned any new cases until the[] [disability] proceedings are resolved." April 6, 2023 Order at 4 (quoting an email, dated April 5, 2023, from Judge Moore to Judge Newman), https://tinyurl.com/yc4uszpt. Moore excluded Newman from assignments despite the fact that neither the Disability Act nor the Conduct Rules authorize any sanctions—much less suspension from hearing cases—until the conclusion of the investigation. *See* 28 U.S.C. § 354(a); R. 20(b)(1)(D).[5]

---

[5] During the pendency of this litigation, Defendants-Appellees

The newly empaneled Special Committee quickly issued orders requiring Judge Newman to submit to neurological and neuropsychological testing by doctors chosen by the Committee without any input from Judge Newman. *See* April 7, 2023 Order, https://tinyurl.com/mr3rdyah. Ten days later, the Committee issued another order, this time directing Judge Newman to "provide hospital records, medical, psychiatric or psychological, and other health-professional records that relate to" the alleged "heart attack" and a "fainting episode," as well as all "hospital records and medical, psychiatric or psychological, or other health-professional records of any treatment or consultation in the last two years regarding attention, focus, confusion, memory loss, fatigue or stamina." April 17, 2023 Order at 1-2, https://tinyurl.com/2p9jwvty. Following the exchange of several letters

---

changed the rationale for Judge Newman's suspension from panel assignments from a suspension *pendente lite*, to a suspension due to a purported case backlog. *See* June 5, 2023 Judicial Council Order, https://tinyurl.com/mwkpkfru. Once Judge Newman cleared her "backlog," the Judicial Council vacated this suspension, *see* November 9, 2023 Judicial Council Order, ECF32, Exh.4. By that point, the *vacatur* ceased to be relevant, because, as described below, the Judicial Council had entered a punitive suspension against Judge Newman. *See* Sept. 20, 2023 Judicial Council Order, https://tinyurl.com/mue496ru.

between Judge Newman and the Committee, the latter clarified that "Judge Newman need not supply such records to the Committee itself but only to the neurologist whom the Committee has selected to conduct an evaluation of Judge Newman."    May 16, 2023 Order at 6, https://tinyurl.com/3xns8zum.

Given Defendants-Appellees' false allegations, refusal to transfer the matter, and failure to engage in any cooperative process with her, Judge Newman declined to undergo the ordered testing.  On more than one occasion, she has represented to the Committee that the medical records requested in the April 17 and May 16 Orders simply do not exist because there never was a "heart attack" (nor a "cardiac episode" to use the Committee's later terminology) nor a fainting spell.  Nor had Judge Newman ever been treated for any of the maladies hypothesized by the Committee.

Nevertheless, Judge Newman submitted for the Committee's and the Judicial Council's consideration expert reports by two clinicians—Ted L. Rothstein, M.D., of the George Washington University School of Medicine and Regina M. Carney, M.D., then of the University of Miami School of Medicine—attesting that Judge Newman's cognitive abilities

13

are fully intact and that there is no reason to believe that she is or would be unable to perform the functions of her office. *See* Sept. 20, 2023 Judicial Council Order, Exhs. 10, 12.

Rejecting, without any medical or scientific support, these expert reports and concluding that Judge Newman's refusal to "cooperate" with the Committee constitutes misconduct, the Committee recommended that Judge Newman "not be permitted to hear any cases, at the panel or en banc level, for a period of one year … subject to consideration of renewal." July 31, 2023 Report & Recommendation at 109, https://tinyurl.com/4az95aat. The recommendation was approved by the Judicial Council. *See* September 20, 2023 Judicial Council Order at 72, https://tinyurl.com/mue496ru. The Judicial Conduct and Disability Committee of the Judicial Conference ("JC&D") affirmed on February 7, 2024. *See In re Complaint of Judicial Misconduct*, C.C.D. 23-01.

On September 6, 2024, the Judicial Council of the Federal Circuit renewed Judge Newman's suspension for a second year. *See* Sept. 6, 2024 Judicial Council Order, https://tinyurl.com/2vs2v627. On September 25, 2024, Judge Newman filed ███████████████, SA1-18, citing yet another expert report, one prepared this time by Aaron G. Filler,

14

M.D., Ph.D, J.D.—a neurosurgeon with extensive expertise in brain imaging and evaluation of cognitive disabilities. The report included a "perfusion CT scan" of Judge Newman's brain, which Dr. Filler interpreted, as did M. Reza Taheri, MD—a neuroradiologist at the George Washington University School of Medicine—as "completely normal." Based on this objective study, as well as neurological and cognitive testing, Dr. Filler opined that Judge Newman shows "no evidence of any mild cognitive impairment, dementia or other mental deterioration." Filler Rept. at 40. To the contrary, the results of her exam "demonstrate an extraordinarily high level of cognitive ability." *Id.* Dr. Filler further opined that "there is no medical, neurological, or cognitive basis for requiring additional testing." *Id.* at 41. Prior to preparing the report, Dr. Filler reviewed over 2,000 pages of Judge Newman's medical records to assure himself that there is nothing therein that would indicate any treatment or evaluations for a "cardiac episode" or a "fainting spell" or for problems with "attention, focus, confusion, memory loss, fatigue or stamina." According to Dr. Filler's review, no such information appears in Judge Newman's medical records.

15

In response to Judge Newman's motion for reconsideration, the

Committee 

. SA19-26.  Judge

Newman objected to this overbroad demand, and the Committee is

presently considering that objection.  SA27-45.  In the meantime, Judge

Newman remains on a suspended status and has not sat on any panels

since her Court's March 2023 sitting.  She has not had any judicial work

since disposing of her last opinion on November 8, 2023.

## III.  PROCEEDINGS BELOW

On May 10, 2023, Judge Newman filed a civil action against

Defendants-Appellees in the United States District Court for the District

of Columbia, and on June 27, 2023 she filed an amended complaint[6]

---

[6] The amended complaint dropped a First Amendment challenge to
the Judicial Council's gag order which precluded Judge Newman from
speaking out against the disciplinary proceedings because on May 16,
2023, pursuant to Judge Newman's request and Rule 23(b)(7), the
Committee agreed to release all prior orders.  After the count was
dropped, the Committee again became recalcitrant about releasing its

16

seeking injunctive and declaratory relief.    Judge Newman sought relief

from her exclusion from service prior to any determination of misconduct

or liability and argued that the Disability Act is facially unconstitutional

in several respects.    First and foremost because the Act's suspension

provision, 28 U.S.C. § 354(a)(2)(A)(i), is an unconstitutional end-run

around impeachment—the sole Constitutional means of removing an

Article III judge from office.    Judge Newman also argued that the Act's

provisions regarding what constitutes a "disability" are, on their face,

unconstitutionally vague and that the Act (to the extent it authorizes

compelled medical examinations and surrender of medical records)

facially violates the Fourth Amendment's prohibition on unreasonable

searches.    Judge    Newman    also    brought    several    "as    applied"

constitutional challenges arguing that adjudication of the matter by her

colleagues who are witnesses to the allegations, and whose own workload

is likely to be affected by a removal of their oft-dissenting colleague,

---

orders or Judge Newman's submissions despite the requirements of Rule
23.  Indeed, the Committee has refused to release its latest orders despite
Judge Newman's request and attempted to hamper Judge Newman's
ability to present the current state of affairs to this Court.  *See* JA264-
266.

violates basic principles of due process.  Finally, Judge Newman alleged that demands for her medical records and a requirement that she undergo a medical examination, to the extent that they are constitutional as a general matter, are unconstitutional as applied to her, because the orders were not issued by a neutral magistrate.

By two separate opinions, the District Court dismissed the entirety of Judge Newman's action.  In the first opinion, filed on February 12, 2024, the District Court held, relying on *McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 54 (D.C. Cir. 2001), that it had no jurisdiction over Judge Newman's as applied challenges, *Newman v. Moore*, 717 F.Supp.3d 43, 55-59 (D.D.C. 2024), and that her facial claim as to the lawfulness of the suspension failed on the merits, *id.* at 64-67.  According to the District Court, because "at least some suspensions do not unconstitutionally arrogate Congress's impeachment power," it followed that the Act was not unconstitutional in all of its applications and therefore the facial challenge failed.  *Id.* at 65-66.  The District Court's opinion did not differentiate between suspensions from *new* cases, and suspensions from *all* judicial functions.

18

On July 9, 2024, the District Court granted Defendants-Appellees' motion for judgment on the pleadings, concluding that because some searches authorized by the Act are not unreasonable, Judge Newman's Fourth Amendment facial challenges failed as a matter of law. The District Court also concluded that the statute is not impermissibly vague because judges are aware of the "duties of [judicial] office," and the term "disability" is "defined in reference to" such duties. *Newman v. Moore*, __ F.Supp.3d__, __, 2024 WL 3338858, at *4 (D.D.C. July 9, 2024). The District Court entered a final judgment on the same day. This timely appeal followed. *See* Fed. R. App. P. 4(a)(1)(A).

## SUMMARY OF THE ARGUMENT

This Court should reverse the judgment below and declare that Judge Newman's suspension from all judicial duties contravenes both the Constitution and the Disability Act.

First, this Court should invalidate the Disability Act's remedies provision as unconstitutional on its face or provide a limiting construction that renders it constitutional. This provision authorizes judicial councils to "order[] that, on a temporary basis for a time certain, no further cases be assigned to [a] judge." 28 U.S.C. § 354(a)(2)(A)(i). The

19

provision is unconstitutional on its face if it is construed to authorize judicial councils to administratively deprive an Article III judge of the ability to perform her judicial duties against her will.

History supports the understanding that Congress cannot authorize judicial councils to prevent a judge from performing all functions of judicial office—including achieving that end by issuing multiple "suspensions." No judicial council has ever issued an order that effectively prevents a judge from performing all judicial functions. Even where limited suspensions have been ordered, they have avoided depriving a judge of all judicial powers. This case is the first wherein a judicial council has ordered a judge removed from *all* functions of her office—for any period of time, much less one that is indefinite.

This Court can and should, however, give the provision a construction that is constitutional by holding that Congress did not authorize judicial councils to prevent an Article III judge from exercising any judicial powers at all. The Court can reach that narrowing construction through a standard exercise in facial statutory construction. It need not conduct a review of the statute as applied to any one set of facts.

20

Second, assuming the Disability Act is given a constitutional construction, it authorizes only suspensions that are, in the Disability Act's plain words, "for a time certain" and "temporary." But the Judicial Council has issued, and its most recent order anticipates, repeated one-year renewals unless Judge Newman agrees to comply with its impermissible demands. That is, in substance, an open-ended suspension—neither "temporary" nor "for a time certain." This Court should reverse the Judicial Council's order as contrary to the statute's plain words. If the Judicial Council considers additional action necessary here, the Act supplies other tools, including referring Judge Newman to Congress for impeachment proceedings.

Finally, this Court should exercise jurisdiction over Judge Newman's "as applied" challenges. In those challenges, she contends that the nature of her suspension violates the Constitution and the Act, and that the Judicial Council proceeding itself violated Due Process of Law because, among other conflicts, its members are fact witnesses. The District Court erroneously concluded it did not have jurisdiction to consider as-applied challenges, based entirely on *McBryde*. This conclusion constituted error for two reasons.

21

First, *McBryde* explicitly left for another day the question of "whether a long-term disqualification from cases could, by its practical effect, affect [*sic*] an unconstitutional 'removal.'" *McBryde*, 264 F.3d at 67 n.5. That day arrived when the Judicial Council issued what is in substance a long-term disqualification of Judge Newman. And as the *McBryde* footnote indicates, that Court did not conclude that its reasoning applies to such cases. Second, in the 23 years since *McBryde*, several legal developments have established Article III courts' jurisdiction over as-applied challenges to the Act. Congress enacted a statute expressly contemplating that Article III courts shall decide "as applied" challenges to the Act. The Supreme Court has issued important decisions holding that judicial review remains available to determine whether the agency acted outside the authority provided by the relevant statute. *See SAS Inst. v. Iancu*, 584 U.S. 357, 370-71 (2018). In *Axon Enter., Inc. v. FTC* and *SEC v. Cochran*, 598 U.S. 175, 195 (2023), it held that being subjected to an unconstitutional process before an unconstitutionally composed body is exactly the type of injury that district courts remain empowered to adjudicate—even where Congress has chosen to deprive these courts of jurisdiction over the agencies'

22

substantive decisions.  Lastly, the JC&D, despite this Court's invitation in *McBryde*, steadfastly refused to adjudicate constitutional challenges to the Act.  This Court has jurisdiction over the as-applied challenges and the obligation to exercise that jurisdiction.

## ARGUMENT

## I.    SUSPENDING AN ARTICLE III JUDGE FROM ALL JUDICIAL FUNCTIONS OF HER OFFICE IS UNCONSTITUTIONAL

### A.    The Nature of Judicial Office

The Constitution ensures judicial independence through two mechanisms—the twin guarantees that Article III judges will "hold their Offices during good Behaviour" and their "Compensation ... [will] not be diminished during the[ir] Continuance in Office."  Art. III, § 1.  An Article III judicial office then, consists of more than an ability to draw life-time salary from the United States Treasury.  As the National Commission on Judicial Discipline and Removal recognized, "[u]nder Article III, federal judicial office has two consequences.  First, a judge is legally eligible to exercise judicial power, because the judicial power of the United States is vested in courts made up of judges.  Second, a judge is entitled to receive undiminished compensation."    Nat'l Comm'n on Judicial

23

Discipline and Removal, Report, 152 F.R.D. 265, 287 (1993).[7] *See also*
*United States v. United Steelworkers of Am.*, 271 F.2d 676, 680 n.1 (3d
Cir. 1959), *aff'd*, 361 U.S. 39 (1959) (distinguishing between "hold[ing]
office" and receiving compensation).  If the ability to "exercise judicial
power" means anything, it must mean the ability to perform routine
judicial functions such as hearing cases, and ruling on the controversies
brought before the court.  This understanding is consistent with the
original public meaning and two-plus centuries of unbroken
understanding of the term "office."

Although the Constitution does not explicitly define the terms
"office" or "officer" (despite using these terms over 20 times), the courts
from very early on construed these terms by reference to the powers and
duties to be exercised.  As Chief Justice Marshall wrote in 1823, an

---

[7] The Committee concluded that any suspension of a judge's salary
or benefits in the absence of impeachment would violate the Constitution.
152 F.R.D. at 354 ("[T]ermination of salary would violate the
Constitution absent resignation or removal.").  Despite recognizing that
"federal judicial office has two consequences," *id.* at 287, the Committee
incongruously concluded that Congress can tread (or authorize judicial
councils to tread) on the first of those consequences—ability to "exercise
judicial power."  Of the two inconsistent conclusions only the first one is
correct.

"office" is employment having a "duty … which is defined by rules prescribed by the government," and an "officer is one who is "appointed by government to perform … the duties appertaining to his station." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823). Four decades later, the full Court agreed, writing that "[a]n office is a public station or employment, conferred by the appointment of government; and embraces the ideas of tenure, duration, emolument, and *duties*." *United States v. Hartwell*, 73 U.S. 385, 385 (1867) (emphasis added). *See also United States v. Germaine*, 99 U.S. 508, 511 (1878). Although these cases dealt with Executive Branch officials, it was widely understood that the same applies to the Judicial Branch. For example, "[i]n 1899, a Report of the Judiciary Committee of the House of Representatives noted that 'the creation and conferring of a [judicial] office involves a delegation to the individual of … the power to … hear and determine judicially questions submitted.'" *Lucia v. SEC*, 585 U.S. 237, 270 (2018) (Sotomayor, J., dissenting) (cleaned up). "The inquiry [of whether one is an "officer"] thus focuse[s] on the extent of power an individual wields in carrying out his assigned functions." *Id.* at 245. The question, is what are the "assigned functions" of a judicial office.

25

The question is not a hard one and has been answered at least as early as *Marbury v. Madison*, which held that "[i]t is emphatically the province and duty of the judicial department to say what the law is" by "apply[ing] the [appropriate legal] rule[s] to particular cases." 5 U.S. 137, 177 (1803). "During the ratification of the Constitution and immediately afterwards, a wide range of constitutional scholars, jurists, and officers explained that the "judicial" power vested by this clause was the power to make authoritative and final judgments in individual cases." William Baude, *The Judgment Power*, 96 Geo. L.J. 1807, 1815 (2008). In other words, the "judicial power" is the power of delivering judgments. *Id.*

The judicial power, though vested in the courts, must be exercised by living persons. As the Office of Legal Counsel observed, "the Constitution describes the *persons* to whom is delegated the judicial Power of the United States. … This power is primarily delegated to the *Judges* of the supreme Court, and the *Judges* of the inferior Courts." *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 78 (2007) (cleaned up; emphasis added). Statutory law confirms this understanding. *See* 28 U.S.C. § 132(c)

26

(stating that "the judicial power … may be exercised by a single judge");

28 U.S.C. § 46 (similar provision for Courts of Appeal).

### B. Historical and Modern Practice Confirm That Administrative Suspensions from Judicial Office Are Impermissible

Given the nature of the judicial office, can a duly appointed Article

III judge (even if disabled) be deprived, through a process other than

impeachment, of the ability to exercise "the judicial Power of the United

States?"  The answer is an emphatic "No."  *See Mistretta v. United States*,

488 U.S. 361, 410 (1989) (noting that no Act can authorize the President

(or by extension anyone else) "to remove, *or in any way diminish* the

status of Article III judges, as judges.") (emphasis added).

#### 1. *Judge Newman Is Not Exercising Any Judicial Functions*

As an initial matter, it should be noted that it is *undisputed* that

since at least November 8, 2023, when Judge Newman authored the last

opinion that had been assigned to her, she has not been permitted to

perform any *judicial* work, *i.e.*, she has had no "power to hear and

determine judicially questions submitted."  *Lucia*, 585 U.S. at 270

(Sotomayor, J., dissenting) (cleaned up).  As Defendants-Appellees

themselves admit, Judge Newman was not only suspended from hearing

27

cases, but even "removed … from distribution lists related to Federal Circuit cases," and that the entirety of her constitutional "duties" have been reduced to "receiv[ing] emails from various court departments, including HR, Circuit Librarians, the Administrative Services Office … regarding network outages, server patches, new equipment upgrades, and the new International IT access policy," and being invited "to various court-related social events." July 24, 2024 Report & Recommendation at 27, https://tinyurl.com/bdtwnbfa. Nowhere on that list is the "power to hear and determine judicially questions submitted" mentioned or even alluded to. It is essentially undisputed that Defendants-Appellees divested Judge Newman of one of the two consequences of holding a federal judicial office. Such divestment is contrary to two centuries of precedents.

### 2. Historically, Judges Were Not Divested of the Power to Adjudicate Cases Even When Disabled or Engaged in Misconduct

Both historical and modern practice confirm the consistent understanding that, absent impeachment process, judges cannot be suspended from office either as a result of misconduct or disability. Congress dealt with the issue of judicial disability early on, first

28

addressing the issue in the Judiciary Act of 1801. *See* 2 Stat. 89 (Feb. 13, 1801), *repealed by* Judiciary Act of 1802, 2 Stat. 156 (April 29, 1802). Section 25 of that Act permitted a circuit court to appoint one of its own judges "to perform the duties of [a disabled] district judge … for and during the period the inability of the district judge shall continue." 2 Stat. 97. That Act, however, did not *suspend* the allegedly disabled district judge, but rather permitted circuit courts to provide additional help to district courts. When the provision was utilized to deal with the mental deterioration of District Judge John Pickering, and assign First Circuit Judge Jeremiah Smith to sit in his stead, it was done because Judge Pickering (due to illness) did not hold court. *See* History of the New Hampshire Federal Courts ("NH Courts History") at 33, *available at* https://tinyurl.com/bdzhs2vx. However, when Judge Pickering chose to show up, he retained his powers to adjudicate matters pending before his court. *Id.* at 33. Judge Pickering was thus not divested from one of the consequences of holding judicial office—exercising the power to decide cases and render judgments—rather, he *chose* (due to illness) not to exercise such power while those problems persisted. It was well understood that the *power to decide* whether or not to exercise the judicial

29

office to which one was duly appointed for life rested with the judge himself, and not with his colleagues.[8]

Congress also always understood that if it wished to remove constitutional officers by means other than impeachment, it needed to enact a constitutional amendment. For example, once Congress realized the problems that could arise were the President to become disabled, it proposed, and the States ratified, the Twenty-Fifth Amendment. *See* S. Rep. 88-1017 at 6-7 (1964). The original Constitution does not differentiate between methods of removing a President and an Article III judge, leaving the impeachment mechanism as a sole option to accomplish either. *See* U.S. Const. art. II, § 4; The Federalist No. 79 (Alexander Hamilton) (Cooke ed., 1961); Joseph Story, 2 Commentaries on the Constitution of the United States § 790 at 258 (Hilliard, Gray 1833) (Fred B. Rothman & Co reprint ed. 1991) (stating that judicial officers are civil officers within the meaning of Article II). It therefore stands to reason that if Congress could not, by mere statute, create a

---

[8] Congress always retained the power to impeach and remove a judge who was derelict in his duties.

mechanism that would divest a President from any of his powers even in the face of obvious disability, it equally could not, by mere statute, divest an Article III judge of any of *her* powers, even in the face of disability.

The understanding that judges cannot be removed from their judicial duties has continued to the present day and is supported by the contemporaneous practices of various judicial councils. As the report of the committee chaired by Associate Justice Stephen Breyer stated, since 1980, when the Act became law, and until 2006, when the report was filed, the committee found "*no instances* in which the council ordered a suspension in the assignment of new cases." Implementation of the Judicial Conduct and Disability Act of 1980, Report to the Chief Justice of the Judicial Conduct and Disability Act Study Committee, 239 F.R.D. 116, 143 (Sept. 2006) ("Breyer Report").[9] The fact that in twenty-six

---

[9] The Breyer Committee identified a single case of misconduct where an accused judge, as part of a "settlement" "*agreed* to go on administrative leave for at least six months, during which he would undergo behavioral counseling, and to waive any doctor-patient privilege so that his doctor could consult with the special committee's expert." 239 F.R.D. at 196. The Breyer Committee noted that this was a "voluntary corrective action." This is similar to the actions of Judge Pickering who chose not to exercise the functions of his office while ill.

years not a single federal judge was involuntarily suspended from her judicial functions as punishment for any misconduct strongly suggests that judicial councils uniformly view this option as constitutionally suspect.

The Breyer Report finding is consistent with the understanding of constitutional limitations on judicial discipline that prevailed in Congress prior to the enactment of the Act.  For example, when the Judicial Council for the Tenth Circuit reassigned cases from District Judge Stephen S. Chandler and prohibited assignments of new cases to him, the House Judiciary Committee set out to investigate the matter.  In considering whether the Tenth Circuit acted appropriately, the House Judiciary Committee concluded that it did not, writing that the Tenth Circuit's attempt to bar Judge Chandler from exercising judicial functions was "completely beyond the legal authority of the Council.  Such an action is forbidden by the Constitution.  Congress has never authorized circuit judges to inquire into the fitness of a district judge to hold his office and to remove him if they so determine."  U.S. House of Rep., Comm. on Judiciary, *Report on Investigation of Judicial Behavior in the Tenth Circuit United States Court of Appeals* 72 (1968) (quoted in

Lee R. West, *Biographical Sketch for the Historical Society of the Tenth Circuit on Judge Stephen S. Chandler, Jr.*, *available at* https://tinyurl.com/398u8tss) ("Chandler Report").    Although the Supreme Court later on upheld the Tenth Circuit's action, *see Chandler v. Jud. Council of Tenth Cir. of U. S.*, 398 U.S. 74 (1970), it did so because the Court concluded that Judge Chandler "acquiesced" in the newly established regime for the division of cases in his Court.  In other words, Judge Chandler's behavior was no different than Judge Pickering's over a century-and-a-half earlier.  Both judges simply *chose* not to exercise their judicial powers—a choice that any judge can always make.  Judge Newman has not and will not acquiesce in what is being done to her.

*Chandler* did not hold that judicial councils possessed any sort of authority to strip Article III judges of their duties without their consent. Indeed, the Court specifically "d[id] not find it necessary to answer," Chandler Report at 86, the question of "[w]hether the action taken by the Council with respect to the division of business in Judge Chandler's district falls to one side or the other of the line defining the maximum permissible intervention consistent with the constitutional requirement of judicial independence," *id.* at 84.  The entire decision was premised on

33

the understanding that, were Judge Chandler to withdraw his agreement to the division of labor within his district, his home judicial council would honor his wishes. *See* 398 U.S. at 88 ("Nothing in this record suggests that, were he to express disagreement, relief would not be forthcoming.").

### 3. Prior "Suspensions" Merely Memorialized a Judge's Own Decision to Temporarily Forgo Powers of His Office

In proceedings below and in the administrative proceedings Defendants-Appellees cited inapposite instances of judicial suspensions to bless and justify the proceedings against Judge Newman. The examples do not help them.

First, as discussed above, the Supreme Court (save for one Justice whose opinion was joined by no one else, *see Chandler*, 398 U.S. at 89-129 (Harlan, J., concurring)) never approved involuntary suspensions. Rather, in *Chandler*, the Court merely held that in light of Judge Chandler's agreement "with the disposition of judicial business effected by" the Tenth Circuit Judicial Council's order, he "has not made a case for the extraordinary relief of mandamus or prohibition." 398 U.S. at 89.

Since the passage of the Act and the publication of the Breyer Report, there has been one other instance of Judicial Council suspension

34

of an Article III judge. Just as in the case of Judge Chandler, this suspension was not objected to, meaning that once again, the subject judge exercised his *own power* to choose not to exercise the functions of his judicial office.

The suspension in question arose as part of the proceedings against District Judge G. Thomas Porteous, Jr., who was investigated for various allegations of misconduct including perjury in bankruptcy cases. Upon concluding that Judge Porteous did commit the violations complained of, the Judicial Council of the Fifth Circuit ordered that "no bankruptcy cases or appeals or criminal or civil cases to which the United States is a party" were to be assigned to Judge Porteous, but that he could "continue his civil docket and administrative duties until it is determined that he must devote his time primarily to his defense." *In re Complaint of Judicial Misconduct Against United States District Judge G. Thomas Porteous, Jr.*, No. 07-05-351-0085 (5th Cir. Judicial Council Dec. 20, 2007) at 6. The initial order preserved Judge Porteous's "power to hear and determine judicially questions submitted," in at least a subset of cases.

35

When the House of Representatives commenced impeachment proceedings against Judge Porteous, the Judicial Council of the Fifth Circuit amended its prior order and precluded Judge Porteous from hearing any cases "for two years … or until Congress takes final action on the impeachment proceedings, *whichever occurs earlier*." *Id.* (Sept. 10, 2008) at 4 (emphasis added). Precisely because Judge Porteous was consumed with his impeachment defense, he did not object to the order. *See, e.g.*, *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011) (noting that "Judge Porteous, … did not seek review of the Council's order by the Judicial Conference of the United States through the mechanism provided by statute.").[10]

Likewise, when the Judicial Council of the Fifth Circuit concluded that then-District Judge Samuel G. Kent engaged in "sexual harassment toward an employee of the federal judicial system," Judge Kent accepted his *voluntary* four-month leave of absence, coupled with a public

---

[10] That the length of the suspension was tied to the length of the impeachment proceedings confirms that the suspension was imposed with Judge Porteous's consent and in recognition of the fact that he was too preoccupied with other matters, and thus chose (like Judge Pickering) not to hear cases.

36

reprimand as an appropriate sanction. *In re Complaint of Judicial Misconduct Against United States District Judge Samuel B. Kent*, No. 07-05-351-0086 at 2 (5th Cir. Judicial Council Sept. 28, 2007).

The Porteous and Kent examples do not stand for the proposition that judicial councils can suspend from duties Article III judges who are *unwilling* to step aside. Rather, they stand for the simple and uncontroversial proposition (stretching back to at least the case of Judge Pickering) that judges have the individual power to choose to exercise or not exercise the functions and powers of their office—at least when temporarily disabled. *See also* Breyer Report, 239 F.R.D. at 196. But the fact that some judges, in the face of health or legal problems, decided to forgo the exercise of their judicial office until those problems were resolved does not undermine Judge Newman's argument that *involuntary* suspension of her "power to hear and determine judicially questions submitted" is unconstitutional.

### 4. *Even Where Prior Suspensions Were Imposed, They Never Deprived a Judge from All Functions of the Office*

Several other precedents also illustrate that in no prior case has any sanctioned judge ever been subjected to the complete withdrawal of

37

the powers of the office.

Returning to the case of Judge Chandler, his suspension did not result in complete divestiture of his power to adjudicate cases. To the contrary, though originally the Tenth Circuit's Judicial Council attempted to both prohibit Judge Chandler from hearing new cases and to reassign cases already pending before him, upon learning of Judge Chandler's objection to the latter part of the order, the Council "entered an order authorizing Judge Chandler to continue to sit on cases filed and assigned to him prior to" the date of the order. *Chandler*, 398 U.S. at 80. While Judge Chandler was precluded (for a time) from hearing *new* cases, he retained the "power to hear and determine judicially questions [previously] submitted."

In another example, the Judicial Council of the Fifth Circuit ordered a one-year suspension of District Judge Walter S. Smith, Jr. after concluding that he engaged in "inappropriate and unwanted physical and non-physical sexual advances" coupled with "allow[ing] false factual assertions to be made in response to the complaint." *In re Complaint of Judicial Misconduct Against United States District Judge Walter S. Smith, Jr.*, No. 05-14-90120 at 1 (5th Cir. Judicial Council Dec. 3, 2015).

As was the case with Judge Chandler, the suspension was limited to *new* case assignments, *id.* at 2, thus allowing Judge Smith to continue to exercise the powers of his office over the already pending cases during the course of his suspension.[11]  Similarly, when the Judicial Council of the Seventh Circuit concluded that District Judge Colin S. Bruce of the Central District of Illinois "frequently had *ex parte* communications with the Office" of the United States Attorney which "involved draft plea agreements, jury instructions, or docketing issues" and other matters regarding pending trials, *In re Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053, 07-18-90067 (7th Cir. Judicial Council May 14, 2019), it ordered a suspension for a period of one year of only that part of the criminal docket which the Office of the U.S. Attorney for the Central District of Illinois handled, *id.* at 11.

The Judicial Council of the Ninth Circuit took a similar approach. When it concluded that the then-Chief District Judge for the District of

---

[11] A cursory Westlaw search shows that during the course of his one-year suspension from hearing new cases, Judge Smith issued at least seventy-three separate opinions, which indicates that throughout the "suspension" he retained the "power to hear and determine judicially questions submitted."

39

Montana Richard Cebull repeatedly used the Court's email system to send extraordinarily racist and obviously political messages, it ordered that he be assigned no *new* cases for 180 days. *In re Complaint of Judicial Misconduct*, No. 12-90026 and 12-90032 (9th Cir. Judicial Council Mar. 15, 2013). Finally, when the Fifth Circuit's Judicial Council found that Judge John H. McBryde "engaged for a number of years in a pattern of abusive behavior," it imposed a one-year suspension from hearing *new* cases, and a three-year suspension from "presid[ing] over cases involving any of 23 lawyers who had participated in the investigation." *McBryde*, 264 F.3d at 54.

The history of Section 354(a)(2)(A)(i) thus shows that it has *never* before been utilized to fully withdraw the "power to hear and determine judicially questions submitted" from a judge who had not made his own decision to surrender such power. There is a good reason that judicial councils have abjured actually using this provision to do so. They recognize—much like the House Judiciary Committee did when it investigated Judge Chandler—that such an action traduces the House's *sole* power of impeachment and the Senate's *sole* power to try impeachments, and is therefore unconstitutional. This "want of assertion

40

of power by those who presumably would be alert to exercise it, is …

significant in determining whether such power was actually conferred."

*West Virginia v. EPA*, 597 U.S. 697, 725 (2022) (quoting *FTC v. Bunte*

*Brothers, Inc.*, 312 U.S. 349, 352 (1941)).  The Act does not confer on

judicial councils the power to fully deprive Article III judges of their

judicial functions, and the Constitution affirmatively denies such power.

## C.   The Court Can Avoid a Constitutional Question by Giving the Disability Act a Narrowing Construction

Judge Newman does not dispute the well-settled proposition that

"[a] facial challenge may be defeated if the statute in question is readily

susceptible to a narrowed construction that is constitutional." *Dimmitt*

*v. City of Clearwater*, 985 F.2d 1565, 1572 (11th Cir. 1993).  It is for that

reason "[w]hen the validity of an act of the Congress is drawn in question,

and even if a serious doubt of constitutionality is raised, it is a cardinal

principle that this Court will first ascertain whether a construction of the

statute is fairly possible by which the question may be avoided." *Crowell*

*v. Benson*, 285 U.S. 22, 62 (1932). *See also Comm'ns Workers of Am. v.*

*Beck*, 487 U.S. 735, 762 (1988).  Thus, the Court has a choice—it can

either conclude that § 354(a)(2)(A)(i) does not extend to suspensions that

drain the entirety of a judge's "power to hear and determine judicially questions submitted," or, if it were to conclude that the statute is *not* amenable to such a narrowing construction, it must then decide that it is unconstitutional on its face. But the upshot is that under *either* approach, judicial councils lack the power to suspend a judge from the exercise of all her judicial functions.

The Court can avoid a weighty constitutional question and construe the Act narrowly to authorize judicial councils to *limit*, "on a temporary basis for a time certain," 28 U.S.C. § 354(a)(2)(A)(i), a judge's docket, but not to completely revoke a judge's ability "to exercise judicial power." Construing the statute in that way would not call into question prior orders such as the ones entered against Judges Chandler, Smith, McBryde, etc., and indeed would be *consistent with* judicial councils' long-standing understanding of their own powers as well as statutory and constitutional limits on those powers. *See ante*, Part I.B.2-4. Adopting such a construction would recognize that an order that fully divests a judge from judicial functions is well outside the Act's statutory limits. But if so, then Defendants-Appellees were never clothed with authority to deprive Judge Newman against her will of the "power to hear and

42

determine judicially questions submitted," and a declaratory judgment (and if necessary, an injunction) should issue to that effect.[12]

### D. If the Court Is Unable to Construe the Disability Act Narrowly, the Court Must Hold It Unconstitutional

Were this Court to conclude that the Act *does* in fact authorize judicial councils to suspend judges from the exercise of all judicial power against their will, it must then hold the statute unconstitutional. As discussed *ante*, holding judicial office necessarily involves the ability "to exercise judicial power," that is the power to perform routine judicial functions such as hearing cases, and delivering judgments. When such power is wholly removed from a judge it follows that one of the "two consequences" that constitutionally appertains to the holding of a "federal judicial office" is abrogated by a mere administrative order,

---

[12] Applying a narrowing construction does not convert Judge Newman's claim into an "as applied" challenge because "the federal courts have the duty to avoid constitutional difficulties by doing so if such a construction is fairly possible." *Boos v. Barry*, 485 U.S. 312, 331 (1988). Defining statutes' boundaries is part and parcel of facial constitutional challenges. *See Harmon v. Brucker*, 355 U.S. 579, 581 (1958) ("In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioners' non-constitutional claim that respondent acted in excess of powers granted him by Congress.").

43

instead of through the constitutionally prescribed impeachment process.

And though Judge Newman does not dispute the uncontroversial proposition that "impeachment power does not exclude all intrabranch discipline," *McBryde*, 264 F.3d at 67, such discipline cannot have the same practical consequences as impeachment, otherwise Congress would be able to circumvent constitutional strictures by merely giving the procedure a new name. Accordingly, *all* applications of the Act that wholly and involuntarily withdraw from Article III judges the "power to hear and determine judicially questions submitted" are contrary to the Constitution. *See United States v. Salerno*, 481 U.S. 739, 475 (1987).

## II.  TO THE EXTENT THE DISABILITY ACT'S SUSPENSION PROVISION IS CONSTITUTIONAL, IT AUTHORIZES ONLY TIME-LIMITED SUSPENSIONS THAT HAVE A DEFINITE END DATE

The Act (to the extent it is constitutional at all) permits judicial councils to "order[] that, on a *temporary basis for a time certain*, no further cases be assigned to the judge whose conduct is the subject of a complaint." 28 U.S.C. § 354(a)(2)(A)(i) (emphasis added). While the Act does not define "time certain," it is well established that "unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369,

376 (2013) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)).

And "time certain" is a term with a well-established ordinary meaning.

"Time certain" is a term well known in both law and parliamentary

procedure. For example, Black's Law Dictionary defines "time certain"

as "[a] *definite*, *specific* date and time." *Time Certain*, Black's Law

Dictionary 4629 (8th ed. 2004). *See also Prasad v. Holder*, 776 F.3d 222,

226 (4th Cir. 2015) (finding that a statute at issue "sets out a fixed and

specific time-certain by which applications must be filed—April 30,

2001."); *First Fed. Sav. & Loan Ass'n of Rochester v. United States*, 88

Fed. Cl. 572, 594 (2009) (finding that "time certain" means "[a] strict time

limit" for an action to be taken). The Rules of the United States House

of Representatives and the Rules of the Senate authorize a motion to

adjourn or to postpone to "time certain" and under both sets of rules the

effect of such a motion is to set a *specific* date and time at which point the

matter postponed would be taken up or the chamber adjourned would

come back into session. *See, e.g.*, House Practice: A Guide to the Rules,

Precedents and Procedures of the House, ch. 38, § 2 ("When the House

adopts a motion to postpone a measure to a day certain, the effect is to

45

suspend consideration of the measure *until the day specified* in the motion.") (emphasis added).

Given that all Members of Congress are well familiar with the rules under which Congress itself operates and legislation is considered and ultimately enacted, it follows that they attached a well-familiar meaning to a well-familiar term. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-98 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law.").

Congress reinforced the meaning of "time certain" by also insisting that suspension must be "temporary." 28 U.S.C. § 354(a)(2)(A)(i). The plain meaning of this term—"[l]asting for a time only; existing or continuing for a limited (usu. short) time," *Temporary*, Black's Law Dictionary 4582; *see also United States v. McHugh*, 583 F.Supp.3d 1, 33 (D.D.C. 2022)—reinforces the aforementioned definition of "time certain." In contrast, a suspension that is "renewable," by definition lasts more than "a limited time."

To the extent that § 354(a)(2)(A)(i) is constitutional at all, it must be construed in accordance with its plain meaning, and therefore, Judge Newman's suspension from judicial duties must have a definitive end

46

date.  The order that permits renewed suspensions until Judge Newman submits to medical testing is therefore *ultra vires* and in excess of Defendants-Appellees' statutory authority.

In their rejection of this argument during the administrative process, Defendants-Appellees stated that § 354(a)(2)(A)(i) must be given a broader construction than its ordinary and plain meaning because otherwise "any judge could defy orders from a special committee under the Act, wait the committee out, thwart the functioning of the Act, and be free and clear of any consequence for ongoing misconduct after a single year." July 24, 2024 Report & Recommendation at 34.  This argument flies in the face of the Supreme Court's clear instructions on the proper approach to statutory construction, and the ability of the Congress to impeach upon referral which has not issued.

By now, it is long-settled that courts are obliged to give statutes their plain and ordinary meaning even where it may lead to unwelcome results.  *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534, 538 (2004) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.").  Courts "are compelled to follow the statute's

plain meaning, 'even though effectuating that meaning may have undesirable public policy ramifications.'" *Connecticut v. EPA*, 656 F.2d 902, 910 (2d Cir. 1981) (quoting *Manchester Env't Coal. v. EPA*, 612 F.2d 56, 60 (2d Cir. 1979)). *See also Weddel v. HHS*, 23 F.3d 388, 393 (Fed. Cir. 1994) (So long as "the outcome dictated by the plain meaning [of the statute] is not so bizarre that Congress could not possibly have intended it," the courts are limited to that plain meaning.).

There is nothing to suggest that a limited suspension, even in the face of continuing (alleged) misconduct, is "absurd." When misconduct is not rectified by a temporary suspension and such misconduct is serious, the Disability Act provides for, and indeed *requires*, that the offending judge be referred to Congress for impeachment proceedings. *See* 28 U.S.C. §§ 354(b)(2), 355(b)(1) (stating that a judicial council "shall" certify its determination that the judge has engaged in impeachable conduct to the Judicial Conference, which in turn, if it concurs, "shall" make the same certification to the House of Representatives). The Act recognizes that in some instances, a judge "may have engaged in conduct [that] is not amenable to resolution by the judicial council" and provides that in such instances, the council "shall" refer the matter to the Judicial

Conference for its resolution. 28 U.S.C. § 354(b)(2). Congress fully foresaw a circumstance where a time-limited suspension does not cause a judge to change his wrongful behavior, and it provided for specific remedies which do not include recurrent suspensions.

The Act provides *two additional* remedies to judicial councils—it allows a council to certify (even over the judge's objection) the disability of a judge, [13] and it permits the council to request that the judge voluntarily retire. 28 U.S.C. §§ 354(a)(2)(B)(i), (ii). But the Act does not permit judicial councils, through renewable suspensions, to *involuntarily* retire a judge.

Given the plethora of choices available to a judicial council that is faced with a judge who refuses to comply with the council's orders, there is nothing "absurd" or "implausible" about Congress's choice to limit suspensions to "temporary" periods lasting for "a time certain." This is especially so given that Congress could have authorized judicial councils to order suspensions (assuming suspensions are constitutionally

---

[13] Such a certification would not, in and of itself, cause such a judge to lose the powers of her office. *See* 28 U.S.C. § 372(b).

49

permissible) "on a temporary basis for a time certain *or for so long as the misconduct or disability persists*."  Since Congress chose not to enact the italicized language, courts "are compelled to follow the statute's" actual text.  *Connecticut v. EPA*, 656 F.2d at 910.  And the statute's actual text simply does not permit Defendants-Appellees to indefinitely renew Judge Newman's suspension from her judicial duties.

## III.   THIS COURT HAS JURISDICTION TO ENTERTAIN "AS APPLIED" CHALLENGES TO THE DISABILITY ACT

The Court below, relying on this Court's decision in *McBryde*, held that § 357 bars federal courts from entertaining Judge Newman's "as applied" challenges to the Disability Act.  *See Newman*, 717 F.Supp.3d at 55-60.  That conclusion is wrong for several reasons.

### A.   Courts Retain Jurisdiction to Ensure That Agencies Do Not Transgress the Bounds of Their Statutory Authority

The mere fact that § 357 does not permit judicial review of certain orders does not divest district courts of jurisdiction over all orders issued, no matter how beyond the scope of a judicial council's authority such orders may be.  It is a fundamental principle of administrative law that courts not only may, but "shall hold unlawful and set aside agency action … found to be in excess of statutory jurisdiction, authority, or

50

limitations." 5 U.S.C. § 706(2)(C). *See also Cuozzo Speed Techs. v. Lee*, 579 U.S. 261, 275 (2016); *Wallace v. Christensen*, 802 F.2d 1539, 1551 (9th Cir. 1986) (e*n banc*) (holding that even where Congress vests an agency with complete discretion to act under a statute, "[a] court may consider whether the [agency] has acted outside the[] statutory limits."). "[A]n inquiry into the legality of agency action, as opposed to the appropriateness of agency action within legal bounds, is 'uniquely appropriate for judicial determination.'" *Farkas v. United States*, 744 F.2d 37, 39 (6th Cir. 1984) (quoting *Scanwell Lab'ys, Inc. v. Shaffer*, 424 F.2d 859, 875 (D.C. Cir. 1970)). The resolution of whether Defendants-Appellees' actions exceed the Congressionally-set boundaries is for this Court to decide.

Even where a statute vests an agency with a power to render a "final and not appealable" decision, such a statute does not deprive courts of authority to determine whether the "agency … act[ed] outside its statutory limits." *SAS Inst. v. Iancu*, 584 U.S. 357, 370-71 (2018) (internal quotations omitted). According to the Supreme Court "judicial review remains available consistent with the Administrative Procedure Act, which directs courts to set aside agency action 'not in accordance

51

with law' or 'in excess of statutory jurisdiction, authority, or limitations.'"
*Id.* at 371 (quoting 5 U.S.C. §§ 706(2)(A), (C)).

The statutory limits on judicial review addressed in *SAS Institute* are similar to the limits imposed by § 357(c).  There, the Patent Act authorized the Director of the Patent Office to institute *inter partes* review proceedings with respect to already issued patents.  The relevant statutory provision made any "determination by the Director whether to institute an *inter partes* review … final and nonappealable."  35 U.S.C. § 314(d).  When SAS sought review of certain patents, the Director of the Patent Office, despite finding that review is warranted, instituted review on only some of the issues raised by SAS, rather than on all of them.  *SAS Inst.*, 584 U.S. at 361-62.  SAS then challenged the decision.  *Id.* at 362.  The Director argued that by virtue of § 314(d) his decision on whether or not to institute review is insulated from judicial oversight.  *Id.* at 370.  The Court, while agreeing that Congress meant to foreclose judicial review of the Director's determination as to whether a particular challenge to an issued patent meets the statutory requirements for *inter partes* review, Congress did not mean to preclude review of the agency's actions for compliance with statutory limits on its authority.  *Id.* at 370-

71.  The Court concluded that the Director's decision to institute review only in part violated the statutory limits on his authority which extended only to the decision whether to grant a petition to institute *inter partes* review in its entirety or deny it in its entirety.  *Id.* at 371.

The same logic applies here.  While 28 U.S.C. § 357(c) precludes this (or any other) Court from second-guessing the appropriateness of a sanction imposed within the Judicial Council's statutory authority (*e.g.*, whether a public or private reprimand would have been more appropriate), it does not preclude this Court from ensuring that the Judicial Council of the Federal Circuit (which is an administrative agency and not a court) did not act in excess of its statutory authority. To hold otherwise, would be to leave without judicial review judicial councils' actions that are clearly unauthorized by the Act (*e.g.*, imposition of fines, or worse yet, an order of removal despite such being explicitly prohibited by the statute, *see* 28 U.S.C. § 354(a)(3)(A)).

As every other citizen, Judge Newman enjoys a right to a judicial review of unlawful agency actions.[14]  And while the review of judicial

---

[14] A review by the Judicial Conference (or its JC&D Committee) is

53

councils' orders may be more limited than the review of other administrative actions (*e.g.*, no review may be available on the ground that a judicial council's order is "arbitrary or capricious"), review of actions that are plainly in excess of authority granted by Congress remains.[15]  *See Griffith v. FLRA*, 842 F.2d 487, 492 (D.C. Cir. 1988) ("Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction.") (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)).[16]

---

no substitute because the Conference, like judicial councils, is merely another administrative agency.

[15] Even in situations where Congressional authority is at its apex, as in enforcing the Fourteenth Amendment by appropriate legislation, *see* U.S. Const. amend. XIV, § 5, the Supreme Court has never endorsed a complete preclusion of all judicial review.  In *South Carolina v. Katzenbach*, the Court held that although an Attorney General's determination that a particular jurisdiction is covered by the relevant provisions of the Voting Rights Act is not judicially reviewable, a provision of the statute that allowed such a jurisdiction to "go into [an Article III] court and obtain termination of coverage … serves as a partial substitute for direct judicial review." 383 U.S. 301, 333 (1966).  There must thus be *some* opportunity to challenge an administrative action before an Article III tribunal.  Yet, under Defendants-Appellees' view of the case, no such opportunity exists.

[16] The *McBryde* Court recognized the continued vitality of this

Were this Court to conclude that the Disability Act, properly construed, does not permit judicial councils to wholly deprive judges of their vested "judgment power," it should and is empowered to set aside Defendants-Appellees' sanctions against Judge Newman as "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (C).

The District Court's reliance on *McBryde* to reach a contrary conclusion was erroneous for at least two reasons. First, *McBryde* itself excepted from its holding situations where "a long-term disqualification from cases ..., by its practical effect, affect[s] an unconstitutional 'removal,'" 264 F.3d at 67 n.5—precisely the situation Judge Newman finds herself in. Second, subsequent legislation, cases from the Supreme Court, and the decisions of the JC&D call the premise of *McBryde* into question.

## B.  *McBryde*, by Its Own Terms, Does Not Bar Judge Newman's "As Applied" Challenge

Judge Newman raised several "as applied" challenges to the

---

exception, holding that judicial review is not precluded with respect to actions not authorized by the Act. 264 F.3d at 63.

proceedings against her, but the most important ones concern 1) the length of the suspension being imposed on her, and 2) the violation of the basic norms of Due Process stemming from having the same individuals act as both witnesses and adjudicators.

With respect to the first issue, whether it is characterized as a facial constitutional challenge, *see ante* Part I.B., statutory jurisdictional challenge, *see ante* Parts I.C. and II., or an "as applied" constitutional challenge, the result is the same—this Court has jurisdiction to entertain it, and the *McBryde* Court recognized as much.

The *McBryde* Court explicitly left for another day the question of "whether a long-term disqualification from cases could, by its practical effect, affect [*sic*] an unconstitutional 'removal.'" *McBryde*, 264 F.3d at 67 n.5. Of course, in order to address such a question, there first has to exist "a long-term disqualification from cases," and such disqualification can exist only once the Act is *applied* to a particular judge. That the *McBryde* Court left this question open indicates that even on its own terms *McBryde* does not foreclose all non-facial challenges to the Act.

Judge Newman's challenge is precisely of the type left open by Footnote 5. As of this writing, Judge Newman has already been

56

suspended from hearing cases for twenty-one months.[17]  She has had no judicial work of any kind for the last thirteen months.  This suspension is thus already one of the longest—if not the longest—in the history of the American judiciary.  Given the Judicial Council's most recent order, *see* Sept. 6, 2024 Judicial Council Order, her lack of judicial duties will continue for at least an additional nine months and total twenty-two months.  Defendants-Appellees have indicated that they intend to renew the suspension yet again once the latest order expires.

Judge Newman has made it clear that she will not comply with Defendants-Appellees' unlawful and unconstitutional demands.  But even if one disagrees with Judge Newman's legal position and believes that Judge Newman's refusal to "cooperate" is itself unlawful, it does not follow that Defendants can indefinitely, and essentially (especially in light of her age) permanently suspend her from office.  To the contrary, if Defendants-Appellees truly believe that Judge Newman is acting

---

[17] Of these twenty-one months, the suspension during the first six months was not authorized by the Act, and the justification for the same provided by Defendants-Appellees changed during the course of litigation.

unlawfully in resisting their demands, they are entirely free to recommend impeachment proceedings to the House of Representatives, or take other steps contemplated by § 354(c). *See ante*, Part II. But Defendants-Appellees are not free to effectively remove Judge Newman from office by stringing together and indefinitely extending numerous suspensions. <u>They</u> <u>do</u> <u>not</u> <u>have</u> <u>that</u> <u>power</u>. Under the *McBryde* precedent, this Court has the power and the obligation to consider whether the suspension(s) of Judge Newman are so "long-term" that they have "by [their] practical effect, [e]ffect[ed] an unconstitutional 'removal.'" 264 F.3d at 67 n.5.

The *McBryde* decision should not be construed as stripping this Court of its ability to hear "as applied" challenges that cannot be addressed by the Judicial Conference. To do so would raise significant constitutional concerns as it would leave certain decisions of judicial councils entirely beyond review. *See, e.g.*, *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975) (construing statutes in such a way that "absolutely no judicial consideration of [an] issue would be available … raise[s] a serious constitutional question of the validity of the statute as so construed."). For example, Judge Newman specifically challenged, on due process and

58

statutory grounds, Defendants-Appellees' refusal to recuse in this matter.  Although Defendants now argue that it is not necessary for them to serve as witnesses, from very early on, Defendants-Appellees premised their investigation on their own perceptions of Judge Newman's abilities, behavior, and decision-making.  *See* March 24, 2023 Order at 2.  Besides which, Judge Newman could choose to call some or all of them as witnesses to re-examine alleged facts already in the record.

As a result, throughout these proceedings, Judge Newman has argued that in light of Defendant-Appellees' dual witness and adjudicator (not to mention investigator and litigant) roles, a transfer is not merely advisable, but statutorily and constitutionally required, and that an absence of such a transfer violates the basic principles of the due process of law.  Defendants have ignored these arguments and refused to seek a transfer of the investigation to the judicial council of another circuit.  But it is not clear that the Judicial Conference (or its JC&D Committee) has authority to review this decision.  *See* R. 26 (stating that "a chief judge or a judicial council may ask the Chief Justice to transfer a proceeding" under the Act).  If the Judicial Conference doesn't have such authority, it is powerless to reverse the decision not to ask for a transfer even if it were

to conclude that such a decision violates due process of law. If so, absent a review by this Court, Judge Newman would be left entirely without remedy, which in and of itself would pose significant constitutional difficulties. *Weinberger*, 422 U.S. at 762.

Fortunately, this Court need not face these difficult constitutional questions, because the Act need not be construed as barring all "as applied" constitutional challenges, nor did the *McBryde* Court so hold.

### C. *McBryde* Has Been Overtaken by Subsequent Legal Developments

There are at least three separate reasons why *McBryde* is no longer good law.

First and foremost, after *McBryde* was decided, Congress enacted a statute that *expressly* contemplates "as applied" challenges to the Act being adjudicated in Article III courts. *See* 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, Div. C, Title I, Subtitle C, § 11044, 116 Stat. 1758, 1856 (Nov. 2, 2002) (codified as Note to 28 U.S.C. § 351). That Act enacted a "savings clause" to the Act and provides that if any portion of the Act "*or the application of such provision* … to any person or circumstance is held to be unconstitutional,

60

the remainder of [the Act] and the application of [its] provisions of such to any person or circumstance shall not be affected thereby." *Id.* (emphasis added). The only circumstance where an *application* of a provision of the Act could be held unconstitutional is in a proceeding before a district court (and any subsequent appeals).

Judicial councils (and the Judicial Conference), though staffed by Article III judges, are merely agencies and thus are not empowered to declare statutes unconstitutional. *See Califano v. Sanders*, 430 U.S. 99, 109 (1977) ("Constitutional questions obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions."); *see also Axon Enter., Inc. v. FTC* and *SEC v. Cochran*, 598 U.S. 175, 195 (2023) ("'[A]gency adjudications are generally ill suited to address structural constitutional challenges'—like those maintained here." (quoting *Carr v. Saul*, 593 U.S. 83, 92 (2021)). Because Congress could not have expected an agency to entertain an "as applied" challenge, the *only* way to understand the relevant provision of the 2002 Act is that it conferred jurisdiction on federal courts to adjudicate "as applied" challenges to the Act. It then follows that *McBryde*'s holding to the contrary cannot be

61

relied upon. And because the 2002 Act confers jurisdiction on federal courts to hear as applied challenges, this Court is now required to exercise it. *See FBI v. Fikre*, 601 U.S. 234, 240 (2024) ("A court with jurisdiction has a 'virtually unflagging obligation' to hear and resolve questions properly before it.") (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

Second, recent Supreme Court decisions confirmed that constitutional questions are outside the scope of agencies' expertise. *See, e.g.*, *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 (2010) ("[C]onstitutional claims are also outside the [agency]'s competence and expertise."); *see also Axon/Cochran*, 598 U.S. at 195. While no one questions the expertise of *individual judges* who staff judicial councils and the Judicial Conference to resolve constitutional questions, the *agencies* that these judges staff (*i.e.*, judicial councils and the Judicial Conference) have no *institutional* expertise or authority to pass on such questions.

As the Supreme Court explained just two Terms ago, being subjected to an unconstitutional process before an unconstitutionally composed body, is exactly the type of injury that district courts remain

62

empowered to adjudicate, *even where* Congress has chosen to deprive these courts of jurisdiction over the agencies' substantive decisions and channel any review through other bodies. *See Axon/Cochran*, 598 U.S. at 191. If failure to transfer a case where all judicial council members are witnesses to issues in dispute violates Due Process (which it does), then "being subjected to unconstitutional agency authority … is impossible to remedy once the proceeding is over," *id.*, especially where, as in this case, the judicial council not only refuses to await the JC&D's decision prior to suspending the judge, but actually enters suspension orders prior to the conclusion of the disciplinary proceedings. Indeed, given the fact that the Judicial Conference apparently lacks the authority to order a transfer as part of its own appellate review, *see* R. 26, it is a certainty that absent this (or the District) Court's exercising jurisdiction, Judge Newman's due process argument will *never* be addressed.[18]

---

[18] Thus, to the extent that claims of bias in a judicial proceedings can be addressed as part of regular appellate review, the same (absent the Court exercising jurisdiction over "as applied" challenges) is not true in disciplinary proceedings.

Finally, *McBryde*'s conclusion that courts are precluded from hearing "as applied" challenges to the Act rested on the premise that the JC&D "Committee was authorized to entertain … constitutional as applied challenges." 264 F.3d at 68. The Court recognized "that the Judicial Conference committee has disclaimed authority to rule on as applied, as well as facial, constitutional challenges," *id.* at 62, but nevertheless asked the JC&D "Committee [to] reconsider its view in light of [the *McBryde*] opinion and we therefore request[ed] it to do so," *id.* at 68. Despite this Court's request to the Judicial Conference that it "reconsider" its position that it has "no competence to adjudicate the facial constitutionality of the statute or its constitutional application," *id.* at 82 (quoting *In re: Complaints of Judicial Misconduct or Disability*, No. 98-372-001 at 21 (U.S. Jud. Conf. Sept. 18, 1998)), the JC&D Committee has steadfastly refused to do so.

In this very case, the JC&D Committee did not address, even in passing, Judge Newman's constitutional arguments. This failure shows that the Court's fundamental premise in *McBryde*—that the Judicial Conference remains an appropriate and open forum to litigate "as applied" constitutional challenges—was erroneous, and that the Judicial

64

Conference's conclusion that "[t]he courts of the United States are open for the adjudication of such questions," *McBryde*, 264 F.3d at 62 (quoting *Complaints of Judicial Misconduct or Disability*, No. 98-372-001 at 21), remains the correct statement of the law.

For all these reasons, the Court, even if it were to conclude that *McBryde* (contrary to its own Footnote 5) would otherwise apply to Judge Newman's suspension, it should not continue to rely on that precedent.

## CONCLUSION

The Court should reverse the judgment below and render judgment for Judge Newman.  Our constitutional structure and the independence of the federal judiciary demand nothing less.

65

## POSITION ON ORAL ARGUMENT

Appellant respectfully requests that this matter be calendared for oral argument at an early date.

Respectfully submitted,

/s/ Gregory Dolin
Gregory Dolin
    *Counsel of Record*
John J. Vecchione
Andrew Morris
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
Greg.Dolin@ncla.legal
*Counsel for Plaintiff-Appellant*

Dated: December 5, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,917 words. This brief also complies with the typeface and type-style requirements of the Federal Rule of Appellate Procedure because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

/s/ Gregory Dolin
Gregory Dolin

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ Gregory Dolin

Gregory Dolin