# In the United States Court of Appeals
# for the District of Columbia Circuit

THE HON. PAULINE NEWMAN,

*Plaintiff-Appellant,*

*v.*

THE HON. KIMBERLY A. MOORE, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia

## JOINT APPENDIX

Gregory Dolin, MD
*Counsel of Record*
John J. Vecchione
Andrew Morris
NEW CIVIL LIBERTIES ALLIANCE
1225 19TH ST. NW, SUITE 450
Washington, DC 20036
(202) 869-5210
greg.dolin@ncla.legal
*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS
## Joint Appendix

District Court Docket Sheet.............................................................. JA1

Complaint [Doc. 1] .............................................................. JA7

Amended Complaint [Doc. 10] ........................................... JA31

Motion to Dismiss [Doc. 24] ............................................. JA64

Transcript of Motion Hearing [Doc. 39].............................. JA66

Feb. 12, 2024 District Court Memorandum Opinion
   and Order [Doc. 43] ...................................................... JA147

Answer to Amended Complaint [Doc. 44]......................... JA183

Motion for Judgment on Pleadings [Doc. 45]. .................. JA198

July 9, 2024 District Court Order [Doc. 49]...................... JA200

July 9, 2024 District Court Memorandum Opinion [Doc. 50]............. JA201

July 10, 2024 Notice of Appeal [Doc. 51] ......................... JA216

# 1:23cv1334, Newman V. Moore Et Al

US District Court Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 07/31/2024**

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 05/10/2023 | COMPLAINT against PAULINE NEWMAN with Jury Demand ( Filing fee $ 402 receipt number ADCDC-10061036) filed by PAULINE NEWMAN. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons to the Hon. Kimberly A. Moore, # 3 Summons Summons to the Hon. Sharon Prost, # 4 Summons Summons to the Hon. Richard G. Taranto, # 5 Summons Summons to Judicial Council of the Federal Circuit)(Vecchione, John) (Entered: 05/10/2023) | |
| 2 | 05/10/2023 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by PAULINE NEWMAN (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit Proposed Sealed Exhibit)(Vecchione, John) (Entered: 05/10/2023) | |
| | 05/11/2023 | Case Assigned to Judge Christopher R. Cooper. (zrtw) (Entered: 05/11/2023) | |
| 3 | 05/11/2023 | SUMMONS (4) Issued Electronically as to JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Notice and Consent)(zrtw) (Entered: 05/11/2023) | |
| | 05/11/2023 | NOTICE OF ERROR re 1 Complaint; emailed to john.vecchione@ncla.legal, cc'd 1 associated attorneys -- The PDF file you docketed contained errors: 1. Missing summonses-government. When naming a government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zrtw, ) (Entered: 05/11/2023) | |
| 4 | 05/11/2023 | REQUEST FOR SUMMONS TO ISSUE to AG Merrick Garland by PAULINE NEWMAN re 1 Complaint, filed by PAULINE NEWMAN. Related document: 1 Complaint, filed by PAULINE NEWMAN.(Vecchione, John) (Entered: 05/11/2023) | |
| 5 | 05/11/2023 | REQUEST FOR SUMMONS TO ISSUE U.S. Attorney for DC by PAULINE NEWMAN re 1 Complaint, filed by PAULINE NEWMAN. Related document: 1 Complaint, filed by PAULINE NEWMAN.(Vecchione, John) (Entered: 05/11/2023) | |
| 6 | 05/15/2023 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zjm) (Entered: 05/15/2023) | |
| | 05/15/2023 | MINUTE ORDER granting 2 Plaintiff's Sealed Motion for Leave to File Documents Under Seal. Signed by Judge Christopher R. Cooper on 05/15/2023. (lccrc3) (Entered: 05/15/2023) | |
| 7 | 05/15/2023 | SEALED DOCUMENT filed by PAULINE NEWMAN. (This document is SEALED and only available to authorized persons.)(zjm) (Entered: 05/24/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 8 | 05/31/2023 | NOTICE of Appearance by Stephen Ehrlich on behalf of All Defendants (Ehrlich, Stephen) (Entered: 05/31/2023) | |
| 9 | 05/31/2023 | NOTICE of Appearance by Michael Andrew Zee on behalf of All Defendants (Zee, Michael) (Entered: 05/31/2023) | |
| 10 | 06/27/2023 | AMENDED COMPLAINT against All Defendants with Jury Demand filed by PAULINE NEWMAN. (Attachments: # 1 Exhibit)(Vecchione, John) (Entered: 06/27/2023) | |
| 11 | 06/27/2023 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by PAULINE NEWMAN (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Exhibit)(Vecchione, John) (Entered: 06/27/2023) | |
| 12 | 06/27/2023 | MOTION for Preliminary Injunction by PAULINE NEWMAN. (Vecchione, John) (Entered: 06/27/2023) | |
| 13 | 06/27/2023 | MOTION for Leave to File Excess Pages in Support of Motion for Preliminary Injunction by PAULINE NEWMAN. (Attachments: # 1 Proposed Memorandum In Support of Motion for Preliminary Injunction)(Vecchione, John) (Entered: 06/27/2023) | |
| 14 | 06/28/2023 | PROPOSED BRIEFING SCHEDULE (Joint) by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Text of Proposed Order)(Ehrlich, Stephen) (Entered: 06/28/2023) | |
| 15 | 06/29/2023 | Consent MOTION to Strike 10 Amended Complaint (Exhibits ONLY), Consent MOTION for Leave to File Corrected Exhibits by PAULINE NEWMAN. (Attachments: # 1 Exhibit Replacement Exhibits to the First Amended Complaint)(Vecchione, John) (Entered: 06/29/2023) | |
| | 06/30/2023 | MINUTE ORDER: Counsel shall appear for status and scheduling conference on July 6, 2023 at 2:00 PM by Zoom before Judge Christopher R. Cooper. Video connection information will be provided to the parties separately. Signed by Judge Christopher R. Cooper on 06/30/2023. (lccrc3) (Entered: 06/30/2023) | |
| 16 | 07/05/2023 | NOTICE of Appearance by Gregory Dolin on behalf of PAULINE NEWMAN (Dolin, Gregory) (Entered: 07/05/2023) | |
| | 07/06/2023 | Minute Entry for video Status Conference held before Judge Christopher R. Cooper on 7/6/2023. Forthcoming briefing Order. (Court Reporter: Jeff Hook) (lsj) (Entered: 07/06/2023) | |
| 17 | 07/07/2023 | NOTICE on Suggestion of Mediation by PAULINE NEWMAN (Dolin, Gregory) (Entered: 07/07/2023) | |
| | 07/07/2023 | MINUTE ORDER granting 15 Plaintiff's Consent Motion to Strike Amended Complaint Exhibits and Motion for Leave to File Corrected Exhibits. The Court directs the Clerk's Office to seal the exhibits attached to Plaintiff's 10 Amended Complaint. Signed by Judge Christopher R. Cooper on 07/07/2023. (lccrc3) (Entered: 07/07/2023) | |
| 18 | 07/11/2023 | ORDER referring case to mediation. See full Order for details. Signed by Judge Christopher R. Cooper on 07/11/2023. (lccrc3) (Entered: 07/11/2023) | |
| 19 | 07/17/2023 | NOTICE of Continuation of Deadline to File Joint Status Report on Mediation by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO (Zee, Michael) (Entered: 07/17/2023) | |
| 20 | 07/25/2023 | TRANSCRIPT OF VIDEO STATUS CONFERENCE before Judge Christopher R. Cooper held on July 6, 2023. Page Numbers: 1 - 12. Date of Issuance: July 25, 2023. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this | |

JA2

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 8/15/2023. Redacted Transcript Deadline set for 8/25/2023. Release of Transcript Restriction set for 10/23/2023.(Hook, Jeff) (Entered: 07/25/2023) | |
| 21 | 08/18/2023 | Joint STATUS REPORT and Request for Briefing Schedule by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Text of Proposed Order)(Ehrlich, Stephen) (Entered: 08/18/2023) | |
| 23 | 08/18/2023 | MOTION for Briefing Schedule by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (See Docket Entry 21 to view document) (zjm) Modified on 8/21/2023 (zjm). (Entered: 08/21/2023) | |
| 22 | 08/21/2023 | ORDER: In light of the 21 parties' Joint Status Report, the Court sets the following briefing schedule. See full order for details. Signed by Judge Christopher R. Cooper on 8/21/2023. (lccrc3) (Entered: 08/21/2023) | |
| 24 | 09/01/2023 | MOTION to Dismiss by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1: Special Committee Report &amp; Recommendation, # 3 Exhibit 2: JCUS Report, # 4 Exhibit 3: Sixth Circuit Judicial Council Order, # 5 Text of Proposed Order)(Ehrlich, Stephen) (Entered: 09/01/2023) | |
| 25 | 09/01/2023 | Memorandum in opposition to re 12 Motion for Preliminary Injunction filed by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Exhibit 1: Special Committee Report &amp; Recommendation, # 2 Exhibit 2: JCUS Report, # 3 Exhibit 3: Sixth Circuit Judicial Council Order, # 4 Declaration of Jarrett B. Perlow, # 5 Text of Proposed Order)(Ehrlich, Stephen) (Entered: 09/01/2023) | |
| 26 | 09/01/2023 | Consent MOTION for Leave to File Excess Pages for Defendants' Reply Brief by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Text of Proposed Order)(Zee, Michael) (Entered: 09/01/2023) | |
| 27 | 09/06/2023 | ORDER granting 26 Defendants' Motion for Leave to File Excess Pages for their reply brief. Signed by Judge Christopher R. Cooper on 9/6/2023. (lccrc3) (Entered: 09/06/2023) | |
| 28 | 10/02/2023 | Joint MOTION for Amended Briefing Schedule by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Text of Proposed Order)(Ehrlich, Stephen) Modified on 10/2/2023 to correct relief (zjm). (Entered: 10/02/2023) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|  | 10/04/2023 | MINUTE ORDER granting the 28 parties' Joint Motion for Amended Briefing Schedule. Plaintiff's combined opposition to Defendants' motion to dismiss and reply in support of her motion for preliminary injunction shall be due by October 25, 2023. Defendants' reply in support of their motion to dismiss shall be due by November 17, 2023. Signed by Judge Christopher R. Cooper on 10/4/2023. (lccrc3) (Entered: 10/04/2023) |  |
| 29 | 10/16/2023 | MOTION for Dispute Resolution Process by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Text of Proposed Order)(Ehrlich, Stephen) (Entered: 10/16/2023) |  |
|  | 10/17/2023 | MINUTE ORDER granting 29 Defendants' Motion for Dispute Resolution Process. It is further ORDERED that the parties are directed to jointly contact Chief Circuit Mediator Robert Fisher at Robert_Fisher@cadc.uscourts.gov for further directions concerning the resolution of this dispute. Signed by Judge Christopher R. Cooper on 10/17/2023. (lccrc3) (Entered: 10/17/2023) |  |
| 30 | 10/25/2023 | REPLY to opposition to motion re 12 MOTION for Preliminary Injunction Combined Response in Opposition to Motion to Dismiss and Reply in Support of Motion for Preliminary Injunction filed by PAULINE NEWMAN. (Attachments: # 1 Declaration Declaration of Gregory Dolin with Supporting Exhibits)(Dolin, Gregory) Modified on 10/26/2023 to correct docket text/ link. (zjm). (Entered: 10/25/2023) |  |
| 31 | 10/25/2023 | RESPONSE re 24 MOTION to Dismiss filed by PAULINE NEWMAN. (See Docket Entry 30 to view document) (zjm) (Entered: 10/26/2023) |  |
|  | 10/26/2023 | NOTICE OF ERROR re 30 Reply to opposition to Motion; emailed to greg.dolin@NCLA.legal, cc'd 14 associated attorneys -- The PDF file you docketed contained errors: 1. Notice of Corrected Docket Entry: Your entry has been modified as a courtesy. Please note the appropriate reminders for future filings; do not refile document, 2. Please note the following for future filings; do not refile document, 3. Counsel is reminded for two-part documents; second docket entry is required. (zjm, ) (Entered: 10/26/2023) |  |
| 32 | 11/17/2023 | REPLY to opposition to motion re 24 MOTION to Dismiss filed by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Exhibit 4: November 9 Judicial Council Order)(Ehrlich, Stephen) (Entered: 11/17/2023) |  |
| 33 | 11/28/2023 | Consent MOTION for Leave to File Sur-reply to ECF32 by PAULINE NEWMAN. (Attachments: # 1 Text of Proposed Order)(Dolin, Gregory) (Entered: 11/28/2023) |  |
| 34 | 11/29/2023 | ORDER granting 33 Plaintiff's Motion for Leave to File Sur-reply. See full Order for details. Signed by Judge Christopher R. Cooper on 11/29/2023. (lccrc3) (Entered: 11/29/2023) |  |
| 35 | 12/06/2023 | SURREPLY to re 24 MOTION to Dismiss , 33 Consent MOTION for Leave to File Sur-reply to ECF32 filed by PAULINE NEWMAN. (Vecchione, John) (Entered: 12/06/2023) |  |
| 36 | 12/13/2023 | SUR-SURREPLY to re 24 MOTION to Dismiss to Plaintiff's Surreply filed by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Ehrlich, Stephen) Modified on 12/13/2023 to correct event (zjm). (Entered: 12/13/2023) |  |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | 12/19/2023 | MINUTE ORDER: The parties are hereby directed to appear for a hearing on 12 Plaintiff's Motion for a Preliminary Injunction and 24 Defendants' Motion to Dismiss on January 25, 2024 at 10:00 AM in Courtroom 27A (In Person) before Judge Christopher R. Cooper. Signed by Judge Christopher R. Cooper on 12/19/2023. (lccrc3) (Entered: 12/19/2023) | |
| | 01/25/2024 | Minute Entry for Motion Hearing held before Judge Christopher R. Cooper on 1/25/2024. Oral arguments submitted on Plaintiff's Motion 12 for Preliminary Injunction and Defendants' Motion 24 to Dismiss. Motions are taken under advisement; forthcoming Order. (Court Reporter: Tammi Sefranek) (lsj) (Entered: 01/25/2024) | |
| 37 | 01/30/2024 | NOTICE by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO (Ehrlich, Stephen) (Entered: 01/30/2024) | |
| 38 | 01/31/2024 | RESPONSE re 37 Notice (Other) after oral argument by PAULINE NEWMAN (Dolin, Gregory) Modified on 2/1/2024 to correct event (zjm). (Entered: 01/31/2024) | |
| 39 | 02/02/2024 | TRANSCRIPT OF MOTION HEARING before Judge Christopher R. Cooper held on 1/25/24; Page Numbers: 1-81. Date of Issuance:2/2/24. Court Reporter/Transcriber Tamara Sefranek, Telephone number 202-354-3246, Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 2/23/2024. Redacted Transcript Deadline set for 3/4/2024. Release of Transcript Restriction set for 5/2/2024.(Sefranek, Tamara) (Entered: 02/02/2024) | |
| 40 | 02/07/2024 | NOTICE of JC&D Committee Order by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO (Attachments: # 1 Feb. 7 JC&amp;D Order)(Ehrlich, Stephen) (Entered: 02/07/2024) | |
| 41 | 02/08/2024 | RESPONSE re 40 Notice (Other) . by PAULINE NEWMAN (Attachments: # 1 Exhibit)(Dolin, Gregory) Modified on 2/9/2024 to correct event (zjm). (Entered: 02/08/2024) | |
| 42 | 02/09/2024 | RESPONSE re 41 Notice (Other) filed by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Ehrlich, Stephen) (Entered: 02/09/2024) | |
| 43 | 02/12/2024 | MEMORANDUM OPINION AND ORDER denying 12 Plaintiff's Motion for a Preliminary Injunction and granting in part and denying in part 24 Defendants' Motion to Dismiss. Defendants shall file an answer to the remaining counts in the Amended Complaint by March 13, 2024. See full Memorandum Opinion and Order for details. Signed by Judge Christopher R. Cooper on 2/12/2024. (lccrc3) (Entered: 02/12/2024) | |
| | 02/12/2024 | MINUTE ORDER granting 11 Plaintiff's Sealed Motion for Leave to File Document Under Seal and 13 Plaintiff's Motion for Leave to | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | File Excess Pages. Signed by Judge Christopher R. Cooper on 2/12/2024. (lccrc3) (Entered: 02/12/2024) | |
| 44 | 03/08/2024 | ANSWER to 10 Amended Complaint by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO.(Ehrlich, Stephen) (Entered: 03/08/2024) | |
| 45 | 03/08/2024 | MOTION for Judgment on the Pleadings by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Ehrlich, Stephen) (Entered: 03/08/2024) | |
| 46 | 03/14/2024 | Joint MOTION for Briefing Schedule by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Attachments: # 1 Text of Proposed Order)(Ehrlich, Stephen) (Entered: 03/14/2024) | |
| | 03/18/2024 | MINUTE ORDER granting the 46 Joint Motion for Briefing Schedule. Plaintiff shall file her opposition to 45 Defendants' Motion for Judgment on the Pleadings by April 5, 2024. Defendants shall file their reply by April 19, 2024. Signed by Judge Christopher R. Cooper on 3/18/2024. (lccrc3) (Entered: 03/18/2024) | |
| 47 | 04/05/2024 | Memorandum in opposition to re 45 MOTION for Judgment on the Pleadings filed by PAULINE NEWMAN. (Dolin, Gregory) Modified on 4/11/2024 to correct event (zjm). (Entered: 04/05/2024) | |
| 48 | 04/18/2024 | REPLY to opposition to motion re 45 MOTION for Judgment on the Pleadings filed by JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT AND ALL MEMBERS THEREOF, KIMBERLY A. MOORE, SHARON PROST, RICHARD G. TARANTO. (Zee, Michael) (Entered: 04/18/2024) | |
| 49 | 07/09/2024 | ORDER granting 45 Defendants' Motion for Judgment on the Pleadings. See full Order and accompanying Memorandum Opinion for details. Signed by Judge Christopher R. Cooper on 7/9/2024. (lccrc3) (Entered: 07/09/2024) | |
| 50 | 07/09/2024 | MEMORANDUM OPINION re 49 Order granting 45 Defendants' Motion for Judgment on the Pleadings. Signed by Judge Christopher R. Cooper on 7/9/2024. (lccrc3) (Entered: 07/09/2024) | |
| 51 | 07/10/2024 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 49 Order on Motion for Judgment on the Pleadings by PAULINE NEWMAN. Filing fee $ 605, receipt number ADCDC-11017011. Fee Status: Fee Paid. Parties have been notified. (Dolin, Gregory) (Entered: 07/10/2024) | |
| 52 | 07/11/2024 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 51 Notice of Appeal to DC Circuit Court. (zjm) (Entered: 07/11/2024) | |
| | 07/18/2024 | USCA Case Number 24-5173 for 51 Notice of Appeal to DC Circuit Court filed by PAULINE NEWMAN. (zjm) (Entered: 07/22/2024) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

**JA6**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE HON. PAULINE NEWMAN,
Circuit Judge
United States Court of Appeals
for the Federal Circuit
717 Madison Place, NW
Washington, DC 20005,

*Plaintiff*,

v.

CIVIL CASE NO. 23-cv-1334

THE HON. KIMBERLY A. MOORE,
in her official capacities as
Chief Judge of the United States Court of Appeals
for the Federal Circuit,
Chair of the Judicial Council of the Federal Circuit,
and
Chair of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

THE HON. SHARON PROST,
in her official capacity as
Member of the Special Committee of the Judicial Council of
the Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

THE HON. RICHARD G. TARANTO,
in his official capacity as
Member of the Special Committee of the Judicial Council of
the Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

**JA7**

and

THE JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT
AND ALL MEMBERS THEREOF,
in their official capacities,
717 Madison Place, NW
Washington, DC 20005,

*Defendants.*

## **INTRODUCTION**

Plaintiff, The Honorable Pauline Newman, brings this action for declaratory and injunctive

relief against Defendants The Hon. Kimberly A. Moore, in her official capacities as Chief Judge

of the United States Court of Appeals for the Federal Circuit, Chair of the Judicial Council of the

Federal Circuit, and Chair of the Special Committee of the Judicial Council of the Federal Circuit,

The Hon. Sharon Prost, in her official capacity as Member of the Special Committee of the Judicial

Council of the Federal Circuit, The Hon. Richard G. Taranto, in his official capacity as Member

of the Special Committee of the Judicial Council of the Federal Circuit, and the Judicial Council

of the Federal Circuit.  As grounds therefor, Plaintiff alleges as follows:

## **JURISDICTION AND VENUE**

1.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

**JA8**

## **PARTIES**

3. Plaintiff Pauline Newman is a Presidentially-appointed, Senate-confirmed federal Circuit Judge of the United States Court of Appeals for the Federal Circuit ("Federal Circuit").

4. Defendant Kimberly A. Moore serves as Chief Judge of the Federal Circuit and, in that capacity, is chair of the Federal Circuit's Judicial Council. Chief Judge Moore became the Chief Judge of the Federal Circuit pursuant to operation of law, 28 U.S.C. § 45(a), on May 22, 2021. In addition to these roles, Chief Judge Moore chairs a "special committee" investigating the complaint against Judge Newman—a complaint which Chief Judge Moore herself initiated. Chief Judge Moore is being sued in her official capacities as Chief Judge of the United States Court of Appeals for the Federal Circuit, Chair of the Judicial Council of the Federal Circuit, and Chair of the Special Committee of the Judicial Council of the Federal Circuit.

5. Defendant Sharon Prost serves as Circuit Judge of the Federal Circuit and was appointed by Chief Judge Moore to be one of the members of the special committee investigating the complaint against Judge Newman. Judge Prost is being sued in her official capacity as Member of the Special Committee of the Judicial Council of the Federal Circuit.

6. Defendant Richard G. Taranto serves as Circuit Judge of the Federal Circuit and was appointed by Chief Judge Moore to be one of the members of the special committee investigating the complaint against Judge Newman. Judge Taranto is being sued in his official capacity as Member of the Special Committee of the Judicial Council of the Federal Circuit.

7. Defendant Judicial Council of the Federal Circuit ("Judicial Council") is the administrative body of the U.S. Court of Appeals for the Federal Circuit and consists of all active-duty judges of that Court. The Judicial Council is responsible for, *inter alia*, receiving and reviewing reports by special committees charged with investigating complaints of judicial misconduct

and/or disability filed under the Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 351-64 ("the Act"). The Judicial Council derives its authority from §§ 332 and 352-54 of the Act and Rules 18-20 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings.

8.  The Judicial Council is unique among all circuit judicial councils because unlike the other circuit judicial councils which consist of a rotating mixture of circuit and district judges, the Judicial Council of the Federal Circuit consists exclusively of the judges of the Federal Circuit who serve as members of the Judicial Council throughout their tenure on that Court.

## STATEMENT OF FACTS

9.  Judge Newman was the first-ever judge appointed directly to the Federal Circuit by President Ronald Reagan on January 30, 1984.  She was confirmed to the seat less than a month later by a voice vote.  She received her commission as a Circuit Judge on February 28, 1984.

10. Since 1984, Judge Newman continued to faithfully, diligently, and meticulously exercise the duties of her office, to recognition and acclaim.  In 2018, she was named "one of the 50 most influential people in the IP world" by Managing IP Magazine.

11. At all relevant times, Judge Newman has been and is in sound physical and mental health.  She has authored majority and dissenting opinions in the whole range of cases before her Court, has voted on petitions for rehearing *en banc*, and has joined in the *en banc* decisions of the Court.

12. In the course of her continuing service as an active-status Circuit Judge, Judge Newman has authored hundreds of majority, concurring, and dissenting opinions.  Often, Judge Newman's dissenting opinions are adopted by the Supreme Court in its frequent reversals of the Federal Circuit.

13. At all relevant times, Judge Newman has been willing and able to fully participate in the work of the Court and, consistent with the Court's internal practice and procedures for active-status judges, has requested to be assigned to the regular panel sittings of the Court.

14. In early March 2023, Chief Judge Moore met with Judge Newman for about 45 minutes and attempted to coax Judge Newman into retirement.  Judge Newman declined Judge Moore's entreaties.

15. On or about March 17, 2023, Chief Judge Moore drafted an order in which she, pursuant to Rule 5 of the Rules of Judicial Conduct and Judicial Disability Proceedings ("Conduct Rules"), "identified a complaint" against Judge Newman alleging that there is a "probable cause to believe that Judge Newman 'has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts' an/or 'is unable to discharge all the duties of office by reason of mental or physical disability.'"

16. Chief Judge Moore offered not to "docket" the complaint were Judge Newman to agree to an "informal resolution" consisting of retiring from the Court.  When Judge Newman declined to do so, on or about March 24, 2023, Chief Judge Moore "docketed" the Order ("March 24 Order") and began the formal investigative process under Rule 11 of the Conduct Rules.

17. The March 24 Order, which served as the basis for launching the disciplinary process and purportedly contained "probable cause to believe that Judge Newman 'has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts' and/or 'is unable to discharge all the duties of office by reason of mental or physical disability,'" is riddled with errors.  For example, the March 24 Order alleges that "[i]n the summer of 2021, Judge Newman, at the age of 94, was hospitalized after suffering a heart attack and having to undergo coronary stent surgery."  During the period (June 2021 through September 2021)

when Chief Judge Moore claims that Judge Newman suffered a heart attack, Judge Newman sat on ten panels and issued at least eight (including majority, concurring, and dissenting) opinions.  Had Judge Newman suffered a heart attack, it would be extremely unusual for anyone, let alone a 94-year-old person, to serve throughout that period without skipping a beat (so to speak).  Besides which, even were the allegation true, having coronary artery disease is simply irrelevant to one's ability to be able to carry out judicial functions.

18. Even more problematic (as these facts were readily available to Chief Judge Moore upon even a cursory inspection) is the allegation in the March 24 Order that "[b]ecause [of] those health issues, [Judge Newman's] sittings were reduced compared to her colleagues."  To the contrary, in the summer of 2021, Judge Newman was a member of *ten* different panels of the Court— more than any other colleague but two.

19. Upon the issuance of the March 24 Order, Chief Judge Moore appointed a special committee consisting of herself, Circuit Judge Sharon Prost, and Circuit Judge Richard G. Taranto.  Chief Judge Moore selected herself to chair the special committee to investigate her own complaint.

20. Before any evidence was taken, hearings held, or reports written, Chief Judge Moore unconstitutionally and unilaterally removed Circuit Judge Newman from all future sittings of the Court.  In an email sent on April 5, 2023, and CC'ed to all judges of the Court, Chief Judge Moore confirmed that Judge Newman, though an active-status member of the Court, "will not be assigned any new cases until these [disciplinary] proceedings are resolved."  Chief Judge Moore stated that this was a unanimous decision of Judge Newman's colleagues.  No legal basis or precedent for such an action or decision has ever been provided.

21. Judge Newman has not been assigned to sit on any panels of the Court for the May, June, and July 2023 sittings, despite repeatedly requesting such assignments.

22. On or about April 6, 2023, Chief Judge Moore issued a new and virtually unprecedented order ("April 6 Order") expanding the scope of the special committee's investigation into Judge Newman's alleged "disability" and "misconduct" to include the questions of internal operations of Judge Newman's chambers.

23. On April 7, 2023, the special committee issued an order ("April 7 Order") demanding that Judge Newman submit to neurological and neuropsychological examinations before physicians of the special committee's choosing.  The order was based in part on the special committee's alleged "direct observations of Judge Newman's behavior."  The April 7 Order afforded Judge Newman, who at that time was still not represented by counsel, a mere *three days* to comply with the request.  Contrary to the Commentary to Rule 13 of the Conduct Rules, no attempt to "enter into an agreement with [Judge Newman] as to the scope and use that may be made of the examination results" was made.  The April 7 Order did not specify either the scope of the requested examination nor any limits on the use of examination results.

24. On April 13, 2023, Chief Judge Moore, claiming that the failure to respond to the unreasonably short three-day deadline set forth in the April 7 Order constituted "sufficient cause to believe that Judge Newman [engaged in] additional misconduct," issued an order ("April 13 Order") further expanding the scope of investigation.

25. On April 17, 2023, the special committee entered yet another order, this time demanding that Judge Newman share private medical records regarding medical events identified in the March 24 Order.  The special committee once again set an unreasonably short response deadline of *four days*.  Furthermore, because the events to which this order referred (*i.e.*, "heart attack" and "coronary stents"), even if they had transpired, are not relevant to any questions pending

**JA13**

before the special committee or the Judicial Council, these requests constitute a baseless invasion into Judge Newman's constitutionally and statutorily protected privacy interests.

26. On April 19, 2023, Chief Judge Moore unilaterally reassigned Judge Newman's judicial assistant/paralegal to another office.  Chief Judge Moore refused to permit Judge Newman to hire a replacement judicial assistant, thus leaving her office short-staffed.  This has greatly impaired Judge Newman's ability to accomplish her judicial duties such as processing her opinions, answering phone calls and emails from her colleagues and the like.  To date, Chief Judge Moore refuses to authorize a search for a new judicial assistant.

27. On the same date, Chief Judge Moore unilaterally reassigned one of Judge Newman's law clerks to the chambers of another Judge.  Given the strained relationship that developed between Judge Newman and this law clerk, Judge Newman responded by email that terminating that law clerk's employment in her chambers was "appropriate."  She, however, did not consent to the law clerk being reassigned to another chambers.  Chief Judge Moore has refused to authorize Judge Newman to hire a replacement law clerk, even though Judge Newman remains an active judge of the Federal Circuit, and is statutorily entitled to four law clerks and a judicial assistant.

28. On April 20, 2023, Chief Judge Moore issued a new order once again expanding the scope of investigation, this time to cover matters concerning the internal workings of Judge Newman's chambers.  The complaint alleged, *inter alia*, that Judge Newman's refusal to assign her own law clerk to another judge's chambers—a highly unusual, if not unprecedented practice—likely constituted misconduct.

29. On April 21, Judge Newman, now represented by the undersigned counsel, sent a letter to Chief Judge Moore and the remaining members of the special committee requesting immediate

restoration of Judge Newman to the hearing calendar as well as a transfer of the identified complaint to a different Judicial Council as contemplated by Rule 26 of Conduct Rules. Judge Newman explained that basic norms of due process cannot permit the same individuals to be accusers, witnesses, rapporteurs, and adjudicators of a complaint against her.

30. The letter to Chief Judge Moore cited opinions of leading judicial ethics experts who have unequivocally stated that in these circumstances transfer to another circuit's judicial council is necessary.

31. The letter to Chief Judge Moore and other members of the special committee reiterated that Judge Newman "will not fail to cooperate with any investigation that is conducted consistent with the limits that the Constitution, the Judicial Disability Act of 1980, and the Rules for Judicial Conduct and Judicial Disability Proceedings place on such investigations."

32. At and around the time the undersigned counsel sent the letter to Chief Judge Moore, the story about the investigation and the surrounding events began to be reported in the press, academic, and legal community. In response to these reports, the Judicial Council confirmed the existence of an investigation into Judge Newman and published the March 24 Order (in a redacted form) and the April 13 Order on the Federal Circuit's website.

33. On May 3, 2023, the special committee issued two orders. The first order ("Gag Order") was in effect a gag order threatening Judge Newman and her counsel with sanctions should any of them publicize the ongoing investigation. The order intimated that even if Judge Newman were to agree to disclose the materials pursuant to Rule 23(b)(7) of the Conduct Rules, Chief Judge Moore would withhold her consent for the same.

34. Commentary to Rule 23 states that "[o]nce the subject judge has consented to the disclosure of confidential materials related to a complaint, the chief judge ordinarily will refuse consent *only*

**JA15**

to the extent necessary to protect the confidentiality interests of the complainant or of witnesses." (emphasis added).  Thus, threats to withhold consent to release information even with Judge Newman's agreement are contrary to the process contemplated by the Conduct Rules.

35. The second order issued on May 3, 2023 ("May 3 Order") by the special committee denied the request for transfer, without addressing the manifest due process concerns.  The May 3 Order again ordered Judge Newman to submit to neurological and neuropsychological examinations before physicians of the special committee's choosing.  The Order also rejected Judge Newman's suggestions that she and the special committee "enter into an agreement … as to the scope and use that may be made of the examination results."  Finally, the May 3 Order again required Judge Newman to surrender medical records including for events that have never occurred.  The May 3 Order threatened Judge Newman with expanding the scope of investigation unless she indicated her consent to the examination by 9:00 am on May 10, 2023.

36. Though there is no emergency with respect to any investigative proceeding, except to restore an active member of the federal judiciary who has been unlawfully deprived from hearing cases this month (and for the next two months unless and until the calendar is altered), the May 3 Order afforded Judge Newman merely seven days to respond.  In contrast, the Federal Rules of Appellate Procedure afford ten days for any party to respond to any motion and the Federal Rules of Civil Procedure permit fourteen days for a response.  While investigations into judicial misconduct or disability are not governed by the Federal Rules of Appellate Procedure or Rules of Civil Procedure, both of those documents serve as a useful reference for what the guarantee of due process entails.  The undue haste with which the special committee is proceeding is indicative of the denial of due process.

37. Judge Newman does not, in principle, object to undergoing a medical evaluation, if there is a sufficient and sound scientific basis for requesting the same; however, she objects to not being able to select or even participate in the selection of a medical professional to examine her, and to having no input into the scope of the medical investigation. The special committee's refusal to even engage in the process of attempting to define the scope of the examination and selection of a qualified professional, as well as its demand to submit to the examination on an expedited basis, are contrary to the requirements of the Conduct Rules and the guarantees of due process.

38. If and when the special committee proceeds to a hearing as contemplated by Rules 14(b) and 15(c), Judge Newman intends to call, and compel witness testimony from each member of the Judicial Council as is her right under the aforementioned rules.

39. While the special committee has been pursuing its investigation, Judge Newman has issued several opinions in previous cases, even though Chief Judge Moore's actions interfered with the normal operations of Judge Newman's chambers. Thus, on March 22, 2023, Judge Newman wrote an eighteen-page opinion for the Court in *Military-Veterans Advocacy, Inc. v. Sec'y of Veterans Affairs*, ___ F.4th ___, No. 20-1537 (Fed. Cir. 2023). On March 6, 2023, Judge Newman delivered a seven-page dissenting opinion in *May v. McDonough*, ___ F.4th ___, No. 22-1803 (Fed. Cir. 2023). On March 31, 2023, Judge Newman filed a four-page dissenting opinion from the Court's opinion in *Roku Inc. v. Univ. Elecs., Inc.*, ___ F.4th ___, No. 22-1058 (Fed. Cir. 2023), and on April 6, 2023, Judge Newman filed a fifteen-page dissenting opinion in *SAS Inst. v. World Programming Ltd.*, ___ F.4th ___, No. 21-1542 (Fed. Cir. 2023). These opinions have been praised by the various members of the bar, and nothing therein even hints at any mental disability.

**JA17**

40. Judge Newman has also continued to participate in *en banc* decisions of the Court with no indication of any mental or physical disability.  Thus, she joined the *en banc* portion of the opinion in *Moore v. United States*, ___ F.4th ___, No. 22-1475 (Fed. Cir. 2023).  Judge Newman also participated in the poll to take up the matter *en banc*.  There appears to have been no objections to this participation by any members of the Federal Circuit bench or bar.

41. As recently as late 2022 or early 2023, Chief Judge Moore effusively praised Judge Newman's abilities and insight, writing in the American Intellectual Property Association Quarterly Journal that "Among patent practitioners, Judge Newman is particularly well-known for her insightful dissents, which have often been vindicated by the Supreme Court."  Chief Judge Moore then listed several cases where the Supreme Court, in reversing the Federal Circuit, "adopt[ed] essentially the reasoning of Judge Newman's dissent."

42. An empirical study, attached hereto as Exhibit A, shows that in "the three-year period of January 1, 2020 to December 31, 2022," Judge Newman's deviation from the average productivity and timeliness among the active judges of the Federal Circuit was not statistically significant.  These data also show that there has been no difference in Judge Newman's timeliness or productivity between 2020 and late 2022.  This is noteworthy because Chief Judge Moore's original "identification of the complaint" is predicated in large part on Judge Newman's alleged lack of sufficient output as compared to her colleagues.  The empirical data stand in sharp contrast to these false allegations.

## CLAIMS FOR RELIEF

### Count I: Improper Removal, Violation of Separation of Powers

43. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

44. The Constitution provides that "Judges, both of the supreme and inferior Courts, shall hold

**JA18**

their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const. art. III, § 1.   The Constitution also provides that "[t]he House of Representatives … shall have the sole Power of Impeachment," and that "[t]he Senate shall have the sole Power to try all Impeachments."   U.S. Const. art. I, §§ 2, 3.   In light of these provisions, no executive or judicial agency or body may exercise, in form or in substance, the impeachment power reserved by the Constitution to the House and Senate.   Nor may any executive or judicial agency or body be delegated—or arrogate to itself—the impeachment power which the Constitution reserves to the House and Senate.

45. Defendants' orders and threats constitute an attempt to remove Plaintiff from office—and already have unlawfully removed her from hearing cases—without impeachment and in violation of the Constitution, in substance if not form, by, *inter alia*, (a) refusing to assign Plaintiff any new cases and threatening to forbid the assignment of new cases to her; (b) removing, without Plaintiff's consent, judicial staff Plaintiff is statutorily authorized to retain and refusing authorization to hire replacement staff; (c) interfering with Plaintiff's abilities to administer her own chambers; (d) ordering Plaintiff to undergo an involuntary mental health examination without a sufficient basis or legal authority for doing so, by physicians unknown to and unapproved by Plaintiff, as set forth in this Complaint; and (e) ordering that the scope of the investigation into Plaintiff's conduct be expanded, merely because Plaintiff requires time to properly evaluate and answer special committee requests.

46. Plaintiff has been and will continue to be irreparably harmed unless and until (a) Defendants' orders excluding Plaintiff from regular duties of an Article III judge and their threats to continue with such exclusion are declared to be unconstitutional and enjoined; and (b)

Defendants are enjoined from requiring Plaintiff to refrain from publicizing the proceedings against her and publicly defending herself from the outrageous complaint lodged against her.

47. Plaintiff has no adequate remedy at law.

### Count II: *Ultra Vires* – Improper Removal, Violation of Separation of Powers

48. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

49. To the extent that the Judicial Disability Act of 1980 is constitutional, it authorizes the Judicial Council, upon *conclusion* of a special committee's investigation and receipt of a report from such a committee, to "order[] that, on a temporary basis for a time certain, no further cases be assigned to the judge whose conduct is the subject of a complaint." 28 U.S.C. § 354(a)(2)(A)(i).  Neither the Act nor the Conduct Rules authorize either a Chief Judge acting alone, nor a judicial council of any circuit, to issue any orders or directives which have an effect of precluding an active Article III judge from being assigned cases in regular order while an investigation is still underway.  "Sentence first—verdict afterwards" is a notorious and textbook example of deprivation of due process known even to children's literature.

50. Defendants' orders excluding Plaintiff from regular duties of an Article III judge and threats to continue with such exclusion constitute an attempt to remove Plaintiff from office, without impeachment and in violation of the Constitution, in substance if not form, by, *inter alia*, (a) refusing to assign Plaintiff any new cases and threatening to forbid the assignment of new cases to her; (b) removing, without Plaintiff's consent, judicial staff Plaintiff is statutorily authorized to retain and refusing authorization to hire replacement staff; (c) ordering Plaintiff to undergo an involuntary mental health examination without a sufficient basis or legal authority for doing so, by physicians unknown to and unapproved by Plaintiff, as set forth in this Complaint; (d) interfering with Plaintiff's abilities to administer her own chambers; and

(e) ordering that the scope of the investigation into Plaintiff's conduct be expanded, merely because Plaintiff requires time to properly evaluate and answer special committee requests.

51. Plaintiff has been and will continue to be irreparably harmed unless and until (a) Defendants' orders excluding Plaintiff from regular duties of an Article III judge and their threats to continue with such exclusion are declared to be contrary to statutory law and enjoined; and (b) Defendants are enjoined from requiring Plaintiff to refrain from publicizing the proceedings against her and publicly defending herself from the outrageous complaint lodged against her.

52. Plaintiff has no adequate remedy at law.

### Count III: Fifth Amendment – As Applied Due Process of Law Violation

53. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

54. Defendants' continued investigation into Plaintiff's conduct violates the fundamental principles of due process because the special committee is composed of witnesses to Plaintiff's alleged disability.  The March 24 Order and May 3 Order specifically reference, as basis for the beginning and continuing investigation the "personal observations" of the special committee members and other members of the Judicial Council.  It has been established for centuries that one cannot serve as a "judge in his own cause."  Permitting the Judicial Council and its special committee to continue the disciplinary proceedings against Plaintiff in a case where all members of the Judicial Council are actual or potential witnesses violates Plaintiff's Fifth Amendment right to due process of law.

55. Plaintiff has been and will continue to be irreparably harmed unless and until Defendants' violation of her Fifth Amendment right to due process of law is declared unconstitutional and Defendants are enjoined from continuing their investigation into Plaintiff, except

insofar as any actions are required to transfer this matter to a judicial council of another circuit.

56. Plaintiff has no adequate remedy at law.

**Count IV: First Amendment Violation – Unlawful Prior Restraint**

57. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

58. The First Amendment guarantees to everyone, including federal judges, freedom of speech and generally prohibits prior restraint on speech.  U.S. Const. am. I; *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022).  It is well settled that "gag orders" are prior restraints under the First Amendment, *Alexander v. United States*, 509 U.S. 544, 550 (1993).  They thus bear "a heavy presumption against [their] constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963), and are subject to strict scrutiny, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

59. The Gag Order forbids Plaintiff or her attorneys from engaging in any speech that would in any way publicize the ongoing disciplinary proceedings against Plaintiff, thus imposing a prior restraint.  Such orders cannot be justified even in judicial proceedings unless there is a likelihood that "publicity, unchecked, would so distort the views of potential jurors that [they could not] fulfill their sworn duty to render a just verdict exclusively on the evidence … ."  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 569 (1976).  Because there is no danger that judicial officers with life tenure would be so influenced by any amount of publicity as to be unable to discharge their duties, the Gag Order cannot survive strict scrutiny and thus violates the First Amendment.

60. Plaintiff has been and will continue to be irreparably harmed unless and until Defendants' Gag Order is declared to be unconstitutional as in violation of her First Amendment right to

free speech and Defendants are enjoined from requiring Plaintiff to refrain from publicizing the proceedings against her and publicly defending herself from the outrageous complaint lodged against her.

61. Plaintiff has no adequate remedy at law.

**Count V: _Ultra Vires_ – Unlawful Prior Restraint**

62. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

63. The Conduct Rules, to the extent they are themselves constitutional, permit a judge who is subject to disciplinary proceedings, with consent of the relevant Chief Judge, to publicly disclose all matters related to such proceedings except insofar as "the confidentiality interests of the complainant or of witnesses" are at issue.  _See_ Commentary to Rule 23.

64. Plaintiff has consented to such a disclosure; however, the Gag Order states that Chief Judge Moore is under no obligation to do so, despite the Commentary to the relevant rule stating that "[o]nce the subject judge has consented to the disclosure of confidential materials related to a complaint, the chief judge ordinarily will refuse consent _only_ to the extent necessary to protect the confidentiality interests of the complainant or of witnesses."

65. Defendant Chief Judge Moore's refusal to consent to the disclosure of the materials relevant to the disciplinary process against Plaintiff, except insofar as "the confidentiality interests of the complainant or of witnesses" is contrary to the Conduct Rules and _ultra vires_.

66. Plaintiff has been and will continue to be irreparably harmed unless and until Defendants' Gag Order is declared to be _ultra vires_ as in violation of her rights under the Conduct Rules and Defendants are enjoined from requiring Plaintiff to refrain from publicizing the proceedings against her and publicly defending herself from the outrageous complaint lodged against her.

67. Plaintiff has no adequate remedy at law.

## Count VI: Fifth Amendment – Unconstitutional Vagueness of the Act's Disability Provision

68. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

69. Plaintiff has liberty and property interests in the outcome of any misconduct or disability proceeding against her.  She also has liberty and property interests in not being subjected to an involuntary medical or psychiatric examination and further liberty and property interests in not being stigmatized as having committed misconduct and having her mental health questioned, as well as having her status as an Article III judge altered by ordering her to undergo a compelled medical or psychiatric evaluation by physicians not chosen by her and who are unknown to her.  Under the Fifth Amendment to the United States Constitution, Plaintiff cannot be deprived of her liberty and property interests without due process of law.

70. Plaintiff further has liberty and property interests in her private medical records, and those interests may not be invaded by requiring her to surrender these same records to an investigative authority absent due process of law.

71. The Act is unconstitutionally vague and violates the Due Process Clause of the Fifth Amendment because, *inter alia*, it fails to provide adequate notice of what constitutes a mental disability that renders a judge "unable to discharge all the duties of office."  It also is unconstitutionally vague and violates the Due Process Clause because it lacks minimal enforcement guidelines identifying when an Article III judge may be subject to a disability investigation, and, accordingly, when an Article III judge may be disciplined for objecting in good faith to undergoing a compelled medical or psychiatric examination or surrendering private medical records as part of an investigation into whether she suffers from a disability rendering her unable to discharge her duties.

72. Defendants' enforcement of the Act's unconstitutionally vague disability provisions against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from a) enforcing any orders excluding Plaintiff from regular duties of an Article III judge; (b) requiring Plaintiff to refrain from publicizing the proceedings against her and publicly defending herself from the outrageous complaint lodged against her; and c) requiring Plaintiff to undergo a compelled medical or psychiatric examination and/or surrendering private medical records and disciplining Plaintiff for objecting in good faith to these demands.

73. Plaintiff has no adequate remedy at law.

### Count VII: *Ultra Vires*, Unconstitutional Examinations

74. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

75.  Neither the Act nor the U.S. Constitution authorizes compelling an Article III judge to undergo a medical or psychiatric examination or to surrender to any investigative authority her private medical records in furtherance of an investigation into whether the judge suffers from a mental or physical disability that renders her unable to discharge all the duties of office.

76. As Defendants have neither statutory nor constitutional power to compel Plaintiff to undergo an involuntary medical or psychiatric examination, or to compel Plaintiff to surrender her private medical records, the imposition of these requirements on Plaintiff are *ultra vires* and unconstitutional, as is disciplining Plaintiff for objecting to the same.

77. Defendants' *ultra vires* and unconstitutional acts have caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until they are declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled

medical or psychiatric examination and/or surrendering private medical records and disciplining Plaintiff for objecting in good faith to these demands.

78. Plaintiff has no adequate remedy at law.

## Count VIII: Fifth Amendment – Unconstitutional Vagueness of the Act's Investigative Authority

79. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

80. The Act is unconstitutionally vague to the extent it purports to authorize compelled medical or psychiatric examinations of Article III judges or demands from special committees for Article III judges to surrender their private medical records. Section 353(c) of the Act, which authorizes a special committee to conduct an investigation "as extensive as it considers necessary," lacks minimal enforcement guidelines identifying the circumstances under which an Article III judge may be compelled to undergo a medical or psychiatric examination or surrender her private medical records. It vests virtually complete discretion in the hands of a special committee to determine when the compliance with such demands may be compelled. Consequently, the Act violates the due process protections of the Fifth Amendment and impermissibly intrudes on judicial independence.

81. Defendants' enforcement of the Act's unconstitutionally vague investigative provision against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled medical or psychiatric examination and/or surrendering private medical records and disciplining Plaintiff for objecting in good faith to these demands.

82. Plaintiff has no adequate remedy at law.

**Count IX: Fourth Amendment – Unconstitutional Search**

83. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

84.  Plaintiff enjoys the right to be secure in her person and effects against unreasonable search and seizures, as guaranteed by the Fourth Amendment to the U.S. Constitution.

85. A compelled medical or psychiatric examination constitutes a search and seizure for purposes of the Fourth Amendment and therefore must satisfy minimum standards of constitutional reasonableness to be lawful.

86. The Act violates the Fourth Amendment to the extent it authorizes a compelled medical or psychiatric examination of an Article III judge without a warrant based on probable cause and issued by a neutral judicial official or a demonstration of constitutional reasonableness.

87. Defendants' enforcement of the unconstitutional Act against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled medical or psychiatric examination and disciplining Plaintiff for objecting in good faith to these demands.

88. Plaintiff has no adequate remedy at law.

**Count X: Fourth Amendment – Unconstitutional Search**

89. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

90. Plaintiff enjoys the right to be secure in her person and effects against unreasonable search and seizures, as guaranteed by the Fourth Amendment to the U.S. Constitution.

91. A compelled surrender of private medical records constitutes a search and seizure for purposes of the Fourth Amendment and therefore must satisfy minimum standards of constitutional reasonableness to be lawful.

92. The Act violates the Fourth Amendment to the extent it authorizes a compelled surrender of medical records belonging to an Article III judge without a warrant based on probable cause and issued by a neutral judicial official or a demonstration of constitutional reasonableness.

93. Defendants' enforcement of the unconstitutional Act against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to surrender her private medical records and disciplining Plaintiff for objecting in good faith to these demands.

94. Plaintiff has no adequate remedy at law.

### Count XI: Fourth Amendment – As Applied Challenge

95. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

96. Defendants lack either a warrant issued on probable cause by a neutral judicial official or a constitutionally reasonable basis for requiring Plaintiff to submit to an involuntary medical or psychiatric examination.  Accordingly, compelling Plaintiff to undergo an involuntary medical or psychiatric examination violates Plaintiff's Fourth Amendment rights.

97. Defendants' enforcement of the unconstitutional Act against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled medical or psychiatric examination and disciplining Plaintiff for objecting in good faith to these demands.

98. Plaintiff has no adequate remedy at law.

### Count XII: Fourth Amendment – As Applied Challenge

99. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

100.    Defendants lack either a warrant issued on probable cause by a neutral judicial official or a constitutionally reasonable basis for requiring Plaintiff to surrender her private medical records none of which bear on her fitness to continue serving as an Article III judge. Accordingly, compelling Plaintiff to surrender her private medical records violates Plaintiff's Fourth Amendment rights.

101.    Plaintiff has been and will continue to be irreparably harmed unless and until Defendants' violation of her Fourth Amendment rights is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to surrender her private medical records and disciplining Plaintiff for objecting in good faith to these demands.

102.    Plaintiff has no adequate remedy at law.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff respectfully requests that the Court: (1) declare the Act to be unconstitutional, either in whole or in part and enjoin Defendants from enforcing the Act to the extent it is unconstitutional; (2) declare any continued proceedings against Plaintiff by the Judicial Council of the Federal Circuit to be unconstitutional as violative of due process of law and enjoin Defendants from continuing any such proceedings, except to the extent necessary to transfer the matter to a judicial council of another circuit; (3) order the termination of any further investigation of Plaintiff by the Judicial Council of the Federal Circuit; (4) declare any decisions by any and all Defendants authorizing a limitation of Plaintiff's docket or other special restrictions on her actions as a federal judge, including, but not limited to the reduction in statutorily authorized number of staff to be unconstitutional and/or not in accordance with the law, and enjoin Defendants from continuing any such actions; (5) declare any orders precluding Plaintiff from publicizing or otherwise speaking about the ongoing disciplinary proceedings to be unconstitutional and/or not

in accordance with the law and enjoin Defendants from enforcing the foregoing unconstitutional orders; (6) declare any orders of the special committee requiring Plaintiff to undergo a compelled medical or psychiatric examination and/or disciplining Plaintiff for objecting in good faith to these demands to be unconstitutional and enjoin Defendants from enforcing the foregoing unconstitutional orders; (7) declare any orders of the special committee requiring Plaintiff to surrender her private medical records and/or disciplining Plaintiff for objecting in good faith to these demands to be unconstitutional and enjoin Defendants from enforcing the foregoing unconstitutional orders; (8) award Plaintiff reasonable attorneys' fees and costs; and (9) grant Plaintiff such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of any triable issues.

May 10, 2023

Respectfully submitted,

/s/  John J. Vecchione

JOHN J. VECCHIONE (DC Bar No. 431764)
Senior Litigation Counsel
GREGORY DOLIN, *Pro Hac Vice Forthcoming*
Senior Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
john.vecchione@ncla.legal

**JA30**

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

THE HON. PAULINE NEWMAN,
Circuit Judge
United States Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20005,

                                        *Plaintiff,*

          v.

THE HON. KIMBERLY A. MOORE,
in her official capacities as
Chief Judge of the U.S. Court of Appeals for the Federal Circuit,
Chair of the Judicial Council of the Federal Circuit, and
Chair of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

THE HON. SHARON PROST,
in her official capacity as
Member of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

THE HON. RICHARD G. TARANTO,
in his official capacity as
Member of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

and

THE JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT,
717 Madison Place, NW
Washington, DC 20005,

                                        *Defendants.*

NO. 1:23-cv-01334-CRC

FIRST AMENDED COMPLAINT

## INTRODUCTION

Plaintiff, The Honorable Pauline Newman, brings this action for declaratory and injunctive

relief against Defendants The Hon. Kimberly A. Moore, in her official capacities as Chief Judge of the

**JA31**

United States Court of Appeals for the Federal Circuit, Chair of the Judicial Council of the Federal Circuit, and Chair of the Special Committee of the Judicial Council of the Federal Circuit, The Hon. Sharon Prost, in her official capacity as Member of the Special Committee of the Judicial Council of the Federal Circuit, The Hon. Richard G. Taranto, in his official capacity as Member of the Special Committee of the Judicial Council of the Federal Circuit, and the Judicial Council of the Federal Circuit.  As grounds therefor, Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

## PARTIES

3.  Plaintiff Pauline Newman is a Presidentially-appointed, Senate-confirmed active federal Circuit Judge of the United States Court of Appeals for the Federal Circuit ("Federal Circuit").

4.  Defendant Kimberly A. Moore serves as Chief Judge of the Federal Circuit and, in that capacity, is chair of the Federal Circuit's Judicial Council. Chief Judge Moore became the Chief Judge of the Federal Circuit pursuant to operation of law, 28 U.S.C. § 45(a), on May 22, 2021.  In addition to these roles, Chief Judge Moore chairs a "Special Committee" investigating the complaint against Judge Newman—a complaint which Chief Judge Moore herself initiated under Rule 5 of the Rules of Judicial Conduct and Judicial Disability Proceedings ("Conduct Rules").  Chief Judge Moore is being sued in her official capacities as Chief Judge of the United States Court of Appeals for the Federal Circuit, Chair of the Judicial Council of the Federal Circuit, and Chair of the Special Committee of the Judicial Council of the Federal Circuit.

5.   Defendant Sharon Prost serves as Circuit Judge of the Federal Circuit and was appointed by Chief Judge Moore to be one of the members of the Special Committee investigating the complaint

**JA32**

against Judge Newman.  Judge Prost is being sued in her official capacity as Member of the Special Committee of the Judicial Council of the Federal Circuit.

6. Defendant Richard G. Taranto serves as Circuit Judge of the Federal Circuit and was appointed by Chief Judge Moore to be one of the members of the Special Committee investigating the complaint against Judge Newman.  Judge Taranto is being sued in his official capacity as Member of the Special Committee of the Judicial Council of the Federal Circuit.

7. Defendant Judicial Council of the Federal Circuit ("Judicial Council") is the administrative body of the U.S. Court of Appeals for the Federal Circuit and consists of all active-duty judges of that Court.  The Judicial Council is responsible for, *inter alia*, receiving and reviewing reports by Special Committees charged with investigating complaints of judicial misconduct and/or disability filed under the Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 351-64 ("the Act"). The Judicial Council derives its authority from §§ 332 and 352-54 of the Act and Rules 18-20 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings.

8. The Judicial Council is unique among all circuit judicial councils because unlike the other circuit judicial councils which consist of a rotating mixture of circuit and district judges, the Judicial Council of the Federal Circuit consists exclusively of the active judges of the Federal Circuit who serve as members of the Judicial Council throughout their tenure on that Court.

9. By statute, the Federal Circuit is required to adopt "a procedure for the rotation of judges from panel to panel to ensure that all of the judges sit on a representative cross section of the cases." 28 U.S.C. § 46(b).

<u>**STATEMENT OF FACTS**</u>

10. Judge Newman was the first-ever judge appointed directly to the Federal Circuit, by President Ronald Reagan on January 30, 1984.  She was confirmed to the seat less than a month later by a voice vote.  She received her commission as a Circuit Judge on February 28, 1984.

11. Since 1984, Judge Newman has continued to faithfully, diligently, and meticulously exercise the duties of her office, to recognition and acclaim.  In 2018, she was named "one of the 50 most influential people in the IP world" by Managing IP Magazine.

12. At all relevant times, Judge Newman has been and is in sound physical and mental health.  She has authored majority and dissenting opinions in the whole range of cases before her Court, has voted on petitions for rehearing *en banc*, and has joined in the *en banc* decisions of the Court.

13. In the course of her continuing service as an active-status Circuit Judge, Judge Newman has authored hundreds of majority, concurring, and dissenting opinions.  Judge Newman's dissenting opinions are often adopted by the Supreme Court in its frequent reversals of the Federal Circuit.

14. At all relevant times, Judge Newman has been willing and able to fully participate in the work of the Court and, consistent with the Court's internal practice and procedures for active-status judges, she has requested and expected to be assigned to the regular panel sittings of the Court.

15. Judge Newman's medical records reveal no disability, condition, or set of conditions, physical or mental, that would prevent her from carrying out the duties of an Article III judge.

16. A recent examination by Ted L. Rothstein, MD—a qualified neurologist and a full Professor of Neurology and Rehabilitation Medicine at the George Washington University School of Medicine & Health Sciences—revealed no significant cognitive deficits and led that expert to conclude that Judge Newman's "cognitive function is sufficient to continue her participation in her court's proceedings."  Exh. Y (filed under seal).

17. In early March 2023, Chief Judge Moore met with Judge Newman and attempted to convince Judge Newman to retire.  Judge Newman declined Judge Moore's entreaties.

18. On or about March 17, 2023, Chief Judge Moore drafted an order in which she, pursuant to Rule 5 of the Conduct Rules, "identified a complaint" against Judge Newman alleging that there is a "probable cause to believe that Judge Newman 'has engaged in conduct prejudicial to the effective

and expeditious administration of the business of the courts' and/or 'is unable to discharge all the duties of office by reason of mental or physical disability.'"  Exh. A.

19. The March 24 Order alleged that Chief Judge Moore offered not to "docket" the complaint were Judge Newman to agree to an "informal resolution" consisting of retiring from the Court.  When Judge Newman declined to submit to this intimidation tactic on or about March 24, 2023, Chief Judge Moore "docketed" the Order ("March 24 Order") and began the formal investigative process under Rule 11 of the Conduct Rules.  Exh. A at 5-6.

20. The March 24 Order, which served as the basis for launching the disciplinary process and purportedly contained "probable cause to believe that Judge Newman 'has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts' and/or 'is unable to discharge all the duties of office by reason of mental or physical disability,'" Exh. A at 1, is riddled with errors.  For example, the March 24 Order alleges that "[i]n the summer of 2021, Judge Newman, at the age of 94, was hospitalized after suffering a heart attack and having to undergo coronary stent surgery."  *Id.*  During the period (June 2021 through September 2021) when Chief Judge Moore claims that Judge Newman supposedly suffered a heart attack, Judge Newman sat on ten panels and issued at least eight (including majority, concurring, and dissenting) opinions.  Had Judge Newman suffered a heart attack, it would be extremely unusual for anyone, let alone a 94-year-old person, to serve throughout that period without skipping a beat (so to speak).  Besides which, even were the allegation true, having coronary artery disease is simply irrelevant to one's ability to be able to carry out judicial functions.

21. Judge Newman's medical records evince no history of any heart attacks or coronary artery stents.

22. Even more problematic (as these facts were readily available to Chief Judge Moore upon even a cursory inspection) is the allegation in the March 24 Order that "[b]ecause [of] those health issues, [Judge Newman's] sittings were reduced compared to her colleagues."  Exh. A at 1.  To the

JA35

contrary, in the summer of 2021, Judge Newman was a member of *ten* different panels of the Court—more than any other colleague but two.

23. Upon the issuance of the March 24 Order, Chief Judge Moore appointed a Special Committee consisting of herself, Circuit Judge Sharon Prost, and Circuit Judge Richard G. Taranto.  Chief Judge Moore selected herself to chair the Special Committee to investigate the complaint that she herself "identified" and that as the complaint itself asserts, is predicated, at least in part, on statements by other Federal Circuit judges.

24. Before any evidence was taken, hearings held, or reports written, Chief Judge Moore and/or other Defendants unconstitutionally and unilaterally removed Circuit Judge Newman from all future sittings of the Court.  In an email sent on April 5, 2023, and CC'ed to all judges of the Court, Chief Judge Moore confirmed that Judge Newman, though an active-status member of the Court, "will not be assigned any new cases until these [disciplinary] proceedings are resolved."  Exh. B at 4.  Chief Judge Moore stated that this was a unanimous decision of Judge Newman's colleagues.  *Id.*  No legal basis or precedent for such an action or decision had been provided until June 5, 2023, at which point the justification for the pre-investigatory suspension changed.  *See infra*, ¶¶ 54-**Error! Reference source not found.**.  To the extent that the suspension was a disciplinary measure, the action directly contradicted the Disability Act and Conduct Rules.  *See* 28 U.S.C. §§ 353(c), 354(a)(2)(A)(i), Conduct Rules, R. 20(a), (b)(1)(D); *see also* 25(e), cmt. (noting that the Disability "Act[] allow[s] a subject judge to continue to decide cases and to continue to exercise the powers of chief circuit or district judge.").

25. Judge Newman has not been assigned to sit on any panels of the Court, starting with the April 2023 sitting, despite repeatedly requesting such assignments.  The Defendants have indicated that they do not intend to assign Judge Newman to any panels in the foreseeable future.  *See* Exh. O.

**JA36**

26. On or about April 6, 2023, Chief Judge Moore issued a new and virtually unprecedented order ("April 6 Order") expanding the scope of the Special Committee's investigation into Judge Newman's alleged "disability" and "misconduct" to include the questions of internal operations of Judge Newman's chambers.  Exh. B.

27. On April 7, 2023, the Special Committee issued an order ("April 7 Order") demanding that Judge Newman submit to neurological and neuropsychological examinations before physicians of the Special Committee's choosing.  The order was based in part on the Special Committee's alleged "direct observations of Judge Newman's behavior."  The April 7 Order afforded Judge Newman, who at that time was still not represented by counsel, a mere *three days* to comply with the request. Contrary to the Commentary to Rule 13 of the Conduct Rules, no attempt was made to "enter into an agreement with [Judge Newman] as to the scope and use that may be made of the examination results[.]"  The April 7 Order did not specify the scope of the requested examination, nor any limits on the use of examination results.  Exh. C.

28. On April 13, 2023, Chief Judge Moore, claiming that the failure to respond to the unreasonably short three-day deadline set forth in the April 7 Order constituted "sufficient cause to believe that Judge Newman [engaged in] additional misconduct," issued an order ("April 13 Order") further expanding the scope of investigation.  Exh. D.

29. On April 17, 2023, the Special Committee entered yet another order, this time demanding that Judge Newman share private medical records regarding medical events alleged in the March 24 Order.  The Special Committee once again set an unreasonably short response deadline of *four days*.  Exh. E.  Furthermore, the events this order alleged (*i.e.*, "heart attack" and "coronary stents") never transpired.  Even if they had, as they are not relevant to any questions pending before the Special Committee or the Judicial Council, these requests constitute a baseless invasion into Judge Newman's constitutionally and statutorily protected privacy interests.

30. On April 19, 2023, Chief Judge Moore unilaterally reassigned Judge Newman's judicial assistant/paralegal to another office. *See* Exh. V. For a significant period of time, Defendants refused to permit Judge Newman to hire a replacement judicial assistant, thus leaving her office short-staffed, until at the earliest, June 14, 2023, when Judge Newman was able to obtain a temporary replacement. These delays in replacing her judicial assistant have greatly impaired Judge Newman's ability to accomplish her judicial duties such as processing her opinions, answering phone calls and emails from her colleagues and the like.

31. On the same date, Chief Judge Moore unilaterally reassigned one of Judge Newman's law clerks to the chambers of another judge. *See* Exh. V. Given this law clerk's earlier request made to Judge Newman to seek alternative employment, Judge Newman responded by email that terminating that law clerk's employment in her chambers was "appropriate." She, however, did not consent to the law clerk's being reassigned to another judge's chambers within the Federal Circuit. Defendants have refused to authorize Judge Newman to hire a replacement law clerk, even though Judge Newman remains an active judge of the Federal Circuit, and she is statutorily entitled to four law clerks and a judicial assistant.

32. On April 20, 2023, Chief Judge Moore issued a new order once again expanding the scope of investigation, this time to cover matters concerning the internal workings of Judge Newman's chambers. The complaint alleged, *inter alia*, that Judge Newman's refusal to assign her own law clerk to another judge's chambers—a highly unusual, if not unprecedented practice—likely constituted misconduct. Exh. F.

33. On April 21, 2023, Judge Newman, now represented by the undersigned counsel, sent a letter to Chief Judge Moore and the remaining members of the Special Committee requesting immediate restoration of Judge Newman to the hearing calendar as well as a transfer of the identified complaint to a different Judicial Council as contemplated by Rule 26 of the Conduct Rules. Judge

Newman explained that basic norms of due process cannot permit the same individuals to be accusers, witnesses, rapporteurs, and adjudicators of a complaint against her.  Exh. Q.

34. The letter to Chief Judge Moore cited opinions of leading judicial ethics experts who have unequivocally stated that in these circumstances transfer to another circuit's judicial council is necessary.  Exh. Q.

35. The letter to Chief Judge Moore and other members of the Special Committee reiterated that Judge Newman "will not fail to cooperate with any investigation that is conducted consistent with the limits that the Constitution, the Judicial Disability Act of 1980, and the Rules for Judicial Conduct and Judicial Disability Proceedings place on such investigations."  Exh. Q at 2.

36. At and around the time the undersigned counsel sent the letter to Chief Judge Moore, the story about the investigation and the surrounding events began to be reported in the press, academic, and legal community.  In response to these reports, the Judicial Council confirmed the existence of an investigation into Judge Newman and published the March 24 Order (in a redacted form) and the April 13 Order on the Federal Circuit's website.

37. On May 3, 2023, the Special Committee issued two orders.  Exhs. G; H.  The first order ("Gag Order") was in effect a gag order threatening Judge Newman and her counsel with sanctions should any of them publicize the ongoing investigation.  Exh. G.  The order intimated that even if Judge Newman were to agree to disclose the materials pursuant to Rule 23(b)(7) of the Conduct Rules, Chief Judge Moore would withhold her consent for the same, *see id.* at 3, despite commentary to Rule 23 stating that "[o]nce the subject judge has consented to the disclosure of confidential materials related to a complaint, the chief judge ordinarily will refuse consent *only* to the extent necessary to protect the confidentiality interests of the complainant or of witnesses." (emphasis added).

**JA39**

38. The second order issued on May 3, 2023 ("May 3 Order") by the Special Committee denied the request for transfer, without addressing the manifest due process concerns raised therein. Exh. H. The May 3 Order again ordered Judge Newman to submit to neurological and neuropsychological examinations before physicians of the Special Committee's choosing. *Id.* The Order also rejected Judge Newman's suggestions that she and the Special Committee "enter into an agreement … as to the scope and use that may be made of the examination results." *Id.* at 7-8. Finally, the May 3 Order again required Judge Newman to surrender medical records including records that do not exist for events that have never occurred. *Id.* at 9. The May 3 Order threatened Judge Newman with further expanding the scope of investigation unless she indicated her consent to the examination by 9:00 am on May 10, 2023. *Id.* at 13-14.

39. The Special Committee's May 3 Order, together with a concurrently issued Judicial Council Order, denied Judge Newman's request to have the matter transferred to another circuit. Exhs. H; I.

40. Though there was (and is) no emergency with respect to any investigative proceeding, except to restore an active member of the federal judiciary who has been unlawfully deprived from hearing cases for months (with no end in sight), the May 3 Order afforded Judge Newman merely seven days to respond. Exh. H at 13-14. In contrast, the Federal Rules of Appellate Procedure afford ten days for any party to respond to any motion, and the Federal Rules of Civil Procedure permit fourteen days for a response. While investigations into judicial misconduct or disability are not governed by the Federal Rules of Appellate Procedure or Rules of Civil Procedure, both of those documents serve as a useful reference for what the guarantee of due process entails. The undue haste with which the Special Committee is proceeding is indicative of the denial of due process.

41. The Special Committee attempted to justify its extraordinarily short deadlines by citations to S. Rep. No. 96-362 for the proposition that judicial complaints should be resolved within 90 days. *See* Exh. K at 24; Exh. L at 3. However, because Senate Report 96-362 accompanied an earlier

version of the Disability Act that Congress rejected, *see* H. Rep. 96-1313 at 4; Arthur D. Hellman, *An Unfinished Dialogue: Congress, the Judiciary, and the Rules for Federal Judicial Misconduct Proceedings*, 32 Geo. J. Legal Ethics 341, 352-54 (2019), it cannot possibly justify the Special Committee's actions.

42. As indicated in several letters to the Special Committee, Judge Newman does not, in principle, object to undergoing a medical evaluation, if there is a sufficient and sound scientific basis for requesting the same; however, she objects to not being able to select or even participate in the selection of a medical professional to examine her, to not having any input into the scope of the medical investigation, and to submitting the results of these evaluations to a body that cannot, consistent with due process requirements, adjudicate the matter. *See, e.g.*, Exh. Q at 2; Exh. R at 4-5; Exh. T at 3. The Special Committee's refusal to even engage in a cooperative process to reach agreement as to the selection of practitioners, as well "as to the scope and use that may be made of the examination results," combined with its demand that Judge Newman submit to the examination on an expedited basis, contravene the requirements of the Conduct Rules and the guarantees of due process.

43. If and when the Special Committee proceeds to a hearing as contemplated by Rules 14(b) and 15(c), Judge Newman intends to call, and compel witness testimony from, each Federal Circuit judge (and hence each Judicial Council member), as is her right under the aforementioned rules.

44. On May 9, 2023, Judge Newman responded to the Special Committee. Exh. R. The May 9 Letter objected to the Special Committee's Gag Order on First Amendment grounds and, as an alternative, formally requested the public release of various orders and letters pursuant to Rule 23(b)(7) of the Conduct Rules. The letter also objected to the request for medical records on the basis that the committee did not (and is unlikely to be able to) explain the relevance of the requested records or the scope of their use. On similar grounds, Judge Newman objected to the request for medical testing. At the same time, Judge Newman indicated that she may be willing

11

to discuss the request with the Special Committee in a cooperative manner as contemplated by the commentary to Rule 13(a) which instructs "the Special Committee [to] enter into an agreement with the subject judge as to the scope and use that may be made of the examination results." *Id.* at 4.  The May 9 Letter renewed the request for the matter be transferred to the judicial council of another circuit, once again explaining that since Chief Judge Moore was in effect a complainant in this matter and that since all of Judge Newman's colleagues are potential witnesses to her ability to competently carry out her judicial duties, it is inappropriate for any of them to also serve as adjudicators.  *Id.* at 5-6.  Finally, the May 9 Letter reiterated Judge Newman's demand to be immediately restored to the case assignment calendar.  *Id.* at 6.

45. In response to the May 9 Letter, on May 16, 2023, the Special Committee issued two new orders. Exhs. J; K.  In the first order, though it rejected Judge Newman's First Amendment arguments, the Special Committee agreed to grant Judge Newman's request made under Rule 23(b)(7), to disclose (with appropriate redactions) all prior orders entered in this matter.  Exh. J.  Additionally, the Order clarified that the prior gag order "imposed no restriction on discussion of those orders or other aspects of the proceeding that were already public, as long as no other confidential information is disclosed in such a discussion," and that "[t]o the extent Judge Newman and her counsel wish to publicly discuss aspects of this proceeding that have already been made public, the [May 3] Confidentiality Order placed no restriction on them." *Id.* at 3.

46. Nevertheless, the Special Committee instructed "Judge Newman and her counsel [that they] remain bound by Rule 23 and the [May 3] Confidentiality Order with regard to information not publicly disclosed by the Court such as future orders and filings."  Exh. J at 12.

47. In the second order issued the same day (May 16), the Special Committee reiterated the request for medical records, medical testing, and a video-taped interview, and for the first time it explained the relevance and the scope of its demands.  Exh. K.  Nevertheless, the Special Committee again

rejected Judge Newman's requests to at the very least participate in the selection of providers or negotiations as to the type and scope of testing. *Id.* at 20-21. The Special Committee also did not explain on what basis the selected medical providers were chosen, nor delineate their qualifications to evaluate Judge Newman's mental health. The Special Committee once again denied the request for a transfer and entirely ignored Judge Newman's due process objection to the Judicial Council's suspension of her pending the outcome of the investigation. *Id.* at 26. The Special Committee set a deadline of 9:00 am on May 23, 2023, to respond to its requests. *Id.* at 25.

48. Also, on May 16, 2023, Judge Newman appealed her interlocutory suspension to the Committee on Judicial Conduct and Disability. Exh. U. Judge Newman provided this Committee with copies of prior Judicial Council Orders.

49. On May 24, 2023, the Committee on Judicial Conduct and Disability found that it has no jurisdiction over an "interim order" that "suspend[ed] [Judge Newman] from being assigned any cases *while the complaint is being investigated and adjudicated*." Exh. P.

50. On May 20, 2023, Judge Newman responded to the May 16 Orders seeking an extension of time until June 8, 2023. Exh. S. In support of the request, lead counsel for Judge Newman explained that he was out of the country and visiting Israel until June 1, 2023, in order to attend to family and religious obligations. On May 22, 2023, the Special Committee denied the requested extension of time, and instead reset the deadline to 9:00 am on May 26, 2023—a date that coincided with the Jewish festival of Shavuot ("Feast of Weeks.") Exh. L. As a result, and in order to avoid a conflict with religious obligations, Judge Newman's counsel was forced to respond a day earlier, by May 25, 2023 (Israeli time). Exh. T.

51. In the May 25 letter, Judge Newman responded to the Special Committee's May 16 Order, declining the requests but offering

to undergo necessary testing, provide necessary records, and meet with a Special Committee *provided that she is immediately restored to her rights and duties as a judge and further provided that this matter is promptly transferred to a judicial council of another circuit*, which is unmarred by the prior unlawful decisions and which is willing to "work[] or operat[e] *together*" with Judge Newman, including on selecting medical providers and setting the appropriate parameters of any examination.

Exh. T at 3 (emphasis in original).

52. The following day, "the Committee … requested that the scope of the investigation be expanded to investigate whether Judge Newman has failed to cooperate in violation of the Rules and whether her failure to cooperate constitutes misconduct."  In an order issued the same day, Chief Judge Moore granted the Committee's request and once again expanded the investigation.  Exh. M.

53. Less than a week later, on June 1, 2023, the Committee issued a new order apparently *narrowing* the scope of its investigation.  Exh. N.  The new order stated that "[i]n light of the practical constraints that Judge Newman's [alleged] refusal to cooperate places on the Committee's ability to proceed" it will not, "at this time" pursue the allegations regarding Judge Newman's mental or physical disability.  Instead, the Committee announced that its "investigation will focus on the question whether Judge Newman's refusal to cooperate with the Committee's investigation constitutes misconduct," *id.* at 2, 3.  The June 1 Order directed Judge Newman to, by July 5, 2023, "submit a brief limited to addressing the question whether [her] refusal to undergo examinations, to provide medical records, and to sit for an interview with the Committee … constitute [*sic*] misconduct and the appropriate remedy if the Committee were to make a finding of misconduct …."  *Id.* at 6.  The Committee scheduled oral argument on the matter for July 13, 2023.  *Id.*

54. Despite repeated attempts by Judge Newman to be restored to the regular rotation of judges assigned to hear cases, and several letters pointing out that neither the Disability Act nor the Conduct Rules (to the extent they are constitutional) authorize a suspension of a judge *prior* to the

completion of all of the procedures outlined in these documents, the Judicial Council, on June 5, 2023, issued an order reaffirming its decision to keep Judge Newman from hearing cases.   Exh. O.

55. Bizarrely, the June 5 Order changes the rationale underlying the Judicial Council's actions, yet this hasty attempt to fix errors in Defendants' ill-conceived scheme to remove Judge Newman also fails to rectify the problem.   First, the Judicial Council's June 5 Order was issued unlawfully, as Judge Newman, who is a member of the Judicial Council, was not even notified of any meeting of the Judicial Council, much less invited to participate.   (The same is true about the alleged meeting of the Judicial Council on March 8, 2023).   *See* R. 25(e), cmt. (noting that a judge is not disqualified from membership on the judicial council when there is a complaint pending against her, except insofar as the work of the council involves consideration of the complaint itself).

56. Second, the statements in the Order alleging that Judge Newman's case backlog exceeded the circuit-wide, agreed-upon deadlines are verifiably false.

57. Third, the justifications given for the suspension in the June 5 Order directly contradict Chief Judge Moore's email of April 5, 2023, which explained that the suspension is being imposed not as a result of any delays, but "pending the results of the investigation into potential disability/misconduct."   *See supra* ¶ 24.

58. The June 5 Order claims that the initial decision to suspend Judge Newman from hearing cases was made on March 8, 2023, or *more than two weeks prior to* the docketing of the first complaint against Judge Newman (and more than a week prior to Chief Judge Moore's advising Judge Newman that she intended to take this course of action).   *Compare* Exh. A at 6, *with* Exh. O at 1. There are several problems with this new claim.   First, not only was Judge Newman not invited to participate in the March 8 Judicial Council meeting, but no copy of such an order was ever sent to Judge Newman.   Judge Newman's request for the minutes of this meeting has gone unanswered.

59. Second, the order avers that "the Judicial Council *met* to consider concerns raised about Judge Newman's mental fitness by court staff and Judge Newman's abnormally large backlog in cases and her apparent inability to issue opinions in a timely fashion." Exh. O at 1 (emphasis added). However, no notice of such a meeting was ever provided to Judge Newman who is a member of the Judicial Council. *See* R. 25 (e), cmt.  The minutes of this meeting were not provided to Judge Newman.

60. Third, the June 5 Order falsely alleges that Judge Newman was precluded from sitting during the April 2023 session of the Court because at the time of case assignments (which occurred on February 6, 2023), Judge Newman's "backlog had placed her in violation of Federal Circuit Clerical Procedures #3, ¶ 15." Exh. O at 2.  In fact, on February 6, 2023, Judge Newman had *zero* cases that were subject to the rule.

61. Clerical Procedures #3, ¶ 15 reads: "Any judge who has (1) four or more opinion assignments over six months old, or (2) two or more opinion assignments over a year old (i.e., in which a draft has not been circulated to the panel for more than six months in four or more cases, or in more than one year in two or more cases after submission) will not be assigned to hear additional cases until the judge has reduced the number of such opinion assignments below (1) four over six months, or (2) two over a year," and "applies to all cases barring exceptional circumstances." Exh. W at 5-6.

62. The rule further gives examples of "exceptional circumstances" including a situation where a "panel … decide[s] to hold or stay a case pending en banc or Supreme Court disposition of another matter." Exh. W at 6, n.*.  The rule is explicit that "[i]n such circumstances, the requirements of [the rule] do not apply." *Id.*

63. On February 6, 2023, when the paneling memo for the April sitting was circulating, it is true that two cases on Judge Newman's docket were pending for over one year; however, neither was

16

**JA46**

subject to the requirements of Clerical Procedures #3, ¶ 15.  *Military-Veterans Advocacy, Inc. v. Sec'y of Veterans Affairs*, No. 20-1537 (reported at 63 F.4th 935 (Fed. Cir. 2023)), which at that point had been pending for 424 days, was stayed pending Congress's consideration of the <u>Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022</u>, Pub. L. 117-168, 136 Stat. 1759 (codified at 38 U.S.C. §§ 1116 and 1710) (signed Aug. 10, 2022 and effective Oct. 1, 2022).  Because the case was stayed pending further developments in the law, it was not subject to Clerical Procedures #3, ¶ 15.  In fact, the Court requested additional briefing on the impact the newly enacted statute had on the litigation.  *See* 63 F.4th at 943.  The supplemental briefs were filed on September 14, 2022.  The case was resolved on March 22, 2023, roughly six months after the filing of supplemental briefs.

64. The second case that had been pending for more than a year was *SAS Inst. v. World Programming Ltd.*, No. 21-1542 (reported at 64 F.4th 1319 (Fed. Cir. 2023)).  The oral argument on that case was had on January 3, 2022.  However, Judge Newman was a *dissenting* judge on that case and thus had to wait for the panel to circulate the majority opinion prior to being able to draft her dissent. The majority opinion by Judge Jimmy V. Reyna circulated on October 14, 2022, and the opinion was published on April 6, 2023, *i.e.*, within six months of Judge Reyna's circulating his draft.  In other words, Judge Newman took *three fewer* months to draft her dissent than Judge Reyna took to draft his opinion.

65. No other cases that were over a year old remained with Judge Newman, and only one case that was over six months old was among the cases assigned to her.  Thus, despite the bald assertions contained in the June 5 Order, Judge Newman was *not* "in violation of Federal Circuit Clerical Procedures #3, ¶ 15."

66. These facts were easily ascertainable by the Defendants, yet they instead created a false record and communicated it to the public.

67. Finally, the June 5 Order stated that it "conclude[d] upon *de novo* consideration that Judge Newman is not expeditiously carrying out the work of the Court, that assigning her new cases will only further interfere with expeditious execution of the work of the Court, and that an order precluding Judge Newman from new case assignments is warranted." Exh. O at 4. The Judicial Council asserted that Judge Newman has a "continued backlog of cases, and [an] inability to clear th[at] backlog." *Id.* at 1. Not only does the "continued backlog" justification radically differ from the prior "ongoing disciplinary proceedings" justification for Judge Newman's suspension, but it is also factually false.

68. At the time the order was issued, Judge Newman remained responsible for only nine cases, only one of which was over six months old, and some of which were or are expected to be separate opinions (concurrences and/or dissents). This number is lower than that of several other judges on the Court, yet Judge Newman remains the only judge suspended from the Court's work. As before, Judge Newman, though a member of the Judicial Council, *see* R. 25(e), cmt., was not notified of its meeting (if one ever took place) or the proposal, nor was she given an opportunity to speak or vote on this matter.

69. No end date for this suspension is listed in the Order. The Council asserted that 28 U.S.C. § 332(d)(1) authorizes it to impose such a restriction on Judge Newman's duties and further maintained that the order "is not a censure but rather a decision made for the effective and expeditious administration of the business of the court." Exh. O at 5. This assurance stands in sharp contrast to Chief Judge Moore's email of April 5, 2023, which states unequivocally that Judge Newman was suspended "pending the results of the investigation into potential disability/misconduct" and further states that suspension will not be lifted "until the[] [disciplinary] proceedings are resolved." Exh. B at 4.

70. Judge Newman has been removed from hearing cases for an indefinite period, which is not a permissible penalty even following an investigation.  Additionally, in an order issued on June 1, 2023, Defendants have indicated that they contemplate continued suspension of Judge Newman from "the duties of [her judicial] Office."  *See* Exh. N at 4.

71. The June 5 Order indicates that Defendants believe they have authority to suspend and may continue their suspension of Judge Newman *even in the absence of any finding of misconduct*.  *See* Exh. O at 5.

72. While the Special Committee has been pursuing its investigation(s) premised on a changing set of rationales, Judge Newman has written several opinions in previous cases, even though Chief Judge Moore's actions have interfered with the normal operations of Judge Newman's chambers.  Thus, on March 22, 2023, Judge Newman issued an eighteen-page opinion for the Court in *Military-Veterans Advocacy, Inc. v. Sec'y of Veterans Affairs*, 63 F.4th 935 (Fed. Cir. 2023).  On March 6, 2023, Judge Newman delivered a seven-page dissenting opinion in *May v. McDonough*, 61 F.4th 963 (Fed. Cir. 2023).  On March 31, 2023, Judge Newman filed a four-page dissenting opinion from the Court's opinion in *Roku Inc. v. Univ. Elecs., Inc.*, 63 F.4th 1319 (Fed. Cir. 2023), and on April 6, 2023, Judge Newman filed a fifteen-page dissenting opinion in *SAS Inst. v. World Programming Ltd.*, 64 F.4th 1319 (Fed. Cir. 2023).  Finally, on June 6, 2023, June Newman filed a twelve-page dissenting opinion in *Dep't of Transport. v. Eagle Peak Rock & Paving, Inc.*, No. 21-1837, ___ F.4th ___, 2023 WL 3829625 (Fed. Cir. 2023).  These opinions have been praised by various members of the bar, and nothing in them even hints at any mental disability.  *See, e.g.*, Andrew Michaels, *Judge Newman's Recent Dissents Show She Is Fit For Service*, Law360.com (June 6, 2023).

73. Judge Newman has also continued to participate in *en banc* decisions of the Court with no indication of any mental or physical disability.  Thus, she joined the *en banc* portion of the opinion in *Moore v. United States*, 66 F.4th 991 (Fed. Cir. 2023).  Judge Newman also participated in the poll

**JA49**

to take up the matter *en banc.*  There appear to have been no objections lodged to her participation by any members of the Federal Circuit bench or bar.

74. As recently as late 2022 or early 2023, Chief Judge Moore effusively praised Judge Newman's abilities and insight, writing in the American Intellectual Property Association Quarterly Journal that "Among patent practitioners, Judge Newman is particularly well-known for her insightful dissents, which have often been vindicated by the Supreme Court."  Chief Judge Moore then listed several cases where the Supreme Court, in reversing the Federal Circuit, "adopt[ed] essentially the reasoning of Judge Newman's dissent."   Kimberly A. Moore, *Anniversaries and Observations*, 50 AIPLA Q. J. 521, 524-25 (2022).

75. One empirical study shows that in "the three-year period of January 1, 2020 to December 31, 2022," Judge Newman's deviation from the average productivity and timeliness among the active judges of the Federal Circuit was not statistically significant.  These data also show that there has been no difference in Judge Newman's timeliness or productivity between 2020 and late 2022. Exh. X.

76. Another, more comprehensive empirical dataset shows that from October 1, 2021 to December 31, 2022, Judge Newman authored 25 opinions (including majority, concurring, and dissenting ones), whereas, in the same time period, Judge Raymond Chen authored only 20 opinions.  That dataset also shows that over the same time period, when counted from the time of filing of the appeal to its disposition, cases in which Judge Newman authored majority opinions were pending, on average, for 486 days.  At the same time, cases assigned to Judge Sharon Prost were pending for 509 days, Judge Todd Hughes for 543 days, and Judge Chen for 549 days.  *See* Ron D. Katznelson, Ph.D., *Is There a Campaign to Silence Dissent at the Federal Circuit?* at 18, *available at* https://ssrn.com/abstract=4489143.

**JA50**

77. These empirical studies are noteworthy because Chief Judge Moore predicated her original "identification of the complaint" in large part on Judge Newman's alleged lack of sufficient output as compared to her colleagues.  The empirical data stand in sharp contrast to these false allegations.

78. This empirical study also reveals that given Judge Newman's high rate of dissent, removing her from the Federal Circuit bench and replacing her with a judge whose rate of dissent is in line with the Circuit's average, would reduce the workload of an average Federal Circuit judge by more than 5%.  Katznelson, *supra* at 34-35.  So, Judge Newman's colleagues on the Federal Circuit have a personal interest in the outcome of disciplinary proceedings against her.

79. On information and belief, the ongoing proceedings before the Judicial Council of the Federal Circuit, have undermined the ability of judges and clerks to work together in a cooperative fashion, and have undermined the public confidence in that Court and judiciary as a whole.

**CLAIMS FOR RELIEF**

**Count I: Improper Removal, Violation of Separation of Powers**

80. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

81. The Constitution provides that "Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const. art. III, § 1.  The Constitution also provides that "[t]he House of Representatives … shall have the sole Power of Impeachment," and that "[t]he Senate shall have the sole Power to try all Impeachments."  U.S. Const. art. I, §§ 2, 3.  In light of these provisions, no executive or judicial agency or body may exercise, in form or in substance, the impeachment power reserved by the Constitution to the House and Senate.   Nor may any executive or judicial agency or body be delegated—or arrogate to itself—the impeachment power which the Constitution reserves to the House and Senate.

**JA51**

82. Defendants' orders and threats constitute an attempt to remove Plaintiff from office unlawfully—and already have removed her unlawfully from hearing cases—without impeachment and in violation of the Constitution, in substance if not form, by, *inter alia*, (a) refusing to assign Plaintiff any new cases and threatening to forbid the assignment of new cases to her; (b) removing, without Plaintiff's consent, judicial staff Plaintiff is statutorily authorized to retain and refusing authorization to hire replacement staff; (c) interfering with Plaintiff's abilities to administer her own chambers; (d) ordering Plaintiff to undergo an involuntary mental health examination without a sufficient basis or legal authority for doing so, by physicians unknown to and unapproved by Plaintiff, as set forth in this Complaint; and (e) ordering that the scope of the investigation into Plaintiff's conduct be expanded, merely because Plaintiff requires time to properly evaluate and answer Special Committee requests.

83. Plaintiff has been and will continue to be irreparably harmed unless and until (a) Defendants' orders excluding Plaintiff from regular duties of an Article III judge and their threats to continue with such exclusion are declared to be contrary to statutory law and enjoined; (b) Plaintiff is immediately restored to the case argument calendar as a fully-fledged active judge; and (c) Defendants are enjoined from continuing the investigation into Judge Newman except insofar as any actions are required to transfer this matter to a judicial council of another circuit.

84. Plaintiff has no adequate remedy at law.

**<u>Count II: *Ultra Vires* – Improper Removal, Violation of Separation of Powers</u>**

85. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

86. To the extent that the Judicial Disability Act of 1980 is constitutional, it authorizes the Judicial Council, upon *conclusion* of a Special Committee's investigation and receipt of a report from such a committee, to "order[] that, on a temporary basis for a time certain, no further cases be assigned to the judge whose conduct is the subject of a complaint." 28 U.S.C. § 354(a)(2)(A)(i).  Neither

JA52

the Act nor the Conduct Rules authorize either a Chief Judge acting alone, nor a judicial council of any circuit acting in concert, to issue any orders or directives which preclude an active Article III judge from being assigned cases in regular order while an investigation is still underway. "Sentence first—verdict afterwards" is a notorious and textbook example of deprivation of due process known even to children's literature.

87. Defendants' orders excluding Plaintiff from regular duties of an Article III judge, and their threats to continue with such exclusion, constitute an unlawful attempt to remove Plaintiff from office, without impeachment and in violation of the Constitution, in substance if not form, by, *inter alia*, (a) refusing to assign Plaintiff any new cases and threatening to forbid the assignment of new cases to her; (b) removing, without Plaintiff's consent, judicial staff Plaintiff is statutorily authorized to retain and refusing authorization to hire replacement staff; (c) ordering Plaintiff to undergo an involuntary mental health examination without a sufficient basis or legal authority for doing so, by physicians unknown to and unapproved by Plaintiff, as set forth in this Complaint; (d) interfering with Plaintiff's abilities to administer her own chambers; and (e) ordering that the scope of the investigation into Plaintiff's conduct be expanded, merely because Plaintiff requires time to properly evaluate and answer Special Committee requests.

88. Plaintiff has been and will continue to be irreparably harmed unless and until (a) Defendants' orders excluding Plaintiff from regular duties of an Article III judge and their threats to continue with such exclusion are declared to be contrary to statutory law and enjoined; (b) Plaintiff is immediately restored to the case argument calendar as a fully-fledged active judge; and (c) Defendants are enjoined from continuing the investigation into Judge Newman except insofar as any actions are required to transfer this matter to a judicial council of another circuit.

89. Plaintiff has no adequate remedy at law.

**Count III: *Ultra Vires* – Improper Removal, Violation of Separation of Powers**

JA53

90. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

91. Nothing in Section 332(d)(1) authorizes the Judicial Council of the Federal Circuit, acting without so much as any notice to much less input from one of its members, to indefinitely suspend Judge Newman from her duties as an Article III judge or to reduce her staff as an "administrative" rather than "punitive" measure.

92. Defendants' orders excluding Plaintiff from regular duties of an Article III judge, and their threats to continue with such exclusion, constitute an attempt to remove Plaintiff from office, without impeachment and in violation of the Constitution, in substance if not form, by, *inter alia*, (a) refusing to assign Plaintiff any new cases and threatening to forbid the assignment of new cases to her; (b) removing, without Plaintiff's consent, judicial staff Plaintiff is statutorily authorized to retain and refusing authorization to hire replacement staff; (c) ordering Plaintiff to undergo an involuntary mental health examination without a sufficient basis or legal authority for doing so, by physicians unknown to and unapproved by Plaintiff, as set forth in this Complaint; (d) interfering with Plaintiff's abilities to administer her own chambers; and (e) ordering that the scope of the investigation into Plaintiff's conduct be expanded, merely because Plaintiff requires time to properly evaluate and answer Special Committee requests.

93. Plaintiff has been and will continue to be irreparably harmed unless and until (a) Defendants' orders excluding Plaintiff from regular duties of an Article III judge and their threats to continue with such exclusion are declared to be contrary to statutory law and enjoined; (b) Plaintiff is immediately restored to the case argument calendar as a fully-fledged active judge and (c) Defendants are enjoined from continuing the investigation into Judge Newman, except insofar as any actions are required to transfer this matter to a judicial council of another circuit.

94. Plaintiff has no adequate remedy at law.

**Count IV: Fifth Amendment – As Applied Due Process of Law Violation**

95. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

96. Defendants' continued investigation into Plaintiff's conduct violates the fundamental principles of due process because the Special Committee is composed of complainants about and witnesses to Plaintiff's alleged disability. Furthermore, because the outcome of these proceedings may affect the total amount of work done by other Federal Circuit judges, all members of the Federal Circuit have a personal interest in the outcome of these proceedings. The March 24 and May 3 Orders specifically reference, as a basis for beginning and continuing the investigation, the "personal observations" of the Special Committee members and other members of the Judicial Council. Empirical studies suggest that the work of an average Federal Circuit judge would be reduced by 9% if Judge Newman were replaced with a less dissent-prone judge.

97. It has been established for centuries that one cannot serve as a "judge in his own cause." *See Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). Permitting the Judicial Council and its Special Committee to continue the disciplinary proceedings against Plaintiff in a case where all members of the Judicial Council are either complainants, actual or potential witnesses, interested parties, or all of the above, violates Plaintiff's Fifth Amendment right to due process of law.

98. Plaintiff has been and will continue to be irreparably harmed unless and until Defendants' violations of her Fifth Amendment right to due process of law are declared unconstitutional and Defendants are enjoined from continuing their investigation into Plaintiff, except insofar as any actions are required to transfer this matter to a judicial council of another circuit.

99. Plaintiff has no adequate remedy at law.

### <u>Count V: Fifth Amendment – Unconstitutional Vagueness of the Act's Disability Provision</u>

100. Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

101. Plaintiff has liberty and property interests in the outcome of any misconduct or disability proceeding against her. She also has liberty and property interests in not being subjected to an

JA55

involuntary medical or psychiatric examination and further liberty and property interests in not being stigmatized as having committed misconduct and having her mental health questioned, as well as having her status as an Article III judge altered, by ordering her to undergo a compelled medical or psychiatric evaluation by physicians not chosen by her and who are unknown to her. Under the Fifth Amendment to the United States Constitution, Plaintiff cannot be deprived of her liberty and property interests without due process of law.

102.    Plaintiff further has liberty and property interests in her private medical records, which may not be invaded by requiring her to surrender these same records to an investigative authority as a condition of maintaining her status as an active Article III judge.

103.    The Act is unconstitutionally vague and violates the Due Process Clause of the Fifth Amendment because, *inter alia*, it fails to provide adequate notice of what constitutes a mental disability that renders a judge "unable to discharge all the duties of office."   It also is unconstitutionally vague and violates the Due Process Clause because it lacks minimal enforcement guidelines identifying when an Article III judge may be subject to a disability investigation, and, accordingly, when an Article III judge may be disciplined for objecting in good faith to undergoing a compelled medical or psychiatric examination or surrendering private medical records as part of an investigation into whether she suffers from a disability rendering her unable to discharge her duties.

104.    Defendants' enforcement of the Act's unconstitutionally vague disability provisions against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from (a) enforcing any orders excluding Plaintiff from regular duties of an Article III judge; (b) continuing the investigation into Judge Newman except insofar as any actions are required to transfer this matter to a judicial council of another circuit; and (c) requiring Plaintiff to undergo a compelled

medical or psychiatric examination and/or surrendering private medical records and from disciplining Plaintiff for objecting in good faith to these demands.

105.    Plaintiff has no adequate remedy at law.

### Count VI: *Ultra Vires*, Unconstitutional Examinations

106.    Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

107.    Neither the Act nor the U.S. Constitution authorizes compelling an Article III judge to undergo a medical or psychiatric examination or to surrender to any investigative authority her private medical records in furtherance of an investigation into whether the judge suffers from a mental or physical disability that renders her unable to discharge all the duties of office.

108.    As Defendants have neither statutory nor constitutional power to compel Plaintiff to undergo an involuntary medical or psychiatric examination, or to compel Plaintiff to surrender her private medical records, the imposition of these requirements on Plaintiff are *ultra vires* and unconstitutional, as is disciplining Plaintiff for objecting to the same.

109.    Defendants' *ultra vires* and unconstitutional acts have caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until they are declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled medical or psychiatric examination and/or surrendering private medical records and from disciplining Plaintiff for objecting in good faith to these demands.

110.    Plaintiff has no adequate remedy at law.

### Count VII: Fifth Amendment – Unconstitutional Vagueness of the Act's Investigative Authority

111.    Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

112.    The Act is unconstitutionally vague to the extent it purports to authorize compelled medical or psychiatric examinations of Article III judges or demands from Special Committees for

JA57

Article III judges to surrender their private medical records.  Section 353(c) of the Act, which authorizes a Special Committee to conduct an investigation "as extensive as it considers necessary," lacks minimal enforcement guidelines identifying the circumstances under which an Article III judge may be compelled to undergo a mandatory medical or psychiatric examination or surrender her private medical records.  It vests virtually complete discretion in the hands of a Special Committee to determine when compliance with such demands may be compelled.  Consequently, the Act violates the due process protections of the Fifth Amendment and impermissibly intrudes on judicial independence which is guaranteed by Article III of the Constitution.

113.    Defendants' enforcement of the Act's unconstitutionally vague investigative provision against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled medical or psychiatric examination and/or surrendering private medical records and from disciplining Plaintiff for objecting in good faith to these demands.

114.    Plaintiff has no adequate remedy at law.

### Count VIII: Fourth Amendment – Unconstitutional Search

115.    Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

116.    Plaintiff enjoys the right to be secure in her person and effects against unreasonable search and seizures, as guaranteed by the Fourth Amendment to the U.S. Constitution.

117.    A compelled medical or psychiatric examination constitutes a search and seizure for purposes of the Fourth Amendment and therefore must satisfy minimum standards of constitutional reasonableness to be lawful.

JA58

118.   The Act violates the Fourth Amendment to the extent it authorizes a compelled medical or psychiatric examination of an Article III judge without a warrant based on probable cause and issued by a neutral judicial official or a demonstration of constitutional reasonableness.

119.   Defendants' enforcement of the unconstitutional Act against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled medical or psychiatric examination and from disciplining Plaintiff for objecting in good faith to these demands.

120.   Plaintiff has no adequate remedy at law.

### Count IX: Fourth Amendment – Unconstitutional Search

121.   Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

122.   Plaintiff enjoys the right to be secure in her person and effects against unreasonable search and seizures, as guaranteed by the Fourth Amendment to the U.S. Constitution.

123.   A compelled surrender of private medical records constitutes a search and seizure for purposes of the Fourth Amendment and therefore must satisfy minimum standards of constitutional reasonableness to be lawful.

124.   The Act violates the Fourth Amendment to the extent it authorizes a compelled surrender of medical records belonging to an Article III judge without a warrant based on probable cause and issued by a neutral judicial official or a demonstration of constitutional reasonableness.

125.   Defendants' enforcement of the unconstitutional Act against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to surrender her private medical records and from disciplining Plaintiff for objecting in good faith to these demands.

29

**JA59**

126.    Plaintiff has no adequate remedy at law.

## Count X: Fourth Amendment – As Applied Challenge

127.    Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

128.    Defendants lack either a warrant issued on probable cause by a neutral judicial official or a constitutionally reasonable basis for requiring Plaintiff to submit to an involuntary medical or psychiatric examination.  Accordingly, compelling Plaintiff to undergo an involuntary medical or psychiatric examination violates Plaintiff's Fourth Amendment rights.

129.    Defendants' enforcement of the unconstitutional Act against Plaintiff has caused Plaintiff irreparable harm and will continue to cause Plaintiff irreparable harm unless and until the Act is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to undergo a compelled medical or psychiatric examination and from disciplining Plaintiff for objecting in good faith to these demands.

130.    Plaintiff has no adequate remedy at law.

## Count XI: Fourth Amendment – As Applied Challenge

131.    Plaintiff realleges and incorporates the preceding paragraphs as if fully incorporated herein.

132.    Defendants lack either a warrant issued on probable cause by a neutral judicial official or a constitutionally reasonable basis for requiring Plaintiff to surrender her private medical records none of which bear on her fitness to continue serving as an Article III judge.  Accordingly, compelling Plaintiff to surrender her private medical records violates Plaintiff's Fourth Amendment rights.

133.    Plaintiff has been and will continue to be irreparably harmed unless and until Defendants' violation of her Fourth Amendment rights is declared unconstitutional and Defendants are enjoined from requiring Plaintiff to surrender her private medical records and from disciplining Plaintiff for objecting in good faith to these demands.

JA60

134.    Plaintiff has no adequate remedy at law.

**RELIEF REQUESTED**

**WHEREFORE,** Plaintiff respectfully requests that the Court: (1) declare the Act to be unconstitutional, either in whole or in part and enjoin Defendants from enforcing the Act to the extent it is unconstitutional; (2) declare any continued proceedings against Plaintiff by the Judicial Council of the Federal Circuit to be unconstitutional as violative of due process of law and enjoin Defendants from continuing any such proceedings, except to the extent necessary to transfer the matter to a judicial council of another circuit; (3) order that Judge Newman's ability and authority to hear cases be immediately restored; (4) order the termination of any further investigation of Plaintiff by the Judicial Council of the Federal Circuit, except insofar as necessary to transfer the matter to the judicial council of another circuit; (5) declare any decisions by any and all Defendants authorizing a limitation of Plaintiff's docket or other special restrictions on her actions as a federal judge, including, but not limited to the reduction in statutorily authorized number of staff to be unconstitutional and/or not in accordance with the law, and enjoin Defendants from continuing any such actions; (6) declare any orders of the Special Committee requiring Plaintiff to undergo a compelled medical or psychiatric examination and/or disciplining Plaintiff for objecting in good faith to these demands to be unconstitutional and enjoin Defendants from enforcing the foregoing unconstitutional orders; (7) declare any orders of the Special Committee requiring Plaintiff to surrender her private medical records and/or disciplining Plaintiff for objecting in good faith to these demands to be unconstitutional and enjoin Defendants from enforcing the foregoing unconstitutional orders; (8) award Plaintiff reasonable attorneys' fees and costs; and (9) grant Plaintiff such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of any triable issues.

JA62

June 27, 2023                                  Respectfully submitted,

                                               /s/ *John J. Vecchione*
                                               _____
                                               JOHN J. VECCHIONE (DC Bar No. 431764)
                                               Senior Litigation Counsel

                                               /s/ *Gregory Dolin**
                                               _____
                                               GREGORY DOLIN, MD
                                               Senior Litigation Counsel

                                               NEW CIVIL LIBERTIES ALLIANCE
                                               1225 19th Street NW, Suite 450
                                               Washington, DC 20036
                                               Telephone: (202) 869-5210
                                               Facsimile: (202) 869-5238
                                               john.vecchione@ncla.legal

                                               *Admission Application Pending*

                                               *Counsel for Plaintiff*

JA63

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HON. PAULINE NEWMAN,

        Plaintiff,

    v.

HON. KIMBERLY A. MOORE, *et al.*,

        Defendants.

Case No. 1:23-cv-01334-CRC

## DEFENDANTS' MOTION TO DISMISS

Defendants[1] hereby move to dismiss Plaintiff's First Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  A proposed order is attached.

---

[1] The Honorable Kimberly A. Moore, sued solely in her official capacities as Chief Judge of the U.S. Court of Appeals for the Federal Circuit, Chair of the Judicial Council of the Federal Circuit, and Chair of the Special Committee of the Federal Circuit; the Honorable Sharon Prost, sued solely in her official capacity as a Member of the Special Committee of the Federal Circuit; the Honorable Richard G. Taranto, sued solely in his official capacity as a Member of the Special Committee of the Federal Circuit; and the Judicial Council of the Federal Circuit.

JA64

DATED:  September 1, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

/s/ *Stephen Ehrlich*
STEPHEN EHRLICH
M. ANDREW ZEE
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
Peter W. Rodino, Jr. Federal Building
970 Broad Street, 7th Floor
Newark, NJ 07102
Phone:  (202) 305-9803
Email:   stephen.ehrlich@usdoj.gov

*Attorneys for Defendants*

**JA65**

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2
     HON. PAULINE NEWMAN,           ) Civil Action
 3                                  ) No. 1:23-CV-1334
                         Plaintiff, )
 4                                  )
     vs.                            ) MOTION HEARING
 5                                  )
     HON. KIMBERLY A. MOORE,        )
 6   et al.,                        ) Washington, D.C.
                                    ) January 25, 2024
 7                       Defendants. ) Time:  10:05 A.M.
                                    )
 8   _____

 9          TRANSCRIPT OF MOTION HEARING HELD BEFORE
         THE HONORABLE JUDGE CHRISTOPHER R. COOPER
10               UNITED STATES DISTRICT JUDGE

11   _____

                       A P P E A R A N C E S
12
     For Plaintiff:      GREGORY DOLIN
13                       JOHN JULIAN VECCHIONE
                         New Civil Liberties Alliance
14                       1225 19th Street NW
                         Suite 450
15                       Washington, DC 20036

16   For Defendants:     STEPHEN EHRLICH
                         U.S. Department of Justice
17                       Civil Division, Federal Programs Branch
                         1100 L Street, NW
18                       Washington, DC 20005

19                       MICHAEL ANDREW ZEE
                         U.S. Department of Justice
20                       Civil Division, Federal Programs Branch
                         450 Golden Gate Avenue, Room 7-5395
21                       San Francisco, CA 94102

22   _____

     Court Reporter:     Tamara M. Sefranek, RMR, CRR, CRC
23                       Official Court Reporter
                         United States Courthouse, Room 6714
24                       333 Constitution Avenue, NW
                         Washington, D.C. 20001
25                       202-354-3246
```

**JA66**

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, we're on the
 3    record for Civil Case 23-1334, the Hon. Pauline Newman v. Hon.
 4    Kimberly A. Moore, et al.
 5            Counsel, please approach the lectern, identify
 6    yourself for the record, starting with the plaintiff.
 7            MR. DOLIN:  Good morning, Your Honor.  Gregory Dolin
 8    for Judge Newman.
 9            THE COURT:  Good morning, Mr. Dolin.
10            MR. EHRLICH:  Good morning, Your Honor.  Stephen
11    Ehrlich from Department of Justice on behalf of the defendants.
12            THE COURT:  Good morning, Mr. Ehrlich.  Just give me
13    a minute to get situated.
14            Okay.  I know we're here on cross-motions; we have a
15    preliminary injunction motion by the plaintiff and a motion to
16    dismiss by the defendants.  The defendants' motion is
17    dispositive, so why don't we start with the government, if
18    that's okay.
19            And just before you start, I know there are a lot of
20    moving parts out there.  The way that I've sort of organized
21    the case in my own mind is, first, the mootness of the 332(d)
22    claims.
23            Second, whether the as-applied challenges to the
24    Judicial Conduct and Disability Act are barred by
25    Section 357(c).
```

 1          Third, does the Court otherwise lack original

 2    jurisdiction over at least the as-applied claims.  A subset of

 3    that question is which claims are facial as opposed to

 4    as-applied.  And then, finally, the merits of the facial

 5    claims.

 6          So I don't know if that jibes with what you -- how

 7    you plan to lay it out, but if you could go in that order, that

 8    would be helpful.

 9          MR. EHRLICH:  Absolutely, Your Honor.  I'm happy to

10    do that.

11          Again, may it please the Court, Stephen Ehrlich from

12    the Department of Justice on behalf of defendants.  Defendants

13    did not want to be here today, nor should they be.  In the last

14    year, 96-year-old Judge Newman has shown concerning signs that

15    a possible disability is impeding her ability to perform the

16    duties of an active circuit judge.

17          From the start, other members of the federal circuit,

18    who have long served with and value Judge Newman, approached

19    her in a respectful manner to address the difficult situation,

20    attempting an informal resolution that would have avoided --

21          THE COURT:  Counsel, I'm aware of the background.

22    What I'd like to do is turn the temperature down a little bit

23    and focus on the legal issues, okay?

24          MR. EHRLICH:  Absolutely.  So I'll start with

25    mootness, as Your Honor mentioned.

```
 1              Obviously, we think the June 5th order under the

 2    Judicial Council --

 3              THE COURT:  If you could slow down just a little bit

 4    for the benefit of the court reporter.

 5              MR. EHRLICH:  Apologies, Your Honor.  I have an issue

 6    with that.

 7              THE COURT:  That's all right.  I know you have a lot

 8    to say.

 9              MR. EHRLICH:  So we believe that June 5th order is

10    moot.  I don't think there's any dispute that it's moot; just

11    an issue of whether either of the mootness exceptions that have

12    been briefed in the supplemental briefs overcome that.  And, of

13    course, we would say no.

14              So on voluntary cessation, we say that doesn't apply,

15    first of all, to governmental actors, especially federal

16    judges.  I think as the D.C. Circuit has made clear, you

17    don't -- they're loath to impute a manipulative intent to other

18    government actors.  I think that's all the more so here when

19    they're federal judges.  Also --

20              THE COURT:  I mean, that principle comes from the

21    Clarke case, I believe.

22              MR. EHRLICH:  That's right, Your Honor.

23              THE COURT:  Has that been consistently applied by the

24    circuit and other circuits?  I mean, certainly, I can envision

25    scenarios where a federal actor would, if not engage in
```

1    manipulative conduct, at least strategic conduct.  I mean, I

2    see it all the time.  I mean, it's understandable if someone

3    would withdraw a -- if an agency were to withdraw some sanction

4    or some course of dealing in order to moot a claim.

5            MR. EHRLICH:  Yeah.  I think courts have consistently

6    recognized that this causes -- there's serious doubts about

7    applying this.  What -- they usually, sort of, do both prongs

8    anyway and end up finding no voluntary cessation.  And I would

9    point to the *Chang* case from Judge Walton, issued last month,

10   and he echoed these same concerns that applied in *Alaska*.

11           I think, even more to the point, this exception only

12   applies if it was done to avoid litigation, and that's clearly

13   not what we have here.  The June -- the November 9th order that

14   vacated the June 5th order was done for one reason only, which

15   is she cleared her backlog, which was the basis of the June 5th

16   order, and so they vacated the order.  That was a suspension

17   due to that backlog.  So it wasn't to avoid litigation.

18           We've briefed the merits.  We're not avoiding the

19   issue.  I think for those reasons, that exception clearly does

20   not apply.

21           And then we have, obviously, arguments for --

22           THE COURT:  Be that as it may, certainly, the council

23   could reimpose the sanction at the stroke of a pen, as the

24   circuit said in *Alaska* was sort of one factor.  I know that

25   that gets more at the capable of repetition yet evading review

1     prong.

2                But should the Court not consider the ease with which

3     the circuit could reimpose the sanction given the fact that

4     Judge Newman has indicated that it is likely that she will not

5     be able to keep up with her cases going forward?

6                MR. EHRLICH:  Yes.  So I think a couple things on

7     that, Your Honor.  So I think, first of all, there's an

8     independent -- for both exceptions, she would have to show a

9     reasonable expectation that it would reoccur, and I think -- so

10    for both they, sort of, collapse on this prong, in our view.

11               I think both have the same issue, which is -- one is

12    she has an independent suspension under the act.  So even if

13    you enjoin the June 5th order -- which, obviously, we think is

14    moot -- it would have no effect.  She's not going to begin

15    hearing cases tomorrow, and so she can't build up a backlog.

16    And so any backlog from there is purely speculative.

17               But even if she could hear cases, I think it's

18    entirely speculative that the same exact thing would occur as

19    June 5th.  That backlog took a while to build up.  Some of

20    those cases were 100, 200, 300 days old throughout the

21    suspension.  So there's no -- there's no indication that that

22    would happen -- it certainly wouldn't happen immediately.

23               Even if it happened, the Judicial Council may take a

24    different approach.  They may act proactively.  They may do

25    something short of suspension.  I think we just have no idea.

1    Obviously, it's in the discretion of those 11 circuit judges to

2    determine how to deal with that situation if and when she

3    begins sitting again.

4         I think right now, sitting here today, there's no

5    reasonable expectation that the exact same thing is going to

6    occur.  And when you look at cases like *Alaska*, like the *Usher*

7    case we cite, like the *Armstrong* case, where it's not a matter

8    of reviving the exact thing that's going on here, and you have

9    to speculate about what other actors will do here, other 11

10   circuit judges who acted unanimously in this case.  But once

11   you have to speculate about that, it doesn't really fit into

12   these exceptions for mootness.  You're speculating about

13   further actions and what may happen.

14        So I think for those reasons, we are saying neither

15   of the exceptions would apply.

16             THE COURT:  Okay.

17             MR. EHRLICH:  One moment, Your Honor.  I'm just going

18   to grab some water.

19             THE COURT:  Sure.

20             MR. EHRLICH:  So I'm happy, Your Honor, to turn to

21   the Section 357 bar.  I think that's -- unless you have more

22   questions on mootness.

23             THE COURT:  No.  Please do.

24             MR. EHRLICH:  I think this is fairly laid out in our

25   briefs.  But our position is, basically, *McBryde* covers this.

1    The 357 bar takes care of all as-applied and statutory

2    challenges under the act.  And as pled in the complaint, that's

3    all we have here.  We have, basically, as pled only as-applied

4    challenges under the act to orders and determinations by the

5    special committee and the Judicial Council, and so we think

6    *McBryde* clearly, clearly bars --

7            THE COURT:  Your position is that every count in the

8    complaint is an as-applied challenge?

9            MR. EHRLICH:  Yes, I think so.  As pled, Your Honor,

10   I think that's right.  I understand my friend on the other side

11   thinks that some are trying to assert facial challenges, so

12   he's free to argue that.

13           But as currently pled, as we lay out in our briefs,

14   there's all sorts of orders and determinations that they're

15   challenging.  So just to put this in relief, I think everybody

16   agrees that Counts 2, 3, 4, 10, and 11 are --

17           THE COURT:  Hold on.  Hold on.

18           MR. EHRLICH:  Sure.

19           THE COURT:  2, 10, 4, 11?

20           MR. EHRLICH:  2, 3, 4, 10, and 11, Your Honor.  And I

21   think this is plaintiff's reply at 28 where we, sort of, agree

22   on this.

23           So I think those are clearly barred -- again, not --

24   there's judicial review, but the judicial review is happening

25   in the act-related proceedings with those federal judges.  So I

1    think we all agree that those are as-applied.

2              So the dispute, I think, plaintiff is honing in on

3    is, obviously, the remaining counts, which are 1, 5, 6, 7, 8,

4    and 9.  So 1 and 5 through 9.

5              I think these -- again, Judge Newman and -- plaintiff

6    may have tried to assert a facial challenge, but as pled, we're

7    talking about orders and determinations.  For example, Count 1

8    is their supposed constructive impeachment claim, and that

9    talks about defendants' orders and threats constitute an

10   attempt to remove plaintiff from office unlawfully, and then

11   talks about -- it lists specific actions of the special

12   committee.

13             I mean, we can tick through the list, but same thing,

14   for example, Count 6.  The imposition of these requirements for

15   medical exam and medical records on plaintiff are ultra vires

16   and unconstitutional.  We tick through these in the brief, Your

17   Honor.

18             But I think, in our view, while she could have tried

19   to do facial challenges, that may have evaded the bar.  It's

20   just that as pled, it doesn't -- it doesn't get there.  It's

21   challenging orders and determinations that under *McBryde* are

22   barred.

23             So I think for those reasons, we would say all of the

24   claims fall under the 357(c) bar and are, therefore, not able

25   to progress.  So that may be the -- one of the easier ways to

1    resolve the case.  But, obviously, we have other grounds, and

2    I'm happy to move to the original jurisdiction point for Your

3    Honor.

4         I think there's --

5         THE COURT:  Why don't you address the plaintiff's

6    arguments under -- that *Axon* and *Dart*, essentially, contradict

7    or undermine *McBryde*'s holding that 357 or the predecessor

8    statute barred as-applied challenges.

9         MR. EHRLICH:  Yes.  Happy to, Your Honor.  So nothing

10   in *Axon* casts any doubt on the -- on the holding of *McBryde*.

11   As we say in our brief, *Axon* is about a special statutory

12   review scheme, where the issue is whether you have to go

13   through the agency review process before you can come into

14   federal court, and this is not a special statutory review

15   scheme.  It's a complete bar on judicial review.

16        So *Axon* doesn't really apply at all.  But I think the

17   way this manifests itself is that *Axon* is about, as I said,

18   whether somebody has to go through the agency process before

19   they can get to court.

20        And I think the way to think about this, the way we

21   think about this is that she is already in a court -- she is in

22   the equivalent of a court.  She's going through a judicial

23   process under the act before 11 circuit judges and then 7

24   judges of the JC&D committee.  So in that sense, it doesn't

25   really apply with *Axon*.

1      When you try to apply the *Axon* factors, it just

2  doesn't really compute.  So if you look at the -- *Axon/Thunder*

3  *Basin* factors.  So whether meaningful judicial relief is

4  foreclosed, obviously, we would say no; she's getting judicial

5  relief now through the act-related review.

6      Whether it's a collateral claim in *Axon*, it was that

7  the agency was unconstitutionally structured, but we don't have

8  anything like that here.  The claims are how the Judicial

9  Council and the special committee used their powers, which

10  could be remedied at the end.

11      And then, obviously, the last factor is whether the

12  agency has any expertise in deciding the question at issue.

13  And, obviously, they're federal judges, so they have quite a

14  bit of expertise in deciding constitutional questions.

15      When you tick through those *Axon* factors, I think

16  it's pretty clear that the *Axon* framework doesn't really apply

17  here and *McBryde* is, obviously, still good law.  It doesn't

18  change the plain text of 357, which says that all orders and

19  determinations are barred from judicial review.  So I think

20  nothing in *Axon* does anything to those.

21      And just one last point on *Axon*, which, even if you

22  can go outside of the act -- out of the bar into federal court

23  here, it doesn't solve which court you need to go to.  And so

24  it doesn't solve our issue that you have to go to a court with

25  appellate, not original jurisdiction.

1    The *Dart* and I think *Leedom* are, sort of,

2    interrelated and plaintiff makes those.  We have a few reasons

3    in our briefs, a reply at page 8.  But let me start with

4    *McBryde* itself, which says *Leedom* was merely an application of

5    the familiar requirement that there be clear and convincing

6    evidence of legislative intent to preclude judicial review.

7    That's a quote from *McBryde*.

8        Obviously, *McBryde* then found that there was clear

9    intent to bar everything but facial challenges.  And the same

10   thing with *Dart*.  They expressly addressed *Dart* and said *Dart*

11   stands for the exceedingly narrow proposition that a statute

12   precluding review is limited by its language.  It doesn't mean

13   that every -- the bar is ineffective any time plaintiff asserts

14   a legal error.

15       So I think *McBryde* dealt with these exact arguments

16   and rejected them.  And then we have the reasons we give as

17   well in our brief, Your Honor, which is --

18       THE COURT:  So while there -- I will inquire with

19   plaintiff as to where on the face of the statute or how, if at

20   all, the circuit violated the face of the statute.  But there

21   is a rule governing the disability proceedings that says

22   matters should be transferred under -- to a different Judicial

23   Council in extraordinary circumstances.

24       What if I were to conclude that the committee

25   violated or -- let me ask you.  Did the committee violate that

**JA77**

1    rule by not transferring the matter to a different circuit?  It

2    is somewhat difficult to imagine more extraordinary

3    circumstances than those presented here.

4            MR. EHRLICH:  Sure.

5            THE COURT:  And would that be sort of an ultra vires

6    act consistent with what the agency did in *Dart*?

7            MR. EHRLICH:  I think it would be an as-applied --

8    as-applied aspect of this.  I think Your Honor's question sort

9    of builds that in because you have to examine the extraordinary

10   circumstances that would apply.  So by definition, I think

11   you're under the 357(c) bar to even get there.

12           Obviously, we have our other threshold issues, which

13   is original jurisdiction.  So I'm not sure how you would ever

14   get to that situation.  But if you were, I think we would say

15   absolutely the Judicial Council did not do anything wrong on

16   transfer.

17           I mean, this is laid out in the Judicial Council's

18   September 20th order, and I would point Your Honor to -- at

19   page 43 of that order where they explain all the reasons they

20   didn't transfer.  And it certainly makes no sense to transfer

21   now, which is at the end of the proceedings.

22           It's a narrow proceeding about her misconduct in

23   failing to cooperate.  That proceeding is, essentially, done at

24   the Judicial Council level.  It's before review at the JC&D

25   committee.

14

1              THE COURT:  What's the status of the committee's work

2       at this point?  Have they taken any action?

3              MR. EHRLICH:  They have not taken any public action.

4       It is fully submitted and ready for their decision.  So it is

5       up to them to decide, and I think it -- at this point, under

6       Rule 26, transfer wouldn't even be allowed.  Rule 26 is before

7       it gets to that point.  So, obviously, they didn't misapply

8       that there.

9              I think, as they've said throughout the process,

10      there's no case that they can find where -- and plaintiff has

11      never pointed to any -- about a transfer for disability.  And I

12      think, as the Judicial Council lays out in the citation I gave

13      Your Honor, there's great reasons for keeping it in the federal

14      circuit.

15             A lot of these things were happening in real time.

16      And as you can see from the record, from the Judicial Council's

17      order that chronicles this, I mean, plaintiffs -- excuse me,

18      not plaintiffs -- witnesses were coming forward in real time to

19      give more information about this happened with Judge Newman and

20      now this happened with Judge Newman; so it accumulated.  And

21      that's simply not possible if you transfer it to another

22      circuit that is not immediately available for witnesses.

23             And so I think for that and the other reasons

24      explained in the Judicial Council's order, it was, obviously,

25      not an abuse of discretion or -- I don't even know what

1   standard you would apply.  But if you ever reached this to try

2   and override the 11 circuit judges who decided this --

3            THE COURT:  And it's a should, not shall.

4            MR. EHRLICH:  Correct, Your Honor.  It also says

5   should.

6            Just one last thing on this, which is it's not their

7   decision to transfer.  They can request transfer from the chief

8   justice, but it's not their call.

9            So that the most you could order them to do is to ask

10  for a transfer, and then there may be some redressability

11  problems with that.  Obviously, we think you should never reach

12  that.  But even if you did, obviously, we think they did

13  everything properly, as they lay out in the order.

14           And I think -- I'm happy to move to the original

15  jurisdiction point, Your Honor.

16           THE COURT:  Please do.

17           MR. EHRLICH:  And I think this is, obviously, fairly

18  laid out in our briefs.  I think there seems to be no dispute,

19  as I interpret it from the briefing, that the act-related

20  proceedings are judicial in nature.  There's almost no argument

21  in the opposition about that.  It's mostly about the 332

22  authority and the June 5th suspension which, obviously, we say

23  is now moot.

24           But there's, obviously, a lot of reasons why it's

25  judicial.  Even the statute in 357 says it's judicial review.

 1    It calls it judicial review.  It's, obviously, made up of

 2    exclusively federal judges who have the power to issue

 3    subpoenas and hold hearings.  It's akin to attorney

 4    disciplinary proceedings, as courts have repeatedly held.

 5         I think, if I could point you to one place on this, I

 6    would say Judge Pryor's opinion in *Pitch*, which was joined by a

 7    majority of the 11th Circuit en banc, lays out exactly all of

 8    the reasons why this is a judicial proceeding.  It's in a

 9    slightly different context.  He's analyzing the Federal Rules

10    of Criminal Procedure.

11         But he lays out exactly, in applying the standard

12    that I take both of us to be applying, which is mainly the

13    application of existing policies to present or past facts,

14    that's sort of the formulation from --

15         THE COURT:  It's also formulated in terms of

16    adjudication of present rights.  So the question is, does

17    Judge Newman have a right to hear cases.  I mean, you seem to

18    suggest -- correct me if I'm wrong -- in the due process area

19    that there is no right.  Does she have a right to hear cases?

20    If so, or if not, how are present rights being adjudicated?

21         MR. EHRLICH:  I think she has -- I think -- excuse

22    me, Your Honor.  I think we concede that this is an

23    adjudication of a present right, which is her hearing of cases.

24    And this is why we didn't challenge standing, for example.

25         We don't think that's irreparable harm, as we later

**JA81**

1    say, because she doesn't have an interest in hearing specific

2    cases; that is, the cases she would have heard but for the

3    suspension.  So we don't think it rises to that level.

4         But I think it's certainly her present right to hear

5    cases, and I don't take -- I mean, you can ask plaintiff, but I

6    don't take them to be disputing that.  So I think, in our view,

7    this falls exactly within -- exactly what *Pitch* said for

8    judicial proceedings for all of those factors.  You know, Judge

9    Pryor ticks through, obviously, the Supreme Court precedent on

10   this in terms of *Feldman* and applying that standard that Your

11   Honor just articulated.

12        And then -- so I think the act-related proceedings

13   are pretty clearly judicial.  That only leaves the Judicial

14   Council order that we think is moot.

15        THE COURT:  Just counting heads, if you go to

16   *Chandler*, there were at least five justices that did not agree

17   with Justice Harlan's concurrence that the Judicial Council

18   exercised judicial functions.  Your position is that that was

19   not part of the holding?

20        MR. EHRLICH:  Well, yeah.  I think Your Honor is

21   referring to Footnote 7 of *Chandler* where they, sort of, glaze

22   over this.  I think, first, we would say that's dicta.  I would

23   say -- I believe it was four justices in the majority.  But the

24   three justices, both Justice Harlan and the two dissenting

25   justices, the only three to directly address and analyze this

**JA82**

1    question, all found that it was a judicial action.  So I think

2    that pretty clearly says that.

3          But then you get cases like the Fifth Circuit *McBryde*

4    decision, which was analyzing a 332 order and said, while a

5    Judicial Council may act administratively sometimes, it acts as

6    a court when it reassigns cases.  This was square in the Fifth

7    Circuit decision.  It was cited in *Pitch*, again, for these

8    act-related things as well.

9          So I think all of those things combined paint a

10   pretty clear picture that this is judicial, and I think Justice

11   Harlan, obviously, goes most in-depth on this, and I think he

12   has a great opinion.  He lays out, obviously, reassigning cases

13   or stopping the flow of cases is, as he says, an integral

14   aspect of the cases from beginning to end of the case, just as

15   if Your Honor transferred a case to another court for venue or

16   other reasons.

17         So in that sense, he says it's similar to mandamus

18   and similar to other orders, like setting a time for trial.  So

19   I think in that sense, we would say it's pretty clearly

20   judicial on both fronts.

21         And I think, just to put a fine point on it, I think

22   we reference this in our brief from the *Hohn* case.  But to hold

23   otherwise, to say that they're administrative actions, would

24   mean that nonjudicial actors can review them, which would

25   raise, one, serious constitutional questions that should be

1    avoided, as Justice Kennedy says in *Hohn*; but it would also

2    defeat the entire purpose of the statutory scheme that Congress

3    enacted going back to 1939.

4         They specifically enacted this to take it away from

5    the political branches, to have a completely in-house mechanism

6    for policing the efficient and effective administration of

7    justice under 332 and for acts in 1980.  They wanted that

8    in-house in the judiciary.  So setting aside the grave

9    constitutional questions --

10        THE COURT:  Yet, they stopped short of creating a

11   court, in effect.

12        MR. EHRLICH:  They did stop short of creating a

13   separate court, but I think, as the D.C. Circuit said in

14   *McBryde*, there's functionally not really a difference between

15   that and the JC&D committee review that they ended up settling

16   on that came through the House bill.

17        It's the same idea, which is that -- I mean, even in

18   the court aspect, it would be Article III judges deciding.  I

19   think it was the same aspect.  As *McBryde* says, that was

20   probably more cosmetic than anything.

21        So either way, they wanted this in-house in the

22   judiciary; and to hold that it's administrative and perhaps

23   people in the executive branch could review it, I think, would,

24   again, raise constitutional questions and completely defeat the

25   purpose.

1          I think the second piece of this, Your Honor, is,

2    obviously, once you find that they're judicial, I think it's

3    very clear that that has to go to a court with appellate

4    jurisdiction, not original jurisdiction like this court.

5    That's why Judge McBryde went straight to the Supreme Court,

6    and that's why the three justices who addressed the question

7    said, hey, we have jurisdiction to deal with this.  That was

8    the point of figuring out whether it was judicial.

9          And that's -- the Fifth Circuit and *McBryde*, again,

10   corroborates this where they had -- they said they had no

11   jurisdiction to review Judicial Council orders of their own

12   circuit.  And, obviously, it came up through the district

13   court, so they were able to review it.  But, obviously, no

14   district judges are involved here.

15         So I think it's pretty clear, once you do judicial,

16   this court has no appellate jurisdiction.  You have only

17   original jurisdiction and, therefore, can't hear the case.

18         So I think with that, Your Honor -- I think those are

19   mainly our threshold issues that Your Honor had ordered.  We

20   have another one that we have in our briefs -- excuse me --

21   about these principles of comity and exhaustion which plaintiff

22   never responded to, and I think, therefore, has, essentially,

23   conceded.

24         But we make the point that -- in *Hastings I* about how

25   they talk -- they say, you know, you're going through the act

**JA85**

1    process; let that process play out.  It has to go through these

2    layers upon layers of review.  And to enjoin it in the middle

3    of the process would cause great harm.

4           And so I think, obviously, relying on that and the

5    other arguments we make in that section and we, sort of,

6    analogize it to, for example, the First-Filed Rule where two

7    courts should not simultaneously be deciding the same question.

8           THE COURT:  Right.  But now that it's at the judicial

9    conference level, aren't those sort of comity and prudential

10   arguments weaker because there's nothing at the Judicial

11   Council level to enjoin at this point?

12          MR. EHRLICH:  I wouldn't say weaker.  I would say

13   they've shifted.  They're not -- maybe I would say weaker.

14   They're not as strong as they were when we were at the

15   beginning of the process when this started in June.

16          But I think the principles still hold, and I think in

17   *Hastings I* they specifically talked about the JC&D committee

18   review and said they can interpose constitutional challenges at

19   the conference level.  So I think that -- of course, I mean, as

20   we point out in our reply brief, the judicial conference is not

21   a party here.  So that's the wrong defendant if you were trying

22   to enjoin something.

23          But I think more to the point, the judicial

24   conference could side with Judge Newman and reverse the

25   Judicial Council, in which case your injunction would be,

1    essentially, advisory opinion.

2                I think for those reasons, Your Honor could go that

3    route if you want to.  I think, in our view, it's a prudential

4    doctrine, and so that would be up to Your Honor.  But I think

5    if you cleared all of those hurdles, I think you would end up

6    at the two claims that we move to dismiss --

7                THE COURT:  Just one last point on original

8    jurisdiction.

9                MR. EHRLICH:  Sure.

10               THE COURT:  I take it your position is that we would

11   still have jurisdiction over facial challenges consistent with

12   *McBryde*?

13               MR. EHRLICH:  No.  I don't -- that's not right, Your

14   Honor, and I'll tell you why.  It's because the -- because of

15   the judicial bar, obviously, everything other than -- only

16   facial challenges make it through.  When those courts are

17   deciding it, when the Judicial Council and the JC&D committee

18   are reviewing them, they're performing judicial acts.

19               If we get to the end of that process and facial

20   challenges need to be brought, the place to bring them is in a

21   court with appellate jurisdiction over those judicial entities,

22   which still would not be here.  So for --

23               THE COURT:  Isn't that inconsistent with *Feldman*,

24   where the Supreme Court said that, to the extent there are

25   claims, general challenges to the constitutionality of the bar

1    admission rule that was at issue in that case, they could still

2    be brought in the district court?

3         MR. EHRLICH:  I mean, *Feldman* is a little bit

4    different because it was coming from the equivalent of a state,

5    and here we're dealing with parallel federal judges.  I think

6    the things that Your Honor is seeing from *McBryde*, the

7    statements on this are really doing -- there's really three

8    different aspects of this.

9         One is whether facial challenges can be brought

10   outside of the act; that is, whether the bar bars facial

11   challenges.  *McBryde* says no, and we're not disputing that.

12   The second is where they should be brought.  And our view is

13   they have to be brought in a court of appellate jurisdiction.

14   And that's true under the act, the same as it's true in 332.

15   And that's, again, why Judge McBryde --

16        THE COURT:  But the challenge is not to any action of

17   the judicial conference or to higher-level Article III judges.

18   The challenge, if it's a true facial challenge, is to Congress.

19   And why wouldn't a district court have original jurisdiction

20   over that challenge, putting aside *McBryde*?

21        MR. EHRLICH:  Yes.  I think the answer is the reasons

22   that we've been discussing, which is the actions by -- first of

23   all, the actions that we're talking about, the orders and

24   determinations would fall under the bar.  So, obviously, we

25   think that's all there is here.

1          But setting that aside, if there's a true facial

2     challenge, we think that's a judicial action by the Judicial

3     Council, by the judicial conference who can decide these

4     questions.  And so a review of those --

5          THE COURT:  But if it's a true facial challenge, it's

6     a challenge to the statute in all of its applications, and

7     that's a challenge to congressional action, and it has nothing

8     to do with a lower-level court second-guessing the decisions or

9     application of a law by a higher-level court.

10         MR. EHRLICH:  But I think it does because, again,

11    those courts can address that.  And so, you know, if you, for

12    example, reached a contrary conclusion to the 11 circuit judges

13    on the Judicial Council on a facial constitutional challenge,

14    you have -- I don't really even know.  You have dueling, sort

15    of, determinations.

16          So I think the way we would envision this, there's

17    sort of two tracks.  So on the 332 track, it would be a

18    Judicial Council determination, which you would take directly

19    to an appellate court like Judge Chandler did.  For the act, I

20    think you would -- because of the bar, you would go up through

21    the act process, raising your constitutional challenges, and

22    then go to an appellate court if you're dissatisfied with that.

23    I think that's how these two tracks work out in our view.

24          But, again, I think -- I'm happy to move beyond

25    the -- unless Your Honor has more questions.

1          But moving beyond, even if you surmounted all of

2     these hurdles -- and I'm happy to take the merits in whatever

3     order Your Honor would like, but I'll start with the -- what

4     has been termed the constructive impeachment claim.

5          Again, just to reiterate, we don't think there's a

6     facial challenge, but assuming for the moment that there is, I

7     think, again, *McBryde* forecloses this --

8          THE COURT:  We're on Count 1.  Let's take the counts

9     that plaintiff submits are facial --

10         MR. EHRLICH:  Okay.

11         THE COURT:  -- which begin, I believe, with Count 1.

12         MR. EHRLICH:  Right.

13         THE COURT:  Which is, essentially, no executive or

14    judicial agency or body may exercise in form or in substance

15    the impeachment power reserved by the Constitution to the House

16    and the Senate.  That sounds like a facial challenge to me.

17         MR. EHRLICH:  Well, again, I think, Your Honor -- I

18    mean, we would quibble with that only because of the way it's

19    pled.  It talks about -- I'm looking specifically at

20    paragraph 82, for example, defendants' orders and threats

21    constitute an attempt to remove plaintiff from office

22    unlawfully, and then it lists specific actions taken against

23    Judge Newman.  I mean, that, to us, looks like orders and

24    determinations.  Again, maybe inartful pleading, but things

25    matter.

1        I think even if you reached it, I think, in our view,

2    it wouldn't matter.  I think *McBryde* pretty squarely forecloses

3    this constructive impeachment argument.  It says that things

4    short of full disqualification and removal from office are

5    allowed; interbranch discipline is allowed.  As it says, the

6    Constitution doesn't speak to discipline generally.  It, in

7    fact, allows criminal prosecutions.

8        So I think in that sense, we would say *McBryde*

9    controls.  I guess the only thing -- unless Your Honor has

10   questions, the only other point I would make on this is if

11   you're at this point in the analysis, it's by definition a

12   facial challenge.  So you would have to show that no set of

13   circumstances exist where there could be discipline short of

14   impeachment.

15       Obviously, *McBryde* says that that's not accurate;

16   rejects that argument.  But even if you wanted to say, okay,

17   suspensions, just suspensions specifically, you'd have to say

18   that there's no set of circumstances where a judge could be

19   suspended.  So a one-day suspension, a one-sitting suspension,

20   I mean, all -- none of the courts to address this have taken it

21   that far.

22       And so if you look at, for example, Judge Edwards in

23   dissent in *Hastings I* talks about, he takes issue with 15

24   years, and you have the district court in *McBryde* saying a

25   one-year suspension doesn't approximate removal.  And so,

27

1    because of the nature of a facial challenge, I don't think

2    there's any way to overcome *McBryde*.

3              In addition to the bigger problem here, which is that

4    suspensions of a judge just simply don't equate to removal, I

5    think plaintiff's counsel in their briefs cite to the 1994

6    commission report.  It says in there, as long as judges hold

7    office, receive their undiminished salary and then can exercise

8    the judicial power once they're restored, there hasn't been a

9    removal.

10             And when you look at the cases that *McBryde* --

11   obviously, *McBryde*, we think, settles this.  They cite, for

12   example, the Ninth Circuit case, which was a criminal

13   prosecution against the judge, and the judge made the same

14   argument and said, hey, look if I'm imprisoned, I'm removed,

15   and I can't exercise my judicial functions.

16             And the Ninth Circuit rejected that, in line, by the

17   way, with what the Supreme Court did in *Burton* that it

18   references in that Ninth Circuit decision, the *Claiborne*

19   decision, where a senator -- this is at the Supreme Court --

20   senator made the same argument, said I'm being criminally

21   prosecuted, and that's going to be the equivalent of an

22   expulsion from the Senate, which can only be done by two-thirds

23   of the Senate.

24             And the Supreme Court said no, that doesn't affect

25   your office.  It's about your criminal imprisonment, and you

**JA92**

1    still have your office.  Maybe you'll be expelled after that,

2    but that's a different issue.  I think Your Honor doesn't have

3    to ever get there.  I think you can just say *McBryde* handles

4    this.  I think -- more broadly, I think that's the reason this

5    would fail.

6              THE COURT:  Okay.  Move to Count 5, which is the --

7    at least one of the vagueness counts.  Section 351(a) fails to

8    provide adequate notice of what constitutes a mental disability

9    and renders a judge unfit to perform duties.  And Section

10   355 -- 353(c) authorizes a special committee to conduct an

11   investigation as extensive as it considers necessary, lacks

12   minimum enforcement guidelines.

13             Now, those sound like challenges in all of their

14   applications.

15             MR. EHRLICH:  Yes.  So I think we would agree with

16   that, except for the reasons that we give in our brief at

17   pages 22 to 23 and in our reply, page 10, Footnote 5, which is

18   that under vagueness law, you have to first see whether it's

19   vague as applied to the particular plaintiff.  And once you're

20   doing that, you're in the area that the act bars.

21             So I think this is -- I think we say in our brief,

22   this is the closest they come to asserting a facial challenge.

23   But because of the way that vagueness law would apply -- and we

24   cite the *Hoffman Estates* case and some others -- it necessarily

25   runs into the as-applied challenge bar.

1         THE COURT:  How can you say that those provisions

2    clearly apply to Judge Newman when the special committee did

3    not reach a conclusion as to whether the, sort of, mental

4    disability provision applied to her or not?

5         MR. EHRLICH:  Well, I guess there's a couple things

6    built in there, Your Honor.  But I think the first thing I

7    would say is we haven't briefed the merits of this because,

8    obviously, we have these threshold issues.

9         We're happy to -- if anything made it through our

10   motion to dismiss, we're happy to brief the merits of that.

11   But I think we would -- I mean, this is what the -- so I'm a

12   little bit loath to --

13        THE COURT:  I understand.

14        MR. EHRLICH:  -- sort of riff on that.  I guess I

15   would say here that this is what this was meant for.  351 lays

16   out the reasons for actions under the act, and if a judge has

17   lost their faculties, in a sense, so that they can't -- the

18   things against Judge Newman are true, which as Your Honor

19   points out, we haven't been able to get to the bottom of

20   because she's refused to take the tests.

21        If that were true, I think we would say that clearly

22   falls within -- that is a disability that is exactly within

23   what Congress was envisioning.

24        THE COURT:  We're at the pleading stage now.  I have

25   to take plaintiff's allegations as true, right?

1          MR. EHRLICH:  Right.  But I think -- again, we

2     haven't briefed that on a 12(b)(6) ground.  For -- the only

3     ones we've briefed on the merits are the constructive

4     impeachment and the due process because that's the only ones

5     they raised in their preliminary injunction motion.  We're

6     happy to do that at the appropriate time.  But, again, we don't

7     think you would ever get there because of the jurisdictional

8     issues.

9          So I think that that would bring us to the other

10     claim that they briefed in their preliminary injunction motion,

11     which is the due process claim, and then -- I don't think

12     there's a ton to say on this, Your Honor.  I mean, I don't want

13     to completely reiterate our briefing.

14          But I would just -- just to level-set, I think

15     everyone agrees that the due process is as-applied.  That would

16     be, I think, squarely under the bar.  Obviously, we would then

17     say there's no original jurisdiction, so there's that problem.

18          Then you have the problem for both this and

19     constructive impeachment that we lay out in our brief, which is

20     they've, essentially, conceded by not responding to any of our

21     arguments.  And we lay out all the case law on this at reply

22     brief pages 11 to 12.  So I think those are threshold issues.

23          But even if you got to the due process, again, this

24     is squarely taken care of by *Hastings II*, which said the

25     combination of investigative and adjudicative authority under

1   the act does not offend due process.  I mean, I think that

2   squarely takes care of that.

3              Just one last point on that, Your Honor.  Just, even

4   if that were all -- even if there were an issue with that,

5   which *Hastings* says there's not, the point that *Hastings* makes,

6   too, is that there's review by the JC&D committee and the

7   judicial conference which is, obviously, not by judges of the

8   circuit, which is drawn from judges around the country.  So

9   there's no risk of bias or actual bias in the proceedings.

10             So I think that, essentially, takes care of our

11  entire motion.  I don't know if Your Honor wants me to address

12  the merits of the June 5th and the 332 authority or --

13             THE COURT:  Let's hear from the plaintiffs [sic].

14  Thank you.

15             MR. EHRLICH:  Thank you, Your Honor.

16             THE COURT:  The plaintiff, I should say.  Mr. Dolin.

17             MR. DOLIN:  Good morning, Your Honor.

18             THE COURT:  Good morning.  How are you?

19             MR. DOLIN:  I'm doing well.  Thank you.  I will

20  endeavor to proceed in the same order as my friend on the other

21  side.  So I'll begin with mootness.

22             THE COURT:  Yes.

23             MR. DOLIN:  First, I disagree that voluntary

24  cessation doesn't apply to federal actors or government actors

25  or federal judges.  In fact, just last term -- maybe two terms

1    ago, the Supreme Court in the EPA case applied -- government

2    argued that, because EPA vacated its clean power plant rule,

3    the case is moot, and the Supreme Court declined to hold it

4    moot saying that it is capable of repetition, yet evading

5    review, despite the fact that the EPA voluntarily chose to --

6          THE COURT:  Let's assume I agree with you.  What

7    evidence in the record is there that the Judicial Council

8    vacated the June 5th order in order to manipulate the judicial

9    process somehow?  I mean, didn't the vacatur occur the day

10   after she cleared her backlog?

11         What other evidence is there in the record other than

12   that as to why that order was vacated?

13         MR. DOLIN:  First, I would point out, Your Honor,

14   that the June 5th order itself was strategic.  If you recall,

15   initially, judgment was suspended by this unrecorded,

16   unreported order of March 8th, and throughout -- between

17   March 8th and June 5th, throughout that time, Chief Judge

18   Moore, in her emails, which were then incorporated into orders

19   by the special committee -- so there's not just informal

20   emails; they became formal orders -- throughout said that

21   Judge Newman is suspended pending investigation.

22         After we sued and pointed out that there's no such

23   authority, only that June 5th order came into being, citing an

24   entirely new provision.  Then when Judge Newman fell below the

25   federal circuit's own guidelines as to what constitutes

1    backlog, the June 5th order was not vacated.  And only after we

2    again pointed that out in our briefing to this Court, only

3    then, ten days after we completed the briefing, was the order

4    vacated.

5         Yes, it was vacated the day after.  But, again, if

6    you look at -- just small details, even in the order itself,

7    the June 5th order has a disciplinary complaint number on it

8    even though it says it's under 332.  While we pointed out that

9    that makes us question whether it was truly under 332, the

10   November 9th order takes out that number.

11        So throughout this process, every time we would point

12   out an error, the defendants would do something to undermine

13   this Court's jurisdiction.  So I think the entire history of it

14   shows the November 9th order was strategically entered.

15        On top of that, to address opposing counsel's point

16   that, in order to see whether it's capable of repetition and

17   evading review, I take it that opposing counsel concedes that

18   it's evading review because under D.C. Circuit law, anything

19   that lasts for less than two years is presumptively evading

20   review.

21        So the only issue is, is it capable of repetition,

22   and opposing counsel says, well, injunction may not be

23   appropriate because you don't know what Judge Newman will do,

24   you don't know how the Judicial Council will react.  And I have

25   a couple of points to that.  One --

1          THE COURT:  First, she would have to show that

2     there's a reasonable expectation that she would be subject to

3     the same action again.  She says it's likely that she would

4     fall behind again and, therefore, be subject to similar action.

5     But yet, she just cleared her backlog.

6          What evidence is there in the record that she would

7     be likely to fall behind again?  Isn't that within her own

8     power to control?

9          MR. DOLIN:  Well, so the -- Judge Newman's --

10    contrary to defendants' assertions, Judge Newman's speed of

11    production has not varied in years.  And so we've put that

12    evidence before the Judicial Council.

13         We've done an analysis to how fast was she writing

14    opinions three years ago versus how fast was she writing

15    opinions now.  I know it's not in the record, but as her former

16    clerk, I can tell you 15 years ago it was no faster.  This is

17    just how Judge Newman works.

18         So if that's -- that's enough to suspend her --

19         THE COURT:  I mean, if she's concerned about

20    maintaining or not increasing her backlog, couldn't she go to

21    the Chief Judge and say, you know, can I take a 20 percent

22    reduction and wouldn't that -- I suspect that the answer would

23    be sure.

24         MR. DOLIN:  Sure.  And I want to make it clear.  So

25    the federal circuit has its own internal rules, which is in the

1    record -- Clerical Procedure 3, paragraph 5, I believe -- that
2    says that if you have a certain number of cases that are overly
3    old, four cases over six months old or two cases over a year
4    old, you don't get to do the next sitting.  Judge Newman
5    doesn't object to this general rule that applies to all judges.
6    So if she falls behind where she has these many cases, she
7    would be skipping a sitting or two sittings, or however
8    appropriate.

9          What she suspects will happen, given how she's been
10   treated since February of 2023 through the present day, is that
11   you -- and defendants, by the way, don't dispute that.  In
12   their briefing they said Judicial Council can do whatever it
13   wants whenever it wants.  They literally say that Judicial
14   Council of the Federal Circuit can force Judge Newman to travel
15   somewhere where the Court never sits and stay there even though
16   no cases are ever heard there.  That's not my speculation.
17   That's in their briefing.

18         So it's not speculative that if Judge Newman gets
19   back on the bench, Judicial Council will once again suspend her
20   even if she doesn't fall behind as defined by some proceedings.

21         On top of that, I think, Your Honor, injunction is
22   not, of course, the only remedy available to this Court.  We've
23   asked in our complaint for all other relief as the Court deems
24   just and proper.  For example, declaratory judgment; that
25   treating Judge Newman differently from all other judges, having

1    her jump through different hoops than what are provided by

2    clerical procedures, whatever those rules might be, is

3    improper; whether or not injunction is appropriate.  So I

4    think --

5              THE COURT:  That still requires a case or

6    controversy.

7              MR. DOLIN:  Correct.  But I think, because it's

8    highly unlikely that Judge Newman's speed will change -- it

9    hasn't changed in decades -- and given the fact how she's been

10   treated thus far, it is not speculative -- and, again, given

11   defendants' own briefing -- it's not speculative that another

12   round of sanctions will be imposed on Judge Newman, and I think

13   this Court can take cognizance of that.

14             THE COURT:  All right.

15             MR. DOLIN:  On 357(c) -- unless Your Honor has any

16   questions?

17             THE COURT:  No.

18             MR. DOLIN:  On the 357(c) bar, I think Your Honor

19   correctly queried the defendants as to whether all statutory

20   challenges are barred.  I think defendants are simply

21   incorrect.

22             In two cases with which defendant should be

23   particularly familiar with, because there are cases in which

24   Supreme Court took cases and reversed the federal circuit, are

25   *Cuozzo* and *SAS Institute* -- *Cuozzo v. Lee* and *SAS Institute*.

1          THE COURT:  I'm sorry.  What's the first one?

2          MR. DOLIN:  *Cuozzo*.

3          THE COURT:  Spell that.

4          MR. DOLIN:  C-u-o-z-z-o.  That is at 579 U.S. 261.

5  And *SAS Institute v. Iancu*.  And that's at 138 S.Ct. 1348.

6          THE COURT:  Thank you.

7          MR. DOLIN:  In those cases the court addressed a

8  similar provision barring judicial review that appears at

9  35 U.S.C. 314(d), which exclusively said that certain decisions

10  of the PTO director are, quote, final and unappealable.

11          In *Cuozzo*, the Supreme Court said, yes, that

12  absolutely means that Congress clearly meant to withdraw

13  judicial review from certain decisions of the director; much

14  like defendants argue Section 357(c) does here.

15          However, in both *Cuozzo* and *SAS Institute*, the Court

16  says -- said whenever director does something that the statute

17  authorizes -- so in that case it was whether director grants or

18  doesn't grant certain re-examination petitions -- but it turns

19  out, for example, in *SAS* the court said he cannot grant them in

20  part.  He can either grant them or not grant them.  When he

21  grants them in part, even though there's this bar in judicial

22  review, the court says we can review these ultra vires actions,

23  actions that are not authorized by the statute.

24          And those cases, of course, came after *McBryde*.  And

25  to the extent *McBryde* is inconsistent with those cases, of

38

 1    course, the Supreme Court cases control.

 2              THE COURT:  I will look at those.  The one that you

 3    emphasized most in your pleadings, however, is *Dart*.  And *Dart*

 4    made clear that the agency's ultra vires actions must be clear

 5    based on the face of the statute.

 6              And here, that would beg the question, what actions

 7    has the Judicial Council taken that are on the face of the act

 8    ultra vires?

 9              MR. DOLIN:  At the very least two.  At the very

10    least, suspending Judge Newman before -- so on March 8th --

11    before completion of any proceedings, and, in fact, current

12    suspension that she's serving on, it's unique.  For example, in

13    the *McBryde* case -- and it's referenced in the opinion

14    itself -- Judge McBryde -- leaving aside the fact that he

15    wasn't suspended in total; he was only told not to handle

16    certain kinds of cases.

17              But leaving that aside, Judge McBryde had no sanction

18    imposed upon him until the process ran through the JC&D

19    committee.  Judge John Adams from the Sixth Circuit, same

20    situation.  So this is unique and unprecedented that a judicial

21    council suspended Judge Newman before any -- reaching any

22    conclusion and before letting the appellate process run.

23              That, by the way, goes to defendants' comity and

24    exhaustion argument.  The defendants themselves did not pay any

25    comity and exhaustion through the process.

**JA103**

1          THE COURT:  Okay.  Correct me if I'm wrong, the
2     sanction here is based only on her alleged failure to cooperate
3     with the investigation, which was in the past.
4          MR. DOLIN:  Well, it's a failure to cooperate.
5     There's still a question whether there's a reason to raise --
6     it's an unreasonable failure to cooperate, as the rules say.
7     But, again, so they've suspended her before the JC&D
8     committee's opined on whether or not Judge Newman had a reason
9     or not.
10          But, more importantly, is that the statute explicitly
11     says that one of the sanctions available to the Judicial
12     Council is temporary suspension, and in case that wasn't
13     listed -- as temporary suspension for time certain.  Defendants
14     admit that it's possible that this will be a permanent
15     suspension in their final brief; in their surreply they say
16     it's quite possible that Judge Newman will never hear cases
17     again because they don't intend to restore her.
18          They specifically say in the September 20th order
19     that this is a renewable suspension, and they intend to renew
20     it as they see fit.  That is simply ultra vires.  This is not
21     what the statute authorizes.  They authorize a suspension for a
22     certain period.  It has to be temporary, and it has to be for a
23     time certain; not for a year and possibly another year and
24     possibly another year.  That is not what the statute
25     authorizes.

1        The statute authorizes Judicial Council to do five

2    things:  private reprimand, public reprimand, asking for

3    voluntary retirement, certifying Judge Newman as disabled, and

4    temporary suspension.  And, by the way --

5        THE COURT:  But she could end the suspension tomorrow

6    if she were to comply with their requests, correct?

7        MR. DOLIN:  Actually, Your Honor, that's not clear.

8    Because even if she were to comply, at no point -- and this is

9    clear from the Judicial Council order.  At no point did

10   Judicial Council say that if the physician that we chose or you

11   chose -- again, leaving aside who she choose the physician is,

12   who they should be -- at no point do they say that if any

13   physician or if all physicians certified Judge Newman as being

14   capable to perform the work, that is the end of the matter.

15   They simply said that's going to be an aid of their own

16   decision whether or not Judge Newman is or not disabled.

17       In fact, in the June 5th order, the Court said we

18   reserve the question of whether or not we have the power to

19   suspend Judge Newman on suspicion of disability while the

20   process is running.  They said we don't have to reach it now

21   because we're going to use the 332 provision.  But they

22   explicitly reserved it.

23       So if, for example, she gets certified, gets a clean

24   bill of health, there's nothing to prevent -- again, under

25   defendants' own view of the case, there's nothing that would

1    prevent defendants to say that we still have suspicions given

2    what our staff reported to us that we still need to investigate

3    some more.  And so it doesn't actually -- it's not obvious that

4    she could end her suspension.

5         But even if it were obvious, Your Honor, I think

6    that's somewhat irrelevant because the act, assuming it is

7    constitutional, does allow some punishment for recalcitrance.

8    But it doesn't allow the Judicial Council to hold Judge Newman,

9    essentially, in contempt.

10        There's a provision for contempt proceedings.

11   Judicial Council has to come here and ask this Court to hold

12   Judge Newman in contempt.  They can do their own contempt

13   proceedings under the guise of the disability provision.

14        And as to disability, the point that I wanted to

15   make, that is one of the powers given to Judicial Council.  But

16   even there -- and I think it's worth noting -- if Judicial

17   Council were to declare Judge Newman disabled, the statute

18   doesn't actually say she stops hearing cases.  It merely says

19   that she becomes -- from most senior judge, she becomes most

20   junior judge, and her seat at the present can appoint someone,

21   basically a 13th member of the federal circuit and -- but Judge

22   Newman retains her office, and nothing in the statute said that

23   even as a disabled person she does not get to hear cases.  So I

24   think that's worth noting.  It cannot be that noncooperation

25   gets her more penalty than actual disability.

1    The *Cuozzo* and *SAS Institute* and *Dart* trilogy do show
2    that the Court needs to at least examine whether or not the
3    actions Judicial Council took are within the authorizing
4    statute.  It cannot be that, for example, Judicial Council
5    orders Judge Newman to pay a million dollars fine, say see
6    disability act, and then say that's entirely insulated from
7    review.  That's just not one of the things that's open to them.

8    THE COURT:  Okay.  Move on to the original
9    jurisdiction.

10   MR. DOLIN:  On to the original jurisdiction.  Judge
11   Newman doesn't dispute that the actions that Judicial Council
12   took are judicial in nature.  But actions that are judicial in
13   nature did not mean that the council was exercising judicial
14   power of the United States.  Those are two separate issues.

15   And, for example, in extradition proceedings, judges
16   will hear extradition cases, exercise judicial functions that
17   are judicial in nature.  They determine present rights, they
18   did apply facts to the law, but as the courts have held for a
19   long time -- and Second Circuit, most explicitly in a case
20   called *LoDuca*, that is not a -- these are cases held by -- held
21   by judges but not by courts.  There's a distinction.

22   The fact that somebody is confirmed to an Article III
23   position doesn't mean that in every action that that person
24   takes, he's exercising the function of a court.  So Judicial
25   Council, while staffed by Article III judges, is not the court.

1    It's not the federal circuit.  And so defendants' position --

2             THE COURT:  So your view is that the distinction

3    between judicial and administrative functions is formal -- is a

4    formal one, not a practical one?

5             MR. DOLIN:  Correct.  It's a formal -- in fact, in

6    *Mistretta*, Supreme Court case, the Court talked about Judicial

7    Council, judicial conference, administrative office of the

8    court, sentencing commission as all-in-one package.  *Mistretta*

9    was a challenge to whether federal judges can sit on a

10   sentencing commission.  The Court said judges can do other

11   things such as -- and list it, Judicial Council conference,

12   committees, AO, et cetera.

13            But doesn't mean that -- for example, just yesterday

14   I saw an announcement that another Article III judge was

15   appointed to head the AO.  That doesn't mean that in his

16   function as the head of the AO, he is a court.  He's a judge,

17   but he's not a court.

18            And so Judicial Council of the federal circuit is not

19   United States Court of Appeals for the federal circuit.  And,

20   therefore, the challenges to the acts of Judicial Council lie

21   here and not in appellate jurisdiction.  In essence, defendants

22   want to relitigate *Marbury* because there, essentially, they

23   want Judge Newman to seek in the first instance mandamus relief

24   from the Supreme Court, which the Supreme Court said it's not

25   available in the probably most well-known case, which is why

44

1    Judge Newman is here.

2            I think it's just wrong to assert that this Court

3    doesn't have original jurisdiction.

4            As to defendants' point that Congress meant to keep

5    the process in-house --

6            THE COURT:  I'm considering this for the first time.

7    Didn't *Chandler* involve actions by the Judicial Council?  And I

8    know that there was a split, and Justice Harlan's concurrence

9    in Footnote 7 suggested that the judicial conference or the

10   Judicial Council of whatever circuit was involved in that case

11   was acting as a judicial body, notwithstanding the fact that

12   it's, obviously, not an Article III court.

13           MR. DOLIN:  Again, I think --

14           THE COURT:  I think your colleagues are right that

15   that's dicta.  I don't think it's formally controlling, but

16   certainly it's out there.

17           MR. DOLIN:  I think to answer that, first, I think

18   you're right, it's dicta, it's not formally controlling and the

19   court -- the Court never reached this question.  This was in

20   Justice Harlan -- with all respect to Justice Harlan, he was

21   just speaking for himself.

22           Second, the Court actually did not say that they have

23   mandamus jurisdiction.  They simply assumed; saying, assuming

24   that this is all correct, would I need to go this far.  Because

25   they simply said that Judge Chandler agreed to whatever

45

1    sanctions were imposed on him.  We don't need to go to these

2    constitutional quagmire.  We simply say that, look, he has

3    nothing to complain about.  He agreed to whatever that he's now

4    complaining about.

5            I don't think the Supreme Court actually said that

6    this is a proper vehicle.  They simply assumed it without

7    deciding.

8            Finally, I guess -- well, two points.  I think that

9    defendants are not incorrect that Congress meant judiciary to

10   police itself and to keep it in-house, but this Court is part

11   of the judiciary.  We're not taking it out of judiciary's house

12   bringing this complaint here.  Keeping it in-house doesn't

13   actually mean just keeping it with the federal circuit.

14           And defendants are simply incorrect to say that this

15   Court can't even hear facial challenges because it has to go

16   through Supreme Court.  In fact, *McBryde* itself, one of the

17   issues that survived in *McBryde* and was so clear, was not even

18   appealed to the D.C. Circuit, was a facial challenge on a

19   prohibition to disseminate information once the process was

20   complete.

21           And it was decided by the District Court for the

22   District of Columbia, and the Department of Justice chose not

23   to appeal that portion of the decision.  So *McBryde* itself is

24   pretty clear evidence that this Court can, in fact, hear facial

25   challenges to the statute.

1          Unless the Court --

2          THE COURT:  That's a good dovetail into the last

3     area.  You say that Counts 1 and 5 through 9 are facial.

4          MR. DOLIN:  Yes.

5          THE COURT:  And so by process of elimination, you

6     acknowledge that the others are as-applied?

7          MR. DOLIN:  Yes.  In fact, some of them actually have

8     a title as-applied.

9          THE COURT:  Are titled -- okay.  Just to get that

10    clear.

11         Okay.  Proceed.

12         MR. DOLIN:  So unless Your Honor has further question

13    on original jurisdiction, I would like to move to constructive

14    impeachment.

15         Just to -- as an outset, I want to point out and

16    disagree with my learned colleague on the other side about

17    paragraph 82.  Paragraph 82 was cited to Your Honor, saying

18    that -- it mentions the various orders and threats of the

19    Judicial Council; and in defendants' interpretation, that means

20    this was as an-applied challenge.

21         But paragraph 82 simply goes to standing.  Judge

22    Newman is just not some freelancing judge saying, look, I read

23    the statute and I don't like it just to show that she was

24    injured by this statute.  And so -- but, of course, Count 1

25    reincorporates everything that came beforehand.

47

1        And in paragraph 81, we specifically challenge the

2    ability or congressional authorization of judicial councils to

3    suspend judges.

4        THE COURT:  For however long?  A one-day suspension

5    would violate the impeachment clause?

6        MR. DOLIN:  Well, certainly long-term suspensions.

7    So to the point that it has to be unconstitutional in every

8    application.

9        Certainly, to the extent -- again, that might require

10   Your Honor to construe what the statute means.  But, again,

11   it's still a facial challenge.  It doesn't involve what Judge

12   Newman went through.  That goes to the ultra vires claim.

13       But, certainly, to the extent that this statute

14   authorizes Judicial Council suspend a judge for 100 years, for

15   20 years, we're not -- to make it very clear, we're not saying

16   that, look, a suspension for a year was generally okay, but

17   because Judge Newman is 96 and given the actuarial table, it's

18   not okay with respect to her.

19       We're saying that at some point suspension becomes

20   long enough.  And McBryde put in Footnote 5, acknowledged that

21   at some point they become long enough to become effective

22   removal.

23       THE COURT:  So you've argued that -- you've hinted in

24   your briefs and you've argued today that Judge Newman's

25   suspension is, in fact, indefinite; and, therefore, at least by

**JA112**

1    implication, an unconstitutional long-term suspension.  I don't

2    see that alleged in the complaint.  Is that in the complaint?

3           MR. DOLIN:  It is not in our complaint because the

4    complaint was filed before, of course, the September 20th

5    order.

6           So like I said earlier at the beginning of my

7    presentation, as we would file a paper with the Court, Judicial

8    Council would take some sort of contrary action.  So defendants

9    are at least right in one regard; this is a fast-paced

10   proceeding, and this is difficult to litigate while there's

11   other things going on on the other track.

12          But nevertheless -- of course, we are happy to amend

13   the complaint if need be.  Defendants have not responded yet.

14          But the Court, certainly, can take cognizance, can

15   take judicial notice of the fact -- the order is publicly

16   available on the federal circuit website -- that Judge Newman

17   is, in fact, suspended for a year with option of renewal.  And

18   that is a long-term suspension.

19          Again, defendants themselves concede in their

20   briefing -- in their final brief that Judge Newman is likely

21   never to hear any cases again, and I think that ought to be

22   enough.

23          On to Count 5.  So the -- I found defendants'

24   argument somewhat odd that, even though they concede it's a

25   facial challenge, they still say it has to be processed as if

1    it's an as-applied challenge.  I, frankly, don't fully

2    understand it, but let me try to parse it as best I can.

3           THE COURT:  Well, let's assume that it's a facial

4    challenge.  Why should it not be dismissed?

5           MR. DOLIN:  So the statute says disabled.  But it in

6    no way, sort of, defines it.  So, for example, the Social

7    Security Act has a definition of what disability is.  The

8    Americans with Disabilities Act has a definition of what

9    disability is.  But here --

10          THE COURT:  Isn't it framed in terms of whether the

11   disability prevents a federal judge from fulfilling the duties

12   of their office?  And don't federal judges know better than

13   anybody else what the duties of their office are?

14          MR. DOLIN:  I would hope so.  But that's not how the

15   statute is framed or -- maybe that was the intent of Congress,

16   but that's not what the statute says.  I think the history of

17   application of that statute illustrates that.

18          So step back from Judge Newman's own case and take a

19   look at Judge Adams' case from the Sixth Circuit.  Judge Adams

20   was accused of being disabled and ordered to go through various

21   psychiatric examinations because -- again, this is just in

22   papers -- because his colleagues thought that he was overly

23   prickly and issued orders that reflected poorly on the

24   administration of justice.

25          That may or may not be true, but that hardly sounds

1    as a disability.  Yet, the Sixth Circuit Judicial Council was

2    able to cite it as disability.

3          Look at Judge Newman.  Judge Newman was one of the --

4    leaving aside from the fact that throughout these proceedings,

5    the Judicial Council kept changing and kept adding, kept

6    subtracting certain allegations.  The allegations that were --

7    one of the, for example, allegations that was cited against

8    Judge Newman showing that she's disabled was that she drafted

9    opinions that nobody on the panel would join.

10         And, respectfully, I -- with all respect to Judicial

11   Council of the Federal Circuit, I don't think that's evidence

12   of disability.  That's evidence of somebody being an

13   idiosyncratic -- maybe even an incorrect -- thinker but not

14   somebody who is disabled.  It's not as if in the case she was

15   writing a habeas opinion.  That perhaps could be evidence of

16   disability.

17         So it's one of those situations where I think

18   Congress may have had good intentions, but the way the statute

19   is drafted, it gives this unlimited power to Judicial Council

20   to call anything they want a disability, and they have.

21         Of course, I think, as Your Honor correctly pointed

22   out, Judicial Council itself cannot say that Judge Newman is

23   disabled.  Now, they, of course, say that's because Judge

24   Newman is recalcitrant and refuses to submit to any sort of

25   tests.  But, of course, they don't say if she does submit to

1    tests, they would end the proceedings.

2         I think it goes to show that it is an entirely

3    amorphous standard.  They can call disability anything they

4    want.  In fact -- it's not on the record, but in one of the

5    emails to Judge Newman, one of her colleagues said that one of

6    the problems he has with her is that he no longer is -- he no

7    longer thinks that her dissents really make an important point.

8    That's a just a very odd way to think of disability.

9         So I think that kind of -- that covers most, I think,

10   of what Your Honor laid out.

11        THE COURT:  Okay.

12        MR. DOLIN:  If the Court wishes, I can also talk

13   about our preliminary injunction motion.

14        THE COURT:  I think we've covered the merits.  You

15   can touch on the other PI, if you like.

16        MR. DOLIN:  I just want to touch very, very quickly

17   on kind of the balance of harms.  First, I think balance of

18   harm tips to Judge Newman.  If mere suspicion and even a strong

19   one of disability were enough, the statute would, in fact,

20   authorize suspensions.  But it doesn't.  In fact, as I

21   mentioned, even actual disability doesn't give Judicial Council

22   power to permanently suspend judges.

23        So as a result, defendants have zero interest in

24   keeping Judge Newman suspended, especially while JC&D process

25   is still pending.  And that's evidenced by the fact that,

1      again, as I mentioned, that in all their cases no consequences

2      were imposed while review committee process was ongoing.

3              While harm to Judge Newman is irreparable and ongoing

4      and while I agree that she doesn't have any right to sit on any

5      particular cases, there are -- and that also goes to ultra

6      vires -- there are, for example, pending en banc proceedings

7      where the statute explicitly says that en banc courts shall

8      consist of all active judges, and Judge Newman is an active

9      judge.  So she has a right to sit on that court.  And yet, her

10     colleagues have prevented her from doing so.

11             So while she may not have the rights on any

12     particular panel, but, certainly, has a right to sit on an

13     en banc court, I think balance of harm tips towards her.

14             Finally, she did not unduly delay seeking injunctive

15     relief.  This is what defendants allege.  She tried to work in

16     good faith with her colleagues to try to resolve it, to try to

17     see what is justification for the March 8th order.  And

18     finally, as soon as they entered this new June 5th order, then

19     she sought injunctive relief.

20             THE COURT:  So putting aside Judge Newman, you would

21     agree, though, that if there are credible allegations of

22     disability lodged against any judge that there's a public

23     interest in conducting an expedited, efficient investigation

24     and perhaps, if the allegations are credible enough, keeping

25     that judge from sitting on cases in the public interest pending

1      the results of that investigation?

2              If you were a litigant, would you want that judge on

3      your case?

4              MR. DOLIN:  I probably would not want a disabled

5      judge on my case.  However, I think, Your Honor, there are

6      procedures to do that.  If somebody is disabled, you know, that

7      can be certified to Congress if the judge would not voluntarily

8      retire, and Congress can proceed with impeachment.

9              And I understand that's a long and cumbersome

10     process, but I think that's a feature, not a bug.  Because --

11     precisely because -- I take your point, if a judge starts

12     exhibiting symptoms of schizophrenia or dementia or things like

13     that, I get that.

14             But given how amorphous disability can be under the

15     statute, I'm not sure which way the public interest tips when

16     colleagues can simply say, well, we suspect you're disabled and

17     so we're going to keep you off the bench until you do a bunch

18     of things.

19             I take your point.  But I think Judge Newman has been

20     writing opinions.  There's no evidence, for example, for that

21     so-called backlog that any of her opinions are somehow bizarre.

22     Supreme Court is currently considering a case where she was one

23     of two judges in dissent, a veterans case.  And although it's a

24     fool's errand to predict what the Court will do, but the

25     commentator said it's -- the federal circuit is likely to be

1    reversed and Judge Newman's opinion is likely to be vindicated.

2    That was written a year ago.

3              On the facts of this case, there's no allegations

4    that Judge Newman is so disabled as not to be able to hear

5    cases and fairly adjudicate them.

6              THE COURT:  Thank you.

7              MR. DOLIN:  Thank you.

8              THE COURT:  All right.  Mr. Ehrlich, brief last word.

9              MR. EHRLICH:  Thank you, Your Honor.  I just want to,

10   as you said, be brief and just hit a few highlights here.  So

11   I'll start with mootness.  I'll start with something that my

12   colleague brought up, which is we exactly foreshadowed this,

13   that the suspension may be vacated when she clears her backlog

14   and not before that.

15             And I can point you to our brief at page -- if I can

16   read my own writing -- 37, Note 20, and our reply brief at page

17   23, Note 13, where we explain the reason that we wouldn't

18   vacate the suspension before that was because -- and the June

19   5th order of the Judicial Council specifically explains, it

20   would exacerbate the problem because she's now getting new

21   cases and can't work through her old cases.  We exactly

22   foreshadowed that.  This is not a litigation tactic.  She

23   cleared her backlog, and the Judicial Council vacated the

24   suspension.

25             I think my friend on the other side has talked a lot

1    about the case caption.  The reason the June 5th order was on

2    the disability caption is because, as the June 5th order lays

3    out, it arose in the context of the disability proceedings.

4    She requested that.  As it says in the June 5th order, she

5    requested a reconsideration for a suspension.  As it says in

6    the June 5th order, that was then referred to the Judicial

7    Council through that process.  That's why the caption is on

8    that.

9           That's why in the November 9th there's no caption.

10   It's just from the Judicial Council.  It was a sua sponte

11   vacatur.  So there's nothing fishy going on here.

12          To the point -- I think it's a minor point about

13   applying the government actors -- the *Chang* case that I noted

14   to you --

15          THE COURT:  I'm sorry, which one?

16          MR. EHRLICH:  On the voluntary cessation applying

17   to government actors, the *Chang* case that I had cited to you by

18   Judge Walton was just last month, which is, obviously, post

19   *West Virginia v. EPA*, and he also cast serious doubts on that.

20   I don't think we need to win on that.  We didn't do it for

21   litigation purposes.

22          On capable of repetition, I think we don't concede

23   that, obviously.  We have some arguments in our brief on why

24   that doesn't apply, including that it's not evading review.  If

25   she had gone to, in our view, the proper court to review this,

1   she could have obtained review before it got mooted.  So we

2   don't concede that.

3           And then on the reasonable expectation, just a couple

4   things, Your Honor.  We absolutely never --

5           THE COURT:  I'm sorry.  What was that court?

6           MR. EHRLICH:  Well, I think you would have to go to a

7   court with appellate jurisdiction.

8           THE COURT:  So the Supreme Court in this case?

9           MR. EHRLICH:  Yes.  I would say Your Honor doesn't

10  have to decide which court that is or what the jurisdiction

11  would be.  But I will -- yes, Judge Chandler went to the

12  Supreme Court above the Judicial Council, and they could try

13  that here.

14          That's as -- we cite the *Ralls* case for this.  They

15  say if you had gone directly to the place you should have gone,

16  that wouldn't be evading review.  So we would apply that here.

17  But, again, on the --

18          THE COURT:  And the Supreme Court would have

19  mandatory jurisdiction over that case?

20          MR. EHRLICH:  Again, I don't -- Your Honor doesn't

21  have to decide that.  All you have to decide is that you don't

22  have original jurisdiction.  I don't think it would be

23  mandatory.  I think -- I don't want to craft their petition for

24  them.  Again, that's not for Your Honor.  I think they could

25  make a case, and Judge Chandler, obviously, made his case and

1    got three justices to go along with him.

2         On the reasonable expectation for mootness, just to

3    be absolutely clear, we never said that she will never hear

4    cases again.  We absolutely never said that.  We said that she

5    currently is subject to a separate suspension.

6         And so even if you enjoin the June 5th order, for a

7    million reasons we say you shouldn't do that, but even if you

8    did, she wouldn't start hearing cases anymore anyway.  She

9    wouldn't immediately start sitting.  She has a separate

10   suspension.

11        So that's where we say, obviously, while that

12   suspension is in place, she's not going to be hearing cases.

13   She won't get a backlog and won't be suspended.

14        And then just to -- I think I touched on this before,

15   but the last point on reasonable expectation is we don't know

16   what the Judicial Council would do if she started sitting -- if

17   she decided to take the test and the Judicial Council decided

18   to reinstate her and she started hearing cases again, it's

19   entirely possible that Judicial Council would set up some sort

20   of system so that she doesn't get a backlog again

21        THE COURT:  But that's all contingent on her taking

22   actions that she challenged in this court that she believes are

23   not only unconstitutional but personally invasive and onerous,

24   et cetera.

25        MR. EHRLICH:  Well, I think there's a couple things

**JA122**

1    built in there.  To the extent -- this is going to my point

2    that there's a separate suspension going on because she's not

3    taking the test, then yes, that is tied to her action.  But I'm

4    saying I think, even if she started hearing cases, even if she

5    acceded, even if she started getting cases tomorrow, it's

6    entirely speculative what the Judicial Council would do and how

7    they would handle that.

8         They might try to handle that as they're allowed to

9    on the front end and sort of maybe do -- you know, piecemeal a

10   sitting.  I don't know.  I'm completely speculating.  But

11   that's, I think, the point, which is that it's pure

12   speculation.

13        There's nothing to say that an exact same

14   suspension -- certainly not on the same backlog that would

15   arise under the June 5th order, but it would have to be a

16   different backlog, and the Judicial Council would have to take

17   a new action.  I don't think -- obviously, we think that's not

18   a reasonable expectation.

19        Then moving to the 357 bar, I think there was a lot

20   of discussion there.  One thing I do want to point out, I

21   think, when you asked for the ultra vires action, I think my

22   friend pointed to the March 8th.  The March 8th and the things

23   that they take issue with that was on the Council's 332

24   authority, not under the act.  And we described this.

25        The Judicial Council -- the 11 circuit judges

1     unanimously of the Judicial Council described this in the

2     June 5th order and said that was based on her backlog and the

3     concerns have not abated.  In fact, they've increased.

4             So in terms of ultra vires action, they try to push

5     the March 8th order under the act, but you have the 11 circuit

6     judges of the Judicial Council saying that's our 332 authority.

7     We used it on March 8th, and we're using it again on June 5th.

8             I mean, it's a little bit odd only because the

9     March 8th order is, I would say, doubly irrelevant.  It was

10    superseded by the June 5th, which was a de novo determination.

11    The Judicial Council looked fresh on Judge Newman's request and

12    said, backlog is still there, it's not good, you're not making

13    progress.  We have another suspension.  And then, obviously,

14    the November 9th order vacated that.

15            The March 8th has absolutely no bearing here.  And,

16    of course, Your Honor doesn't have to reach anything about

17    March 8th.

18            Just moving to original jurisdiction, Your Honor --

19            THE COURT:  Before you get there, address briefly the

20    *Cuozzo* and *SAS* cases which counsel suggested at least do not

21    require that the agency's action violate the statute on its

22    face in order to be ultra vires.

23            MR. EHRLICH:  Yeah.  So I guess I don't have a great

24    response because in the two briefs that they submitted of

25    extreme length, they never once raised these cases.

1        So I would think at that point it's waived, and if

2   Your Honor would like us to submit something extra on that, I

3   think we're happy to, but I don't think that's necessary.

4   Again, they didn't raise this before.

5        I think *McBryde* just squarely deals with that.  I

6   don't have those cases offhand.

7        THE COURT:  We'll take a look at them, and if we want

8   supplemental, we'll --

9        MR. EHRLICH:  Okay.  Great.  The last thing I would

10  say on that is *McBryde* did the analysis.  They did the analysis

11  of the statutory bar and said this -- we need clear evidence

12  that they're trying to bar constitutional claims.  We see the

13  clear evidence for as-applied, but facial or not to orders and

14  determinations.

15       So I don't think what I heard my friend say abrogates

16  that type of analysis, which is just looking at the statute and

17  interpreting it as *McBryde* did.  So I didn't hear anything that

18  would cast doubt on the analysis that *McBryde* did.  But as Your

19  Honor said, we're happy to submit something on that.

20       On the original jurisdiction point, I didn't hear any

21  answer to *Pitch* and all the cases we cited.  I think I heard

22  them concede that it's judicial.  I think there's some

23  confusion.  Maybe we're talking past each other in judicial

24  versus administrative.

25       We don't dispute that there's some actions that the

```
 1    Judicial Council takes that are administrative.  McBryde --

 2              THE COURT:  As I heard the argument is that this

 3    Court does, in fact, have jurisdiction to review orders of

 4    bodies even if they are comprised of judges and undertake

 5    functionally judicial actions if that body is not an

 6    Article III court.  So it is a formal distinction between

 7    judicial and administrative as opposed to a functional

 8    distinction.

 9              MR. EHRLICH:  And I don't think that's correct.  I

10    mean, we concede that you can do that if there are

11    administrative actions, but once you concede that they're

12    judicial, once you recognize that they're judicial actions in

13    the way that we had talked about before and the way that

14    Prentis and Pitch and Feldman talk about, you're automatically

15    in a judicial action that has to go to an appellate court.

16              THE COURT:  But Pitch and Feldman, at least, dealt

17    with courts, higher courts.  Chandler dealt with the judicial

18    conference, if I'm not mistaken.

19              What's the authority for your position that the

20    distinction is functional and not formal?

21              MR. EHRLICH:  So I think we had agreed on that.

22    Because in their brief they say it's not the nature of the body

23    as a whole, but it's the nature of the proceeding, and we cite

24    this in our reply.

25              THE COURT:  I didn't hear that in counsel's argument.
```

1    So maybe there's an inconsistency between what they briefed and

2    what they argued today.

3          MR. EHRLICH:   Right.   I think what we say in our

4    brief, which is the way we interpreted their argument before,

5    which was there are some things -- and *McBryde* in the Fifth

6    Circuit -- sorry, the Fifth Circuit in their *McBryde* case says

7    this, which is there's some things that courts do that are

8    administrative, but when it reassigns cases, it acts as a

9    court.   And in the Fifth Circuit, they specifically said we

10   can't review the orders of our Judicial Council because those

11   are judicial actions.   They specifically said that in *McBryde*.

12         The reason it ended up in review is because they had

13   a district judge having to implement things and use their

14   discretion to implement the order, and so they had jurisdiction

15   over the district judge.   So that's the only scenario where

16   that's come up where they thought they could review judicial

17   actions.

18         Certainly, Justice Harlan and the two dissenters in

19   *Chandler* didn't say, yes, it's judicial, but we still don't

20   have appellate jurisdiction because it's -- I don't really know

21   what the theory is anymore.   It's both judicial and

22   administrative or something.   But once it was judicial -- once

23   it was a judicial action in the way we've been talking about,

24   it has to go to a court with appellate jurisdiction.

25         I think that's what happened in *Chandler* and as the

1    Fifth Circuit in *McBryde* said, as *Pitch* cited the Fifth Circuit

2    *McBryde*.  So I think I would just quibble with whatever

3    analysis that was.

4          Just the last point on this, Your Honor, as we talk

5    about in our brief, the statute sets out certain things that it

6    thinks are administrative.  Obviously, there's the

7    Administrative Office of United States Courts which has

8    specific things, and then there's things they can delegate to a

9    circuit executive that it calls administrative.  It's things

10   like space management and security and IT.  So, I mean, I think

11   the fact that they've conceded that it's judicial gets you all

12   the way there at this point.

13         And then just one point on *McBryde*.  *McBryde*, as we

14   say in our brief, didn't squarely address this question, didn't

15   decide this jurisdictional issue, and so we cite the *Portland

16   Cement* case in our brief, but that is not a precedent that Your

17   Honor needs to abide by because they didn't directly address

18   the question.

19         On the constructive impeachment issue, just two quick

20   points.  I think we would say it's not -- it's not a forever

21   suspension.  It's a one-year renewable suspension depending on

22   what happens with Judge Newman.  And the Judicial Council can

23   reconsider every year whether to take further action or not.

24   So it's absolutely not a forever suspension.

25         Again, just to be absolutely clear, we never said

1    that she'll never sit on cases again.  That has never been our

2    position.

3          THE COURT:  To be fair, it is a forever suspension or

4    it's an indefinite suspension unless she complies with actions

5    that she feels are illegal.

6          MR. EHRLICH:  Well, I don't -- I don't think it's

7    indefinite.  It's for one year.  And then the Judicial

8    Council --

9          THE COURT:  Or what -- the sooner of one year or

10   compliance?

11         MR. EHRLICH:  Right.  And when she -- if she

12   complied, obviously, that would be within the Judicial

13   Council's discretion.  Certainly, if she complied, it wouldn't

14   be renewable.  I think that's clear from the face of the

15   judicial order -- Judicial Council's order.  It's certainly

16   not.  I think for the reasons that I discussed before, even if

17   it --

18         THE COURT:  Just to be clear, if a year from now, or

19   however many months from now is left, she still has not

20   complied, the Council would have to upset the current

21   status quo somehow in order for the suspension to lapse.

22         MR. EHRLICH:  The Judicial Council would have to take

23   some action.

24         THE COURT:  Yes.

25         MR. EHRLICH:  Yes.  Obviously, in their discretion on

1      how to do that.

2              I think the most important thing I took away from my

3      friend's argument was --

4              THE COURT:  And by that time, hopefully, the judicial

5      conference would have taken at least some action.

6              MR. EHRLICH:  Right.  There's no timeline, much like

7      our courts; and those are courts, and they can roll whenever

8      they'd like.

9              I think the most important thing I heard on this from

10     the other side was that they said, well, at some point it

11     becomes an unconstitutional suspension, and I think that's all

12     Your Honor needs to hear because it's a facial challenge.  And

13     so they have to show that there's no circumstance in which this

14     could be constitutionally applied.

15             And I think the fact that they've come out and said

16     it's maybe not this point, maybe not this point, but somewhere

17     down here -- and this is sort of what I was getting at with

18     the -- that Judge Edwards was talking about 15 years seems like

19     too much in his *Hastings I* dissent.  I think on a facial

20     challenge, which is the only way you would get to this because

21     of the bar, I think that's all you need to -- that and *McBryde,*

22     obviously, to say that this challenge fails.

23             And then, just on the vagueness point, I think there

24     was a lot of back-and-forth about the Count 5.  Just to be very

25     clear, they did not move on that for their preliminary

66

1     injunction.  We did not move on that on 12(b)(6) grounds to

2     dismiss, and so we haven't addressed the merits of that.

3          The only thing, I think, before Your Honor now is the

4     issue of whether it's facial or as-applied for purposes of the

5     bar.  Obviously, if it made it past the bar and our other

6     jurisdictional objections, we can brief that on summary

7     judgment for Your Honor.

8          THE COURT:  Well, for any of these claims, if I

9     decide that they are facial and, therefore, I have jurisdiction

10    that they escape *McBryde*, then the question is whether they've

11    stated a claim on a 12(b)(6) standard, right?

12         MR. EHRLICH:  Well, I guess, two things.  One is,

13    even if you got past *McBryde*, we still have the original

14    jurisdiction problem.  But even past that, we haven't moved on

15    12(b)(6) on those.  We've only 12(b)(6)'d the constructive

16    impeachment and the due process, which they had moved on for

17    their preliminary injunction.

18         So I don't think you have anything before you to rule

19    on that.  We could be prepared to move for SJ quickly, but I

20    don't think that's before you -- the merits of the vagueness

21    challenge is not before you now.

22         I guess, for your purposes, though, the only thing I

23    would say now is, I think you saw from that discussion, it

24    seems very much like an as-applied challenge because they were

25    discussing how clearly it applies to her; well, maybe if it was

1    this but not this, you know, if she had -- if she was clearly

2    off the reservation and was trying to decide a different -- I

3    think this is exactly what we were saying in our briefing where

4    we pointed out that that inquiry, even if it's -- you have to

5    do the as-applied first under case law, and so that runs you

6    into the bar.

7           And then I think, just very quickly, Your Honor, just

8    a couple points on the harms.  And I think Your Honor raised a

9    great point about litigants appearing before Judge Newman if

10   she was sitting.

11          Just to be clear, we don't think you would ever reach

12   this point because there's no likelihood of success on the

13   claims that have been raised.  But as we point out in our

14   brief, there's already been a litigant who petitioned the

15   Supreme Court to overturn their case because Judge Newman was

16   sitting on the panel and all of these allegations about the

17   disability came out.

18          I think that's a serious thing to take into account.

19   I think another serious thing to take into account is what they

20   say in their supplemental brief, which is she's going to

21   continue to operate at an extremely slow pace, and that's a

22   pace that the Judicial Council has found is detrimental to the

23   effective and expeditious administration of justice, which is

24   why they used the 332 authority.

25          So I think that's a harm to the public and the

1    federal circuit and its judges and its litigants to take into

2    account, too.

3           The very last point is, I think it would be

4    extraordinary to enjoin an act of Congress in this posture,

5    especially as we've been talking about when this is up at the

6    JC&D committee.  But this is something that Congress considered

7    for a very long time.  They wanted to bring this process

8    in-house in 1939 and then 1980, and this has been on the books

9    for decades, obviously -- almost 50 years -- and to enjoin it

10   now would, I think, effectively show that the judiciary is not

11   capable of policing itself.  And I think, as this case shows,

12   that should not be true.

13          The Judicial Council and the special committee before

14   it have operated by the book, everything they needed to do by

15   the statutes, by the JC&D rules, and it's going through that

16   process.

17          So I think, unless Your Honor has more questions,

18   that's all I have.

19          THE COURT:  Thank you very much.  All right.

20   Well-briefed and well-argued on both sides.  I had hoped not to

21   be in this position, obviously, but here we are.  So the case

22   is under advisement.  We'll get something out sooner rather

23   than later.  Have a good day.

24          (The hearing adjourned at 11:40 a.m.)

25

1     CERTIFICATE OF OFFICIAL COURT REPORTER

2

3   I, TAMARA M. SEFRANEK, do hereby certify that the

4 above and foregoing constitutes a true and accurate transcript

5 of my stenographic notes and is a full, true and complete

6 transcript of the proceedings to the best of my ability.

7    Dated this 29th day of January, 2024.

8

9      /s/ Tamara M. Sefranek_____

10     Tamara M. Sefranek, RMR, CRR, CRC
      Official Court Reporter
      Room 6714

11     333 Constitution Avenue, N.W.
      Washington, D.C.  20001

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 69:9

## 1

**1** [7] - 9:3, 9:4, 9:7, 25:8, 25:11, 46:3, 46:24
**10** [4] - 8:16, 8:19, 8:20, 28:17
**100** [2] - 6:20, 47:14
**10:05** [1] - 1:7
**11** [11] - 7:1, 7:9, 8:16, 8:19, 8:20, 10:23, 15:2, 24:12, 30:22, 58:25, 59:5
**1100** [1] - 1:17
**11:40** [1] - 68:24
**11th** [1] - 16:7
**12** [1] - 30:22
**12(b)(6** [4] - 30:2, 66:1, 66:11, 66:15
**12(b)(6)'d** [1] - 66:15
**1225** [1] - 1:14
**13** [1] - 54:17
**1348** [1] - 37:5
**138** [1] - 37:5
**13th** [1] - 41:21
**15** [3] - 26:23, 34:16, 65:18
**1939** [2] - 19:3, 68:8
**1980** [2] - 19:7, 68:8
**1994** [1] - 27:5
**19th** [1] - 1:14
**1:23-CV-1334** [1] - 1:3

## 2

**2** [3] - 8:16, 8:19, 8:20
**20** [3] - 34:21, 47:15, 54:16
**200** [1] - 6:20
**20001** [2] - 1:24, 69:11
**20005** [1] - 1:18
**20036** [1] - 1:15
**202-354-3246** [1] - 1:25
**2023** [1] - 35:10
**2024** [2] - 1:6, 69:7
**20th** [3] - 13:18, 39:18, 48:4
**22** [1] - 28:17
**23** [2] - 28:17, 54:17
**23-1334** [1] - 2:3
**25** [1] - 1:6
**26** [2] - 14:6
**261** [1] - 37:4
**28** [1] - 8:21
**29th** [1] - 69:7

## 3

**3** [3] - 8:16, 8:20, 35:1
**300** [1] - 6:20
**314(d** [1] - 37:9
**332** [12] - 15:21, 18:4, 19:7, 23:14, 24:17, 31:12, 33:8, 33:9, 40:21, 58:23, 59:6, 67:24
**332(d** [1] - 2:21
**333** [2] - 1:24, 69:11
**35** [1] - 37:9
**351** [1] - 29:15
**351(a** [1] - 28:7
**353(c** [1] - 28:10
**355** [1] - 28:10
**357** [6] - 7:21, 8:1, 10:7, 11:18, 15:25, 58:19
**357(c** [5] - 9:24, 13:11, 36:15, 36:18, 37:14
**357(c)** [1] - 2:25
**37** [1] - 54:16

## 4

**4** [3] - 8:16, 8:19, 8:20
**43** [1] - 13:19
**450** [2] - 1:14, 1:20

## 5

**5** [9] - 9:3, 9:4, 28:6, 28:17, 35:1, 46:3, 47:20, 48:23, 65:24
**50** [1] - 68:9
**579** [1] - 37:4
**5th** [26] - 4:1, 4:9, 5:14, 5:15, 6:13, 6:19, 15:22, 31:12, 32:8, 32:14, 32:17, 32:23, 33:1, 33:7, 40:17, 52:18, 54:19, 55:1, 55:2, 55:4, 55:6, 57:6, 58:15, 59:2, 59:7, 59:10

## 6

**6** [2] - 9:3, 9:14
**6714** [2] - 1:23, 69:10

## 7

**7** [4] - 9:3, 10:23, 17:21, 44:9
**7-5395** [1] - 1:20

## 8

**8** [2] - 9:3, 12:3
**81** [1] - 47:1
**82** [4] - 25:20, 46:17, 46:21
**8th** [11] - 32:16, 32:17, 38:10, 52:17, 58:22, 59:5, 59:7, 59:9, 59:15, 59:17

## 9

**9** [3] - 9:4, 46:3
**94102** [1] - 1:21
**96** [1] - 47:17
**96-year-old** [1] - 3:14
**9th** [5] - 5:13, 33:10, 33:14, 55:9, 59:14

## A

**a.m** [1] - 68:24
**A.M** [1] - 1:7
**abated** [1] - 59:3
**abide** [1] - 63:17
**ability** [3] - 3:15, 47:2, 69:6
**able** [6] - 6:5, 9:24, 20:13, 29:19, 50:2, 54:5
**abrogates** [1] - 60:15
**absolutely** [10] - 3:9, 3:24, 13:15, 37:12, 56:4, 57:3, 57:4, 59:15, 63:24, 63:25
**abuse** [1] - 14:25
**acceded** [1] - 58:5
**account** [3] - 67:18, 67:19, 68:2
**accumulated** [1] - 14:20
**accurate** [2] - 26:15, 69:4
**accused** [1] - 49:20
**acknowledge** [1] - 46:6
**acknowledged** [1] - 47:20
**act** [27] - 6:12, 6:24, 8:2, 8:4, 8:25, 10:23, 11:5, 11:22, 13:6, 15:19, 17:12, 18:5, 18:8, 20:25, 23:10, 23:14, 24:19, 24:21, 28:20, 29:16, 31:1, 38:7, 41:6, 42:6, 58:24, 59:5, 68:4
**Act** [3] - 2:24, 49:7, 49:8

**act-related** [5] - 8:25, 11:5, 15:19, 17:12, 18:8
**acted** [1] - 7:10
**acting** [1] - 44:11
**Action** [1] - 1:2
**action** [20] - 14:2, 14:3, 18:1, 23:16, 24:2, 24:7, 34:3, 34:4, 42:23, 48:8, 58:3, 58:17, 58:21, 59:4, 59:21, 61:15, 62:23, 63:23, 64:23, 65:5
**actions** [23] - 7:13, 9:11, 18:23, 23:22, 23:23, 25:22, 29:16, 37:22, 37:23, 38:4, 38:6, 42:3, 42:11, 42:12, 44:7, 57:22, 60:25, 61:5, 61:11, 61:12, 62:11, 62:17, 64:4
**active** [3] - 3:16, 52:8
**actor** [1] - 4:25
**actors** [8] - 4:15, 4:18, 7:9, 18:24, 31:24, 55:13, 55:17
**acts** [5] - 18:5, 19:7, 22:18, 43:20, 62:8
**actual** [3] - 31:9, 41:25, 51:21
**actuarial** [1] - 47:17
**Adams** [2] - 38:19, 49:19
**Adams'** [1] - 49:19
**adding** [1] - 50:5
**addition** [1] - 27:3
**address** [10] - 3:19, 10:5, 17:25, 24:11, 26:20, 31:11, 33:15, 59:19, 63:14, 63:17
**addressed** [4] - 12:10, 20:6, 37:7, 66:2
**adequate** [1] - 28:8
**adjourned** [1] - 68:24
**adjudicate** [1] - 54:5
**adjudicated** [1] - 16:20
**adjudication** [2] - 16:16, 16:23
**adjudicative** [1] - 30:25
**administration** [3] - 19:6, 49:24, 67:23
**Administrative** [1] - 63:7
**administrative** [12] - 18:23, 19:22, 43:3, 43:7, 60:24, 61:1,

61:7, 61:11, 62:8, 62:22, 63:6, 63:9
**administratively** [1] - 18:5
**admission** [1] - 23:1
**admit** [1] - 39:14
**advisement** [1] - 68:22
**advisory** [1] - 22:1
**affect** [1] - 27:24
**agency** [7] - 5:3, 10:13, 10:18, 11:7, 11:12, 13:6, 25:14
**agency's** [2] - 38:4, 59:21
**ago** [4] - 32:1, 34:14, 34:16, 54:2
**agree** [7] - 8:21, 9:1, 17:16, 28:15, 32:6, 52:4, 52:21
**agreed** [4] - 44:25, 45:3, 61:21
**agrees** [2] - 8:16, 30:15
**aid** [1] - 40:15
**akin** [1] - 16:3
**al** [2] - 1:6, 2:4
**Alaska** [3] - 5:10, 5:24, 7:6
**all-in-one** [1] - 43:8
**allegations** [8] - 29:25, 50:6, 50:7, 52:21, 52:24, 53:3, 67:16
**allege** [1] - 52:15
**alleged** [2] - 39:2, 48:2
**Alliance** [1] - 1:13
**allow** [2] - 41:7, 41:8
**allowed** [4] - 14:6, 26:5, 58:8
**allows** [1] - 26:7
**almost** [2] - 15:20, 68:9
**amend** [1] - 48:12
**Americans** [1] - 49:8
**amorphous** [2] - 51:3, 53:14
**an-applied** [1] - 46:20
**analogize** [1] - 21:6
**analysis** [7] - 26:11, 34:13, 60:10, 60:16, 60:18, 63:3
**analyze** [1] - 17:25
**analyzing** [2] - 16:9, 18:4
**ANDREW** [1] - 1:19
**announcement** [1] - 43:14
**answer** [4] - 23:21, 34:22, 44:17, 60:21

**JA135**

**anyway** [2] - 5:8, 57:8
**AO** [3] - 43:12, 43:15, 43:16
**apologies** [1] - 4:5
**appeal** [1] - 45:23
**appealed** [1] - 45:18
**Appeals** [1] - 43:19
**appearing** [1] - 67:9
**appellate** [13] - 11:25, 20:3, 20:16, 22:21, 23:13, 24:19, 24:22, 38:22, 43:21, 56:7, 61:15, 62:20, 62:24
**application** [5] - 12:4, 16:13, 24:9, 47:8, 49:17
**applications** [2] - 24:6, 28:14
**applied** [26] - 2:23, 3:2, 3:4, 4:23, 5:10, 8:1, 8:3, 8:8, 9:1, 10:8, 13:7, 13:8, 28:19, 28:25, 29:4, 30:15, 32:1, 46:6, 46:8, 46:20, 49:1, 60:13, 65:14, 66:4, 66:24, 67:5
**applies** [3] - 5:12, 35:5, 66:25
**apply** [15] - 4:14, 5:20, 7:15, 10:16, 10:25, 11:1, 11:16, 13:10, 15:1, 28:23, 29:2, 31:24, 42:18, 55:24, 56:16
**applying** [6] - 5:7, 16:11, 16:12, 17:10, 55:13, 55:16
**appoint** [1] - 41:20
**appointed** [1] - 43:15
**approach** [2] - 2:5, 6:24
**approached** [1] - 3:18
**appropriate** [4] - 30:6, 33:23, 35:8, 36:3
**approximate** [1] - 26:25
**area** [3] - 16:18, 28:20, 46:3
**argue** [2] - 8:12, 37:14
**argued** [5] - 32:2, 47:23, 47:24, 62:2, 68:20
**argument** [11] - 15:20, 26:3, 26:16, 27:14, 27:20, 38:24, 48:24, 61:2, 61:25, 62:4, 65:3
**arguments** [7] - 5:21, 10:6, 12:15, 21:5,

21:10, 30:21, 55:23
**arise** [1] - 58:15
**Armstrong** [1] - 7:7
**arose** [1] - 55:3
**Article** [7] - 19:18, 23:17, 42:22, 42:25, 43:14, 44:12, 61:6
**articulated** [1] - 17:11
**as-applied** [19] - 2:23, 3:2, 3:4, 8:1, 8:3, 8:8, 9:1, 10:8, 13:7, 13:8, 28:25, 30:15, 46:6, 46:8, 49:1, 60:13, 66:4, 66:24, 67:5
**aside** [8] - 19:8, 23:20, 24:1, 38:14, 38:17, 40:11, 50:4, 52:20
**aspect** [4] - 13:8, 18:14, 19:18, 19:19
**aspects** [1] - 23:8
**assert** [3] - 8:11, 9:6, 44:2
**asserting** [1] - 28:22
**assertions** [1] - 34:10
**asserts** [1] - 12:13
**assume** [2] - 32:6, 49:3
**assumed** [2] - 44:23, 45:6
**assuming** [3] - 25:6, 41:6, 44:23
**attempt** [2] - 9:10, 25:21
**attempting** [1] - 3:20
**attorney** [1] - 16:3
**authority** [8] - 15:22, 30:25, 31:12, 32:23, 58:24, 59:6, 61:19, 67:24
**authorization** [1] - 47:2
**authorize** [2] - 39:21, 51:20
**authorized** [1] - 37:23
**authorizes** [6] - 28:10, 37:17, 39:21, 39:25, 40:1, 47:14
**authorizing** [1] - 42:3
**automatically** [1] - 61:14
**available** [5] - 14:22, 35:22, 39:11, 43:25, 48:16
**Avenue** [3] - 1:20, 1:24, 69:11
**avoid** [2] - 5:12, 5:17
**avoided** [2] - 3:20, 19:1
**avoiding** [1] - 5:18

**aware** [1] - 3:21
**Axon** [12] - 10:6, 10:10, 10:11, 10:16, 10:17, 10:25, 11:1, 11:6, 11:15, 11:16, 11:20, 11:21
**Axon/Thunder** [1] - 11:2

**B**

**back-and-forth** [1] - 65:24
**background** [1] - 3:21
**backlog** [18] - 5:15, 5:17, 6:15, 6:16, 6:19, 32:10, 33:1, 34:5, 34:20, 53:21, 54:13, 54:23, 57:13, 57:20, 58:14, 58:16, 59:2, 59:12
**balance** [3] - 51:17, 52:13
**banc** [4] - 16:7, 52:6, 52:7, 52:13
**bar** [25] - 7:21, 8:1, 9:19, 9:24, 10:15, 11:22, 12:9, 12:13, 13:11, 22:15, 22:25, 23:10, 23:24, 24:20, 28:25, 30:16, 36:18, 37:21, 58:19, 60:11, 60:12, 65:21, 66:5, 67:6
**barred** [6] - 2:24, 8:23, 9:22, 10:8, 11:19, 36:20
**barring** [1] - 37:8
**bars** [3] - 8:6, 23:10, 28:20
**based** [3] - 38:5, 39:2, 59:2
**Basin** [1] - 11:3
**basis** [1] - 5:15
**bearing** [1] - 59:15
**became** [1] - 32:20
**become** [2] - 47:21
**becomes** [4] - 41:19, 47:19, 65:11
**BEFORE** [1] - 1:9
**beforehand** [1] - 46:25
**beg** [1] - 38:6
**begin** [3] - 6:14, 25:11, 31:21
**beginning** [3] - 18:14, 21:15, 48:6
**begins** [1] - 7:3
**behalf** [2] - 2:11, 3:12
**behind** [4] - 34:4,

34:7, 35:6, 35:20
**believes** [1] - 57:22
**below** [1] - 32:24
**bench** [2] - 35:19, 53:17
**benefit** [1] - 4:4
**best** [2] - 49:2, 69:6
**better** [1] - 49:12
**between** [5] - 19:14, 32:16, 43:3, 61:6, 62:1
**beyond** [2] - 24:24, 25:1
**bias** [2] - 31:9
**bigger** [1] - 27:3
**bill** [2] - 19:16, 40:24
**bit** [6] - 3:22, 4:3, 11:14, 23:3, 29:12, 59:8
**bizarre** [1] - 53:21
**bodies** [1] - 61:4
**body** [4] - 25:14, 44:11, 61:5, 61:22
**book** [1] - 68:14
**books** [1] - 68:8
**bottom** [1] - 29:19
**Branch** [2] - 1:17, 1:20
**branch** [1] - 19:23
**branches** [1] - 19:5
**brief** [25] - 9:16, 10:11, 12:17, 18:22, 21:20, 28:16, 28:21, 29:10, 30:19, 30:22, 39:15, 48:20, 54:8, 54:10, 54:15, 54:16, 55:23, 61:22, 62:4, 63:5, 63:14, 63:16, 66:6, 67:14, 67:20
**briefed** [8] - 4:12, 5:18, 29:7, 30:2, 30:3, 30:10, 62:1, 68:20
**briefing** [9] - 15:19, 30:13, 33:2, 33:3, 35:12, 35:17, 36:11, 48:20, 67:3
**briefly** [1] - 59:19
**briefs** [9] - 4:12, 7:25, 8:13, 12:3, 15:18, 20:20, 27:5, 47:24, 59:24
**bring** [3] - 22:20, 30:9, 68:7
**bringing** [1] - 45:12
**broadly** [1] - 28:4
**brought** [6] - 22:20, 23:2, 23:9, 23:12, 23:13, 54:12
**bug** [1] - 53:10
**build** [2] - 6:15, 6:19

**builds** [1] - 13:9
**built** [2] - 29:6, 58:1
**bunch** [1] - 53:17
**Burton** [1] - 27:17

**C**

**C-u-o-z-z-o** [1] - 37:4
**CA** [1] - 1:21
**cannot** [4] - 37:19, 41:24, 42:4, 50:22
**capable** [7] - 5:25, 32:4, 33:16, 33:21, 40:14, 55:22, 68:11
**caption** [4] - 55:1, 55:2, 55:7, 55:9
**care** [4] - 8:1, 30:24, 31:2, 31:10
**case** [50] - 2:21, 4:21, 5:9, 7:7, 7:10, 10:1, 14:10, 18:14, 18:15, 18:22, 20:17, 21:25, 23:1, 27:12, 28:24, 30:21, 32:1, 32:3, 36:5, 37:17, 38:13, 39:12, 40:25, 42:19, 43:6, 43:25, 44:10, 49:18, 49:19, 50:14, 53:3, 53:5, 53:22, 53:23, 54:3, 55:1, 55:13, 55:17, 56:8, 56:14, 56:19, 56:25, 62:6, 63:16, 67:5, 67:15, 68:11, 68:21
**Case** [1] - 2:3
**cases** [54] - 6:5, 6:15, 6:17, 6:20, 7:6, 16:17, 16:19, 16:23, 17:2, 17:5, 18:3, 18:6, 18:12, 18:13, 18:14, 27:10, 35:2, 35:3, 35:6, 35:16, 36:22, 36:23, 36:24, 37:7, 37:24, 37:25, 38:1, 38:16, 39:16, 41:18, 41:23, 42:16, 42:20, 48:21, 52:1, 52:5, 52:25, 54:5, 54:21, 57:4, 57:8, 57:12, 57:18, 58:4, 58:5, 59:20, 59:25, 60:6, 60:21, 62:8, 63:3
**cast** [2] - 55:19, 60:18
**casts** [1] - 10:10
**causes** [1] - 5:6
**Cement** [1] - 63:16
**certain** [10] - 35:2, 37:9, 37:13, 37:18, 38:16, 39:13, 39:22,

39:23, 50:6, 63:5
**certainly** [15] - 4:24,
5:22, 6:22, 13:20,
17:4, 44:16, 47:6,
47:9, 47:13, 48:14,
52:12, 58:14, 62:18,
64:13, 64:15
**CERTIFICATE** [1] -
69:1
**certified** [3] - 40:13,
40:23, 53:7
**certify** [1] - 69:3
**certifying** [1] - 40:3
**cessation** [4] - 4:14,
5:8, 31:24, 55:16
**cetera** [2] - 43:12,
57:24
**challenge** [31] - 8:8,
9:6, 16:24, 23:16,
23:18, 23:20, 24:2,
24:5, 24:6, 24:7,
24:13, 25:6, 25:16,
26:12, 27:1, 28:22,
28:25, 43:9, 45:18,
46:20, 47:1, 47:11,
48:25, 49:1, 49:4,
65:12, 65:20, 65:22,
66:21, 66:24
**challenged** [1] - 57:22
**challenges** [20] - 2:23,
8:2, 8:4, 8:11, 9:19,
10:8, 12:9, 21:18,
22:11, 22:16, 22:20,
22:25, 23:9, 23:11,
24:21, 28:13, 36:20,
43:20, 45:15, 45:25
**challenging** [2] - 8:15,
9:21
**Chandler** [10] - 17:16,
17:21, 24:19, 44:7,
44:25, 56:11, 56:25,
61:17, 62:19, 62:25
**Chang** [3] - 5:9, 55:13,
55:17
**change** [2] - 11:18,
36:8
**changed** [1] - 36:9
**changing** [1] - 50:5
**Chief** [2] - 32:17,
34:21
**chief** [1] - 15:7
**choose** [1] - 40:11
**chose** [4] - 32:5,
40:10, 40:11, 45:22
**CHRISTOPHER** [1] -
1:9
**chronicles** [1] - 14:17
**Circuit** [22] - 4:16,
16:7, 18:3, 18:7,
19:13, 20:9, 27:12,

27:16, 27:18, 33:18,
35:14, 38:19, 42:19,
45:18, 49:19, 50:1,
50:11, 62:6, 62:9,
63:1
**circuit** [30] - 3:16,
3:17, 4:24, 5:24, 6:3,
7:1, 7:10, 10:23,
12:20, 13:1, 14:14,
14:22, 15:2, 20:12,
24:12, 31:8, 34:25,
36:24, 41:21, 43:1,
43:18, 43:19, 44:10,
45:13, 48:16, 53:25,
58:25, 59:5, 63:9,
68:1
**circuit's** [1] - 32:25
**circuits** [1] - 4:24
**circumstance** [1] -
65:13
**circumstances** [5] -
12:23, 13:3, 13:10,
26:13, 26:18
**citation** [1] - 14:12
**cite** [8] - 7:7, 27:5,
27:11, 28:24, 50:2,
56:14, 61:23, 63:15
**cited** [6] - 18:7, 46:17,
50:7, 55:17, 60:21,
63:1
**citing** [1] - 32:23
**Civil** [5] - 1:2, 1:13,
1:17, 1:20, 2:3
**Claiborne** [1] - 27:18
**claim** [8] - 5:4, 9:8,
11:6, 25:4, 30:10,
30:11, 47:12, 66:11
**claims** [11] - 2:22, 3:2,
3:3, 3:5, 9:24, 11:8,
22:6, 22:25, 60:12,
66:8, 67:13
**Clarke** [1] - 4:21
**clause** [1] - 47:5
**clean** [24] - 3:2, 40:23
**clear** [24] - 4:16,
11:16, 12:5, 12:8,
18:10, 20:3, 20:15,
34:24, 38:4, 40:7,
40:9, 45:17, 45:24,
46:10, 47:15, 57:3,
60:11, 60:13, 63:25,
64:14, 64:18, 65:25,
67:11
**cleared** [5] - 5:15,
22:5, 32:10, 34:5,
54:23
**clearly** [13] - 5:12,
5:19, 8:6, 8:23,
17:13, 18:2, 18:19,
29:2, 29:21, 37:12,

66:25, 67:1
**clears** [1] - 54:13
**clerical** [1] - 36:2
**Clerical** [1] - 35:1
**clerk** [1] - 34:16
**closest** [1] - 28:22
**cognizance** [2] -
36:13, 48:14
**collapse** [1] - 6:10
**collateral** [1] - 11:6
**colleague** [2] - 46:16,
54:12
**colleagues** [6] -
44:14, 49:22, 51:5,
52:10, 52:16, 53:16
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 45:22
**combination** [1] -
30:25
**combined** [1] - 18:9
**coming** [2] - 14:18,
23:4
**comity** [4] - 20:21,
21:9, 38:23, 38:25
**commentator** [1] -
53:25
**commission** [3] -
27:6, 43:8, 43:10
**committee** [18] - 8:5,
9:12, 10:24, 11:9,
12:24, 12:25, 13:25,
19:15, 21:17, 22:17,
28:10, 29:2, 31:6,
32:19, 38:19, 52:2,
68:6, 68:13
**committee's** [2] -
14:1, 39:8
**committees** [1] -
43:12
**complain** [1] - 45:3
**complaining** [1] - 45:4
**complaint** [10] - 8:2,
8:8, 33:7, 35:23,
45:12, 48:2, 48:3,
48:4, 48:13
**complete** [3] - 10:15,
45:20, 69:5
**completed** [1] - 33:3
**completely** [4] - 19:5,
19:24, 30:13, 58:10
**completion** [1] - 38:11
**compliance** [1] -
64:10
**complied** [2] - 64:12,
64:13, 64:20
**complies** [1] - 64:4
**comply** [2] - 40:6, 40:8
**comprised** [1] - 61:4
**compute** [1] - 11:2
**concede** [8] - 16:22,

48:19, 48:24, 55:22,
56:2, 60:22, 61:10,
61:11
**conceded** [3] - 20:23,
30:20, 63:11
**concedes** [1] - 33:17
**concerned** [1] - 34:19
**concerning** [1] - 3:14
**concerns** [2] - 5:10,
59:3
**conclude** [1] - 12:24
**conclusion** [3] -
24:12, 29:3, 38:22
**concurrence** [2] -
17:17, 44:8
**Conduct** [1] - 2:24
**conduct** [3] - 5:1,
28:10
**conducting** [1] - 52:23
**conference** [12] -
21:9, 21:19, 21:20,
21:24, 23:17, 24:3,
31:7, 43:7, 43:11,
44:9, 61:18, 65:5
**confirmed** [1] - 42:22
**confusion** [1] - 60:23
**Congress** [12] - 19:2,
23:18, 29:23, 37:12,
44:4, 45:9, 49:15,
50:18, 53:7, 53:8,
68:4, 68:6
**congressional** [2] -
24:7, 47:2
**consequences** [1] -
52:1
**consider** [1] - 6:2
**considered** [1] - 68:6
**considering** [2] - 44:6,
53:22
**considers** [1] - 28:11
**consist** [1] - 52:8
**consistent** [2] - 13:6,
22:11
**consistently** [2] -
4:23, 5:5
**constitute** [2] - 9:9,
25:21
**constitutes** [3] - 28:8,
32:25, 69:4
**Constitution** [4] -
1:24, 25:15, 26:6,
69:11
**constitutional** [1] -
11:14, 18:25, 19:9,
19:24, 21:18, 24:13,
24:21, 41:7, 45:2,
60:12
**constitutionality** [1] -
22:25
**constitutionally** [1] -

65:14
**constructive** [8] - 9:8,
25:4, 26:3, 30:3,
30:19, 46:13, 63:19,
66:15
**construe** [1] - 47:10
**contempt** [4] - 41:9,
41:10, 41:12
**context** [2] - 16:9,
55:3
**contingent** [1] - 57:21
**continue** [1] - 67:21
**contradict** [1] - 10:6
**contrary** [3] - 24:12,
34:10, 48:8
**control** [2] - 34:8, 38:1
**controlling** [2] -
44:15, 44:18
**controls** [1] - 26:9
**controversy** [1] - 36:6
**convincing** [1] - 12:5
**COOPER** [1] - 1:9
**cooperate** [3] - 13:23,
39:2, 39:4, 39:6
**correct** [8] - 15:4,
16:18, 36:7, 39:1,
40:6, 43:5, 44:24,
61:9
**correctly** [2] - 36:19,
50:21
**corroborates** [1] -
20:10
**cosmetic** [1] - 19:20
**council** [3] - 5:22,
38:21, 42:13
**Council** [74] - 4:2,
6:23, 8:5, 11:9,
12:23, 13:15, 13:24,
14:12, 17:14, 17:17,
18:5, 20:11, 21:11,
21:25, 22:17, 24:3,
24:13, 24:18, 32:7,
33:24, 34:12, 35:12,
35:14, 35:19, 38:7,
39:12, 40:1, 40:9,
40:10, 41:8, 41:11,
41:15, 41:17, 42:3,
42:4, 42:11, 42:25,
43:7, 43:11, 43:18,
43:20, 44:7, 44:10,
46:19, 47:14, 48:8,
50:1, 50:5, 50:11,
50:19, 50:22, 51:21,
54:19, 54:23, 55:7,
55:10, 56:12, 57:16,
57:17, 57:19, 58:6,
58:16, 58:25, 59:1,
59:6, 59:11, 61:1,
62:10, 63:22, 64:8,
64:20, 64:22, 67:22,

68:13
Council's [6] - 13:17,
14:16, 14:24, 58:23,
64:13, 64:15
councils [1] - 47:2
counsel [6] - 2:5,
3:21, 27:5, 33:17,
33:22, 59:20
counsel's [2] - 33:15,
61:25
count [1] - 8:7
Count [8] - 9:7, 9:14,
25:8, 25:11, 28:6,
46:24, 48:23, 65:24
counting [1] - 17:15
country [1] - 31:8
Counts [2] - 8:16, 46:3
counts [3] - 9:3, 25:8,
28:7
couple [6] - 6:6, 29:5,
33:25, 56:3, 57:25,
67:8
course [13] - 4:13, 5:4,
21:19, 35:22, 37:24,
38:1, 46:24, 48:4,
48:12, 50:21, 50:23,
50:25, 59:16
Court [52] - 1:22, 1:23,
3:1, 3:11, 6:2, 17:9,
20:5, 22:24, 27:17,
27:19, 27:24, 32:1,
32:3, 33:2, 35:15,
35:22, 35:23, 36:13,
36:24, 37:11, 37:15,
38:1, 40:17, 41:11,
42:2, 43:6, 43:10,
43:19, 43:24, 44:2,
44:19, 44:22, 45:5,
45:10, 45:15, 45:16,
45:21, 45:24, 46:1,
48:7, 48:14, 51:12,
53:22, 53:24, 56:8,
56:12, 56:18, 61:3,
67:15, 69:10
court [47] - 4:4, 10:14,
10:19, 10:21, 10:22,
11:22, 11:23, 11:24,
18:6, 18:15, 19:11,
19:13, 19:18, 20:3,
20:4, 20:13, 20:16,
22:21, 23:2, 23:13,
23:19, 24:8, 24:9,
24:19, 24:22, 26:24,
37:7, 37:19, 37:22,
42:24, 42:25, 43:8,
43:16, 43:17, 44:12,
44:19, 52:9, 52:13,
55:25, 56:5, 56:7,
56:10, 57:22, 61:6,
61:15, 62:9, 62:24

COURT [87] - 1:1, 2:9,
2:12, 3:21, 4:3, 4:7,
4:20, 4:23, 5:22,
7:16, 7:19, 7:23, 8:7,
8:17, 8:19, 10:5,
12:18, 13:5, 14:1,
15:3, 15:16, 16:15,
17:15, 19:10, 21:8,
22:7, 22:10, 22:23,
23:16, 24:5, 25:8,
25:11, 25:13, 28:6,
29:1, 29:13, 29:24,
31:13, 31:16, 31:18,
31:22, 32:6, 34:1,
34:19, 36:5, 36:14,
36:17, 37:1, 37:3,
37:6, 38:2, 39:1,
40:5, 42:8, 43:2,
44:6, 44:14, 46:2,
46:5, 46:9, 47:4,
47:23, 49:3, 49:10,
51:11, 51:14, 52:20,
54:6, 54:8, 55:15,
56:5, 56:8, 56:18,
57:21, 59:19, 60:7,
61:2, 61:16, 61:25,
64:3, 64:9, 64:18,
64:24, 65:4, 66:8,
68:19, 69:1
Court's [1] - 33:13
Courthouse [1] - 1:23
COURTROOM [1] -
2:2
Courts [1] - 63:7
courts [14] - 5:5, 16:4,
21:7, 22:16, 24:11,
26:20, 42:18, 42:21,
52:7, 61:17, 62:7,
65:7
covered [1] - 51:14
covers [2] - 7:25, 51:9
craft [1] - 56:23
CRC [2] - 1:22, 69:9
creating [2] - 19:10,
19:12
credible [2] - 52:21,
52:24
criminal [3] - 26:7,
27:12, 27:25
Criminal [1] - 16:10
criminally [1] - 27:20
cross [1] - 2:14
cross-motions [1] -
2:14
CRR [2] - 1:22, 69:9
cumbersome [1] -
53:9
Cuozzo [7] - 36:25,
37:2, 37:11, 37:15,
42:1, 59:20

current [2] - 38:11,
64:20

# D

D.C [7] - 1:6, 1:24,
4:16, 19:13, 33:18,
45:18, 69:11
Dart [9] - 10:6, 12:1,
12:10, 13:6, 38:3,
42:1
Dated [1] - 69:7
days [2] - 6:20, 33:3
DC [2] - 1:15, 1:18
de [1] - 59:10
deal [2] - 7:2, 20:7
dealing [2] - 5:4, 23:5
deals [1] - 60:5
dealt [3] - 12:15,
61:16, 61:17
decades [2] - 36:9,
68:9
decide [8] - 14:5, 24:3,
56:10, 56:21, 63:15,
66:9, 67:2
decided [4] - 15:2,
45:21, 57:17
deciding [4] - 11:12,
11:14, 19:18, 21:7,
22:17, 45:7
decision [8] - 14:4,
15:7, 18:4, 18:7,
27:18, 27:19, 40:16,
45:23
decisions [3] - 24:8,
37:9, 37:13
declaratory [1] - 35:24
declare [1] - 41:17
declined [1] - 32:3
deems [1] - 35:23
defeat [2] - 19:2,
19:24
defendant [2] - 21:21,
36:22
defendants [20] -
2:11, 2:16, 3:12,
33:12, 35:11, 36:19,
36:20, 37:14, 38:24,
39:13, 41:1, 43:21,
45:9, 45:14, 48:8,
48:13, 48:19, 51:23,
52:15
Defendants [2] - 1:7,
1:16
defendants' [11] -
2:16, 9:9, 25:20,
34:10, 36:11, 38:23,
40:25, 43:1, 44:4,
46:19, 48:23
defined [1] - 35:20

defines [1] - 49:6
definition [4] - 13:10,
26:11, 49:7, 49:8
delay [1] - 52:14
delegate [1] - 63:8
dementia [1] - 53:12
Department [5] - 1:16,
1:19, 2:11, 3:12,
45:22
depth [1] - 18:11
DEPUTY [1] - 2:2
described [2] - 58:24,
59:1
despite [1] - 32:5
details [1] - 33:6
determination [2] -
24:18, 59:10
determinations [9] -
8:4, 8:14, 9:7, 9:21,
11:19, 23:24, 24:15,
25:24, 60:14
determine [2] - 7:2,
42:17
detrimental [1] - 67:22
dicta [3] - 17:22,
44:15, 44:18
difference [1] - 19:14
different [10] - 6:24,
12:22, 13:1, 16:9,
23:4, 23:8, 28:2,
36:1, 58:16, 67:2
differently [1] - 35:25
difficult [3] - 3:19,
13:2, 48:10
directly [4] - 17:25,
24:18, 56:15, 63:17
director [4] - 37:10,
37:13, 37:16, 37:17
Disabilities [1] - 49:8
Disability [1] - 2:24
disability [28] - 3:15,
12:21, 14:11, 28:8,
29:4, 29:22, 40:19,
41:13, 41:14, 41:25,
42:6, 49:7, 49:9,
49:11, 50:1, 50:2,
50:12, 50:16, 50:20,
51:3, 51:8, 51:19,
51:21, 52:22, 53:14,
55:2, 55:3, 67:17
disabled [13] - 40:3,
40:16, 41:17, 41:23,
49:5, 49:20, 50:8,
50:14, 50:23, 53:4,
53:6, 53:16, 54:4
disagree [2] - 31:23,
46:16
disciplinary [2] - 16:4,
33:7
discipline [2] - 26:5,

26:6, 26:13
discretion [5] - 7:1,
14:25, 62:14, 64:13,
64:25
discussed [1] - 64:16
discussing [2] -
23:22, 66:25
discussion [2] -
58:20, 66:23
dismiss [4] - 2:16,
22:6, 29:10, 66:22
dismissed [1] - 49:4
dispositive [1] - 2:17
dispute [6] - 4:10, 9:2,
15:18, 35:11, 42:11,
60:25
disputing [2] - 17:6,
23:11
disqualification [1] -
26:4
dissatisfied [1] -
24:22
disseminate [1] -
45:19
dissent [3] - 26:23,
53:23, 65:19
dissenters [1] - 62:18
dissenting [1] - 17:24
dissents [1] - 51:7
distinction [5] - 42:21,
43:2, 61:6, 61:8,
61:20
district [7] - 20:12,
20:14, 23:2, 23:19,
26:24, 62:13, 62:15
District [2] - 45:21,
45:22
DISTRICT [3] - 1:1,
1:1, 1:10
Division [2] - 1:17,
1:20
doctrine [1] - 22:4
DOLIN [32] - 1:12, 2:7,
31:17, 31:19, 31:23,
32:13, 34:9, 34:24,
36:7, 36:15, 36:18,
37:2, 37:4, 37:7,
38:9, 39:4, 40:7,
42:10, 43:5, 44:13,
44:17, 46:4, 46:7,
46:12, 47:6, 48:3,
49:5, 49:14, 51:12,
51:16, 53:4, 54:7
Dolin [3] - 2:7, 2:9,
31:16
dollars [1] - 42:5
done [5] - 5:12, 5:14,
13:23, 27:22, 34:13
doubly [1] - 59:9
doubt [2] - 10:10,

60:18
**doubts** [2] - 5:6, 55:19
**dovetail** [1] - 46:2
**down** [3] - 3:22, 4:3, 65:17
**drafted** [2] - 50:8, 50:19
**drawn** [1] - 31:8
**due** [8] - 5:17, 16:18, 30:4, 30:11, 30:15, 30:23, 31:1, 66:16
**dueling** [1] - 24:14
**duties** [4] - 3:16, 28:9, 49:11, 49:13

**E**

**ease** [1] - 6:2
**easier** [1] - 9:25
**echoed** [1] - 5:10
**Edwards** [2] - 26:22, 65:18
**effect** [2] - 6:14, 19:11
**effective** [3] - 19:6, 47:21, 67:23
**effectively** [1] - 68:10
**efficient** [2] - 19:6, 52:23
**Ehrlich** [4] - 2:11, 2:12, 3:11, 54:8
**EHRLICH** [55] - 1:16, 2:10, 3:9, 3:24, 4:5, 4:9, 4:22, 5:5, 6:6, 7:17, 7:20, 7:24, 8:9, 8:18, 8:20, 10:9, 13:4, 13:7, 14:3, 15:4, 15:17, 16:21, 17:20, 19:12, 21:12, 22:9, 22:13, 23:3, 23:21, 24:10, 25:10, 25:12, 25:17, 28:15, 29:5, 29:14, 30:1, 31:15, 54:9, 55:16, 56:6, 56:9, 56:20, 57:25, 59:23, 60:9, 61:9, 61:21, 62:3, 64:6, 64:11, 64:22, 64:25, 65:6, 66:12
**either** [3] - 4:11, 19:21, 37:20
**elimination** [1] - 46:5
**emails** [3] - 32:18, 32:20, 51:5
**emphasized** [1] - 38:3
**en** [4] - 16:7, 52:6, 52:7, 52:13
**enacted** [2] - 19:3, 19:4
**end** [11] - 5:8, 11:10, 13:21, 18:14, 22:5,

22:19, 40:5, 40:14, 41:4, 51:1, 58:9
**endeavor** [1] - 31:20
**ended** [2] - 19:15, 62:12
**enforcement** [1] - 28:12
**engage** [1] - 4:25
**enjoin** [7] - 6:13, 21:2, 21:11, 21:22, 57:6, 68:4, 68:9
**entered** [2] - 33:14, 52:18
**entire** [3] - 19:2, 31:11, 33:13
**entirely** [6] - 6:18, 32:24, 42:6, 51:2, 57:19, 58:6
**entities** [1] - 22:21
**envision** [2] - 4:24, 24:16
**envisioning** [1] - 29:23
**EPA** [4] - 32:1, 32:2, 32:5, 55:19
**equate** [1] - 27:4
**equivalent** [3] - 10:22, 23:4, 27:21
**errand** [1] - 53:24
**error** [2] - 12:14, 33:12
**escape** [1] - 66:10
**especially** [3] - 4:15, 51:24, 68:5
**essence** [1] - 43:21
**essentially** [9] - 10:6, 13:23, 20:22, 22:1, 25:13, 30:20, 31:10, 41:9, 43:22
**Estates** [1] - 28:24
**et** [4] - 1:6, 2:4, 43:12, 57:24
**evaded** [1] - 9:19
**evading** [5] - 5:25, 32:4, 33:17, 33:18, 33:19, 55:24, 56:16
**evidence** [12] - 12:6, 32:7, 32:11, 34:6, 34:12, 45:24, 50:11, 50:12, 50:15, 53:20, 60:11, 60:13
**evidenced** [1] - 51:25
**exacerbate** [1] - 54:20
**exact** [5] - 6:18, 7:5, 7:8, 12:15, 58:13
**exactly** [8] - 16:7, 16:11, 17:7, 29:22, 54:12, 54:21, 67:3
**exam** [1] - 9:15
**examination** [1] - 37:18

**examinations** [1] - 49:21
**examine** [2] - 13:9, 42:2
**example** [19] - 9:7, 9:14, 16:24, 21:6, 24:12, 25:20, 26:22, 27:12, 35:24, 37:19, 38:12, 40:23, 42:4, 42:15, 43:13, 49:6, 50:7, 52:6, 53:20
**exceedingly** [1] - 12:11
**except** [1] - 28:16
**exception** [2] - 5:11, 5:19
**exceptions** [4] - 4:11, 6:8, 7:12, 7:15
**exclusively** [1] - 16:2, 37:9
**excuse** [3] - 14:17, 16:21, 20:20
**executive** [3] - 19:23, 25:13, 63:9
**exercise** [4] - 25:14, 27:7, 27:15, 42:16
**exercised** [1] - 17:18
**exercising** [2] - 42:13, 42:24
**exhaustion** [3] - 20:21, 38:24, 38:25
**exhibiting** [1] - 53:12
**exist** [1] - 26:13
**existing** [1] - 16:13
**expectation** [7] - 6:9, 7:5, 34:2, 56:3, 57:2, 57:15, 58:18
**expedited** [1] - 52:23
**expeditious** [1] - 67:23
**expelled** [1] - 28:1
**expertise** [2] - 11:12, 11:14
**explain** [2] - 13:19, 54:17
**explained** [1] - 14:24
**explains** [1] - 54:19
**explicitly** [4] - 39:10, 40:22, 42:19, 52:7
**expressly** [1] - 12:10
**expulsion** [1] - 27:22
**extensive** [1] - 28:11
**extent** [5] - 22:24, 37:25, 47:9, 47:13, 58:1
**extra** [1] - 60:2
**extradition** [2] - 42:15, 42:16
**extraordinary** [4] - 12:23, 13:2, 13:9,

68:4
**extreme** [1] - 59:25
**extremely** [1] - 67:21

**F**

**face** [6] - 12:19, 12:20, 38:5, 38:7, 59:22, 64:14
**facial** [33] - 3:3, 3:4, 8:11, 9:6, 9:19, 12:9, 22:11, 22:16, 22:19, 23:9, 23:10, 23:18, 24:1, 24:5, 24:13, 25:6, 25:9, 25:16, 26:12, 27:1, 28:22, 45:15, 45:18, 45:24, 46:3, 47:11, 48:25, 49:3, 60:13, 65:12, 65:19, 66:4, 66:9
**fact** [26] - 6:3, 26:7, 31:25, 32:5, 36:9, 38:11, 38:14, 40:17, 42:22, 43:5, 44:11, 45:16, 45:24, 46:7, 47:25, 48:15, 48:17, 50:4, 51:4, 51:19, 51:20, 51:25, 59:3, 61:3, 63:11, 65:15
**factor** [2] - 5:24, 11:11
**factors** [4] - 11:1, 11:3, 11:15, 17:8
**facts** [3] - 16:13, 42:18, 54:3
**faculties** [1] - 29:17
**fail** [1] - 28:5
**failing** [1] - 13:23
**fails** [2] - 28:7, 65:22
**failure** [3] - 39:2, 39:4, 39:6
**fair** [1] - 64:3
**fairly** [3] - 7:24, 15:17, 54:5
**faith** [1] - 52:16
**fall** [5] - 9:24, 23:24, 34:4, 34:7, 35:20
**falls** [3] - 17:7, 29:22, 35:6
**familiar** [2] - 12:5, 36:23
**far** [3] - 26:21, 36:10, 44:24
**fast** [3] - 34:13, 34:14, 48:9
**fast-paced** [1] - 48:9
**faster** [1] - 34:16
**feature** [1] - 53:10
**February** [1] - 35:10
**Federal** [5] - 1:17, 1:20, 16:9, 35:14,

50:11
**federal** [27] - 3:17, 4:15, 4:19, 4:25, 8:25, 10:14, 11:13, 11:22, 14:13, 16:2, 23:5, 31:24, 31:25, 32:25, 34:25, 36:24, 41:21, 43:1, 43:9, 43:18, 43:19, 45:13, 48:16, 49:11, 49:12, 53:25, 68:1
**Feldman** [5] - 17:10, 22:23, 23:3, 61:14, 61:16
**fell** [1] - 32:24
**few** [2] - 12:2, 54:10
**Fifth** [8] - 18:3, 18:6, 20:9, 62:5, 62:6, 62:9, 63:1
**figuring** [1] - 20:8
**file** [1] - 48:7
**Filed** [1] - 21:6
**filed** [1] - 48:4
**final** [3] - 37:10, 39:15, 48:20
**finally** [4] - 3:4, 45:8, 52:14, 52:18
**fine** [2] - 18:21, 42:5
**first** [16] - 2:21, 4:15, 6:7, 17:22, 23:22, 28:18, 29:6, 31:23, 32:13, 34:1, 37:1, 43:23, 44:6, 44:17, 51:17, 67:5
**First** [1] - 21:6
**First-Filed** [1] - 21:6
**fishy** [1] - 55:11
**fit** [2] - 7:11, 39:20
**five** [2] - 17:16, 40:1
**flow** [1] - 18:13
**focus** [1] - 3:23
**fool's** [1] - 53:24
**Footnote** [4] - 17:21, 28:17, 44:9, 47:20
**FOR** [1] - 1:1
**force** [1] - 35:14
**foreclosed** [1] - 11:4
**forecloses** [1] - 25:7, 26:2
**foregoing** [1] - 69:4
**foreshadowed** [2] - 54:12, 54:22
**forever** [3] - 63:20, 63:24, 64:3
**form** [1] - 25:14
**formal** [6] - 32:20, 43:3, 43:4, 43:5, 61:6, 61:20
**formally** [2] - 44:15, 44:18

**former** [1] - 34:15
**formulated** [1] - 16:15
**formulation** [1] -
16:14
**forth** [1] - 65:24
**forward** [2] - 6:5,
14:18
**four** [2] - 17:23, 35:3
**framed** [2] - 49:10,
49:15
**framework** [1] - 11:16
**Francisco** [1] - 1:21
**frankly** [1] - 49:1
**free** [1] - 8:12
**freelancing** [1] - 46:22
**fresh** [1] - 59:11
**friend** [5] - 8:10,
31:20, 54:25, 58:22,
60:15
**friend's** [1] - 65:3
**front** [1] - 58:9
**fronts** [1] - 18:20
**fulfilling** [1] - 49:11
**full** [2] - 26:4, 69:5
**fully** [2] - 14:4, 49:1
**function** [2] - 42:24,
43:16
**functional** [2] - 61:7,
61:20
**functionally** [2] -
19:14, 61:5
**functions** [4] - 17:18,
27:15, 42:16, 43:3

### G

**Gate** [1] - 1:20
**general** [2] - 22:25,
35:5
**generally** [2] - 26:6,
47:16
**given** [8] - 6:3, 35:9,
36:9, 36:10, 41:1,
41:15, 47:17, 53:14
**glaze** [1] - 17:21
**Golden** [1] - 1:20
**governing** [1] - 12:21
**government** [6] - 2:17,
4:18, 31:24, 32:1,
55:13, 55:17
**governmental** [1] -
4:15
**grab** [1] - 7:18
**grant** [4] - 37:18,
37:19, 37:20
**grants** [2] - 37:17,
37:21
**grave** [1] - 19:8
**great** [6] - 14:13,
18:12, 21:3, 59:23,

60:9, 67:9
**Gregory** [1] - 2:7
**GREGORY** [1] - 1:12
**ground** [1] - 30:2
**grounds** [2] - 10:1,
66:1
**guess** [7] - 26:9, 29:5,
29:14, 45:8, 59:23,
66:12, 66:22
**guessing** [1] - 24:8
**guidelines** [2] - 28:12,
32:25
**guise** [1] - 41:13

### H

**habeas** [1] - 50:15
**handle** [3] - 38:15,
58:7, 58:8
**handles** [1] - 28:3
**happy** [13] - 3:9, 7:20,
10:2, 10:9, 15:14,
24:24, 25:2, 29:9,
29:10, 30:6, 48:12,
60:3, 60:19
**hardly** [1] - 49:25
**Harlan** [5] - 17:24,
18:11, 44:20, 62:18
**Harlan's** [2] - 17:17,
44:8
**harm** [6] - 16:25, 21:3,
51:18, 52:3, 52:13,
67:25
**harms** [2] - 51:17,
67:8
**Hastings** [7] - 20:24,
21:17, 26:23, 30:24,
31:5, 65:19
**head** [2] - 43:15, 43:16
**heads** [1] - 17:15
**health** [1] - 40:24
**hear** [18] - 6:17, 16:17,
16:19, 17:4, 20:17,
31:13, 39:16, 41:23,
42:16, 45:15, 45:24,
48:21, 54:4, 57:3,
60:17, 60:20, 61:25,
65:12
**heard** [6] - 17:2,
35:16, 60:15, 60:21,
61:2, 65:9
**HEARING** [2] - 1:4,
1:9
**hearing** [9] - 6:15,
16:23, 17:1, 41:18,
57:8, 57:12, 57:18,
58:4, 68:24
**hearings** [1] - 16:3
**held** [4] - 16:4, 42:18,
42:20

**HELD** [1] - 1:9
**helpful** [1] - 3:8
**hereby** [1] - 69:3
**higher** [3] - 23:17,
24:9, 61:17
**higher-level** [2] -
23:17, 24:9
**highlights** [1] - 54:10
**highly** [1] - 36:8
**himself** [1] - 44:21
**hinted** [1] - 47:23
**history** [2] - 33:13,
49:16
**hit** [1] - 54:10
**Hoffman** [1] - 28:24
**Hohn** [2] - 18:22, 19:1
**hold** [10] - 8:17, 16:3,
18:22, 19:22, 21:16,
27:6, 32:3, 41:8,
41:11
**holding** [3] - 10:7,
10:10, 17:19
**HON** [2] - 1:2, 1:5
**Hon** [2] - 2:3
**honing** [1] - 9:2
**Honor** [72] - 2:2, 2:7,
2:10, 3:9, 3:25, 4:5,
4:22, 6:7, 7:17, 7:20,
8:9, 8:20, 9:17, 10:3,
10:9, 12:17, 13:18,
14:13, 15:4, 15:16,
16:22, 17:11, 17:20,
18:15, 20:1, 20:18,
20:19, 22:2, 22:4,
22:14, 23:6, 24:25,
25:3, 25:17, 26:9,
28:2, 29:6, 29:18,
30:12, 31:3, 31:11,
31:15, 31:17, 32:13,
35:21, 36:15, 36:18,
40:7, 41:5, 46:12,
46:17, 47:10, 50:21,
51:10, 53:5, 54:9,
56:4, 56:9, 56:20,
56:24, 59:16, 59:18,
60:2, 60:19, 63:4,
63:17, 65:12, 66:3,
66:7, 67:7, 67:8,
68:17
**Honor's** [1] - 13:8
**HONORABLE** [1] - 1:9
**hoops** [1] - 36:1
**hope** [1] - 49:14
**hoped** [1] - 68:20
**hopefully** [1] - 65:4
**House** [2] - 19:16,
25:15
**house** [8] - 19:5, 19:8,
19:21, 44:5, 45:10,
45:11, 45:12, 68:8

**hurdles** [2] - 22:5,
25:2

### I

**Iancu** [1] - 37:5
**idea** [2] - 6:25, 19:17
**identify** [1] - 2:5
**idiosyncratic** [1] -
50:13
**II** [1] - 30:24
**III** [7] - 19:18, 23:17,
42:22, 42:25, 43:14,
44:12, 61:6
**illegal** [1] - 64:5
**illustrates** [1] - 49:17
**imagine** [1] - 13:2
**immediately** [3] -
6:22, 14:22, 57:9
**impeachment** [12] -
9:8, 25:4, 25:15,
26:3, 26:14, 30:4,
30:19, 46:14, 47:5,
53:8, 63:19, 66:16
**impeding** [1] - 3:15
**implement** [2] - 62:13,
62:14
**implication** [1] - 48:1
**important** [3] - 51:7,
65:2, 65:9
**importantly** [1] - 39:10
**imposed** [4] - 36:12,
38:18, 45:1, 52:2
**imposition** [1] - 9:14
**imprisoned** [1] - 27:14
**imprisonment** [1] -
27:25
**improper** [1] - 36:3
**impute** [1] - 4:17
**IN** [1] - 1:1
**in-depth** [1] - 18:11
**in-house** [7] - 19:5,
19:8, 19:21, 44:5,
45:10, 45:12, 68:8
**inartful** [1] - 25:24
**including** [1] - 55:24
**inconsistency** [1] -
62:1
**inconsistent** [2] -
22:23, 37:25
**incorporated** [1] -
32:18
**incorrect** [4] - 36:21,
45:9, 45:14, 50:13
**increased** [1] - 59:3
**increasing** [1] - 34:25
**indefinite** [3] - 47:25,
64:4, 64:7
**independent** [2] - 6:8,
6:12

**indicated** [1] - 6:4
**indication** [1] - 6:21
**ineffective** [1] - 12:13
**informal** [3] - 3:20,
32:19
**information** [2] -
14:19, 45:19
**injunction** [10] - 2:15,
21:25, 30:5, 30:10,
33:22, 35:21, 36:3,
51:13, 66:1, 66:17
**injunctive** [2] - 52:14,
52:19
**injured** [1] - 46:24
**inquire** [1] - 12:18
**inquiry** [1] - 67:4
**instance** [1] - 43:23
**Institute** [5] - 36:25,
37:5, 37:15, 42:1
**insulated** [1] - 42:6
**integral** [1] - 18:13
**intend** [2] - 39:17,
39:19
**intent** [4] - 4:17, 12:6,
12:9, 49:15
**intentions** [1] - 50:18
**interbranch** [1] - 26:5
**interest** [5] - 17:1,
51:23, 52:23, 52:25,
53:15
**internal** [1] - 34:25
**interpose** [1] - 21:18
**interpret** [1] - 15:19
**interpretation** [1] -
46:19
**interpreted** [1] - 62:4
**interpreting** [1] -
60:17
**interrelated** [1] - 12:2
**invasive** [1] - 57:23
**investigate** [1] - 41:2
**investigation** [5] -
28:11, 32:21, 39:3,
52:23, 53:1
**investigative** [1] -
30:25
**involve** [2] - 44:7,
47:11
**involved** [2] - 20:14,
44:10
**irrelevant** [2] - 41:6,
59:9
**irreparable** [2] - 16:25,
52:3
**issue** [17] - 4:5, 4:11,
5:19, 6:11, 10:12,
11:12, 11:24, 16:2,
23:1, 26:23, 28:2,
31:4, 33:21, 58:23,
63:15, 63:19, 66:4

**JA140**

issued [2] - 5:9, 49:23
issues [8] - 3:23,
13:12, 20:19, 29:8,
30:8, 30:22, 42:14,
45:17
IT [1] - 63:10
itself [10] - 10:17,
12:4, 32:14, 33:6,
38:14, 45:10, 45:16,
45:23, 50:22, 68:11

## J

January [2] - 1:6, 69:7
JC&D [11] - 10:24,
13:24, 19:15, 21:17,
22:17, 31:6, 38:18,
39:7, 51:24, 68:6,
68:15
jibes [1] - 3:6
John [1] - 38:19
JOHN [1] - 1:13
join [1] - 50:9
joined [1] - 16:6
judge [23] - 3:16,
26:18, 27:4, 27:13,
28:9, 29:16, 41:19,
41:20, 43:14, 43:16,
46:22, 47:14, 49:11,
52:9, 52:22, 52:25,
53:2, 53:5, 53:7,
53:11, 62:13, 62:15
JUDGE [2] - 1:9, 1:10
Judge [84] - 2:8, 3:14,
3:18, 5:9, 6:4, 9:5,
14:19, 14:20, 16:6,
16:17, 17:8, 20:5,
21:24, 23:15, 24:19,
25:23, 26:22, 29:2,
29:18, 32:17, 32:21,
32:24, 33:23, 34:9,
34:10, 34:17, 34:21,
35:4, 35:14, 35:18,
35:25, 36:8, 36:12,
38:10, 38:14, 38:17,
38:19, 38:21, 39:8,
39:16, 40:3, 40:13,
40:16, 40:19, 41:8,
41:12, 41:17, 41:21,
42:5, 42:10, 43:23,
44:1, 44:25, 46:21,
47:11, 47:17, 47:24,
48:16, 48:20, 49:18,
49:19, 50:3, 50:8,
50:22, 50:23, 51:5,
51:18, 51:24, 52:3,
52:8, 52:20, 53:19,
54:1, 54:4, 55:18,
56:11, 56:25, 59:11,
63:22, 65:18, 67:9,

67:15
judges [35] - 4:16,
4:19, 7:1, 7:10, 8:25,
10:23, 10:24, 11:13,
15:2, 16:2, 19:18,
20:14, 23:5, 23:17,
24:12, 27:6, 31:7,
31:8, 31:25, 35:5,
35:25, 42:15, 42:21,
42:25, 43:9, 43:10,
47:3, 49:12, 51:22,
52:8, 53:23, 58:25,
59:6, 61:4, 68:1
judgment [3] - 32:15,
35:24, 66:7
Judicial [78] - 2:24,
4:2, 6:23, 8:5, 11:8,
12:22, 13:15, 13:17,
13:24, 14:12, 14:16,
14:24, 17:13, 17:17,
18:5, 20:11, 21:10,
21:25, 22:17, 24:2,
24:13, 24:18, 32:7,
33:24, 34:12, 35:12,
35:13, 35:19, 38:7,
39:11, 40:1, 40:9,
40:10, 41:8, 41:15,
41:16, 42:3, 42:4,
42:11, 42:24, 43:6,
43:11, 43:18, 43:20,
44:7, 44:10, 46:19,
47:14, 48:7, 50:1,
50:5, 50:10, 50:19,
50:22, 51:21, 54:19,
54:23, 55:6, 55:10,
56:12, 57:16, 57:17,
57:19, 58:6, 58:16,
58:25, 59:1, 59:6,
59:11, 61:1, 62:10,
63:22, 64:7, 64:12,
64:15, 64:22, 67:22,
68:13
judicial [69] - 8:24,
10:15, 10:22, 11:3,
11:4, 11:19, 12:6,
15:20, 15:25, 16:1,
16:8, 17:8, 17:13,
17:18, 18:1, 18:10,
18:20, 20:2, 20:8,
20:15, 21:8, 21:20,
21:23, 22:15, 22:18,
22:21, 23:17, 24:2,
24:3, 25:14, 27:8,
27:15, 31:7, 32:8,
37:8, 37:13, 37:21,
38:20, 41:11, 42:12,
42:13, 42:16, 42:17,
43:3, 43:7, 44:9,
44:11, 47:2, 48:15,
60:22, 60:23, 61:5,
61:7, 61:12, 61:15,

61:17, 62:11, 62:16,
62:19, 62:21, 62:22,
62:23, 63:11, 64:15,
65:4
judiciary [5] - 19:8,
19:22, 45:9, 45:11,
68:10
judiciary's [1] - 45:11
JULIAN [1] - 1:13
jump [1] - 36:1
June [28] - 4:1, 4:9,
5:13, 5:14, 5:15,
6:13, 6:19, 15:22,
21:15, 31:12, 32:8,
32:14, 32:17, 32:23,
33:1, 33:7, 40:17,
52:18, 54:18, 55:1,
55:2, 55:4, 55:6,
57:6, 58:15, 59:2,
59:7, 59:10
junior [1] - 41:20
jurisdiction [36] - 3:2,
10:2, 11:25, 13:13,
15:15, 20:4, 20:7,
20:11, 20:16, 20:17,
22:8, 22:11, 22:21,
23:13, 23:19, 30:17,
33:13, 42:9, 42:10,
43:21, 44:3, 44:23,
46:13, 56:7, 56:10,
56:19, 56:22, 59:18,
60:20, 61:3, 62:14,
62:20, 62:24, 66:9,
66:14
jurisdictional [3] -
30:7, 63:15, 66:6
Justice [13] - 1:16,
1:19, 2:11, 3:12,
17:17, 17:24, 18:10,
19:1, 44:8, 44:20,
45:22, 62:18
justice [4] - 15:8, 19:7,
49:24, 67:23
justices [6] - 17:16,
17:23, 17:24, 17:25,
20:6, 57:1
justification [1] -
52:17

## K

keep [4] - 6:5, 44:4,
45:10, 53:17
keeping [5] - 14:13,
45:12, 45:13, 51:24,
52:24
Kennedy [1] - 19:1
kept [3] - 50:5
Kimberly [1] - 2:4
KIMBERLY [1] - 1:5

kind [2] - 51:9, 51:17
kinds [1] - 38:16
known [1] - 43:25

## L

lack [1] - 3:1
lacks [1] - 28:11
laid [4] - 7:24, 13:17,
15:18, 51:10
language [1] - 12:12
lapse [1] - 64:21
last [15] - 3:13, 5:9,
11:11, 11:21, 15:6,
22:7, 31:3, 31:25,
46:2, 54:8, 55:18,
57:15, 60:9, 63:4,
68:3
lasts [1] - 33:19
law [8] - 11:17, 24:9,
28:18, 28:23, 30:21,
33:18, 42:18, 67:5
lay [1] - 3:7, 8:13,
15:13, 30:19, 30:21
layers [2] - 21:2
lays [6] - 14:12, 16:7,
16:11, 18:12, 29:15,
55:2
learned [1] - 46:16
least [12] - 3:2, 5:1,
17:16, 28:7, 38:9,
38:10, 42:2, 47:25,
48:9, 59:20, 61:16,
65:5
leaves [1] - 17:13
leaving [4] - 38:14,
38:17, 40:11, 50:4
lectern [1] - 2:5
Lee [1] - 36:25
Leedom [2] - 12:1,
12:4
left [1] - 64:19
legal [2] - 3:23, 12:14
legislative [1] - 12:6
length [1] - 59:25
less [1] - 33:19
letting [1] - 38:22
level [9] - 13:24, 17:3,
21:9, 21:11, 21:19,
23:17, 24:8, 24:9,
30:14
level-set [1] - 30:14
Liberties [1] - 1:13
lie [1] - 43:20
likelihood [1] - 67:12
likely [6] - 6:4, 34:3,
34:7, 48:20, 53:25,
54:1
limited [1] - 12:12
line [1] - 27:16

list [2] - 9:13, 43:11
listed [1] - 39:13
lists [2] - 9:11, 25:22
literally [1] - 35:13
litigant [2] - 53:2,
67:14
litigants [2] - 67:9,
68:1
litigate [1] - 48:10
litigation [4] - 5:12,
5:17, 54:22, 55:21
loath [4] - 4:17, 29:12
lodged [1] - 52:22
LoDuca [1] - 42:20
long-term [3] - 47:6,
48:1, 48:18
look [13] - 7:6, 11:2,
26:22, 27:10, 27:14,
33:6, 38:2, 45:2,
46:22, 47:16, 49:19,
50:3, 60:7
looked [1] - 59:11
looking [2] - 25:19,
60:16
looks [1] - 25:23
lost [1] - 29:17
lower [1] - 24:8
lower-level [1] - 24:8

## M

maintaining [1] -
34:20
majority [2] - 16:7,
17:23
management [1] -
63:10
mandamus [3] -
18:17, 43:23, 44:23
mandatory [2] - 56:19,
56:23
manifests [1] - 10:17
manipulate [1] - 32:8
manipulative [2] -
4:17, 5:1
manner [1] - 3:19
Marbury [1] - 43:22
March [11] - 32:16,
32:17, 38:10, 52:17,
58:22, 59:5, 59:7,
59:9, 59:15, 59:17
matter [5] - 7:7, 13:1,
25:25, 26:2, 40:14
matters [1] - 12:22
McBryde [52] - 7:25,
8:6, 9:21, 10:10,
11:17, 12:4, 12:7,
12:8, 12:15, 18:3,
19:14, 19:19, 20:5,
20:9, 22:12, 23:6,

23:11, 23:15, 23:20, 25:7, 26:2, 26:8, 26:15, 26:24, 27:2, 27:10, 27:11, 28:3, 37:24, 37:25, 38:13, 38:14, 38:17, 45:16, 45:17, 45:23, 47:20, 60:5, 60:10, 60:17, 60:18, 61:1, 62:5, 62:6, 62:11, 63:1, 63:2, 63:13, 65:21, 66:10, 66:13
**McBryde's** [1] - 10:7
**mean** [30] - 4:20, 4:24, 5:1, 5:2, 9:13, 12:12, 13:17, 14:17, 16:17, 17:5, 18:24, 19:17, 21:19, 23:3, 25:18, 25:23, 26:20, 29:11, 30:12, 31:1, 32:9, 34:19, 42:13, 42:23, 43:13, 43:15, 45:13, 59:8, 61:10, 63:10
**meaningful** [1] - 11:3
**means** [3] - 37:12, 46:19, 47:10
**meant** [4] - 29:15, 37:12, 44:4, 45:9
**mechanism** [1] - 19:5
**medical** [2] - 9:15
**member** [1] - 41:21
**members** [1] - 3:17
**mental** [2] - 28:8, 29:3
**mentioned** [3] - 3:25, 51:21, 52:1
**mentions** [1] - 46:18
**mere** [1] - 51:18
**merely** [2] - 12:4, 41:18
**merits** [10] - 3:4, 5:18, 25:2, 29:7, 29:10, 30:3, 31:12, 51:14, 66:2, 66:20
**MICHAEL** [1] - 1:19
**middle** [1] - 21:2
**might** [3] - 36:2, 47:9, 58:8
**million** [2] - 42:5, 57:7
**mind** [1] - 2:21
**minimum** [1] - 28:12
**minor** [1] - 55:12
**minute** [1] - 2:13
**misapply** [1] - 14:7
**misconduct** [1] - 13:22
**mistaken** [1] - 61:18
**Mistretta** [1] - 43:6
**mistretta** [1] - 43:8
**moment** [2] - 7:17, 25:6

**month** [2] - 5:9, 55:18
**months** [2] - 35:3, 64:19
**MOORE** [1] - 1:5
**Moore** [2] - 2:4, 32:18
**moot** [8] - 4:10, 5:4, 6:14, 15:23, 17:14, 32:3, 32:4
**mooted** [1] - 56:1
**mootness** [8] - 2:21, 3:25, 4:11, 7:12, 7:22, 31:21, 54:11, 57:2
**morning** [6] - 2:7, 2:9, 2:10, 2:12, 31:17, 31:18
**most** [10] - 15:9, 18:11, 38:3, 41:19, 42:19, 43:25, 51:9, 65:2, 65:9
**mostly** [1] - 15:21
**MOTION** [2] - 1:4, 1:9
**motion** [8] - 2:15, 2:16, 29:10, 30:5, 30:10, 31:11, 51:13
**motions** [1] - 2:14
**move** [10] - 10:2, 15:14, 22:6, 24:24, 28:6, 42:8, 46:13, 65:25, 66:1, 66:19
**moved** [2] - 66:14, 66:16
**moving** [4] - 2:20, 25:1, 58:19, 59:18
**MR** [85] - 2:7, 2:10, 3:9, 3:24, 4:5, 4:9, 4:22, 5:5, 6:6, 7:17, 7:20, 7:24, 8:9, 8:18, 8:20, 10:9, 13:4, 13:7, 14:3, 15:4, 15:17, 16:21, 17:20, 19:12, 21:12, 22:9, 22:13, 23:3, 23:21, 24:10, 25:10, 25:12, 25:17, 28:15, 29:5, 29:14, 30:1, 31:15, 31:17, 31:19, 31:23, 32:13, 34:9, 34:24, 36:7, 36:15, 36:18, 37:2, 37:4, 37:7, 38:9, 39:4, 40:7, 42:10, 43:5, 44:13, 44:17, 46:4, 46:7, 46:12, 47:6, 48:3, 49:5, 49:14, 51:12, 51:16, 53:4, 54:7, 54:9, 55:16, 56:6, 56:9, 56:20, 57:25, 59:23, 60:9, 61:9, 61:21, 62:3, 64:6,

64:11, 64:22, 64:25, 65:6, 66:12
**must** [1] - 38:4

## N

**N.W** [1] - 69:11
**narrow** [2] - 12:11, 13:22
**nature** [7] - 15:20, 27:1, 42:12, 42:13, 42:17, 61:22, 61:23
**necessarily** [1] - 28:24
**necessary** [2] - 28:11, 60:3
**need** [9] - 11:23, 22:20, 41:2, 44:24, 45:1, 48:13, 55:20, 60:11, 65:21
**needed** [1] - 68:14
**needs** [3] - 42:2, 63:17, 65:12
**never** [15] - 14:11, 15:11, 20:22, 35:15, 39:16, 44:19, 48:21, 56:4, 57:3, 57:4, 59:25, 63:25, 64:1
**nevertheless** [1] - 48:12
**New** [1] - 1:13
**new** [4] - 32:24, 52:18, 54:20, 58:17
**Newman** [59] - 2:3, 2:8, 3:14, 3:18, 6:4, 9:5, 14:19, 14:20, 16:17, 21:24, 25:23, 29:2, 29:18, 32:21, 32:24, 33:23, 34:17, 35:4, 35:14, 35:18, 35:25, 36:12, 38:10, 38:21, 39:8, 39:16, 40:3, 40:13, 40:16, 40:19, 41:8, 41:12, 41:17, 41:22, 42:5, 42:11, 43:23, 44:1, 46:22, 47:12, 47:17, 48:16, 48:20, 50:3, 50:8, 50:22, 50:24, 51:5, 51:18, 51:24, 52:3, 52:8, 52:20, 53:19, 54:4, 63:22, 67:9, 67:15
**NEWMAN** [1] - 1:2
**Newman's** [7] - 34:9, 34:10, 36:8, 47:24, 49:18, 54:1, 59:11
**next** [1] - 35:4
**Ninth** [3] - 27:12, 27:16, 27:18
**nobody** [1] - 50:9

**noncooperation** [1] - 41:24
**none** [1] - 26:20
**nonjudicial** [1] - 18:24
**Note** [2] - 54:16, 54:17
**noted** [1] - 55:13
**notes** [1] - 69:5
**nothing** [10] - 10:9, 11:20, 21:10, 24:7, 40:24, 40:25, 41:22, 45:3, 55:11, 58:13
**notice** [2] - 28:8, 48:15
**noting** [1] - 41:16, 41:24
**notwithstanding** [1] - 44:11
**November** [5] - 5:13, 33:10, 33:14, 55:9, 59:14
**novo** [1] - 59:10
**number** [3] - 33:7, 33:10, 35:2
**NW** [3] - 1:14, 1:17, 1:24

## O

**object** [1] - 35:5
**objections** [1] - 66:6
**obtained** [1] - 56:1
**obvious** [2] - 41:3, 41:5
**Obviously** [1] - 30:16
**obviously** [47] - 4:1, 5:21, 6:13, 7:1, 9:3, 10:1, 11:4, 11:11, 11:13, 11:17, 12:8, 13:12, 14:7, 14:24, 15:11, 15:12, 15:17, 15:22, 15:24, 16:1, 17:9, 18:11, 18:12, 20:2, 20:12, 20:13, 21:4, 22:15, 23:24, 26:15, 27:11, 29:8, 31:7, 44:12, 55:18, 55:23, 56:25, 57:11, 58:17, 59:13, 63:6, 64:12, 64:25, 65:22, 66:5, 68:9, 68:21
**occur** [5] - 6:18, 7:6, 32:9
**odd** [3] - 48:24, 51:8, 59:8
**OF** [3] - 1:1, 1:9, 69:1
**offend** [1] - 31:1
**offhand** [1] - 60:6
**office** [10] - 9:10, 25:21, 26:4, 27:7, 27:25, 28:1, 41:22,

43:7, 49:12, 49:13
**Office** [1] - 63:7
**OFFICIAL** [1] - 69:1
**Official** [2] - 1:23, 69:10
**old** [6] - 6:20, 35:3, 35:4, 54:21
**once** [12] - 7:10, 20:2, 20:15, 27:8, 28:19, 35:19, 45:19, 59:25, 61:11, 61:12, 62:22
**one** [44] - 5:14, 5:24, 6:11, 7:17, 9:25, 11:21, 15:6, 16:5, 18:25, 20:20, 22:7, 23:9, 26:19, 26:25, 28:7, 31:3, 33:25, 37:1, 38:2, 39:11, 41:15, 42:7, 43:4, 43:8, 45:16, 47:4, 48:9, 50:3, 50:7, 50:17, 51:4, 51:5, 51:19, 53:22, 55:15, 58:20, 63:13, 63:21, 64:7, 64:9, 66:12
**one-day** [2] - 26:19, 47:4
**one-sitting** [1] - 26:19
**one-year** [2] - 26:25, 63:21
**onerous** [1] - 57:23
**ones** [2] - 30:3, 30:4
**ongoing** [2] - 52:2, 52:3
**open** [1] - 42:7
**operate** [1] - 67:21
**operated** [1] - 68:14
**opined** [1] - 39:8
**opinion** [6] - 16:6, 18:12, 22:1, 38:13, 50:15, 54:1
**opinions** [5] - 34:14, 34:15, 50:9, 53:20, 53:21
**opposed** [2] - 3:3, 61:7
**opposing** [3] - 33:15, 33:17, 33:22
**opposition** [1] - 15:21
**option** [1] - 48:17
**order** [55] - 3:7, 4:1, 4:9, 5:4, 5:13, 5:14, 5:16, 6:13, 13:18, 13:19, 14:17, 14:24, 15:9, 15:13, 17:14, 18:4, 25:3, 31:20, 32:8, 32:12, 32:14, 32:16, 32:23, 33:1, 33:3, 33:6, 33:7, 33:10, 33:14, 33:16,

39:18, 40:9, 40:17, 48:5, 48:15, 52:17, 52:18, 54:19, 55:1, 55:2, 55:4, 55:6, 57:6, 58:15, 59:2, 59:5, 59:9, 59:14, 59:22, 62:14, 64:15, 64:21

**ordered** [2] - 20:19, 49:20

**orders** [19] - 8:4, 8:14, 9:7, 9:9, 9:21, 11:18, 18:18, 20:11, 23:23, 25:20, 25:23, 32:18, 32:20, 42:5, 46:18, 49:23, 60:13, 61:3, 62:10

**organized** [1] - 2:20

**original** [18] - 3:1, 10:2, 11:25, 13:13, 15:14, 20:4, 20:17, 22:7, 23:19, 30:17, 42:8, 42:10, 44:3, 46:13, 56:22, 59:18, 60:20, 66:13

**otherwise** [2] - 3:1, 18:23

**ought** [1] - 48:21

**outset** [1] - 46:15

**outside** [2] - 11:22, 23:10

**overcome** [2] - 4:12, 27:2

**overly** [2] - 35:2, 49:22

**override** [1] - 15:2

**overturn** [1] - 67:15

**own** [11] - 2:21, 20:11, 32:25, 34:7, 34:25, 36:11, 40:15, 40:25, 41:12, 49:18, 54:16

---

## P

**pace** [2] - 67:21, 67:22

**paced** [1] - 48:9

**package** [1] - 43:8

**page** [5] - 12:3, 13:19, 28:17, 54:15, 54:16

**pages** [2] - 28:17, 30:22

**paint** [1] - 18:9

**panel** [3] - 50:9, 52:12, 67:16

**paper** [1] - 48:7

**papers** [1] - 49:22

**paragraph** [6] - 25:20, 35:1, 46:17, 46:21, 47:1

**parallel** [1] - 23:5

**parse** [1] - 49:2

---

**part** [4] - 17:19, 37:20, 37:21, 45:10

**particular** [3] - 28:19, 52:5, 52:12

**particularly** [1] - 36:23

**parts** [1] - 2:20

**party** [1] - 21:21

**past** [6] - 16:13, 39:3, 60:23, 66:5, 66:13, 66:14

**PAULINE** [1] - 1:2

**Pauline** [1] - 2:3

**pay** [2] - 38:24, 42:5

**pen** [1] - 5:23

**penalty** [1] - 41:25

**pending** [4] - 32:21, 51:25, 52:6, 52:25

**people** [1] - 19:23

**percent** [1] - 34:21

**perform** [3] - 3:15, 28:9, 40:14

**performing** [1] - 22:18

**perhaps** [3] - 19:22, 50:15, 52:24

**period** [1] - 39:22

**permanent** [1] - 39:14

**permanently** [1] - 51:22

**person** [2] - 41:23, 42:23

**personally** [1] - 57:23

**petition** [1] - 56:23

**petitioned** [1] - 67:14

**petitions** [1] - 37:18

**physician** [3] - 40:10, 40:11, 40:13

**physicians** [1] - 40:13

**PI** [1] - 51:15

**picture** [1] - 18:10

**piece** [1] - 20:1

**piecemeal** [1] - 58:9

**Pitch** [7] - 16:6, 17:7, 18:7, 60:21, 61:14, 61:16, 63:1

**place** [4] - 16:5, 22:20, 56:15, 57:12

**plain** [1] - 11:18

**Plaintiff** [2] - 1:3, 1:12

**plaintiff** [16] - 2:6, 2:15, 9:2, 9:5, 9:10, 9:15, 12:2, 12:13, 12:19, 14:10, 17:5, 20:21, 25:9, 25:21, 28:19, 31:16

**plaintiff's** [4] - 8:21, 10:5, 27:5, 29:25

**plaintiffs** [3] - 14:17, 14:18, 31:13

**plan** [1] - 3:7

**plant** [1] - 32:2

---

**play** [1] - 21:1

**pleading** [2] - 25:24, 29:24

**pleadings** [1] - 38:3

**pled** [7] - 8:2, 8:3, 8:9, 8:13, 9:6, 9:20, 25:19

**point** [56] - 5:9, 5:11, 10:2, 11:21, 13:18, 14:2, 14:5, 14:7, 15:15, 16:5, 18:21, 20:8, 20:24, 21:11, 21:20, 21:23, 22:7, 26:10, 26:11, 31:3, 31:5, 32:13, 33:11, 33:15, 40:8, 40:9, 40:12, 41:14, 44:4, 46:15, 47:7, 47:19, 47:21, 51:7, 53:11, 53:19, 54:15, 55:12, 57:15, 58:1, 58:11, 58:20, 60:1, 60:20, 63:4, 63:12, 63:13, 65:10, 65:16, 65:23, 67:9, 67:12, 67:13, 68:3

**pointed** [7] - 14:11, 32:22, 33:2, 33:8, 50:21, 58:22, 67:4

**points** [5] - 29:19, 33:25, 45:8, 63:20, 67:8

**police** [1] - 45:10

**policies** [1] - 16:13

**policing** [2] - 19:6, 68:11

**political** [1] - 19:5

**poorly** [1] - 49:23

**portion** [1] - 45:23

**Portland** [1] - 63:15

**position** [9] - 7:25, 8:7, 17:18, 22:10, 42:23, 43:1, 61:19, 64:2, 68:21

**possible** [5] - 3:15, 14:21, 39:14, 39:16, 57:19

**possibly** [2] - 39:23, 39:24

**post** [1] - 55:18

**posture** [1] - 68:4

**power** [9] - 16:2, 25:15, 27:8, 32:2, 34:8, 40:18, 42:14, 42:15, 50:4, 51:1, 52:6, 55:3, 69:6

**powers** [2] - 11:9, 41:15

**practical** [1] - 43:4

**precedent** [2] - 17:9, 63:16

---

**precisely** [1] - 53:11

**preclude** [1] - 12:6

**precluding** [1] - 12:12

**predecessor** [1] - 10:7

**predict** [1] - 53:24

**preliminary** [6] - 2:15, 30:5, 30:10, 51:13, 65:25, 66:17

**Prentis** [1] - 61:14

**prepared** [1] - 66:19

**present** [8] - 16:13, 16:16, 16:20, 16:23, 17:4, 35:10, 41:20, 42:17

**presentation** [1] - 48:7

**presented** [1] - 13:3

**presumptively** [1] - 33:19

**pretty** [8] - 11:16, 17:13, 18:2, 18:10, 18:19, 20:15, 26:2, 45:24

**prevent** [2] - 40:24, 41:1

**prevented** [1] - 52:10

**prevents** [1] - 49:11

**prickly** [1] - 49:23

**principle** [1] - 4:20

**principles** [2] - 20:21, 21:16

**private** [1] - 40:2

**proactively** [1] - 6:24

**problem** [5] - 27:3, 30:17, 30:18, 54:20, 66:14

**problems** [2] - 15:11, 51:6

**Procedure** [2] - 16:10, 35:1

**procedures** [2] - 36:2, 53:6

**proceed** [3] - 31:20, 46:11, 53:8

**proceeding** [5] - 13:22, 13:23, 16:8, 48:10, 61:23

**proceedings** [18] - 8:25, 12:21, 13:21, 15:20, 16:4, 17:8, 17:12, 31:9, 35:20, 38:11, 41:10, 41:13, 42:15, 50:4, 51:1, 52:6, 55:3, 69:6

**process** [32] - 10:13, 10:18, 10:23, 14:9, 16:18, 21:1, 21:3, 21:15, 22:19, 24:21, 30:4, 30:11, 30:15, 30:23, 31:1, 32:9,

---

33:11, 38:18, 38:22, 38:25, 40:20, 44:5, 45:19, 46:5, 51:24, 52:2, 53:10, 55:7, 66:16, 68:7, 68:16

**processed** [1] - 48:25

**production** [1] - 34:11

**Programs** [2] - 1:17, 1:20

**progress** [2] - 9:25, 59:13

**prohibition** [1] - 45:19

**prong** [2] - 6:1, 6:10

**prongs** [1] - 5:7

**proper** [3] - 35:24, 45:6, 55:25

**properly** [1] - 15:13

**proposition** [1] - 12:11

**prosecuted** [1] - 27:21

**prosecution** [1] - 27:13

**prosecutions** [1] - 26:7

**provide** [1] - 28:8

**provided** [1] - 36:1

**provision** [5] - 29:4, 32:24, 37:8, 40:21, 41:10, 41:13

**provisions** [1] - 29:1

**prudential** [2] - 21:9, 22:3

**Pryor** [1] - 17:9

**Pryor's** [1] - 16:6

**psychiatric** [1] - 49:21

**PTO** [1] - 37:10

**public** [6] - 14:3, 40:2, 52:22, 52:25, 53:15, 67:25

**publicly** [1] - 48:15

**punishment** [1] - 41:7

**pure** [1] - 58:11

**purely** [1] - 6:16

**purpose** [2] - 19:2, 19:25

**purposes** [3] - 55:21, 66:4, 66:22

**push** [1] - 59:4

**put** [4] - 8:15, 18:21, 34:11, 47:20

**putting** [2] - 23:20, 52:20

---

## Q

**quagmire** [1] - 45:2

**queried** [1] - 36:19

**questions** [10] - 7:22, 11:14, 18:25, 19:9, 19:24, 24:4, 24:25,

---

26:10, 36:16, 68:17
**quibble** [2] - 25:18, 63:2
**quick** [1] - 63:19
**quickly** [3] - 51:16, 66:19, 67:7
**quite** [2] - 11:13, 39:16
**quo** [1] - 64:21
**quote** [2] - 12:7, 37:10

## R

**raise** [4] - 18:25, 19:24, 39:5, 60:4
**raised** [4] - 30:5, 59:25, 67:8, 67:13
**raising** [1] - 24:21
**Ralls** [1] - 56:14
**ran** [1] - 38:18
**rather** [1] - 68:22
**re** [1] - 37:18
**re-examination** [1] - 37:18
**reach** [5] - 15:11, 29:3, 40:20, 59:16, 67:11
**reached** [4] - 15:1, 24:12, 26:1, 44:19
**reaching** [1] - 38:21
**react** [1] - 33:24
**read** [2] - 46:22, 54:16
**ready** [1] - 14:4
**real** [2] - 14:15, 14:18
**really** [11] - 7:11, 10:16, 10:25, 11:2, 11:16, 19:14, 23:7, 24:14, 51:7, 62:20
**reason** [7] - 5:14, 28:4, 39:5, 39:8, 54:17, 55:1, 62:12
**reasonable** [7] - 6:9, 7:5, 34:2, 56:3, 57:2, 57:15, 58:18
**reasons** [17] - 5:19, 7:14, 9:23, 12:2, 12:16, 13:19, 14:13, 14:23, 15:24, 16:8, 18:16, 22:2, 23:21, 28:16, 29:16, 57:7, 64:16
**reassigning** [1] - 18:12
**reassigns** [2] - 18:6, 62:8
**recalcitrance** [1] - 41:7
**recalcitrant** [1] - 50:24
**receive** [1] - 27:7
**recognize** [1] - 61:12

**recognized** [1] - 5:6
**reconsider** [1] - 63:23
**reconsideration** [1] - 55:5
**record** [9] - 2:3, 2:6, 14:16, 32:7, 32:11, 34:6, 34:15, 35:1, 51:4
**records** [1] - 9:15
**redressability** [1] - 15:10
**reduction** [1] - 34:22
**reference** [1] - 18:22
**referenced** [1] - 38:13
**references** [1] - 27:18
**referred** [1] - 55:6
**referring** [1] - 17:21
**reflected** [1] - 49:23
**refused** [1] - 29:20
**refuses** [1] - 50:24
**regard** [1] - 48:9
**reimpose** [2] - 5:23, 6:3
**reincorporates** [1] - 46:25
**reinstate** [1] - 57:18
**reiterate** [2] - 25:5, 30:13
**rejected** [2] - 12:16, 27:16
**rejects** [1] - 26:16
**related** [5] - 8:25, 11:5, 15:19, 17:12, 18:8
**relief** [7] - 8:15, 11:3, 11:5, 35:23, 43:23, 52:15, 52:19
**relitigate** [1] - 43:22
**relying** [1] - 21:4
**remaining** [1] - 9:3
**remedied** [1] - 11:10
**remedy** [1] - 35:22
**removal** [5] - 26:4, 26:25, 27:4, 27:9, 47:22
**remove** [2] - 9:10, 25:21
**removed** [1] - 27:14
**renders** [1] - 28:9
**renew** [1] - 39:19
**renewable** [3] - 39:19, 63:21, 64:14
**renewal** [1] - 48:17
**reoccur** [1] - 6:9
**repeatedly** [1] - 16:4
**repetition** [5] - 5:25, 32:4, 33:16, 33:21, 55:22
**reply** [7] - 8:21, 12:3, 21:20, 28:17, 30:21,

54:16, 61:24
**report** [1] - 27:6
**reported** [1] - 41:2
**Reporter** [3] - 1:22, 1:23, 69:10
**reporter** [1] - 4:4
**REPORTER** [1] - 69:1
**reprimand** [2] - 40:2
**request** [2] - 15:7, 59:11
**requested** [2] - 55:4, 55:5
**requests** [1] - 40:6
**require** [2] - 47:9, 59:21
**requirement** [1] - 12:5
**requirements** [1] - 9:14
**requires** [1] - 36:5
**reservation** [1] - 67:2
**reserve** [1] - 40:18
**reserved** [2] - 25:15, 40:22
**resolution** [1] - 3:20
**resolve** [2] - 10:1, 52:16
**respect** [3] - 44:20, 47:18, 50:10
**respectful** [1] - 3:19
**respectfully** [1] - 50:10
**responded** [2] - 20:22, 48:13
**responding** [1] - 30:20
**response** [1] - 59:24
**restore** [1] - 39:17
**restored** [1] - 27:8
**result** [1] - 51:23
**results** [1] - 53:1
**retains** [1] - 41:22
**retire** [1] - 53:8
**retirement** [1] - 40:3
**reverse** [1] - 21:24
**reversed** [2] - 36:24, 54:1
**review** [41] - 5:25, 8:24, 10:12, 10:13, 10:14, 10:15, 11:5, 11:19, 12:6, 12:12, 13:24, 15:25, 16:1, 18:24, 19:15, 19:23, 20:11, 20:13, 21:2, 21:18, 24:4, 31:6, 32:5, 33:17, 33:18, 33:20, 37:8, 37:13, 37:22, 42:7, 52:2, 55:24, 55:25, 56:1, 56:16, 61:3, 62:10, 62:12, 62:16

**reviewing** [1] - 22:18
**reviving** [1] - 7:8
**riff** [1] - 29:14
**rights** [4] - 16:16, 16:20, 42:17, 52:11
**rises** [1] - 17:3
**risk** [1] - 31:9
**RMR** [2] - 1:22, 69:9
**roll** [1] - 65:7
**Room** [3] - 1:20, 1:23, 69:10
**round** [1] - 36:12
**route** [1] - 22:3
**Rule** [2] - 14:6, 21:6
**rule** [7] - 12:21, 13:1, 14:6, 23:1, 32:2, 35:5, 66:18
**rules** [4] - 34:25, 36:2, 39:6, 68:15
**Rules** [1] - 16:9
**run** [1] - 38:22
**running** [1] - 40:20
**runs** [2] - 28:25, 67:5

## S

**S.Ct** [1] - 37:5
**salary** [1] - 27:7
**San** [1] - 1:21
**sanction** [5] - 5:3, 5:23, 6:3, 38:17, 39:2
**sanctions** [3] - 36:12, 39:11, 45:1
**SAS** [7] - 36:25, 37:5, 37:15, 37:19, 42:1, 59:20
**saw** [2] - 43:14, 66:23
**scenario** [1] - 62:15
**scenarios** [1] - 4:25
**scheme** [3] - 10:12, 10:15, 19:2
**schizophrenia** [1] - 53:12
**seat** [1] - 41:20
**second** [5] - 2:23, 20:1, 23:12, 24:8, 44:22
**Second** [1] - 42:19
**second-guessing** [1] - 24:8
**section** [2] - 21:5, 28:7
**Section** [4] - 2:25, 7:21, 28:9, 37:14
**security** [1] - 63:10
**Security** [1] - 49:7
**see** [9] - 5:2, 14:16, 28:18, 33:16, 39:20, 42:5, 48:2, 52:17,

60:12
**seeing** [1] - 23:6
**seek** [1] - 43:23
**seeking** [1] - 52:14
**seem** [1] - 16:17
**SEFRANEK** [1] - 69:3
**Sefranek** [3] - 1:22, 69:9, 69:9
**Senate** [3] - 25:16, 27:22, 27:23
**senator** [2] - 27:19, 27:20
**senior** [1] - 41:19
**sense** [6] - 10:24, 13:20, 18:17, 18:19, 26:8, 29:17
**sentencing** [2] - 43:8, 43:10
**separate** [5] - 19:13, 42:14, 57:5, 57:9, 58:2
**September** [3] - 13:18, 39:18, 48:4
**serious** [5] - 5:6, 18:25, 55:19, 67:18, 67:19
**served** [1] - 3:18
**serving** [1] - 38:12
**set** [4] - 26:12, 26:18, 30:14, 57:19
**sets** [1] - 63:5
**setting** [3] - 18:18, 19:8, 24:1
**settles** [1] - 27:11
**settling** [1] - 19:15
**shall** [2] - 15:3, 52:7
**shifted** [1] - 21:13
**short** [5] - 6:25, 19:10, 19:12, 26:4, 26:13
**show** [8] - 6:8, 26:12, 34:1, 42:1, 46:23, 51:2, 65:13, 68:10
**showing** [1] - 50:8
**shown** [1] - 3:14
**shows** [2] - 33:14, 68:11
**sic]** [1] - 31:13
**side** [6] - 8:10, 21:24, 31:21, 46:16, 54:25, 65:10
**sides** [1] - 68:20
**signs** [1] - 3:14
**similar** [4] - 18:17, 18:18, 34:4, 37:8
**simply** [12] - 14:21, 27:4, 36:20, 39:20, 40:15, 44:23, 44:25, 45:2, 45:6, 45:14, 46:21, 53:16
**simultaneously** [1] -

21:7
**sit** [5] - 43:9, 52:4, 52:9, 52:12, 64:1
**sits** [1] - 35:15
**sitting** [11] - 7:3, 7:4, 26:19, 35:4, 35:7, 52:25, 57:9, 57:16, 58:10, 67:10, 67:16
**sittings** [1] - 35:7
**situated** [1] - 2:13
**situation** [4] - 3:19, 7:2, 13:14, 38:20
**situations** [1] - 50:17
**six** [1] - 35:3
**Sixth** [3] - 38:19, 49:19, 50:1
**SJ** [1] - 66:19
**skipping** [1] - 37:3
**slightly** [1] - 16:9
**slow** [2] - 4:3, 67:21
**small** [1] - 33:6
**so-called** [1] - 53:21
**Social** [1] - 49:6
**solve** [2] - 11:23, 11:24
**someone** [2] - 5:2, 41:20
**sometimes** [1] - 18:5
**somewhat** [3] - 13:2, 41:6, 48:24
**somewhere** [2] - 35:15, 65:16
**soon** [1] - 52:18
**sooner** [2] - 64:9, 68:22
**sorry** [4] - 37:1, 55:15, 56:5, 62:6
**sort** [22] - 2:20, 5:7, 5:24, 6:10, 8:21, 12:1, 13:5, 13:8, 16:14, 17:21, 21:5, 21:9, 24:14, 24:17, 29:3, 29:14, 48:8, 49:6, 50:24, 57:19, 58:9, 65:17
**sorts** [1] - 8:14
**sought** [1] - 52:19
**sound** [1] - 28:13
**sounds** [2] - 25:16, 49:25
**space** [1] - 63:10
**speaking** [1] - 44:21
**special** [9] - 8:5, 9:11, 10:11, 10:14, 11:9, 28:10, 29:2, 32:19, 68:13
**specific** [4] - 9:11, 17:1, 25:22, 63:8
**specifically** [9] - 19:4, 21:17, 25:19, 26:17,

39:18, 47:1, 54:19, 62:9, 62:11
**speculate** [2] - 7:9, 7:11
**speculating** [2] - 7:12, 58:10
**speculation** [2] - 35:16, 58:12
**speculative** [6] - 6:16, 6:18, 35:18, 36:10, 36:11, 58:6
**speed** [2] - 34:10, 36:8
**spell** [1] - 37:3
**split** [1] - 44:8
**sponte** [1] - 55:10
**square** [1] - 18:6
**squarely** [6] - 26:2, 30:16, 30:24, 31:2, 60:5, 63:14
**staff** [1] - 41:2
**staffed** [1] - 42:25
**stage** [1] - 29:24
**standard** [5] - 15:1, 16:11, 17:10, 51:3, 66:11
**standing** [2] - 16:24, 46:21
**stands** [1] - 12:11
**start** [10] - 2:17, 2:19, 3:17, 3:24, 12:3, 25:3, 54:11, 57:8, 57:9
**started** [2] - 21:15, 57:16, 57:18, 58:4, 58:5
**starting** [1] - 2:6
**starts** [1] - 53:11
**state** [1] - 23:4
**statements** [1] - 23:7
**States** [4] - 1:23, 42:14, 43:19, 63:7
**STATES** [2] - 1:1, 1:10
**status** [2] - 14:1, 64:21
**statute** [32] - 10:8, 12:11, 12:19, 12:20, 15:25, 24:6, 37:16, 37:23, 38:5, 39:10, 39:21, 39:24, 40:1, 41:17, 41:22, 42:4, 45:25, 46:23, 46:24, 47:10, 47:13, 49:5, 49:15, 49:16, 49:17, 50:18, 51:19, 52:7, 53:15, 59:21, 60:16, 63:5
**statutes** [1] - 68:15
**statutory** [6] - 8:1, 10:11, 10:14, 19:2, 36:19, 60:11

**stay** [1] - 35:15
**stenographic** [1] - 69:5
**step** [1] - 49:18
**Stephen** [2] - 2:10, 3:11
**STEPHEN** [1] - 1:16
**still** [17] - 11:17, 21:16, 22:11, 22:22, 23:1, 28:1, 36:5, 39:5, 41:1, 41:2, 47:11, 48:25, 51:25, 59:12, 62:19, 64:19, 66:13
**stop** [1] - 19:12
**stopped** [1] - 19:10
**stopping** [1] - 18:13
**stops** [1] - 41:18
**straight** [1] - 20:5
**strategic** [2] - 5:1, 32:14
**strategically** [1] - 33:14
**Street** [2] - 1:14, 1:17
**stroke** [1] - 5:23
**strong** [2] - 21:14, 51:18
**structured** [1] - 11:7
**sua** [1] - 55:10
**subject** [3] - 34:2, 34:4, 57:5
**submit** [4] - 50:24, 50:25, 60:2, 60:19
**submits** [1] - 25:9
**submitted** [2] - 14:4, 59:24
**subpoenas** [1] - 16:3
**subset** [1] - 3:2
**substance** [1] - 25:14
**subtracting** [1] - 50:6
**success** [1] - 67:12
**sued** [1] - 32:22
**suggest** [1] - 16:18
**suggested** [2] - 44:9, 59:20
**Suite** [1] - 1:14
**summary** [1] - 66:6
**superseded** [1] - 59:10
**supplemental** [3] - 4:12, 60:8, 67:20
**supposed** [1] - 9:8
**Supreme** [21] - 17:9, 20:5, 22:24, 27:17, 27:19, 27:24, 32:1, 32:3, 36:24, 37:11, 38:1, 43:6, 43:24, 45:5, 45:16, 53:22, 56:8, 56:12, 56:18, 67:15

**surmounted** [1] - 25:1
**surreply** [1] - 39:15
**survived** [1] - 45:17
**suspect** [2] - 34:22, 53:16
**suspects** [1] - 35:9
**suspend** [6] - 34:18, 35:19, 40:19, 47:3, 47:14, 51:22
**suspended** [9] - 26:19, 32:15, 32:21, 38:15, 38:21, 39:7, 48:17, 51:24, 57:13
**suspending** [1] - 38:10
**suspension** [41] - 5:16, 6:12, 6:21, 6:25, 15:22, 17:3, 26:19, 26:25, 38:12, 39:12, 39:13, 39:15, 39:19, 39:21, 40:4, 40:5, 41:4, 47:4, 47:16, 47:19, 47:25, 48:1, 48:18, 54:13, 54:18, 54:24, 55:5, 57:5, 57:10, 57:12, 58:2, 58:14, 59:13, 63:21, 63:24, 64:3, 64:4, 64:21, 65:11
**suspensions** [5] - 26:17, 27:4, 47:6, 51:20
**suspicion** [2] - 40:19, 51:18
**suspicions** [1] - 41:1
**symptoms** [1] - 53:12
**system** [1] - 57:20

---

**T**

---

**table** [1] - 47:17
**tactic** [1] - 54:22
**talks** [4] - 9:9, 9:11, 25:19, 26:23
**TAMARA** [1] - 69:3
**Tamara** [3] - 1:22, 69:9, 69:9
**temperature** [1] - 3:22
**temporary** [4] - 39:12, 39:13, 39:22, 40:4
**ten** [1] - 33:3
**term** [4] - 31:25, 47:6, 48:1, 48:18
**termed** [1] - 25:4
**terms** [5] - 16:15, 17:10, 31:25, 49:10, 59:4
**test** [2] - 57:17, 58:3
**tests** [3] - 29:20, 50:25, 51:1

**text** [1] - 11:18
**THE** [89] - 1:1, 1:1, 1:9, 2:2, 2:9, 2:12, 3:21, 4:3, 4:7, 4:20, 4:23, 5:22, 7:16, 7:19, 7:23, 8:7, 8:17, 8:19, 10:5, 12:18, 13:5, 14:1, 15:3, 15:16, 16:15, 17:15, 19:10, 21:8, 22:7, 22:10, 22:23, 23:16, 24:5, 25:8, 25:11, 25:13, 28:6, 29:1, 29:13, 29:24, 31:13, 31:16, 31:18, 31:22, 32:6, 34:1, 34:19, 36:5, 36:14, 36:17, 37:1, 37:3, 37:6, 38:2, 39:1, 40:5, 42:8, 43:2, 44:6, 44:14, 46:2, 46:5, 46:9, 47:4, 47:23, 49:3, 49:10, 51:11, 51:14, 52:20, 54:6, 54:8, 55:15, 56:5, 56:8, 56:18, 57:21, 59:19, 60:7, 61:2, 61:16, 61:25, 64:3, 64:9, 64:18, 64:24, 65:4, 66:8, 68:19
**themselves** [2] - 38:24, 48:19
**theory** [1] - 62:21
**therefore** [7] - 9:24, 20:17, 20:22, 34:4, 43:20, 47:25, 66:9
**they've** [8] - 14:9, 21:13, 30:20, 39:7, 59:3, 63:11, 65:15, 66:10
**thinker** [1] - 50:13
**thinks** [3] - 8:11, 51:7, 63:6
**third** [1] - 3:1
**thirds** [1] - 27:22
**threats** [3] - 9:9, 25:20, 46:18
**three** [6] - 17:24, 17:25, 20:6, 23:7, 34:14, 57:1
**threshold** [4] - 13:12, 20:19, 29:8, 30:22
**throughout** [7] - 6:20, 14:9, 32:16, 32:17, 32:20, 33:11, 50:4
**tick** [3] - 9:13, 9:16, 11:15
**ticks** [1] - 17:9
**tied** [1] - 58:3
**timeline** [1] - 65:6

**JA145**

**tips** [3] - 51:18, 52:13, 53:15
**title** [1] - 46:8
**titled** [1] - 46:9
**today** [4] - 3:13, 7:4, 47:24, 62:2
**tomorrow** [3] - 6:15, 40:5, 58:5
**ton** [1] - 30:12
**took** [5] - 6:19, 36:24, 42:3, 42:12, 65:2
**top** [2] - 33:15, 35:21
**total** [1] - 38:15
**touch** [2] - 51:15, 51:16
**touched** [1] - 57:14
**towards** [1] - 52:13
**track** [2] - 24:17, 48:11
**tracks** [2] - 24:17, 24:23
**TRANSCRIPT** [1] - 1:9
**transcript** [2] - 69:4, 69:6
**transfer** [9] - 13:16, 13:20, 14:6, 14:11, 14:21, 15:7, 15:10
**transferred** [2] - 12:22, 18:15
**transferring** [1] - 13:1
**travel** [1] - 35:14
**treated** [2] - 35:10, 36:10
**treating** [1] - 35:25
**trial** [1] - 18:18
**tried** [3] - 9:6, 9:18, 52:15
**trilogy** [1] - 42:1
**true** [12] - 23:14, 23:18, 24:1, 24:5, 29:18, 29:21, 29:25, 49:25, 68:12, 69:4, 69:5
**truly** [1] - 33:9
**try** [8] - 11:1, 15:1, 49:2, 52:16, 56:12, 58:8, 59:4
**trying** [4] - 8:11, 21:21, 60:12, 67:2
**turn** [2] - 3:22, 7:20
**turns** [1] - 37:18
**two** [19] - 17:24, 21:6, 22:6, 24:17, 24:23, 27:22, 31:25, 33:19, 35:3, 35:7, 36:22, 38:9, 42:14, 45:8, 53:23, 59:24, 62:18, 63:19, 66:12
**two-thirds** [1] - 27:22
**type** [1] - 60:16

## U

**U.S** [3] - 1:16, 1:19, 37:4
**U.S.C** [1] - 37:9
**ultra** [11] - 9:15, 13:5, 37:22, 38:4, 38:8, 39:20, 47:12, 52:5, 58:21, 59:4, 59:22
**unanimously** [2] - 7:10, 59:1
**unappealable** [1] - 37:10
**unconstitutional** [5] - 9:16, 47:7, 48:1, 57:23, 65:11
**unconstitutionally** [1] - 11:7
**under** [29] - 4:1, 6:12, 8:2, 8:4, 9:21, 9:24, 10:6, 10:23, 12:22, 13:11, 14:5, 19:7, 23:14, 23:24, 28:18, 29:16, 30:16, 30:25, 33:8, 33:9, 33:18, 40:24, 41:13, 53:14, 58:15, 58:24, 59:5, 67:5, 68:22
**undermine** [2] - 10:7, 33:12
**understandable** [1] - 5:2
**undertake** [1] - 61:4
**undiminished** [1] - 27:7
**unduly** [1] - 52:14
**unfit** [1] - 28:9
**unique** [2] - 38:12, 38:20
**UNITED** [2] - 1:1, 1:10
**United** [4] - 1:23, 42:14, 43:19, 63:7
**unlawfully** [2] - 9:10, 25:22
**unless** [8] - 7:21, 24:25, 26:9, 36:15, 46:1, 46:12, 64:4, 68:17
**unlikely** [1] - 36:8
**unlimited** [1] - 50:19
**unprecedented** [1] - 38:20
**unreasonable** [1] - 39:6
**unrecorded** [1] - 32:15
**unreported** [1] - 32:16
**up** [16] - 5:8, 6:5, 6:15, 6:19, 14:5, 16:1, 19:15, 20:12, 22:4,

22:5, 24:20, 54:12, 57:19, 62:12, 62:16, 68:5
**upset** [1] - 64:20
**Usher** [1] - 7:6

## V

**vacate** [1] - 54:18
**vacated** [11] - 5:14, 5:16, 32:2, 32:8, 32:12, 33:1, 33:4, 33:5, 54:13, 54:23, 59:14
**vacatur** [2] - 32:9, 55:11
**vague** [1] - 28:19
**vagueness** [5] - 28:7, 28:18, 28:23, 65:23, 66:20
**value** [1] - 3:18
**varied** [1] - 34:11
**various** [2] - 46:18, 49:20
**VECCHIONE** [1] - 1:13
**vehicle** [1] - 45:6
**venue** [1] - 18:15
**versus** [2] - 34:14, 60:24
**veterans** [1] - 53:23
**view** [10] - 6:10, 9:18, 17:6, 22:3, 23:12, 24:23, 26:1, 40:25, 43:2, 55:25
**vindicated** [1] - 54:1
**violate** [3] - 12:25, 47:5, 59:21
**violated** [2] - 12:20, 12:25
**vires** [11] - 9:15, 13:5, 37:22, 38:4, 38:8, 39:20, 47:12, 52:6, 58:21, 59:4, 59:22
**Virginia** [1] - 55:19
**voluntarily** [2] - 32:5, 53:7
**voluntary** [5] - 4:14, 5:8, 31:23, 40:3, 55:16
**vs** [1] - 1:4

## W

**waived** [1] - 60:1
**Walton** [2] - 5:9, 55:18
**wants** [3] - 31:11, 35:13
**Washington** [5] - 1:6, 1:15, 1:18, 1:24, 69:11

**water** [1] - 7:18
**ways** [1] - 9:25
**weaker** [3] - 21:10, 21:12, 21:13
**website** [1] - 48:16
**well-argued** [1] - 68:20
**well-briefed** [1] - 68:20
**well-known** [1] - 43:25
**West** [1] - 55:19
**whole** [1] - 61:23
**win** [1] - 55:20
**wishes** [1] - 51:12
**withdraw** [3] - 5:3, 37:12
**witnesses** [2] - 14:18, 14:22
**word** [1] - 54:8
**works** [1] - 34:17
**worth** [2] - 41:16, 41:24
**writing** [5] - 34:13, 34:14, 50:15, 53:20, 54:16
**written** [1] - 54:2

## Y

**year** [14] - 3:14, 26:25, 35:3, 39:23, 39:24, 47:16, 48:17, 54:2, 63:21, 63:23, 64:7, 64:9, 64:18
**years** [9] - 26:24, 33:19, 34:11, 34:14, 34:16, 47:14, 47:15, 65:18, 68:9
**yesterday** [1] - 43:13
**yourself** [1] - 2:6

## Z

**ZEE** [1] - 1:19
**zero** [1] - 51:23

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HON. PAULINE NEWMAN**, | |
| Plaintiff, | |
| v. | Case No. 23-cv-01334 (CRC) |
| **HON. KIMBERLY A. MOORE**, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Veteran Federal Circuit Judge Pauline Newman has sued Federal Circuit Chief Judge Kimberly A. Moore, along with all the other judges on the court, over their handling of reports from court staff implicating Judge Newman's fitness for office.  Judge Newman has been hailed, by Chief Judge Moore no less, as a "trailblazer" and "heroine of the patent system."  Kimberly A. Moore, *Anniversaries and Observations*, 50 AIPLA Q. J. 521, 524–25 (2022).  After leading the intellectual property department of a major corporation at a time when "female attorneys, particularly female patent attorneys, were rare," <u>id.</u> at 524, Judge Newman became the first judge directly appointed to the Federal Circuit, by President Ronald Reagan in 1984.  First Amended Complaint ("FAC") ¶ 10.  During her tenure on the court, she has authored hundreds of opinions and been particularly recognized for her "insightful dissents."  <u>Id.</u> ¶¶ 13, 74.  On multiple occasions when Judge Newman dissented, the Supreme Court reversed the Federal Circuit and "adopt[ed] . . . [her] reasoning."  Moore, *supra*, at 525.

In 2021, however, court personnel began reporting "behavior that [] called into question Judge Newman's ability to perform her duties."  Mot. Dismiss at 4.  Specifically, staff relayed information about Judge Newman "indicative of memory loss, a lack of focus, confusion over simple matters, uncharacteristic paranoia, and an inability to perform simple tasks."  <u>Id.</u>  These

**JA147**

reports eventually led to Chief Judge Moore convening a Special Committee to investigate a judicial misconduct complaint against Judge Newman; the Federal Circuit Judicial Council suspending Judge Newman from hearing new cases on the recommendation of the Special Committee; and Judge Newman filing this lawsuit against members of the Special Committee and the Judicial Council as a whole ("Defendants").  At the Court's urging, the parties attempted to resolve the dispute through mediation with retired D.C. Circuit Judge Thomas B. Griffith. The mediation proved unsuccessful, however, and litigation resumed.

At the heart of the dispute are two important, but at times competing, priorities: judicial independence and the need for oversight of Article III judges.  The Constitution provides for judicial independence through the "great bulwarks" of life tenure and undiminished salary during good behavior.  McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S., 264 F.3d 52, 64 (D.C. Cir. 2001); U.S. CONST. Art. III, § 1.  But with this independence comes the risk that, should judges falter in performing their duties, there is no means for sanctioning them short of impeachment.

Congress addressed this gap by creating a system for the judiciary to police itself.  With the passage of 28 U.S.C. § 332, which created circuit judicial councils, and later the Judicial Conduct and Disability ("JC&D") Act, Congress gave "the judiciary the power to 'keep its own house in order.'"  McBryde, 264 F.3d at 61 (citing S. Rep. No. 96-362, at 11); see also Chandler v. Jud. Council of Tenth Cir. of U. S., 398 U.S. 74, 85 (1970).  Employing this "housekeeping" power, federal courts created common-sense rules to deal with shortcomings in judges' performance.  One such rule, a variant of which Judge Newman's colleagues invoked in this case, provides that "when a judge has a given number of cases under submission, he will not be assigned more cases until opinions and orders issue on his 'backlog.'"  Chandler, 398 U.S. at 85. The Supreme Court has blessed these rules.  See id. ("These are reasonable, proper, and

JA148

necessary rules, and the need for enforcement cannot reasonably be doubted.").  And it has rejected the notion that "the extraordinary machinery of impeachment" is the "only recourse" "if one judge in any system refuses to abide by such reasonable procedures." Id.

Cases dealing with this system of oversight thankfully are rare, but they have consistently affirmed the judiciary's authority to police itself.  See, e.g., McBryde, 264 F.3d at 61–64; Hastings v. Jud. Conf. of U.S. ("Hastings II"), 829 F.2d 91, 103–05 (D.C. Cir. 1987).  Judge Newman now asks the Court to break ranks with higher courts that have upheld this self-regulatory regime.  The Court must decline the invitation.

Spanning eleven counts, Judge Newman's First Amended Complaint mounts both facial and as-applied constitutional challenges to the JC&D Act and 28 U.S.C. § 332.  Now before the Court are two motions.  First, Judge Newman has moved for a preliminary injunction to prohibit Defendants from continuing her suspension from new case assignments and from proceeding with any further disciplinary proceedings until the matter is transferred to the judicial council of another circuit.  Second, Defendants have moved to dismiss the case, primarily on jurisdictional grounds.  For the reasons explained below, Judge Newman is not entitled to preliminary relief because the Court lacks jurisdiction over most of her claims and she has failed to establish a likelihood of prevailing on the others.  Moving to Defendants' motion, the Court will dismiss the claims over which it lacks jurisdiction (Counts II–IV, VI, and X–XI).  As for the remaining claims, Defendants have moved to dismiss two (Count I and part of Count VII) under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  The Court will grant that relief.  Defendants have not, however, sought Rule 12(b)(6) dismissal of the remaining claims over which the Court has jurisdiction (Counts V and VIII–IX and part of Count VII).  The Court therefore may not entertain dismissal of the case in its entirety at this juncture.  Defendants may seek dismissal of the surviving claims under Rule 12(c) or via summary judgment.

**JA149**

## I.   Background

### A.   Statutory Frameworks

Under federal law, each circuit has a judicial council, composed—in most cases—of the chief judge of the circuit and an equal number of district and circuit judges.  28 U.S.C. § 332(a)(1).  The Judicial Council for the Federal Circuit, however, is composed of all active judges of the Federal Circuit.  See United States Court of Appeals for the Federal Circuit, Judicial Council.[1]  Judicial councils have a range of powers, but two sources of authority are of particular relevance here: 28 U.S.C. § 332 and the JC&D Act, 28 U.S.C. § 351 et seq.

Under 28 U.S.C. § 332(d), judicial councils may "make all necessary and appropriate orders for the effective and expeditious administration of justice within [their] circuit."  As the Supreme Court explained over fifty years ago, "[t]he legislative history of 28 U.S.C § 332 and related statutes is clear that some management power was both needed and granted."  Chandler, 398 U.S. at 85.  And courts since have found that § 332 "gives considerable discretion to courts and circuit Judicial Councils to choose how to regulate court business, whether by formal rules, standing orders, or other means."  Truesdale v. Moore, 142 F.3d 749, 760 (4th Cir. 1998).

Second, judicial councils may "take [] action" on judicial misconduct complaints filed under the JC&D Act.  28 U.S.C. § 354(a)(1)(C).  The act permits any person to file a complaint "alleging that [a] judge is unable to discharge all the duties of office by reason of mental or physical disability."  Id. § 351(a).  "In the interests of the effective and expeditious administration of the business of the courts," the chief judge may also "identify a complaint" and dispense with the filing of a written complaint.  Id. § 351(b).  The chief judge then reviews the complaint and takes one of several routes.  Id. § 352(a).  She may dismiss the complaint (e.g.,

---

[1] https://perma.cc/2AF4-LG8R.

JA150

because it is frivolous, relates to the merits of a decision, or lacks any factual foundation), id. §§ 352(b)(1), (b)(1)(A)(ii)–(iii), (b)(1)(B); conclude the proceeding if appropriate action has already been taken, id. § 352(b)(2); or appoint a special committee to conduct "an investigation as extensive as it considers necessary," id. §§ 353(a), (c).  On this final avenue, once the committee completes its investigation, it presents its findings and recommendations to the judicial council. Id. § 353(c).

The judicial council, in turn, may conduct an additional investigation, dismiss the complaint, or "take such action as is appropriate to assure the effective and expeditious administration of the business of the courts within the circuit."  Id. § 354(a)(1)(C).  One possible action is to "order[] that, on a temporary basis for a time certain, no further cases be assigned to the judge whose conduct is the subject of a complaint."  Id. § 354(a)(2)(A)(i).  A judge aggrieved by an action of a judicial council may petition the Judicial Conference of the United States' Committee on Judicial Conduct and Disability for review.  Id. § 357(a).[2]  The Judicial Conference, in turn, "after consideration of the prior proceedings and such additional investigation as it considers appropriate" may take the same actions available to a judicial council.  Id. § 355(a).  Or, if the Judicial Conference deems impeachment warranted, it may certify and transmit that determination to the House of Representatives.  Id. § 355(b)(1).

---

[2]  Created by Congress, the Judicial Conference of the United States, through an executive committee and nineteen topic-related subcommittees, establishes and implements policies for the administration of the federal judiciary.  United States Courts, About the Judicial Conference, https://perma.cc/A9XB-9C8F.  Though Judicial Conference review of complaints is discretionary, see JC&D R. 21(a), the D.C. Circuit found it "fair to suppose that both houses of Congress realistically expected that the Judicial Conference would hear all *serious* claims," McBryde, 264 F.3d at 61.

JA151

B.  Proceedings against Judge Newman

In 2021, according to Defendants, Federal Circuit court personnel began reporting "behavior that [] called into question Judge Newman's ability to perform her duties."  Mot. Dismiss at 4.  These reports included "information indicative of memory loss, a lack of focus, confusion over simple matters, uncharacteristic paranoia, and an inability to perform simple tasks."  Id.  In early March 2023, Chief Judge Moore allegedly met with Judge Newman and "attempted to convince [her] to retire."  FAC ¶ 17.  After she refused, the Federal Circuit Judicial Council proceeded along two separate, but overlapping, tracks:  It pursued action under both § 332(d) and the JC&D Act.

Starting with § 332, on March 8, 2023, the Judicial Council convened without Judge Newman present to consider "concerns raised about [her] mental fitness" and "her abnormally large backlog in cases."  FAC, Ex. O at 1.  Though the Council did not issue a written order or identify the source of its authority, it voted on March 8 to preclude the assignment of new cases to her.  Id.  After Judge Newman asked to be restored to the case calendar, the Judicial Council reconsidered its March 8 opinion "*de novo*."  Id. at 2.  In a June 5 order, the Council concluded that "precluding Judge Newman from new case assignments [wa]s warranted" under the Council's § 332 authority.  Id. at 4.  The Council cited Judge Newman's "continued backlog of cases, and her inability to clear the backlog despite the absence of new cases."  Id.  Specifically, the June 5 order noted that Judge Newman still "ha[d] a backlog of seven opinions, three of which [were] pending for over 200 days and all of which [we]re pending for over 100 days."  Id. at 3.

The June 5 order remained in effect until November 9, 2023.  On November 8, the seventh and final case in Judge Newman's backlog issued.  The following day, the Judicial Council "*sua sponte* vacate[d]" the June 5 order.  Defs.' Reply, Ex. 4 at 2.

**JA152**

Separately, the Judicial Council proceeded along the track laid by the JC&D Act.   On
March 24, 2023, Chief Judge Moore initiated a complaint against Judge Newman under the act.
FAC, Ex. A.  She did so pursuant to Rule 5 of the Rules for Judicial-Conduct and Judicial-
Disability Proceedings ("JC&D Rules"), which permits a chief judge to "identify" a complaint
upon a finding of "probable cause to believe that misconduct occurred or that a disability exists."
JC&D R. 5(a); see also 28 U.S.C. § 351(b).  In the order initiating the complaint, Chief Judge
Moore cited several factors as providing probable cause, including Judge Newman's delay in
issuing opinions and voting on other judges' opinions, reports that she had made statements
indicating a lack of awareness about the issues in cases, and reports that she had inappropriately
managed staff.  FAC, Ex. A.

Chief Judge Moore then appointed a special committee, consisting of herself and Federal
Circuit Judges Sharon Prost and Richard G. Taranto, to investigate the allegations in the
complaint.  FAC ¶ 23.  Throughout the spring, the Special Committee issued a series of orders
affecting the scope of its investigation and seeking cooperation from Judge Newman.  Among
them, the Special Committee expanded the investigation to include alleged misconduct in Judge
Newman's management of staff, FAC, Exs. B, E; ordered Judge Newman to submit to
neurological and neuro-psychological testing by physicians of the committee's choosing, FAC,
Exs. C, K; and directed Judge Newman to provide the Committee with medical records related to
incidents described in the complaint, FAC, Exs. E, K.

When Judge Newman refused to undergo testing by doctors chosen by the Special
Committee or share her medical records, the Committee changed course.  It decided to narrow
the investigation to focus only on "whether Judge Newman's refusal to cooperate with the
Committee's investigation constitute[d] misconduct."  FAC, Ex. N at 3; see also JC&D R.
4(a)(5) ("Cognizable misconduct includes . . . refusing, without good cause shown, to cooperate

JA153

in the investigation of a complaint. . . .").  In early May, the Judicial Council also denied Judge

Newman's request to transfer her complaint to the judicial council of another circuit.  FAC, Exs.

H–I.  The Council denied the transfer request without prejudice to re-filing after Judge Newman

complied with its orders for her to undergo the specified testing and provide relevant medical

records.  FAC, Ex. H at 9.

      As part of its investigation, the Special Committee interviewed more than twenty court

employees, reviewed case-processing records, and consulted with a physician experienced in

judicial-disability matters.  Mot. Dismiss at 13.  Judge Newman's counsel countered with several

letters raising objections to the Special Committee's investigation and orders.  See FAC, Exs. Q–

T.  Counsel also provided the Committee with medical records from one of Judge Newman's

own doctors.  FAC ¶ 16; id., Ex. Y (filed under seal).  On July 31, the Special Committee

released its Report & Recommendation to the Judicial Council.  Mot. Dismiss at 15; id., Ex. 1.

The report concluded that "there is, at a minimum, a reasonable basis for concluding that Judge

Newman may suffer from a disability that renders her unable to perform the duties of her office"

and that her "failure to cooperate with the Committee's orders constitutes misconduct."  Mot.

Dismiss, Ex. 1 at 31, 60.  The Special Committee recommended that Judge Newman not be

permitted to hear new cases "for the fixed period of one year or at least until she ceases her

misconduct and cooperates such that the Committee can complete its investigation, whichever

comes sooner."  Id. at 110–11.

      After receiving Judge Newman's response, the Judicial Council adopted the Special

Committee's recommendations.  Pl.'s Opp'n, Exs. A–B.  The Council found that the Committee

had a reasonable basis to order Judge Newman to undergo medical examinations and submit

medical records, and that her refusal to comply "was not excused by good cause."  Pl.'s Opp'n,

Ex. B at 37, 40.  The Council therefore concluded that her "refusal, without good cause"

**JA154**

"constitute[d] serious misconduct." Id. at 72.  The Council ordered that she not be permitted to hear any cases "for a period of one year," "subject to consideration of renewal if [her] refusal to cooperate continues after that time and to consideration of modification or rescission if justified by an end of the refusal to cooperate."  Id. at 72–73.

Judge Newman petitioned the Judicial Conference of the United States for review of the Judicial Council's order, and the Judicial Conference affirmed the order on February 7, 2024. Defs.' Notice of JC&D Comm. Order [ECF No. 40] at 14.  The Judicial Conference found that (1) the Chief Circuit Judge and Judicial Council had not abused their discretion by refusing to request transfer of the complaint to another circuit's judicial council, (2) Judge Newman had not shown good cause for refusing to cooperate with the Special Committee's investigation, and (3) the sanction imposed by the Judicial Council did not exceed its statutory authority.  Id. at 14–29.

While the Judicial Council proceedings were still ongoing, Judge Newman filed this federal lawsuit.  Compl.  She subsequently amended her complaint and now brings eleven counts against the three judges on the Special Committee (Chief Judge Moore and Judges Prost and Taranto) in their official capacities and the Judicial Council of the Federal Circuit.  FAC ¶¶ 4–7. (The Court will elaborate on the specific claims later.)  Judge Newman also moved for a preliminary injunction, asking the Court to enjoin the Defendants "from suspending [her] from, or otherwise interfering with, the duties and functions of the judicial office to which [she] was confirmed."  Prelim. Inj. at 2.  At the Court's suggestion, the parties agreed to informal mediation with retired D.C. Circuit Judge Thomas B. Griffith.[3]  See Joint Statement on Notice of Mediation [ECF No. 17]; Mediation Referral Order [ECF No. 18].  Despite Judge Griffith's best efforts, the mediation proved unsuccessful.  See Joint Status Report [ECF No. 21] at 1.

---

[3]  The Court thanks Judge Griffith for his volunteer service.

JA155

Defendants followed with a motion to dismiss.  Both motions are fully briefed, and the Court heard argument on the motions on January 25, 2024.

## II.   Legal Standards

### A.   Motion for Preliminary Injunction

"A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To obtain a preliminary injunction, the moving party must show: (1) that she is likely to succeed on the merits of his claim; (2) that she is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in her favor; and (4) that a preliminary injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  An absence of irreparable injury is fatal to a preliminary injunction motion.  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  The D.C. Circuit has suggested, without holding, that failure to establish a likelihood of success on the merits also categorically forecloses preliminary relief.  Sherley v. Sebelius, 644 F.3d 388, 393 (D.C. Cir. 2011); see also Changji Esquel Textile Co. v. Raimondo, 40 F.4th 716, 726 (D.C. Cir. 2022).

### B.   Motion to Dismiss

Defendants challenge this Court's subject matter jurisdiction and argue that certain counts fail to state a claim.  The Court will therefore apply Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

As "[f]ederal courts are courts of limited jurisdiction," Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), a court must ensure it has subject matter jurisdiction over a claim before proceeding to the merits, Moms Against Mercury v. FDA, 483 F.3d 824, 826 (D.C. Cir. 2007).  On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff

**JA156**

bears the burden of establishing jurisdiction.  <u>Knapp Med. Ctr. v. Hargan</u>, 875 F.3d 1125, 1128

(D.C. Cir. 2017).  The Court must "accept all well-pleaded factual allegations as true and draw

all reasonable inferences from those allegations in the plaintiff's favor," but need not "assume

the truth of legal conclusions" in the complaint.  <u>Williams v. Lew</u>, 819 F.3d 466, 472 (D.C. Cir.

2016) (cleaned up).  The Court also "may consider materials outside the pleadings in deciding

whether to grant a motion to dismiss for lack of jurisdiction."  <u>Jerome Stevens Pharms., Inc. v.

FDA</u>, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual

allegations, accepted as true, to "state a claim to relief that is plausible on its face."  <u>Ashcroft v.

Iqbal</u>, 556 U.S. 662, 678 (2009).  A claim is plausible on its face if it "pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  <u>Id.</u>  A court evaluating a Rule 12(b)(6) motion will "construe the complaint 'liberally,'

granting plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  <u>Barr

v. Clinton</u>, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting <u>Kowal v. MCI Commc'ns Corp.</u>, 16

F.3d 1271, 1276 (D.C. Cir. 1994)).  However, a "court need not accept a plaintiff's legal

conclusions as true, . . . nor must a court presume the veracity of legal conclusions that are

couched as factual allegations."  <u>Alemu v. Dep't of For-Hire Vehicles</u>, 327 F. Supp. 3d 29, 40

(D.D.C. 2018) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2009)).

## III. **Analysis**

### A. <u>Judge Newman's Challenges to Judicial Council Action Taken Pursuant to 28 U.S.C.<br>§ 332(d) Are Moot</u>

Defendants' first line of attack asserts that Judge Newman's challenges to Judicial

Council action taken pursuant to 28 U.S.C. § 332(d) are moot.  "A case becomes moot—and

therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues

11

presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."

Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (cleaned up).  Even where claims presented a

live controversy when filed, the mootness doctrine "requires a federal court to refrain from

deciding it if events have so transpired that [a judicial] decision will neither presently affect the

parties' rights nor have a more-than-speculative chance of affecting them in the future."  Clarke

v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (cleaned up); see also Arizonans

for Off. Eng. v. Arizona, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court

adjudication, an actual controversy must be extant at all stages of review, not merely at the time

the complaint is filed." (cleaned up)).

The Judicial Council's November 9 order rendered Judge Newman's § 332(d) challenges

moot.  Recall that on June 5, citing its authority under § 332(d), the Judicial Council excluded

Judge Newman from new case assignments because she had accumulated a backlog of opinions

that had been pending for more than one hundred days.  FAC, Ex. O at 3–4.  On November 9, the

Judicial Council *sua sponte* vacated the June 5 order because Judge Newman's final backlogged

opinion had issued the day before.  Defs.' Reply, Ex. 4 at 2.  Because the Judicial Council

vacated the June 5 opinion, any challenge based on § 332(d) is moot.[4]  See Freeport-McMoRan

Oil & Gas Co. v. FERC, 962 F.2d 45, 46 (D.C. Cir. 1992) (finding a case "plainly moot" when

the agency's "challenged orders . . . were superseded by a subsequent [] order"); Am. Wild

Horse Pres. Campaign v. Salazar, 800 F. Supp. 2d 270, 271 (D.D.C. 2011) ("[Because] [the]

administrative decision [] was rescinded after the filing of the complaint, . . . the action is now

moot.").

---

[4]  Any challenge based on the March 8 order is also moot for similar reasons.  In the June 5 order, the Judicial Council reviewed the March decision "*de novo*" and voted to suspend Judge Newman from case assignments.

Indeed, Judge Newman does not contest that the June 5 order is moot; she instead contends that an exception to the mootness doctrine rescues her § 332(d) claims.  See Pl.'s Sur-reply at 1.  First, she argues her claims are "capable of repetition, yet evade[] review."  City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983).  And second, she contends the Court retains jurisdiction because "voluntary cessation of allegedly illegal conduct does not deprive a court of power to hear and determine the case."  Am. Bar Ass'n v. F.T.C., 636 F.3d 641, 648 (D.C. Cir. 2011) (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)).  Neither mootness exception applies.

The first exception requires two circumstances to be "simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."  Lewis v. Cont'l Bank Corp., 494 U.S. 472, 481 (1990) (cleaned up).  The June 5 order satisfies the first requirement as courts assume "orders of less than two years' duration ordinarily evade review."  McBryde, 264 F.3d at 55–56.  But it flunks the second because there is no reasonable expectation that Judge Newman will be subject to the same action again.  "When considering the likelihood that an injury will be repeated, the Supreme Court has in general 'been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury.'"  Id. at 56 (quoting Honig v. Doe, 484 U.S. 305, 320 (1988)).  The Court must therefore presume that Judge Newman will not repeat the "misconduct" that led to the imposition of the June 5 order—that is, accumulate a "backlog of cases."  FAC, Ex. O at 4.

Judge Newman attempts to sidestep this presumption by declaring it "unlikely" that her "speed in issuing opinions will change."  Pl.'s Sur-reply at 2.  But her speed in issuing opinions is a factor within her control.  Indeed, she was able to clear her recent backlog, leading to the

vacatur of the June 5 order.  Defs.' Reply, Ex. 4 at 2.  And the Supreme Court has declined to

find the case or controversy requirement satisfied "where, as here, the litigant[] simply

'anticipate[s] violating'" a valid rule.  See United States v. Sanchez-Gomez, 584 U.S. 381, 394

(2018) (quoting O'Shea v. Littleton, 414 U.S. 488, 496 (1974)); see also id. at 393 ("Our

decisions in [prior] civil cases rested on the litigants' inability, for reasons beyond their control,

to prevent themselves from transgressing and avoid recurrence of the challenged conduct.").  The

analysis might be different if Judge Newman were seeking to challenge the Judicial Council's

authority to issue case-backlog rules in the first instance.[5]  See, e.g., O'Shea, 414 U.S. at 497

("[We] are [] unable to conclude that the case-or-controversy requirement is satisfied by general

assertions . . . that in the course of their activities respondents will be prosecuted for violating

*valid* criminal laws." (emphasis added)).  But she is not.  She rather challenges the *punishment*

the Judicial Council imposed (or might impose) for violations of the rules.

     The voluntary cessation exception does not save Judge Newman's § 332(d) claims either.

"As a general rule, a defendant's 'voluntary cessation of allegedly illegal conduct does not

deprive'" a court of jurisdiction.  Am. Bar Ass'n v. F.T.C., 636 F.3d at 648 (quoting Davis, 440

U.S. at 631).  But that general rule does not apply here for two reasons.  First, the D.C. Circuit

has characterized the voluntary cessation exception as "focused on preventing a private

defendant from manipulating the judicial process."  Clarke, 915 F.2d at 705 (D.C. Cir. 1990).

And it has expressed "doubt" about whether courts should "impute such manipulative conduct"

to Congress, a non-private defendant and a coordinate branch of government.  Id.  Defendants

therefore contend that the voluntary cessation exception does not apply to them as government

actors.  Defs.' Resp. to Sur-Reply at 2.  The Court hesitates to adopt a bright-line rule that the

---

[5]  Of course, such a challenge would be unlikely to succeed given the Supreme Court's
explicit endorsement of "backlog" rules.  See Chandler, 398 U.S. at 85.

exception can never be applied against public-sector defendants.  But Defendants' point is well taken in this context.  Though separation-of-powers concerns do not animate the analysis as in Clarke, "it would seem inappropriate" for this district court "to impute [] manipulative conduct" to the entire roster of Federal Circuit judges save one.  Clarke, 915 F.2d at 705; see also Chandler, 398 U.S. at 94 (Harlan, J., concurring) ("[D]irect review by a district judge of the actions of circuit judges would present serious incongruities and practical problems.").

Second, regardless whether the voluntary cessation exception applies to government defendants, "[t]he established law of this circuit is that the [] exception . . . has no play when the [defendant] did not act in order to avoid litigation."  Alaska v. U.S. Dep't of Agric., 17 F.4th 1224, 1229 (D.C. Cir. 2021) (cleaned up).  Judge Newman opines that the "Defendants vacated the June 5 Order strategically and solely to avoid risking an unfavorable judicial decision."  Pl.'s Sur-reply at 3.  But the timeline of events tells a different story.  The Judicial Council initially suspended Judge Newman from hearing new cases on March 8, 2023.  FAC, Ex. O at 1.  On May 10, Judge Newman filed her complaint and challenged—among other actions—her case suspension.  Compl. ¶¶ 20, 45, 50.  On June 5, reviewing its March 8 order *de novo*, the Judicial Council doubled down and again voted to suspend Judge Newman from hearing cases.  FAC, Ex. O at 2.  If the Judicial Council had wanted to avoid "an unfavorable judicial decision," it seems a poor choice to dig itself a deeper hole by reaffirming its decision.  Then on November 9, the Judicial Council vacated the June 5 order.  Though Judge Newman disputes how the Judicial Council calculated the number of cases on her backlog and adjudged the backlog to have been cleared, see Pl.'s Sur-reply at 3 n.2, there is no question that the Council vacated the order *the day after* the final backlogged opinion issued, see Defs.' Reply, Ex. 4 at 2.  The record thus suggests that Judge Newman's own conduct, rather than this litigation, precipitated the Judicial

JA161

Council's decision to vacate the order.  Accordingly, the voluntary cessation doctrine has "no play."

B. <u>28 U.S.C. § 357(c) Precludes Judge Newman's As-Applied Challenges</u>

Because Judge Newman's challenges to the Judicial Council's § 332(d) orders are moot, the Court now turns to the second track along which the Judicial Council proceeded: the JC&D Act.  Judge Newman has raised both facial and as-applied challenges based on the act.  Before parsing out which claims are facial and which are as-applied, the Court must examine the scope of its jurisdiction to hear challenges to the act.

1. *28 U.S.C § 357(c), as in interpreted in <u>McBryde</u>, precludes district courts from reviewing as-applied challenges to the JC&D Act*

The Court lacks jurisdiction to review Judge Newman's as-applied challenges to the JC&D Act.  Section 357 of the act, titled "No Judicial Review," precludes district court review of judicial council action.  It states, "[e]xcept as expressly provided in this section and section 352(c), all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise."  28 U.S.C. § 357(c).  The enumerated exceptions create avenues for review *within* the framework of the JC&D Act.  Under 352(c), judges may petition judicial councils for review of certain final orders by the chief judge.  <u>Id.</u> § 352(c).  And, under § 357(a), judges may petition the Judicial Conference for review of judicial council action.  <u>Id.</u> § 357(a).  But neither exception allows for district court review of judicial council action.

The D.C. Circuit confirmed as much in <u>McBryde</u>.  The court held that *facial* challenges to the constitutionality of the JC&D Act—*i.e.*, "challenges to the decisions of Congress"—are

**JA162**

not precluded by § 357(c).[6]  McBryde, 264 F.3d at 58; see also id. ("This interpretation . . .

avoid[s] the 'serious constitutional question' that would be posed 'if a federal statute were

construed to deny any judicial forum for a colorable constitutional claim.'" (quoting Webster v.

Doe, 486 U.S. 592, 603 (1988)).  But it found that § 357(c) precludes review in a district court

for as-applied claims, including as-applied claims that invoke the Constitution.  Id. at 59, 62–63.

Only the Judicial Conference can review those challenges.  Id. at 62.  The circuit explained that

members of Congress, "[p]ut ultimately to a choice between review by an Article III 'Court' and

review by a committee of Article III judges chosen by and from the Judicial Conference, [] chose

the latter."  Id. at 63.

### 2.  McBryde remains good law and applies to this case

Judge Newman attempts to circumvent McBryde's holding that § 357(c) bars district-

court review of as-applied claims.  She offers three theories, but none succeeds.  See Pl.'s Opp'n

at 33–36.  First, Judge Newman contends that McBryde is no longer good law in the wake of the

---

[6]  When McBryde was decided, the judicial-review provision was codified in § 372(c)(10) of the JC&D Act.  See 28 U.S.C. § 372(c)(10) (2000).  Congress reorganized the statute in 2002 and relocated the relevant part of 28 U.S.C. § 372(c)(10), without material changes, in § 357(c).  See 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107–273, § 357(c), 116 Stat. 1758, 1853 (2002).  Judge Newman contends that the addition of a severability clause in the 2002 reorganization rendered McBryde's holding on as-applied challenges no longer good law.  See Prelim. Inj. at 30.  The severability clause provides that if "any provision of this subtitle, an amendment made by this subtitle, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of [the JC&D Act] . . . shall not be affected."  21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107–273, § 11044, 116 Stat. 1758, 1856 (2002) (codified as Note to 28 U.S.C. § 351).  According to Judge Newman, the "only circumstance where an *application* of a provision of the Disability Act could be held unconstitutional is in a proceeding before a district court (and any subsequent appeals)."  Prelim. Inj. at 30.  This reading, however, ignores the judicial-review procedure established by § 357(c) (formerly § 372(c)(10)) and endorsed by the D.C. Circuit in McBryde.  Via the appeal right created in § 357(c), Congress "enabled a sanctioned judge to seek review by . . . the Judicial Conference of all claims except (presumably) facial attacks on the statute."  McBryde, 264 F.3d at 62.  The Judicial Conference is thus empowered to find unconstitutional an application of the JC&D Act.

JA163

Supreme Court's recent admonition in Axon Enterprises Inc. v. Federal Trade Commission that "agency adjudications are generally ill suited to address structural constitutional challenges." Pl.'s Opp'n at 34 (quoting Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. 175, 195 (2023)). In McBryde, the Judicial Conference had "disclaimed" any authority to rule on constitutional challenges on the grounds that it was "not a court" and had "no competence to adjudicate the facial constitutionality of the [JC&D Act] or its constitutional application to the speech of an accused judge." 264 F.3d at 62. The D.C. Circuit rejected the Judicial Conference's disavowal of authority. Id. Treating the Conference as an agency, the Circuit held that "agencies [] have an obligation to address properly presented constitutional claims which . . . do not challenge agency actions mandated by Congress." Id. (cleaned up). Judge Newman contends that Axon repudiated this element of McBryde.[7]

But this argument overlooks the fact that McBryde allows facial challenges to the JC&D Act to proceed in district court. The kinds of "structural constitutional challenges" that Axon found agencies are "ill suited to address" are exactly the claims McBryde funnels to Article III courts. See McBryde, 264 F.3d at 58 ("[T]he wording of § 372(c)(10) [now § 357(c)] does not withhold jurisdiction over Judge McBryde's claims that the *Act* unconstitutionally impairs

---

[7] In response to the Judicial Conference order affirming her suspension, Judge Newman filed a notice indicating that the Conference "declined to evaluate [her] constitutional claims, thus leaving these matters to properly constituted Article III courts." Pl.'s Notice [ECF No. 41] at 2. As neither party filed in this Court a copy of Judge Newman's petition to the Conference, the Court is unable to assess which, if any, claims the Conference declined to address. In any event, as noted above, McBryde rejected the notions that Congress intended for the Conference to "disclaim[] authority to rule on as applied . . . constitutional challenges," or that a disavowal of authority by the Conference confers jurisdiction on Article III courts. See McBryde, 264 F.3d at 62–63 ("[T]he statutory mandate to the [Judicial Conference JC&D] committee appears to contain no language justifying a decision to disregard claims that a circuit judicial council has violated a judge's constitutional rights in application of the Act. . . . [W]e find the evidence clear and convincing that Congress intended [§ 357(c)] to preclude review in the courts for as applied constitutional claims."). This Court is bound by the D.C. Circuit's pronouncements in this regard.

JA164

judicial independence and violates separation of powers.").  Though it is perhaps a stretch to say

McBryde was prescient (and, indeed, Axon is in many ways an application of Thunder Basin

Coal Co. v. Reich, 510 U.S. 200 (1994), a case predating McBryde), McBryde's holding accords

fully with Axon and its line of cases.[8]

Judge Newman's second theory is that McBryde does not govern because—unlike the

judges involved in Judge McBryde's discipline—the members of the Federal Circuit Judicial

Council are all her colleagues and were witnesses to her alleged disability.  Pl.'s Opp'n at 34.

Due to this difference, she contends her challenge is permitted under Dart v. United States,

where the D.C. Circuit held that a statute's bar on judicial review of agency decisions does not

apply "when [the] agency is charged with acting beyond its authority."  848 F.2d 217, 221 (D.C.

Cir. 1988).  But, as the circuit noted in McBryde, Dart's exception does not stretch so far as to

negate a statute's judicial-review bar "whenever the complainant asserts legal error."  264 F.3d at

63.  Rather, Dart's "narrow exception" applies when "agency action on its face violate[s] a

statute."  Dart, 848 F.2d at 221–22 (quoting Griffith v. FLRA, 842 F.2d 487, 492 (D.C. Cir.

1988) (cleaned up)).  The make-up of the Federal Circuit Judicial Council does not violate the

JC&D Act on its face.  The JC&D Act's default framework charges judges with reviewing

---

[8]  In any case, the jurisdictional provisions in Axon, dubbed "special statutory review schemes" by the Supreme Court, functioned differently than § 357(c).  The Securities Exchange Act and Federal Trade Commission ("FTC") Act, which supplied the review schemes at issue, required litigants to pursue challenges in federal courts of appeal, not district courts, following exhaustion of the administrative process.  Axon, 598 U.S. at 180–81.  The plaintiffs in Axon, however, sued in district court while their administrative petitions were pending, alleging that "fundamental aspect[s] of the [agencies'] structure violate[d] the Constitution."  Id. at 182.  Unlike the Exchange and FTC Acts, the JC&D Act does not create a "special statutory review scheme" that simply bypasses district court review.  It bars Article III review—in district and circuit courts alike—of all as-applied challenges.  See 28 U.S.C. § 357(c).

complaints about other judges in their circuit.  See 28 U.S.C. §§ 352–53.[9]  In fact, the JC&D

Rules mandate that special committees from the Federal Circuit "be selected from the judges

serving on the subject judge's court."  JC&D R. 12(a); see also 28 U.S.C. § 363.  And JC&D

Rule 26 instructs that complaints should be transferred out-of-circuit only "[i]n exceptional

circumstances."  JC&D R. 26.  The composition of the Federal Circuit Judicial Council thus did

not "on its face violate[]" the JC&D Act.

Finally, at the motions hearing, Judge Newman's counsel suggested for the first time that

two related Supreme Court cases—Cuozzo Speed Technologies, LLC v. Lee, 579 U.S. 261

(2016), and SAS Institute, Inc. v. Iancu, 138 S.Ct. 1348 (2018)—have superseded McBryde.  Tr.

at 36–38.  In both cases, the Supreme Court considered whether 35 U.S.C. § 314's bar on judicial

review precluded federal court review of challenges to certain determinations by the Director of

the U.S. Patent and Trademark Office.  Specifically, § 314 allows third parties, through a

procedure known as "inter partes review," to challenge previously issued patents in an

adversarial process before the Patent Office.  SAS Institute, 138 S.Ct. at 1350.  The statute's "No

Appeal" clause provides that "[t]he determination by the Director [of the Patent Office] whether

to institute an inter partes review under this section shall be final and nonappealable."  35 U.S.C.

---

[9]  The JC&D Act's framework also contemplates that, in some cases, the members of a
judicial council will have personal knowledge about the facts underlying complaints.  For this
reason, it is not evident that 28 U.S.C. § 455—which mandates that judges recuse from "any
proceeding[s]," among others, where their "impartiality might reasonably questioned" or where
they have "personal knowledge of disputed evidentiary facts"—applies to judicial council
proceedings.  28 U.S.C. §§ 455(a)–(b).  Moreover, § 455 defines "proceeding" as including
"pretrial, trial, appellate review, or other stages of litigation."  Id. § 455(d)(1).  None of those
terms maps onto the actions of a judicial council, and—it would seem—for good reason.  A
judicial council's activities fall outside of the normal rubric of judicial activity.  See also
McBryde, 264 F.4d at 58, 62–63 (holding the district court was precluded from reviewing Judge
McBryde's due process claim, which alleged that the whole investigation "arose out of a conflict
between [Judge McBryde] and Chief Judge Politz . . . [and] Chief Judge Politz refused to recuse
himself" (cleaned up)).

§ 314(d).   In both cases, the Supreme Court began by noting that to overcome "the 'strong presumption' in favor of judicial review, . . . th[e] Court's precedents require 'clear and convincing' indications that Congress meant to foreclose review." SAS Institute, 138 S.Ct. at 1359 (quoting Cuozzo, 579 U.S. at 273).  In SAS Institute, which clarified Cuozzo, the Court held that § 314(d) did not preclude judicial review of challenges to *how* the Director conducted the inter partes review.  138 S.Ct. at 1359.  Rather, because of § 314(d)'s plain text and the presumption in favor of judicial review, the Court found "§ 314(d) precludes judicial review only of the Director's 'initial determination'" to institute inter partes review.  Id. (quoting Cuozzo, 579 U.S. at 273).[10]

Neither case upsets McBryde's holding.  If anything, they reinforce it.  In McBryde, the circuit noted the presumption in favor of judicial review, see 264 F.3d at 59, and undertook a painstaking review of the congressional record before finding "the evidence clear and convincing that Congress intended § 372(c)(10) [now § 357(c)] to preclude review in the courts for as-applied constitutional claims," id. at 59–63.  Moreover, § 357(c)'s bar on judicial review does not contain the kind of limiting language present in § 314(d).  Section 357(c) bars review of "all orders and determinations, including denials of petitions for review," and not just a sub-set of decisions (as § 314(d) does).  28 U.S.C. § 357(c).

---

[10]   Both cases reviewed Federal Circuit decisions.  True to form, Judge Newman authored a dissent in each case.  See In re Cuozzo Speed Techs., LLC, 793 F.3d 1268, 1283 (Fed. Cir. 2015) (Newman, J., dissenting); SAS Inst., Inc. v. ComplementSoft, LLC., 825 F.3d 1341, 1353 (Fed. Cir. 2016) (Newman, J., concurring in part and dissenting in part).  In Cuozzo, the Supreme Court rejected her interpretation of § 314(d)'s bar on judicial review.  579 U.S. at 273.  In SAS Institute, Judge Newman did not address § 314(d), but the Supreme Court largely adopted her interpretation of other parts of the statute.  138 S.Ct. at 1354–57.

JA167

The Court thus finds no basis in Supreme Court or D.C. Circuit case law to question McBryde's binding interpretation of § 357(c).  The Court therefore lacks jurisdiction over Judge Newman's as-applied challenges to the JC&D Act.

### 3. 28 U.S.C. § 357(c), as interpreted in McBryde, bars this Court from exercising jurisdiction over six of Judge Newman's claims

Having found that it lacks jurisdiction over as-applied challenges to the JC&D Act, the Court must assess which counts in the First Amended Complaint mount as-applied, as opposed to facial, challenges to the act.  A facial challenge alleges that "no set of circumstances exists under which" a statute is valid.  United States v. Salerno, 481 U.S. 739, 745 (1987).  The "plaintiffs' claim and the relief that would follow" must "reach beyond the particular circumstances of [individual] plaintiffs."  John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010).  An "as-applied challenge, by contrast, asks a court to assess a statute's constitutionality with respect to the particular set of facts before it."  Hodge v. Talkin, 799 F.3d 1145, 1156 (D.C. Cir. 2015).

The Court concludes that six counts of the amended complaint raise as-applied challenges.  Section 357(c) therefore bars this Court from exercising jurisdiction over those claims.  Because some of the counts are related, the Court will take them up in batches.

First, Counts II and III allege that neither the JC&D Act nor § 332(d) permit the Judicial Council to suspend Judge Newman from her cases, reduce her staff, or force her to submit to a mental health examination, among other restrictions.  FAC ¶¶ 86–87, 91–92.  The complaint does not distinguish between Judicial Council action taken pursuant to the JC&D Act and that taken pursuant to § 332(d).  See id. ¶¶ 87, 92 (listing the same conduct as violations of both statutes).  But the Court need not disentangle the two.  As explained above, challenges to the Judicial Council's orders under § 332(d) are moot.  And the challenges to the JC&D Act are as-

22

**JA168**

applied.  Indeed, Count II begins with a tip off that its challenge is as-applied.  See id. ¶ 86 ("To the extent that the Judicial Disability Act of 1980 is constitutional . . .").  The Court is thus precluded from reviewing any parts of Counts II and III that remained live controversies after the Judicial Council's November 9 order.

Second, Count IV, titled "As Applied Due Process of Law Violation," contends that Defendants' continued investigation "violates the fundamental principles of due process because the Special Committee is composed of complainants about and witnesses to Plaintiff's alleged disability."  Id. ¶ 96.  As Judge Newman concedes, this count raises an as-applied challenge to the Special Committee's conduct as the claim is premised on the particular membership of the committee.  See Pl.'s Opp'n at 28.

Third, Count VI alleges that "[n]either the [JC&D] Act nor the U.S. Constitution authorizes compelling an Article III judge to undergo a medical or psychiatric examination or to surrender to any investigative authority her private medical records."  FAC ¶ 107.  The count further alleges that because "Defendants have neither statutory nor constitutional power to compel" Judge Newman to comply with these requirements, their imposition is "*ultra vires* and unconstitutional."  Id. ¶ 108.  Though she does not identify a specific provision of the JC&D Act, § 353(c) allows a special committee to "conduct an investigation as extensive as it considers necessary."  28 U.S.C. § 353(c).  This count therefore boils down to an allegation that, in ordering Judge Newman to undergo a medical examination and produce medical records, the Special Committee acted beyond the scope of its § 353(c) authority.  This is a prohibited as-applied challenge.  McBryde interpreted § 357(c) as barring district courts from considering challenges that "reduce[] to arguments as to the exact reach of the [JC&D Act's] provisions."  McBryde, 264 F.3d at 64.  Count VI makes exactly that kind of argument.  Judge Newman does not contend that every application of § 353(c) is unlawful; instead she alleges that the provision

JA169

does not permit the orders levied against her.  And, to the extent Judge Newman intends to raise

a facial challenge to § 353(c), she has done so in other counts of the complaint (*i.e.*, Counts V,

VII–IX).

Finally, Counts X and XI raise as-applied Fourth Amendment challenges.  The counts

claim Judge Newman's rights were violated because Defendants lacked "either a warrant issued

on probable cause" or "a constitutionally reasonable basis" for requiring her "to submit to an

involuntary medical or psychiatric examination" (Count X) or "to surrender her private medical

records" (Count XI).  FAC ¶¶ 128, 132.  Judge Newman does not contest that these counts

present as-applied attacks.  See Pl.'s Opp'n at 28, 33.  And, even though the challenges invoke

the Constitution, McBryde still precludes their review.  "[T]he evidence [is] clear and convincing

that Congress intended [§ 357(c)] to preclude review in the courts for as applied constitutional

claims."  McBryde, 264 F.3d at 62–63; see also id. at 59 (classifying Judge McBryde's similar

claim that the Judicial Council's "use of psychiatrists" was "fundamentally destructive of judicial

independence" as an as-applied challenge).

For those keeping track, Counts II–IV, VI, and X–XI mount as-applied attacks precluded

by McBryde.  Defendants contend that the remaining counts also pose as-applied challenges, see

Mot. Dismiss at 21–23, but the Court disagrees.  Even though Counts I and VII–IX reference or

allude to specific orders of the Judicial Council, they challenge the underlying provisions of the

JC&D Act authorizing the Judicial Council to issue those orders.  See Pl.'s Opp'n at 33 ("Judge

Newman does not seek review of orders issued pursuant to the statute, but rather challenges the

authorization to issue such orders in the first place.").  In other words, the counts contend that

"no set of circumstances exists under which" the Judicial Council could validly apply those parts

of the statute.  Salerno, 481 U.S. at 745.  Of course, that is a demanding standard, and one the

Court will hold Judge Newman to later in assessing the merits of her facial challenges.

JA170

Count V also mounts a facial attack.  It alleges that the JC&D Act is unconstitutionally vague in that it fails to "provide adequate notice of what constitutes a mental disability" and "lacks minimum enforcement guidelines."  FAC ¶ 103.  Defendants contend this too is a disguised as-applied challenge.  They begin by correctly noting that a plaintiff "to whose conduct a statute clearly applies may not successfully challenge it for vagueness," Parker v. Levy, 417 U.S. 733, 756 (1974), and that, as a result, courts must "examine the complainant's conduct before analyzing other hypothetical applications of the law," Vill. of Hoffman Ests. v. Flipside, Hoffman Ests. Inc., 455 U.S. 489, 495 (1982).  Judge Newman's challenge, they then argue, requires the Court "to perform the very inquiry . . . that Congress placed off limits in § 357(c)"— decide "an as-applied challenge to the Act."  Mot. Dismiss at 23.

This argument falters at its initial premise.  Judge Newman is not "clearly" someone to whom the JC&D Act's standard of disability applies because none of the complaints about her potential disability have been substantiated.  Defendants have acknowledged as much.  In April, the Special Committee ordered "Judge Newman to undergo [medical examinations] to *determine* whether she suffers from a disability."  FAC, Ex. H at 1 (emphasis added).  In a May 16 order, the Special Committee again explained that its "sole purpose regarding the disability inquiry" was to "*determin[e]* whether Judge Newman has a disability and if so the nature and scope . . . ."  FAC, Ex. K at 23 (emphasis added).  And in its final Report and Recommendation, the Special Committee did not reach a conclusion about whether the JC&D Act's disability standard applied to Judge Newman.  See Mot. Dismiss, Ex. 1 at 22 (explaining that "the Committee's ability to make an informed assessment of whether Judge Newman suffers from a disability" was "significantly impaired").  Because Judge Newman is not someone to whom the JC&D Act's definition of disability clearly applies, she may raise a vagueness challenge to that definition.

In sum, § 357(c) permits this Court to exercise jurisdiction over Counts I, V, and VII–IX.

**JA171**

C.  Original Jurisdiction and Comity

According to Defendants, § 357(c) is not the only limitation on this Court's jurisdiction. They also raise two additional jurisdictional arguments: (1) as a Court with original—not appellate—jurisdiction, this Court cannot review decisions of the Federal Circuit Judicial Council, and (2) prudential concerns of comity and exhaustion should cause the Court to decline jurisdiction.

> 1.  *This Court has original jurisdiction to hear Judge Newman's facial challenges to the JC&D Act*

Defendants contend that this Court lacks appellate jurisdiction to review the Judicial Council's actions.  See Mot. Dismiss at 24.  The argument goes like this.  When the Judicial Council, acting pursuant to the JC&D Act, suspended Judge Newman from hearing cases, it performed a "judicial" function.  Id. at 24–26; see also Chandler, 398 U.S. at 102 (Harlan, J., concurring) ("[I]n the issuance of orders to district judges to regulate the exercise of their official duties, the Judicial Council acts as a judicial tribunal[.]"); Pitch v. United States, 953 F.3d 1226, 1245 (11th Cir. 2020) (en banc) (Pryor, J., concurring) ("The ordinary meaning of 'judicial proceeding' plainly include[s] the process required by the Judicial Conduct and Disability Act."). Because the Judicial Council's actions were judicial in nature, only a court with appellate jurisdiction over the Council can review its actions.  Mot. Dismiss at 26.  And, because the Judicial Council functions as a court of appeals, the only court that might be able to don that mantle is the Supreme Court.  Id. at 27.  (Defendants acknowledge that the Supreme Court in Chandler left unresolved "the knotty jurisdictional problem" of whether it could review Judicial Council actions.  Id. at 27 (quoting Chandler, 398 U.S. at 88–89)).

But while the Federal Circuit Judicial Council may have been performing a "judicial" function when it suspended Judge Newman (more on that below), it is not a court of appeals.

JA172

That is, it is not equivalent to the Federal Circuit.  Even though their membership is the same, they are created by different sections of the United States Code.  <u>See</u> 28 U.S.C. §§ 41 (Federal Circuit), 332 (Judicial Council).  And they have different jurisdiction and different powers.  <u>See</u> 28 U.S.C. §§ 1295 (Federal Circuit), 332 (Judicial Council).  It is therefore not clear where, if anywhere, the Federal Circuit Judicial Council sits within Article III's hierarchy of courts.

The better analog for a judicial council—and the one the D.C. Circuit has used—is an administrative body.  <u>See</u> <u>Hastings v. Jud. Conf. of U.S.</u> ("<u>Hastings I</u>"), 770 F.2d 1093, 1102 (D.C. Cir. 1985) ("The [Judicial] Councils, in short, are essentially administrative bodies." (cleaned up)); <u>see also</u> <u>McBryde</u>, 264 F.3d at 62 (treating the Judicial Conference as an agency).  Thus, instead of trying to place the Federal Circuit Judicial Council within Article III's hierarchy, the Court will look to the framework for judicial review of agency adjudications.  And that framework varies by agency—and by statute.  Certain statutes grant district courts jurisdiction to review agency adjudications.  <u>See, e.g.</u>, 42 U.S.C. § 405(g) (social security benefit determinations); 42 U.S.C. § 1395ff(b)(2)(C) (certain Medicare claim determinations).  But other statutes bypass the district courts and channel review directly to the courts of appeal.  <u>See, e.g.</u>, 29 U.S.C. § 160(f) (National Labor Relations Board decisions); 15 U.S.C. § 78y(a)(1) (Securities & Exchange Commission decisions).  Here, the relevant review scheme is laid out in the JC&D Act.  And, as noted above, the JC&D Act bypasses both district and circuit courts for as-applied claims and channels review to the Judicial Conference.  28 U.S.C. §§ 357(a), (c); <u>see also</u> <u>McBryde</u>, 264 F.3d at 63.  But the act directs facial challenges to the district court.  <u>McBryde</u>, 264 F.3d at 58.

In sum, then, though Judge Newman's as-applied challenges to the Judicial Council's actions do not require the Court to exercise jurisdiction over a superior Article III court, judicial

**JA173**

review is nonetheless foreclosed by § 357(c).  Her facial challenges, however, fall within the Court's original jurisdiction.

Even if the Federal Circuit Judicial Council sat above district courts within the Article III hierarchy, the Court would not lose jurisdiction over all of Judge Newman's claims because only some of her claims challenge "judicial" actions.  These are the same claims that mount as-applied challenges to the Judicial Council's orders.  Her other claims, *i.e*, the ones challenging the facial validity of the JC&D Act, do not require the Court to review "judicial" determinations by the Judicial Council; they instead require review of an act of Congress.

The Supreme Court considered the nature of judicial proceedings in <u>District of Columbia Court of Appeals v. Feldman</u>, where two D.C. bar applicants challenged a D.C. Court of Appeals bar-admission rule.  460 U.S. 462 (1983).  "A judicial inquiry," the Court held, "investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist."  <u>Id.</u> at 477 (quoting <u>Prentis v. Atlantic Coast Line</u>, 211 U.S. 210, 226 (1908)).  Judicial inquiries often involve "legal arguments," but their "essence" is an "adjudicat[ion]" of a "present right."  <u>Id.</u> at 480–81.  <u>See also</u> <u>In re Summers</u>, 325 U.S. 561, 567 (1945) (In a judicial proceeding, "[a] declaration on rights as they stand must be sought, not on rights which may arise in the future, and there must be an actual controversy over an issue, not a desire for an abstract declaration of the law." (cleaned up)).

When the Federal Circuit Judicial Council or its Special Committee chose to preclude Judge Newman from new case assignments, investigated her conduct, and ordered her to undergo medical examinations and produce medical records—*e.g.*, the basis for the allegations in Counts II–IV, VI, and X–XI—they acted as part of a "judicial inquiry."  Starting with the initiation of the complaint against Judge Newman, the Defendants "investigate[d]," <u>see, e.g.</u>, Mot. Dismiss, Ex. 1 at 12 (the Special Committee "interview[ed] [] court staff" and retained a

**JA174**

physician consultant); "declare[d]" id. at 64 (the Special Committee concluded that Judge

Newman's refusal to cooperate "constitute[d] a serious form of misconduct"); and "enforce[d]

id. at 110 (the Special Committee recommended imposing a "sanction" of "temporary

suspension of all case assignments") "liabilities as they st[ood] on present or past facts,"

Feldman, 460 U.S. at 470 (cleaned up).  Moreover, throughout the proceeding, the "court [] had

before it legal arguments against the validity of [its actions]."  Id. at 480; see also FAC, Exs. Q–

U (letters from Judge Newman's counsel).  See also Chandler, 398 U.S. at 102 (Harlan, J.,

concurring) ("[A]t least in the issuance of orders to district judges to regulate the exercise of their

official duties, the Judicial Council acts as a judicial tribunal . . . .").[11]  Thus, to the extent Judge

Newman's claims challenge the Judicial Council's application of the JC&D Act to her, those

claims challenge a "judicial inquiry."

But that is not the end of the story.  The Feldman Court went on to hold that "[t]o the

extent [the plaintiffs] mounted a general challenge to the constitutionality of [the D.C. bar-

admission rule], . . . the District Court did have subject matter jurisdiction over their complaints."

460 U.S. at 482–83.  That was so because "state supreme courts may act in a non-judicial

---

[11]  In Chandler, four justices "decline[d]" to decide whether a "challenged action of the
Judicial Council was a judicial act or decision by a judicial tribunal."  398 U.S. at 86.  In dicta,
however, they "[found] no indication that Congress intended to or did vest traditional judicial
powers in the Councils."  Id. at 86 n.7.  Justice Harlan responded to this footnote with a lengthy
concurrence, where he examined the legislative history of the act establishing judicial councils
and considered relevant Supreme Court precedent.  See id. at 96–112.  Based on this analysis, he
concluded that "at least in the issuance of orders to district judges to regulate the exercise of their
official duties, the Judicial Council acts as a judicial tribunal for purposes of this Court's
appellate jurisdiction."  Id. at 102 (Harlan, J., concurring).  In dissent, Justices Douglas and
Black agreed with Justice Harlan that the Judicial Council was "under the circumstances an
inferior judicial tribunal."  Id. at 135 (Douglas, J., dissenting).  Since Chandler, other circuits
have adopted Justice Harlan's concurrence and concluded that judicial councils, in certain
settings, conducted "judicial proceedings" or "judicial inquir[ies]."  See, e.g., Pitch, 953 F.3d at
1245 (Pryor, J., concurring); In re McBryde, 117 F.3d 208, 221 (5th Cir. 1997).  This Court does
the same and applies the standard set out in Feldman to determine when the Federal Circuit
Judicial Council acted as a judicial tribunal.

capacity in promulgating rules regulating the bar." Id. at 485.  Likewise here, Congress acted in a non-judicial capacity when it enacted the JC&D Act.  See Prentis, 211 U.S. at 226 ("Legislation, [as opposed to a judicial inquiry], looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some parts of those subject to its power.").  Thus, consistent with § 357(c), the Court may exercise jurisdiction over Judge Newman's challenges to the constitutionality of the act—in other words, her facial challenges.

### 2.  *Prudential concerns do not mandate dismissal*

Defendants raise two prudential doctrines as final barriers to this Court's jurisdiction.  In a brief filed before the Federal Circuit Judicial Council finalized, and the Judicial Conference affirmed, the order suspending Judge Newman from new case assignments for one year, Defendants urged this Court to decline jurisdiction because neither body had rendered a final decision.  See Mot. Dismiss at 46–48.  Defendants suggested that the "prudential concern[]" of comity and the "complementary" doctrine of exhaustion counseled against this Court "rendering judgment on the constitutionality of proceedings *while* the proceedings themselves are going on."  Id. at 47 (cleaned up).  In no small part because circumstances have changed since Defendants raised this argument, the Court declines to stand down on this basis.

Principles of comity and exhaustion do not preclude this Court from exercising jurisdiction where, as here, the Judicial Council has already imposed a sanction on Judge Newman.  The D.C. Circuit's treatment of Judge Alcee Hastings's federal lawsuit explains why. Judge Hastings, a former district judge in the Southern District of Florida, sued various judges on the Judicial Conference and the Eleventh Circuit's Judicial Council after a JC&D complaint was initiated against him.  Hastings I, 770 F.2d at 1095.  A judge of this court refused to enjoin the investigation into Judge Hastings that was underway by an Eleventh Circuit special committee. Id.  On appeal, the D.C. Circuit agreed.  Id. at 1097.  It declined to reach the merits of Judge

Hastings's challenges to the JC&D Act because, at the time of the district court's decision, the Special Committee was "still at work" and "[n]o report had issued from the [c]ommittee with recommendations for disposition of the complaint." Id.  Because of the misconduct proceeding's nascency, "the possible outcomes under the [JC&D] Act"—*e.g.*, that the Judicial Council or Conference might reject the committee's recommended penalties, adopt them, or impose different penalties all together—were "only *possibilities*." Id. at 1100.  The D.C. Circuit therefore concluded that "the [judicial] councils and Conference are entitled to a measure of comity sufficient to preclude disruptive injunctive relief by federal courts absent a showing that serious and irremediable injury will otherwise result." Id. at 1102.

Unlike in Hastings I, the outcomes in Judge Newman's case are no longer mere possibilities.  The Special Committee submitted its report and recommendation, Mot. Dismiss, Ex. 1; the Judicial Council imposed a sanction suspending Judge Newman from hearing new cases, Pl.'s Opp'n, Ex. B; and—just days ago—the Judicial Conference affirmed the Judicial Council's order, Defs.' Notice of JC&D Comm. Order at 14.  Judge Newman is therefore already subject to a "serious and irremediable injury."  Thus, to the extent the Court retains jurisdiction over Judge Newman's claims, it will not decline to exercise that jurisdiction because of prudential factors.[12]

---

[12]  Defendants also cite Chandler as support for their suggestion the Court bow to the principles of comity and exhaustion.  In Chandler, however, the Supreme Court did not decline to interfere with a judicial council's orders due to prudential concerns.  Instead, the Court declined to issue the "extraordinary relief of mandamus or prohibition" because Judge Chandler had not, in the first instance, sought relief directly from the Judicial Council.  398 U.S. at 87, 89.  Indeed, Judge Chandler had acquiesced in the Judicial Council's decision to assign new cases to judges other than himself.  Id. at 79, 87.

JA177

D.  Merits of Facial Challenges

After facing several obstacles to the exercise of its jurisdiction, the Court is left with

jurisdiction over Counts I, V, and VII–IX.  The only two counts presently at issue, however, are

Count I and part of Count VII.[13]  That is so because Judge Newman does not seek a preliminary

injunction based on the likelihood of prevailing on the other counts, see Prelim. Inj. at 39–51,

and Defendants do not challenge these counts on Rule 12(b)(6) grounds, see Tr. at 66.[14]  The

Court will therefore address the merits of only Count I and part of Count VII.

1. Count I: Improper Removal and Violation of Separation of Powers

As with much of this case, McBryde forecloses Count I.  But this time, on the merits.

"Count I challenges the Disability Act's authorization to suspend Article III judges from office."

Pl.'s Opp'n at 29.  Judge Newman contends that the JC&D Act unconstitutionally "delegate[s]"

---

[13] A note on how the Court reads Count VII.  The count makes three allegations: (1) the
JC&D Act is "unconstitutionally vague to the extent it purports to authorize compelled medical
or psychiatric examinations . . . or demands for . . . Article III judges to surrender their private
medical records"; (2) § 353(c), "which authorizes a Special Committee to conduct an
investigation 'as extensive as it considers necessary' lacks minimal enforcement guidelines"; and
(3) the act "vests virtually complete discretion in the hands of a Special Committee" in violation
of due process and Article III.  FAC ¶ 112.  To the extent the Court can consider the first
allegation, see McBryde, 264 F.3d at 64 (barring the Court from considering provisions that
"reduce[] to arguments as to the exact reach of the [JC&D Act's] provisions"), the allegation
collapses into the second.  The provision purportedly authorizing the Special Committee to
compel medical examinations and the production of records is § 353(c).  As Defendants
acknowledged at the motions hearing, they challenge only the third allegation on 12(b)(6)
grounds.  Tr. at 66.

[14]  Should Defendants wish to argue that the remaining counts fail to state a claim, they
may do so in a motion for judgment on the pleadings or a motion for summary judgment.  See
Fed. R. Civ. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a
motion under this rule must not make another motion under this rule raising a defense or
objection that was available to the party but omitted from its earlier motion."); Fed. R. Civ. P.
12(h)(2)(B) ("Failure to state a claim upon which relief can be granted . . . may be raised . . . by a
motion under Rule 12(c).").

JA178

to judges "the impeachment power which the Constitution reserves to the House and Senate." FAC ¶ 81.

The D.C. Circuit considered and rejected this argument in McBryde.  Judge McBryde argued that "the clause vesting the impeachment power in Congress [] preclude[d] *all* other methods of disciplining judges."  McBryde, 264 F.3d at 64.  "On this theory," he contended, the JC&D Act "violate[s] separation of powers doctrine."  Id.  The circuit disagreed, concluding that the Constitution "sheltered" judges "from removal and salary diminution," absent impeachment, but not "from lesser sanctions of every sort."  Id. at 65; see also id. ("Judge McBryde's attempt to fudge the distinction between impeachment and discipline doesn't work.  The Constitution limits judgments for impeachment to removal from office and disqualification to hold office . . . . It makes no mention of discipline generally.").  The circuit therefore held that the JC&D Act, by permitting discipline short of impeachment or salary diminution, did not violate the Constitution.

Judge Newman attempts to escape McBryde's clutches by casting her challenge as "precisely of the type left open by [McBryde's] Footnote 5,"  Pl.'s Opp'n at 36, where the D.C. Circuit noted that it did "not decide whether a long-term disqualification from cases could, by its practical effect, affect an unconstitutional 'removal,'" 264 F.3d at 67 n.5.  Like the circuit, this Court need not decide that question.  Because Count I raises a facial challenge to the JC&D Act, the Court must construe it as alleging that *any* disqualification, no matter its duration, constitutes an "arrogat[ion]" of "the impeachment power."  FAC ¶ 81.  See Salerno, 481 U.S. at 745 ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").  But, as noted above, the D.C. Circuit held that at least some suspensions do not unconstitutionally arrogate Congress's impeachment power.  McBryde, 264 F.3d at 65.

Moreover, contrary to Judge Newman's contention, footnote 5 does not create a carve-out to McBryde's bar on as-applied challenges. She claims that "[i]n order to address" "whether a long-term disqualification from cases could . . . affect an unconstitutional 'removal,'" "there first has to exist 'a long-term disqualification' . . . and such disqualification can exist only once the Disability Act is *applied* to a particular judge." Pl.'s Opp'n at 36. But nothing in McBryde, including footnote 5, suggests that the circuit intended for Article III courts to decide as-applied challenges based on long-term disqualifications. To the contrary, the circuit held that the JC&D Act funnels "all" non-facial claims, including constitutional claims, to the Judicial Conference. 264 F.3d at 62.

### 2. Count VII: Complete Discretion in the Special Committee

Finally, Count VII contends that the JC&D Act violates the Fifth Amendment's due process protection and Article III's guarantee of judicial independence by "vest[ing] virtually complete discretion in the hands of a Special Committee to determine when compliance with [orders] may be compelled." FAC ¶ 112. Though the Court must credit the plaintiff's well-pleaded factual allegations as true, at least on a motion to dismiss, it need not accept the complaint's legal conclusions. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2009). And two related features of JC&D investigations cabin a special committee's discretion. First, the JC&D Act does not vest special committees with the authority to compel compliance with their orders. The act charges special committees with "conduct[ing] an investigation as extensive as [they] consider[] necessary." 28 U.S.C. § 353(c). But the act does not give them enforcement power. Instead, it directs special committees to present a report to the judicial council with "recommendations for necessary and appropriate action by the judicial council." Id. Second, the JC&D Rules erect guardrails around a special committee's investigation. They allow subject judges to refuse to comply with investigations for "good cause." JC&D R. 4(a)(5). And, as was

**JA180**

the case here, the judicial council, and ultimately the Judicial Conference, decide whether the judge had good cause to refuse.  See Pl.'s Opp'n, Ex. B at 40–68; Defs.' Not. of Defs.' Notice of JC&D Comm. Order 21–26.

In some cases, a circuit judicial council (or even the Judicial Conference) may choose to conduct its own investigation after receiving a special committee's report and recommendation (or, in the Judicial Conference's case, an appeal from the judicial council).  See 28 U.S.C. §§ 354(a)(1), (a)(1)(A) ("The judicial council of a circuit, upon receipt of [the special committee's report] . . . may conduct any additional investigation which it considers to be necessary."): id. § 355 ("Upon referral or certification of any matter . . . , the Judicial Conference, after consideration of the prior proceedings and such additional investigation as it considers appropriate . . . .").  In those cases, the same body would both issue orders as part of an investigation and then determine whether good cause exists to refuse compliance.  The D.C. Circuit found no due process concerns with this arrangement in Hastings II, when Judge Hasting's case arrived back at the circuit following its initial remand.  The circuit held that the JC&D Act's vesting of both investigative and adjudicatory functions in the same body did not violate due process.  829 F.2d at 104–05.  In its view, there was "no [] risk [of actual bias of prejudgment] inherent in the procedures established by the [JC&D] Act."  Id. at 104–05.  "The fact that federal judges administer the mechanism described by the Act contribute[d] in no small measure to this conclusion.  They are called upon every day to put aside considerations not legally relevant to their decisions."  Id. at 105.

To be sure, Hastings II presented a due process, and not an Article III, challenge to judicial councils' authority.  But the reasoning of McBryde picks up where Hastings II left off.  As noted above, in McBryde, the circuit rejected the notion that Article III's grant of "judicial independence" gives judges "absolute freedom from" discipline or sanctions that fall short of

removal or salary diminution.  264 F.3d at 65–66.  The circuit also held that the Constitution does not "exclude[] discipline of judges *by* judges."  Id. at 66.  Surely if the Constitution permits judges to subject other judges to discipline or sanction, it also tolerates judicial councils determining when compliance with orders may be compelled.  In fact, in many cases, there may be no difference between seeking compliance with an order and imposing a sanction.

Accordingly, the Court grants Defendants' motion to dismiss as to Count I and part of Count VII.  Because Judge Newman has not shown a likelihood of prevailing on the merits of these counts, the Court also denies her motion for a preliminary injunction.  See Changji Esquel Textile Co., 40 F.4th at 726.

### IV.   Conclusion

For these reasons, it is hereby

**ORDERED** that [ECF No. 12] Judge Newman's Motion for a Preliminary Injunction is DENIED.  It is further

**ORDERED** that [ECF No. 24] Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.  It is further

**ORDERED** that Defendants shall file an answer to the remaining counts by March 13, 2024.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: February 12, 2024

**JA182**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HON. PAULINE NEWMAN,<br><br>    Plaintiff,<br><br> v.<br><br>HON. KIMBERLY A. MOORE, *et al.*,<br><br>    Defendants. | Case No. 1:23-cv-01334-CRC |

**ANSWER**

   Defendants hereby submit their Answer to Plaintiff's complaint.  Am. Compl., ECF No. 10.  Defendants note that all factual allegations in the complaint are relevant only to Plaintiff's as-applied challenges (Counts I–IV, VI, part of VII, X–XI), which this Court dismissed along with several of Plaintiff's facial challenges.  *See Newman v. Moore*, --- F. Supp. 3d ---, 2024 WL 551836, at *1 (D.D.C. Feb. 12, 2024).  The remaining counts (Counts V, part of VII, VIII–IX) are facial challenges to the Judicial Conduct and Disability Act of 1980.  *See id.* at *11–18.  None of Judge Newman's factual allegations are material to these remaining challenges, and Defendants therefore object to their continued inclusion in the complaint.  *See* Fed. R. Civ. P. 12(f) (allowing the Court to strike any "immaterial" matters "on its own").  Nonetheless, for the sake of completeness, Defendants respond to Plaintiff's allegations.  Defendants generally deny all allegations, except as specifically provided below.  *See* Fed. R. Civ. P. 8(b)(3).

   1.  Denied.

   2.  Admitted.

   3.  Admitted.

JA183

4.     Defendants deny that Chief Judge Moore is the chair of either the Federal Circuit's Judicial Council or the Special Committee, but admit that Chief Judge Moore presides over meetings of the Judicial Council, *see* 28 U.S.C. § 332(a)(1).  Defendants further deny that Chief Judge Moore "initiated"—rather than "identified"—a complaint under Rule 5.  The allegations of this paragraph are otherwise admitted.

5.     Admitted.

6.     Admitted.

7.     The allegations of this paragraph are denied, except to admit that the Judicial Council of the Federal Circuit generally consists of all active-duty judges of the U.S. Court of Appeals for the Federal Circuit; is responsible for, *inter alia*, receiving and reviewing reports by Special Committees charged with investigating complaints of judicial misconduct and/or disability filed under the Judicial Conduct and Disability Act of 1980; and some of its authorities and processes are described in 28 U.S.C. §§ 332 and 352–54 and Rules 18–20 of the Rules for Judicial Conduct and Judicial Disability Proceedings.

8.     The allegations of this paragraph are denied, except to admit that the Judicial Council generally consists of active judges of the Federal Circuit, and that judges who are the subject of an investigation under the Judicial Conduct and Disability Act are not permitted to serve upon a judicial council.  *See* 28 U.S.C. § 359(a).

9.     Admitted.

10.     Admitted.

11.     Defendants deny "[s]ince 1984, Judge Newman has continued to faithfully, diligently, and meticulously exercise the duties of her office, to recognition and acclaim.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and therefore deny.

12.     Defendants admit that Judge Newman has authored majority and dissenting opinions, voted on petitions for rehearing *en banc*, and joined in *en banc* decisions of the Court.  The allegations of this paragraph are otherwise denied.

13.     Defendants admit that Judge Newman is an active-status Circuit Judge who has authored hundreds of opinions, which included majority, concurring, and dissenting opinions.  The allegations of this paragraph are otherwise denied.

14.     Denied.

15.     Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations and therefore deny.

16.     Denied.

17.     Defendants admit that Chief Judge Moore met with Judge Newman around early Mach 2023.  The allegations of this paragraph are otherwise denied.

18.     Admitted.

19.     Defendants admit the March 24, 2023 Order was docketed on March 24, 2023. The allegations of this paragraph are otherwise denied.

20.     Defendants admit that the March 24, 2023 Order states "[i]n the summer of 2021, Judge Newman, at the age of 94, was hospitalized after suffering a heart attack and having to undergo coronary stent surgery" and that between June 2021 and September 2021 Judge Newman sat on ten panels.  Defendants lack knowledge or information sufficient to form a belief about the truth of the fourth sentence and therefore deny.  The allegations of this paragraph are otherwise denied.

21.     Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation and therefore deny.

22.     Defendants admit that Judge Newman sat on ten panels from June 2021 to September 2021.  The allegations of this paragraph are otherwise denied.

23.     Defendants admit upon the issuance of the March 24, 2023 Order, Chief Judge Moore appointed a Special Committee consisting of herself, Circuit Judge Sharon Prost, and Circuit Judge Richard G. Taranto.  The allegations of this paragraph are otherwise denied.

24.     The allegations of this paragraph are denied, except to admit that Chief Judge Moore sent Judge Newman an email on April 5, 2023, copying all active circuit judges.

25.     Defendants admit that Judge Newman has not been assigned to sit on any panels of the Court, starting with the April 2023 sitting, and that she has repeatedly requested to be assigned.  The allegations of this paragraph are otherwise denied.

26.     Defendants admit Chief Judge Moore issued an order on April 6, 2023.  The allegations of this paragraph are otherwise denied.

27.     Defendants admit the April 7, 2023 Order ordered Judge Newman to "undergo a neurological and complete neuro-psychological battery of tests to determine whether she suffers from a disability, and if so, its nature and extent."  Ex. C at 1.  Defendants admit the April 7, 2023 Order identified a qualified neurologist and neuropsychologist to perform the testing.  *Id.* at 2.  Defendants admit that the April 7, 2023 Order states "[b]ased on its investigation and direct observations of Judge Newman's behavior, the Committee has determined that there is a reasonable basis to conclude she might suffer from a disability that interferes with her ability to perform the responsibilities of her office."  *Id.* at 1.  Defendants admit the April 7, 2023 order provided Judge Newman three days (or the option of demonstrating good cause for failure to comply with this deadline) in which to indicate whether she would make herself available for the tests to be conducted at a later date.  *Id.* at 2.  The allegations of this paragraph are otherwise denied.

28.     Defendants admit Chief Judge Moore issued an order on April 13, 2023. The allegations of this paragraph are otherwise denied.

29.     Defendants admit that the Special Committee issued an order on April 17, 2023.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation that "the events this order alleged (*i.e.*, 'heart attack' and 'coronary stents') never transpired" and therefore deny.  The allegations of this paragraph are otherwise denied.

30.     Denied.

31.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation Judge Newman's law clerk made an earlier request to Judge Newman

4

to seek alternative employment and therefore deny.  The allegations of this paragraph are otherwise denied.

32.     Defendants admit that Chief Judge Moore issued an order on April 20, 2023. The allegations of this paragraph are otherwise denied.

33.     Defendants admit that on April 21, 2023 Mark Chenoweth sent a letter to Chief Judge Moore and copied Judges Prost and Taranto requesting immediate restoration of Judge Newman to the regular rotation on the Court's calendar and that the Chief Judge or the Special Committee request the Chief Justice of the United States transfer the investigation to a different judicial council.  The allegations of this paragraph are otherwise denied.

34.     Denied.

35.     Defendants admit the April 21, 2023 letter sent to Chief Judge Moore and copying Judges Prost and Taranto contains the quoted language.  The allegations of this paragraph are otherwise denied.

36.     Defendants admit a redacted form of the March 24, 2023 Order and the April 13, 2023 Order were published on the Federal Circuit's website.  The allegations of this paragraph are otherwise denied.

37.     Defendants admit on May 3, 2023 the Special Committee issued two orders. The allegations of this paragraph are otherwise denied.

38.     Defendants admit that the Special Committee issued an order on May 3, 2023 that ordered Judge Newman to undergo evaluation and testing by identified medical professionals.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation that certain medical records "do not exist" or that certain events "have never occurred" and therefore deny.  The allegations of this paragraph are otherwise denied.

39.     Defendants admit the Special Committee's May 3, 2023 Order and the Judicial Council's May 3, 2023 Order denied without prejudice Judge Newman's request for the Chief Judge and/or the Judicial Council to request that the Chief Justice transfer the proceeding. The allegations of this paragraph are otherwise denied.

JA187

40.     Defendants admit Federal Rule of Appellate Procedure 27(a)(3)(A) provides a response to a motion "must be filed within 10 days after service of the motion unless the court shortens or extends the time."  Defendants admit Federal Rules of Civil Procedure 6(c) provides a written motion and notice of hearing must be served at least 14 days before the time specified for hearing absent certain exceptions.  The allegations of this paragraph are otherwise denied.

41.     Denied,

42.     Defendants lack knowledge or information sufficient to form a belief about the propositions to which Judge Newman does or does not object and therefore deny.  The allegations of this paragraph are otherwise denied.

43.     Defendants lack knowledge or information sufficient to form a belief about the truth of Judge Newman's intent and therefore deny.  The allegations of this paragraph are otherwise denied.

44.     Defendants admit the May 9, 2023 letter objected to the May 3, 2023 Order on alleged First Amendment grounds and requested "disclosure of materials as authorized by Rule 23(a)(7)."  Ex. R at 3.  Defendants admit that in the May 9, 2023 letter Judge Newman declined to provide the requested medical records and the letter stated "[t]he special committee has not explained why it believes that these records are relevant to its investigatory and deliberative processes.  Given the medical data, it is unlikely to be able to do so."  *Id.* at 4.  Defendants admit the May 9, 2023 letter renewed the request for a transfer and Judge Newman's demand to be immediately restored to the case assignment calendar.  *Id.* at 6.  The allegations of this paragraph are otherwise denied.

45.     Defendants deny Plaintiff's characterization of the May 3, 2023 Order as a "prior gag order."  The allegations of this paragraph are otherwise admitted.

46.     Defendants deny Plaintiff's characterization of the Special Committee as having "[n]evertheless" issued certain instructions to Judge Newman and her counsel.  The allegations of this paragraph are otherwise admitted.

**JA188**

47.     Defendants admit the May 16, 2023 Order ordered Judge Newman to undergo the identified evaluation and testing and participate in a video-taped interview.  Defendants admit in the May 16, 2023 order the Special Committee denied Judge Newman's request for the Chief Judge and/or the Judicial Council to request that the Chief Justice transfer the proceeding.  Defendants admit page 26 of the Special Committee's May 16, 2023 Order does not mention Judge Newman's due process objection to the Judicial Council's action.  The allegations of this paragraph are otherwise denied.

48.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and therefore deny.

49.     Admitted.

50.     Defendants admit on May 20, 2023 Judge Newman made a written request for an extension of time to respond to the May 16, 2023 Orders until June 8, 2023, stating that one of her counsel, Gregory Dolin, was in Israel to attend a traditional Jewish baby-naming ceremony, there is a time difference between Israel and Washington, D.C., and Mr. Dolin had "an immovable deadline of May 31, 2023 to submit grades for over 100 students."  Ex. S.  Defendants admit on May 22, 2023 the Special Committee granted a partial extension. Ex. L at 4.  The allegations of this paragraph are otherwise denied.

51.     Defendants admit the quote appears in the cited May 25, 2023 letter.  The allegations of this paragraph are otherwise denied.

52.     Admitted.

53.     Defendants admit the June 1, 2023 Order narrowed the focus of the Special Committee's further investigation "in light of the practical constraints that Judge Newman's refusal to cooperate places on the Committee's ability to proceed."  Ex. N at 2.  Defendants admit the June 1, 2023 Order states "the Committee's investigation will focus on the question of whether Judge Newman's refusal to cooperate with the Committee's investigation constitutes misconduct."  *Id.* at 3.  Defendants admit the June 1, 2023 Order permitted Judge Newman to "submit a brief limited to addressing the question whether Judge Newman's refusal

JA189

to undergo examinations, to provide medical records, and to sit for an interview with the Committee as described in the May 16, Order constitute misconduct and the appropriate remedy if the Committee were to make a finding of misconduct." *Id.* at 6. Defendants admit the June 1, 2023 Order scheduled oral argument on the matter for July 13, 2023. *Id.* The allegations of this paragraph are otherwise denied.

54.    Defendants admit the Judicial Council issued an order on June 5, 2023. The allegations of this paragraph are otherwise denied.

55.    Denied.

56.    Denied.

57.    Denied.

58.    Defendants admit that the June 5 Order discusses the Judicial Council's March 8 decision to suspend Judge Newman from hearing cases, and that Judge Newman was not invited to participate in the March 8 Judicial Council meeting. Defendants deny the existence of meeting minutes for the March 8, 2023 meeting of the Judicial Council, and the allegation that "[t]here are several problems with this new claim." The allegations of this paragraph are otherwise denied.

59.    Defendants deny the existence of meeting minutes for the March 8, 2023 meeting of the Judicial Council. The allegations of this paragraph are otherwise admitted.

60.    Denied.

61.    Admitted.

62.    Admitted.

63.    Defendants admit that *Military-Veterans Advocacy, Inc. v. Sec'y of Veterans Affairs*, No. 20-1537, had been pending for more than one year. Defendants admit that in that case the court requested additional briefing on the impact of Sergeant First Class Heath Robinson Honoring Our Promises to Address Comprehensive Toxics (PACT) Act of 2022 on the case and supplemental briefs were filed on September 14, 2022. Defendants admit the opinion in

JA190

that case was issued on March 22, 2023.  The allegations of this paragraph are otherwise denied.

64.     Defendants admit that *SAS Inst. v. World Programming Ltd.*, No. 21-1542, had been pending for more than a year.  The allegations of this paragraph are otherwise denied.

65.     Denied.

66.     Denied.

67.     Defendants admit the June 5, 2023 Order states the "Judicial Council concludes upon *de novo* consideration that Judge Newman is not expeditiously carrying out the work of the Court, that assigning her new cases will only further interfere with expeditious execution of the work of the Court, and that an order precluding Judge Newman from new case assignments is warranted."  Ex. O at 4.  The allegations of this paragraph are otherwise denied.

68.     Defendants admit that Judge Newman did not vote on the June 5 Order.  *See* 28 U.S.C. § 359(a).  The allegations of this paragraph are otherwise denied.

69.     Defendants admit that the June 5, 2023 Order states "[t]his action is warranted under the Council's statutory authority . . . 28 U.S.C. § 332(d)(1)."  Ex. O. at 4–5.  Defendants admit the June 5, 2023 Order states "[t]his is not a censure but rather a decision made for the effective and expeditious administration of the business of the court."  Ex. O. at 5.  The allegations of this paragraph are otherwise denied.

70.     Denied.

71.     Admitted.

72.     Defendants admit on "March 22, 2023, Judge Newman issued an eighteen-page opinion for the Court in *Military-Veterans Advocacy Inc. v. Sec'y of Veterans Affairs*, 63 F.4th 935 (Fed. Cir. 2023). On March 6, 2023, Judge Newman delivered a seven-page dissenting opinion in *May v. McDonough*, 61 F.4th 963 (Fed. Cir. 2023). On March 31, 2023, Judge Newman filed a four-page dissenting opinion from the Court's opinion in *Roku Inc. v. Univ. Elecs., Inc.*, 63 F.4th 1319 (Fed. Cir. 2023), and on April 6, 2023, Judge Newman filed a fifteen-page

dissenting opinion in *SAS Inst. v. World Programming Ltd.*, 64 F.4th 1319 (Fed. Cir. 2023). Finally, on June 6, 2023, June [sic] Newman filed a twelve-page dissenting opinion in *Dep't of Transport. v. Eagle Peak Rock & Paving, Inc.*, [69 F.4th 1367] (Fed. Cir. 2023)." The allegations of this paragraph are otherwise denied.

73. Defendants admit Judge Newman joined the *en banc* portion of *Moore v. United States*, 66 F.4th 991 (Fed. Cir. 2023) and she participated in the poll to take up the matter *en banc*. The allegations of this paragraph are otherwise denied.

74. Defendants admit the first quote in this paragraph appears in Kimberly A. Moore, *Anniversaries and Observations*, 50 AIPLA Q. J. 521, 524-25 (2022), which was published in 2022. The allegations of this paragraph are otherwise denied.

75. Denied.

76. Denied.

77. Denied.

78. Denied.

79. Denied.

80. The Court dismissed Count I of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required. *See Newman*, 2024 WL 551836, at *18.

81. The Court dismissed Count I of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required. *See Newman*, 2024 WL 551836, at *18.

82. The Court dismissed Count I of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required. *See Newman*, 2024 WL 551836, at *18.

83. The Court dismissed Count I of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required. *See Newman*, 2024 WL 551836, at *18.

84. The Court dismissed Count I of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required. *See Newman*, 2024 WL 551836, at *18.

85. The Court dismissed Count II of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required. *See Newman*, 2024 WL 551836, at *18.

86.     The Court dismissed Count II of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

87.     The Court dismissed Count II of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

88.     The Court dismissed Count II of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

89.     The Court dismissed Count II of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

90.     The Court dismissed Count III of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

91.     The Court dismissed Count III of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

92.     The Court dismissed Count III of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

93.     The Court dismissed Count III of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

94.     The Court dismissed Count III of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

95.     The Court dismissed Count IV of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

96.     The Court dismissed Count IV of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

97.     The Court dismissed Count IV of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

98.     The Court dismissed Count IV of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

JA193

99.     The Court dismissed Count IV of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

100.    This paragraph contains Plaintiff's repetition and incorporation of preceding paragraphs, to which no response is required.  Defendants further restate their objection that none of Plaintiff's preceding factual allegations are material to the remaining facial challenges to the Judicial Conduct and Disability Act, including this Count.  To the extent that a response is deemed required, Defendants' responses to those previous paragraphs are incorporated herein by reference.

101.    Denied.

102.    Denied.

103.    Denied.

104.    Denied.

105.    Denied.

106.    The Court dismissed Count VI of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

107.    The Court dismissed Count VI of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

108.    The Court dismissed Count VI of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

109.    The Court dismissed Count VI of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

110.    The Court dismissed Count VI of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

111.    This paragraph contains Plaintiff's repetition and incorporation of preceding paragraphs, to which no response is required.  Defendants further restate their objection that none of Plaintiff's preceding factual allegations are material to the remaining facial challenges

to the Judicial Conduct and Disability Act, including this Count.  To the extent that a response is deemed required, Defendants' responses to those previous paragraphs are incorporated herein by reference.

112.   The Court dismissed in part Count VII of Plaintiff's Amended Complaint, including part of this allegation, and no response to that part is therefore required.  *See Newman*, 2024 WL 551836, at *18.  The remaining allegations of this paragraph are denied.

113.   Denied.

114.   Denied.

115.   This paragraph contains Plaintiff's repetition and incorporation of preceding paragraphs, to which no response is required.  Defendants further restate their objection that none of Plaintiff's preceding factual allegations are material to the remaining facial challenges to the Judicial Conduct and Disability Act, including this Count.  To the extent that a response is deemed required, Defendants' responses to those previous paragraphs are incorporated herein by reference.

116.   Admitted insofar as Plaintiff generally possesses Fourth Amendment rights.

117.   Denied.

118.   Denied.

119.   Denied.

120.   Denied.

121.   This paragraph contains Plaintiff's repetition and incorporation of preceding paragraphs, to which no response is required.  Defendants further restate their objection that none of Plaintiff's preceding factual allegations are material to the remaining facial challenges to the Judicial Conduct and Disability Act, including this Count.  To the extent that a response is deemed required, Defendants' responses to those previous paragraphs are incorporated herein by reference.

122.   Admitted insofar as Plaintiff generally possesses Fourth Amendment rights.

123.   Denied.

JA195

124.   Denied.

125.   Denied.

126.   Denied.

127.   The Court dismissed Count X of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

128.   The Court dismissed Count X of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

129.   The Court dismissed Count X of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

130.   The Court dismissed Count X of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

131.   The Court dismissed Count XI of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

132.   The Court dismissed Count XI of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

133.   The Court dismissed Count XI of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

134.   The Court dismissed Count XI of Plaintiff's Amended Complaint, including this allegation, and no response is therefore required.  *See Newman*, 2024 WL 551836, at *18.

The remaining allegations following the numbered paragraphs constitute Plaintiff's requests for relief and jury demand, to which no response is required.  To the extent a response is deemed required, Defendants deny that Plaintiff is entitled to the requested relief or any other relief and deny that there are any issues triable to a jury.

The section headings used in Plaintiff's complaint are Plaintiff's characterizations of her allegations and claims to which no response is required, but to the extent a response is deemed required, those headings are denied.

DATED:  March 8, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

/s/ *Stephen Ehrlich*
STEPHEN EHRLICH
M. ANDREW ZEE
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
Peter W. Rodino, Jr. Federal Building
970 Broad Street, 7th Floor
Newark, NJ 07102
Phone: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Attorneys for Defendants*

**JA197**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HON. PAULINE NEWMAN, <br><br> Plaintiff, <br><br> v. <br><br> HON. KIMBERLY A. MOORE, *et al.*, <br><br> Defendants. | Case No. 1:23-cv-01334-CRC |

**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

Under Federal Rule of Civil Procedure 12(c), Defendants[1] hereby move for judgment on the pleadings on all remaining claims of Plaintiff's First Amended Complaint: Count V (Am. Compl. ¶¶ 100–105, ECF No. 10), Count VII (*id.* ¶¶ 111–14), Count VIII (*id.* ¶¶ 115–20), and Count IX (*id.* ¶¶ 121–26).  A proposed order is attached.

---

[1] The Honorable Kimberly A. Moore, sued solely in her official capacities as Chief Judge of the U.S. Court of Appeals for the Federal Circuit, Chair of the Judicial Council of the Federal Circuit, and Chair of the Special Committee of the Federal Circuit; the Honorable Sharon Prost, sued solely in her official capacity as a Member of the Special Committee of the Federal Circuit; the Honorable Richard G. Taranto, sued solely in his official capacity as a Member of the Special Committee of the Federal Circuit; and the Judicial Council of the Federal Circuit.

JA198

DATED:  March 8, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Director, Federal Programs Branch

/s/  *Stephen Ehrlich*
STEPHEN EHRLICH
M. ANDREW ZEE
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
Peter W. Rodino, Jr. Federal Building
970 Broad Street, 7th Floor
Newark, NJ 07102
Phone:  (202) 305-9803
Email:   stephen.ehrlich@usdoj.gov

*Attorneys for Defendants*

JA199

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HON. PAULINE NEWMAN**, | |
| Plaintiff, | |
| v. | Case No. 23-cv-01334 (CRC) |
| **HON. KIMBERLY A. MOORE**, *et al.*, | |
| Defendants. | |

## <u>ORDER</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that [ECF No. 45] Defendants' Motion for Judgment on the Pleadings is

GRANTED.  It is further

**ORDERED** that this case is dismissed.

This is a final appealable Order.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>July 9, 2024</u>

**JA200**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**HON. PAULINE NEWMAN**,

             Plaintiff,

             v.

**HON. KIMBERLY A. MOORE**, *et al.*,

             Defendants.

Case No. 23-cv-01334 (CRC)

---

**MEMORANDUM OPINION**

In 2021, the Chief Judge of the U.S. Court of Appeals for the Federal Circuit, Kimberly

A. Moore, received reports from court staff that raised concerns about whether veteran Federal

Circuit Judge Pauline Newman remained fit to carry out her judicial duties.  The reports

prompted Chief Judge Moore to exercise her authority under the Judicial Conduct & Disability

("JC&D") Act to convene a special committee of the court's judges to conduct an investigation.

See 28 U.S.C. §§ 353(a), (c).  Judge Newman declined to cooperate with the investigation,

however, objecting especially to the committee's requests that she undergo independent

neurological testing and provide it relevant medical records.  In the face of Judge Newman's

recalcitrance, the Federal Circuit Judicial Council, on the recommendation of the special

committee, suspended her from receiving new case assignments until she acquiesced to the

special committee's demands.

Fighting fire with fire, Judge Newman brought this lawsuit against Chief Judge Moore,

the two other members of the special committee, and the Federal Circuit Judicial Council, which

is comprised of every member of the court (collectively, "Defendants").  Her eleven-count

complaint raised both facial and as-applied challenges to provisions of the JC&D Act, as well as

**JA201**

to 28 U.S.C. § 332, which governs the authority of circuit judicial councils.  Following an unsuccessful Court-ordered mediation, the Court denied Judge Newman's request for a preliminary injunction and granted Defendants' motion to dismiss most counts of the complaint. The Court determined that it lacked jurisdiction over Judge Newman's as-applied claims and that two of her facial challenges failed to state a claim.  Defendants now move for judgment on the pleadings as to the remaining facial challenges, which allege that certain provisions of the JC&D Act violate the Fourth Amendment and are unconstitutionally vague.  Because Judge Newman cannot prevail on these counts either, the Court will grant judgment for Defendants and dismiss the case.

## I.   Background

The Court has already detailed the background of this case, including the relevant statutory frameworks.  See Newman v. Moore, No. 23-cv-01334 (CRC), 2024 WL 551836, at *2–5 (D.D.C. Feb. 12, 2024).  It need not replow the same ground here.  After dismissing most of the counts in Judge Newman's complaint, the Court directed Defendants to answer the remaining counts: Counts Eight and Nine, which present facial challenges to the JC&D Act under the Fourth Amendment, and Counts Five and Seven, which allege that provisions of the Act are unconstitutionally vague.  Defendants did so and simultaneously moved under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings.  Judge Newman opposed, and the motion is fully briefed and ripe for review.

## II.   Legal Standards

### A.  Motion for Judgment on the Pleadings

Parties may move for judgment on the pleadings after the pleadings are closed but early enough so as not to delay trial.  Fed. R. Civ. P. 12(c).  Movants are entitled to judgment on the

2

JA202

pleadings under Rule 12(c) if they "demonstrate[] that no material fact is in dispute and that [they are] entitled to judgment as a matter of law." Schuler v. PricewaterhouseCoopers, LLP, 514 F.3d 1365, 1370 (D.C. Cir. 2008) (quoting Peters v. Nat'l R.R. Passenger Corp., 966 F.2d 1483, 1485 (D.C. Cir. 1992)).  Though there are some differences between a Rule 12(b) and Rule 12(c) motion, "[t]he appropriate standard for reviewing a motion for judgment on the pleadings is virtually identical to that applied to a motion to dismiss under Rule 12(b)(6)." Maniaci v. Georgetown Univ., 510 F. Supp. 2d 50, 58 (D.D.C. 2007); see also Tapp v. Washington Metro. Area Transit Auth., 306 F. Supp. 3d 383, 391–92 (D.D.C. 2016) (noting that the "focus of a motion to dismiss lies with the plaintiff's inability to proceed on his claim," while "a motion for judgment on the pleadings centers upon the substantive merits of the parties' dispute").  "When evaluating a motion for judgment on the pleadings, the [C]ourt may rely on the pleadings, the exhibits to the pleadings, and any judicially noticeable facts . . . ." Jimenez v. McAleenan, 395 F. Supp. 3d 22, 30 (D.D.C. 2019) (cleaned up) (alteration in original).  And while the Court must construe the factual allegations in the light most favorable to the non-moving party, it is not bound by that party's legal conclusions.  See Sissel v. U.S. Dep't of Health & Human Servs., 760 F.3d 1, 4 (D.C. Cir. 2014).

## III.  Analysis

Defendants have moved for judgment as to Counts Five, Seven (in part), Eight, and Nine. Again, Counts Eight and Nine allege that the JC&D Act facially violates the Fourth Amendment of the Constitution, and the other two counts allege that provisions of the Act are unconstitutionally vague.  The Court will start with the Fourth Amendment claims before tackling the vagueness challenges.

A.  Counts Eight and Nine: Unconstitutional Searches

As detailed in the Court's prior opinion, following receipt of a judicial misconduct or disability complaint, the chief judge of a circuit may convene a special committee to investigate the complaint.  See Newman, 2024 WL 551836, at *2; see also 28 U.S.C. §§ 353(a), (c).  Here, Chief Judge Moore appointed a special committee to investigate such a complaint against Judge Newman.  Id. at *4.  Under the JC&D Act's "investigation" provision, the special committee was authorized to "conduct an investigation as extensive as it consider[ed] necessary."  28 U.S.C. § 353(c).  Counts Eight and Nine attempt to mount facial attacks to this provision.  Specifically, they allege that § 353(c) "violates the Fourth Amendment to the extent it authorizes a compelled medical or psychiatric examination of an Article III judge" (Count Eight) or "a compelled surrender of medical records belonging to an Article III judge" (Count Nine) "without a warrant based on probable cause."  FAC ¶¶ 118, 124.

To prevail on a facial attack, Judge Newman must show that § 353(c) "is unconstitutional in all of its applications."  Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008).  Although such a challenge is "the most difficult . . . to mount successfully," in "assessing whether a statute meets this standard," a court must consider "only applications of the statute in which it actually authorizes or prohibits conduct."  City of Los Angeles, Calif. v. Patel, 576 U.S. 409, 415, 418 (2015) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).

The relevant question therefore is:  Does section 353(c) authorize special committees to engage in conduct that does not run afoul of the Fourth Amendment?  It does.  In "conduct[ing] an investigation as extensive as it considers necessary," a special committee is authorized to undertake action that falls outside the Fourth Amendment.  28 U.S.C. § 353(c).  For example, under the aegis of § 353(c), a special committee could interview court employees, request and

receive third-party witness statements, or collect relevant communications from the court's email server, none of which necessarily constitutes a search or seizure.  See Florida v. Bostick, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions . . . . [s]o long as a reasonable person would feel free to disregard the police and go about his business." (cleaned up)); United States v. Miller, 425 U.S. 435, 443 (1976) ("[T]he Fourth Amendment does not prohibit the obtaining of information . . . conveyed by [a third party] to Government authorities . . . ."); United States v. Simons, 206 F.3d 392, 395–96, 398 (4th Cir. 2000) (government employee lacked a reasonable expectation of privacy in the "record or fruits of his [i]nternet use" in light of agency's policy that it would monitor employees' internet use and that internet was for official government business only).

Judge Newman concedes that some of § 353(c)'s "investigative tools" "do not implicate the Fourth Amendment."  Pl.'s Opp'n at 7 n.5.  She nonetheless maintains that the use of these tools does not defeat her facial claim for two other reasons.  First, she argues that § 353(c) does "no work" and "is therefore irrelevant" in the context of interviewing a court employee because "the Chief Judge can always interview the Court's employees even in the absence of any complaint against any other judge."  Id.  But a *special committee* has no power to interview an employee in the absence of § 353(c)'s grant of authority.  Indeed, a special committee exists only once a complaint is initiated against a judge, see 28 U.S.C. § 353(a)(1) (permitting the chief judge to appoint a special committee), and its authority to investigate is wholly derived from § 353(c).  Thus, a special committee's power to interview a court employee is an "application[] of the statute in which [the statute] actually authorizes . . . conduct."  Patel, 576 U.S. at 418 (cleaned up).

JA205

Second, Judge Newman contends that Patel's standard for facial challenges limits the inquiry only to "investigative conduct" that "implicate[s] the Fourth Amendment"—as opposed to all conduct authorized by the statute. Pl.'s Opp'n at 7 n.5. But that approach reads Patel too broadly. In Patel, a group of hotel proprietors challenged a provision of the Los Angeles Municipal Code that compelled "[e]very operator of a hotel to keep a record" of certain information about guests and to make this record "available to any officer of the Los Angeles Police Department for inspection" on demand. 576 U.S. at 412 (alteration in original) (quoting Los Angeles Municipal Code §§ 41.49(2), (3)(a), (4) (2015)). In upholding the plaintiffs' facial challenge, the Supreme Court did not question that the only conduct authorized by this provision constituted a search within the meaning of the Fourth Amendment.[1] The Supreme Court thus characterized the statute as one "authorizing warrantless searches," and explained that, "when addressing a facial challenge to [such] a statute," "the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant"—for example, when "exigency or a warrant justifies an officer's search." Id. at 418. But because § 353(c) authorizes conduct that, as Judge Newman admits, does not implicate the Fourth Amendment, this case presents a different kind of statute. And nothing in Patel suggests that the Court must

---

[1] Before Patel reached the Supreme Court, the parties disputed—and the lower courts considered—"whether a police officer's non-consensual inspection of hotel guest records under [the provision] constitute[d] a Fourth Amendment 'search.'" Patel v. City of Los Angeles, 738 F.3d 1058, 1061 (9th Cir. 2013) (en banc), aff'd sub nom. City of Los Angeles, Calif. v. Patel, 576 U.S. 409 (2015). The Ninth Circuit sitting en banc found that such an inspection did implicate the Fourth Amendment. Id. And, only after having made that determination, the circuit concluded that the searches authorized by the provision were unreasonable and—as the final hurdle for a facial challenge—were unreasonable in "all" instances. Id. at 1064–65 ("Because [the] procedural deficiency affects the validity of all searches authorized by § 41.49(3)(a), there are no circumstances in which the record-inspection provision may be constitutionally applied."). But as this order of analysis suggests, the first step in the inquiry is to determine whether all the conduct authorized by the law is a search or seizure—not whether the searches or seizures authorized by the law are constitutional.

narrow its analysis of a facial challenge to conduct that falls within the Fourth Amendment's ambit when the statute also authorizes conduct beyond the amendment's reach.

The D.C. Circuit confirmed as much in <u>Brennan v. Dickson</u>, which challenged a Federal Aviation Administration ("FAA") rule regulating drones.  45 F.4th 48 (D.C. Cir. 2022).  The FAA promulgated a "Remote Identification" rule that required "drones in flight to emit publicly readable radio signals reflecting certain identifying information."  <u>Id.</u> at 53.  The circuit rejected a facial Fourth Amendment challenge to the rule because it found the rule "generally" did not implicate privacy rights.  <u>Id.</u> at 61 ("Brennan's facial Fourth Amendment challenge fails because drone pilots generally lack any reasonable expectation of privacy in the location of their drone systems during flight.").  And though the court noted that future applications of the rule might "violate a pilot's constitutionally cognizable privacy interest," the plaintiff's facial challenge failed because he had "not shown that [] data collection offends the Fourth Amendment *in every application of the Rule* to the typically very public activity of drone piloting."  <u>Id.</u> at 64 (emphasis added).  The same is true for § 353(c).  Though some investigative conduct might trigger Fourth Amendment concerns, and even constitute violations of an individual's privacy rights, Judge Newman has not shown that every application of the provision offends the Fourth Amendment.  Her facial challenges in Counts Eight and Nine therefore fail.

B.  <u>Counts Five and Seven: Vagueness</u>

Counts Five and Seven meet the same fate.  In these counts, Judge Newman contends that two sections of the JC&D Act are unconstitutionally vague and violate the Due Process Clause of the Fifth Amendment.  Count Five challenges § 351(a), which provides that someone may initiate a JC&D complaint against a judge who "is unable to discharge all the duties of office by reason of mental or physical disability."  28 U.S.C. § 351(a).  Judge Newman alleges that this

**JA207**

provision "fails to provide adequate notice of what constitutes a mental disability that renders a judge 'unable to discharge all the duties of office.'" FAC ¶ 103 (citing 28 U.S.C. § 351(a)). And in Count Seven, she claims that § 353(c)—the investigation provision also challenged in Counts Eight and Nine—"lacks minimal enforcement guidelines." Id. ¶ 112 (citing 28 U.S.C. § 353(c)).[2] The Court will take up these two challenges in turn.

### 1. Count Five

"A vague law denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions." Hastings v. Jud. Conf. of U.S., 829 F.2d 91, 105 (D.C. Cir. 1987). Statutes are not impermissibly vague, however, merely because they "require[] a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask." United States v. Bronstein, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (cleaned up). "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning 'specifie[s]' 'no standard of conduct . . . at all.'" Id. (quoting Coates v. Cincinnati, 402 U.S. 611, 614 (1971)); see also Fed. Express Corp. v. United States Dep't of Com., 39 F.4th 756, 773 (D.C. Cir. 2022) ("The Due Process Clause's fair notice requirement generally requires only that the government make the requirements of the law public and afford the citizenry a reasonable

---

[2] A reminder on how the Court reads Count Seven. As described in the Court's previous opinion, the count makes three allegations: (1) the JC&D Act is "unconstitutionally vague to the extent it purports to authorize compelled medical or psychiatric examinations . . . or demands for . . . Article III judges to surrender their private medical records," (2) § 353(c), "which authorizes a Special Committee to conduct an investigation 'as extensive as it considers necessary' lacks minimal enforcement guidelines," and (3) the act "vests virtually complete discretion in the hands of a Special Committee." FAC ¶ 112; see also Newman, 2024 WL 551836, at *16 n.13. The Court has already dismissed the third allegation. See id. at *17–18. And the first allegation collapses into the second as the provision purportedly authorizing the Special Committee to compel medical examinations and the production of records is § 353(c).

opportunity to familiarize itself with its terms and to comply." (cleaned up)).  As the Supreme

Court has cautioned, the vagueness doctrine "is not a principle designed to convert into a

constitutional dilemma the practical difficulties in drawing [] statutes both general enough to

take into account a variety of human conduct and sufficiently specific to provide fair warning

that certain kinds of conduct are prohibited."  Colten v. Kentucky, 407 U.S. 104, 110 (1972).

Given the text, legislative history, and implementing rules of the JC&D Act, section

351(a) is not unconstitutionally vague.  First, the text.  Section 351(a) provides that someone

may initiate a JC&D complaint against a judge who "is unable to discharge all the duties of

office by reason of mental or physical disability."  28 U.S.C. § 351(a); see also id. § 354(2)(A)

(providing that judicial councils may impose penalties based on valid complaints).  The statute's

standard of conduct is thus defined in reference to the "duties of [judicial] office."  And judges,

the only individuals against whom § 351(a) can be enforced, are well aware of their duties.

Indeed, before taking office, all judges must swear an oath to "faithfully and impartially

discharge and perform all the duties incumbent upon" them.  28 U.S.C. § 453.  Because the

provision is pegged to "knowable criteria," it is not impermissibly vague.  United States v.

Ragen, 314 U.S. 513, 523 (1942) (cleaned up); see also Milavetz, Gallop & Milavetz, P.A. v.

United States, 559 U.S. 229, 247–48 (2010) (rejecting a vagueness challenge to a Bankruptcy

Code provision because the individuals against whom the provision would be enforced—

"[a]ttorneys and other professionals who give debtors bankruptcy advice"—"must know" of

other provisions in the Code that impose similar standards).

The legislative history of the JC&D Act provides further color to § 351(a)'s standard.

See United States v. Poindexter, 951 F.2d 369, 379 (D.C. Cir. 1991) (suggesting that clear

legislative history can render a "facially vague" provision constitutional).  As the D.C. Circuit

held in the context of an overbreadth challenge to a related provision of the JC&D Act, the "legislative history demonstrates that the Act was directed against serious judicial transgressions." Hastings, 829 F.2d at 106; see also id. at 106 n.59 ("It is worth pointing out that federal judges, the individuals to whom the Act is directed, are unusually well qualified to interpret statutes in light of their legislative history."). The Act "[wa]s not designed," by contrast, "to assist the disgruntled litigant who is unhappy with the result of a particular case." S. Rep. No. 96-362, 96th Cong., 1st Sess., 8 (1979), reprinted in 1980 U.S. Code Cong. & Ad. News 4315, 4323.[3]

Congress also supplied several reference points for interpreting § 351(a). See Arnett v. Kennedy, 416 U.S. 134, 160 (1974) (finding no vagueness issue when a statute "was not written upon a clean slate"). The Senate Report noted that § 351(a) was "a paraphrase of [the] existing statutory language" of 28 U.S.C. 372(b). S. Rep. No. 96-362, 9. Section 372(b), which was enacted in 1957, permits the president to appoint an additional judge when a sitting judge, who is eligible to retire but does not do so, becomes "unable to discharge efficiently" her duties "by reason of permanent mental or physical disability." 28 U.S.C. § 372(b); see also P.L. 85-261, September 2, 1957, 71 Stat. 586. The Senate Report further counseled that the JC&D Act's standards should be informed by the Code of Judicial Conduct and the Canons of Judicial Ethics of the American Bar Association, resolutions of the Judicial Conference related to judicial

---

[3] Under the version of the statute then before the Senate Judiciary Committee, what is now § 351(a) was located at § 372(c)(1)(a) and had a slightly different formulation. Then-section 372(c)(1)(a) permitted any person to file a written complaint alleging that a "judge is or has been unable to discharge efficiently all the duties of his or her office by reason of mental or physical disability." S. Rep. No. 96-362, 8.

JA210

conduct, and acts of Congress about judicial conduct.  S. Rep. No. 96-362, 9; see also Hastings, 829 F.2d at 106 (citing same).[4]

Finally, the Rules for Judicial-Conduct and Judicial-Disability Proceedings ("JC&D Rules"), promulgated by the Judicial Conference of the United States, clarify the meaning of disability in § 351(a).  See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 504 (1982) (noting that the adoption of "administrative regulations" can "sufficiently narrow potentially vague or arbitrary interpretations" of a local ordinance).[5]  The rules list as "[e]xamples of disability" "substance abuse, the inability to stay awake during court proceedings, or impairment of cognitive abilities that renders the judge unable to function effectively."  JC&D R. 4(c).  Given these definitions, § 351(a) "provides a discernable standard."  Bronstein, 849 F.3d at 1107.

Judge Newman offers two main rebuttals.  First, she claims that the "history of enforcement of [§ 351(a)]," and in particular the proceedings against her, "illustrate[] how standardless [the provision] is."  Pl.'s Opp'n at 19.  But at most, her examples suggest that the statute is subject to multiple interpretations.  See, e.g., id. at 21 (claiming that aspects of the Federal Circuit's investigation "confirm[] the latent subjectivity at play"); id. 24 ("'[E]ffectiveness' is in the eye of the beholder.").  A subjective statute is not an unconstitutional

---

[4]  The commentary to the Code of Judicial Conduct reflects this purpose.  It notes that the code "may [] provide standards of conduct for application in proceedings under the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980."  Code of Conduct for United States Judges, Canon 1, Commentary, https://perma.cc/JW2B-99GU.

[5]  Judge Newman claims the "needed clarity" cannot come from the JC&D Act's implementing rules.  Pl.'s Opp'n at 23.  But neither of the cases she draws on for support concerns a Fifth Amendment vagueness challenge.  See Texas Educ. Agency v. United States Dep't of Educ., 992 F.3d 350, 361 (5th Cir. 2021) (state waivers of sovereign immunity); Bennett v. Kentucky Dep't of Educ., 470 U.S. 656, 666 (1985) (limits on state uses of federal funding).

JA211

one.  See Bronstein, 849 F.3d at 1107 ("[A] statutory term is not rendered unconstitutionally

vague because it do[es] not mean the same thing to all people, all the time, everywhere."

(cleaned up) (second alteration in original)).  Second, she suggests that any subjectivity in §

351(a) is impermissible because it undermines judicial independence.  See, e.g., Pl.'s Opp'n at

25 ("[B]ecause an Article III judge is not subject to 'supervision' by any of her colleagues, an

Article III judge need not meet any other judge's . . . definition of 'effectiveness.'").  But, as the

D.C. Circuit (and this Court) have held, "Article III's grant of 'judicial independence'" does not

give "judges 'absolute freedom from' discipline or sanctions that fall short of removal or salary

diminution."  Newman, 2024 WL 551836, at *18 (quoting McBryde v. Comm. to Rev. Cir.

Council Conduct & Disability Ords. of Jud. Conf. of U.S., 264 F.3d 52, 65 (D.C. Cir. 2001)).

Nor does the Constitution "exclude[] discipline of judges *by* judges."  Id. (quoting McBryde, 264

F.3d at 65).  Given these accepted limits on judicial independence, there is no reason to believe

that Article III imposes a heightened standard of clarity on statutes affecting judicial authority.

Accordingly, the Court grants Defendants' motion as to Count Five.

    *2.  Count Seven*

    Section 353(c) is not unconstitutionally vague either.  The vagueness doctrine "prevents

the government from imposing criminal and, to a lesser extent, civil penalties if the statute or

regulation specifying the prohibited conduct is not sufficiently specific to provide fair notice" or,

as Judge Newman alleges with respect to § 353(c), "fair enforcement."  Maxwell v. Rubin, 3 F.

Supp. 2d 45, 49 (D.D.C. 1998); see also Beckles v. United States, 580 U.S. 256, 265 (2017)

("[T]win concerns underly[] vagueness doctrine—providing notice and preventing arbitrary

enforcement.").  But "the vagueness doctrine applies only to laws that regulate the primary

conduct of private citizens"—*i.e.*, "laws that define crimes," "laws that fix sentences," "laws that

restrict speech," and "laws that regulate businesses."  <u>United States v. Matchett</u>, 837 F.3d 1118,

1119, 1122 (11th Cir. 2016) (en banc); <u>see also</u> <u>El-Shifa Pharm. Indus. Co. v. United States</u>, 607

F.3d 836, 856 n.4 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("If a statute regulating

private conduct provides no discernible standards and therefore insufficient notice of what

actions are prohibited, the statute might be void for vagueness under the Due Process Clause.").

The Supreme Court has found that a statute can lead to arbitrary enforcement in one of two

scenarios: "[I]f it leaves judges and jurors free to decide, without any legally fixed standards,

what is prohibited and what is not in each particular case, . . . or permits them to prescribe the

sentences or sentencing range available."  <u>Beckles</u>, 580 U.S. at 266 (cleaned up); <u>see also</u> <u>id.</u> at

262.

  The JC&D's investigation provision does not fall into either category.  It does not vest a

special committee with authority to decide what judicial conduct is or is not permissible, nor

does it allow a committee to choose the proper penalty for such conduct.  Instead, it merely sets

the outer boundaries for how a special committee may investigate once a JC&D complaint has

been initiated.  It also bears noting that § 353(c) is not unusual.  Federal prosecutors and some

federal agencies enjoy similarly broad investigative authority.  <u>See, e.g.</u>, Justice Manual 9-2.001

("The statutory duty to prosecute for all offenses against the United States (28 U.S.C. § 547)

carries with it the authority necessary to perform this duty.  The [U.S. Attorney] is invested by

statute and delegation from the Attorney General with the broadest discretion in the exercise of

such authority."); 15 U.S.C. § 78u ("The [Securities and Exchange] Commission may, in its

discretion, make such investigations as it deems necessary to determine whether any person has

violated, is violating, or is about to violate any provision of this chapter.").

JA213

Judge Newman does not address whether the vagueness doctrine applies to § 353(c) as a threshold matter.  She does offer two tangential arguments.  Neither succeeds.  First, she claims that "[b]ecause there is no defined reference point" for § 351(a)'s disability standard, "it necessarily follows that any inquiry into whether that standard has been met will itself be hopelessly vague."  Pl.'s Opp'n at 28.  As explained above, however, 351(a) has defined reference points.  Second, she repackages an argument that she made—and the Court rejected— in the last round of motions.  She claims that the "issue" with § 353(c) is that "Defendants can *compel* Judge Newman to turn over private documents and then *directly sanction* her for declining to do so."  Pl.'s Opp's at 28 (emphasis in original).  It is difficult to see how this is a vagueness challenge.  In any event, this point confuses the authority of special committees with that of circuit judicial councils.  Though a special committee can issue orders to subject judges, the JC&D Act "does not give [it] enforcement power."  Newman, 2024 WL 551836, at *17. Instead, the Act "directs special committees to present a report to the judicial council with 'recommendations for necessary and appropriate action by the judicial council.'"  Id. (quoting 28 U.S.C. § 353(c)).  The JC&D Rules also divest the special committee of enforcement power. They "allow subject judges to refuse to comply with investigations for 'good cause,'" and empower "the judicial council, [or] ultimately the Judicial Conference [of the United States]," but not the special committee, to "decide whether the judge had good cause to refuse."  Id. (quoting JC&D R. 4(a)(5)).  Finally, to the extent judicial councils (as opposed to special committees) have the power to both compel and sanction, the D.C. Circuit has found no constitutional defect in that arrangement.  See Newman, 2024 WL 551836, at *17 ("[In Hastings,] [t]he circuit held that the JC&D Act's vesting of both investigative and adjudicatory functions in the same body did not violate due process." (citing Hastings, 829 F.2d at 104–05)).

14

In sum, § 353(c) is not unconstitutionally vague, and Defendants are therefore entitled to judgment on the pleadings as to Count Seven.

## IV.  Conclusion

For these reasons, the Court will grant Defendants' motion for judgment on the pleadings and dismiss this case as to all remaining claims.  A separate Order shall accompany this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>July 9, 2024</u>

JA215

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Hon. Pauline Newman
_____
                Plaintiff

                vs.                          Civil Action No. 23-cv-01334 (CRC)
                                                            _____

Hon. Kimberly Moore, et al.
_____
                Defendant

# NOTICE OF APPEAL

Notice is hereby given this  9th    day of  July               , 20 24    , that

the Hon. Pauline Newman, Plaintiff

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from

the judgment of this Court entered on the   9th        day of  July              , 20 24

in  favor of  the Hon. Kimberly Moore, et al., Defendants

against said   Hon. Pauline Newman, Plaintiff

                                        Gregory Dolin
                        _____
                           Attorney or Pro Se Litigant

(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil
action must be filed within 30 days after the date of entry of judgment or 60 days if the United
States or officer or agency is a party)

**CLERK**      Please mail copies of the above Notice of Appeal to the following at the addresses
                indicated:

**JA216**