No. 24-5173

———————— ◆ ————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————— ◆ ————————

HON. PAULINE NEWMAN,
*Plaintiff-Appellant,*

v.

HON. KIMBERLY A. MOORE, et al.,
*Defendants-Appellees.*

———————— ◆ ————————

On Appeal from the U.S. District Court for the
District of Columbia, No. 23-cv-01334 (CRC)

———————— ◆ ————————

***AMICUS CURIAE* BRIEF OF
THE BUCKEYE INSTITUTE
IN SUPPORT OF
APPELLANT AND REVERSAL**

———————— ◆ ————————

David C. Tryon
  *Counsel of Record*
Alex M. Certo
The Buckeye Institute
88 East Broad Street
Suite 1300
Columbus, OH 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

*Attorneys for Amicus Curiae*

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Counsel for *amicus curiae* certifies the following:

## A. Parties and *Amici*

All parties, intervenors, and amici currently appearing in this Court are listed in Appellant's Opening Brief at i and on the docket.

## B. Rulings Under Review

The February 12, 2024, and July 9, 2024, Memorandum Opinions and Orders of the district court, ECF 43, 49, and 50 in *Newman v. Moore*, No. 23-cv-01334-CRC. The February 12, 2024, Opinion is reported at 717 F.Supp.3d 43 (D.D.C. 2024. The July 9, 2024, Opinion does not yet appear in the Federal Supplement, but it can be found at 2024 WL 3338858 (D.D.C. 2024). The District Court's final order dismissing the action is reproduced at Joint Appendix p. 200.

## C. Related Cases

There are no related cases pending in this or any other court. The disciplinary proceedings under the Judicial Conduct and Disability Act, 28 U.S.C. §§ 351-364 remain pending before the Judicial Council of the Federal Circuit and the Committee on Judicial Conduct and Disability of the Judicial Conference of the United States.

## CERTIFICATE PURSUANT TO CIRCUIT RULE 29(D)

Pursuant to D.C. Circuit Rule 29(d), the undersigned counsel for *amicus curiae* certifies that a separate brief is necessary to provide the unique perspective of The Buckeye Institute.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29(a)(4)(A) and 26.1 of the Federal Rules of Appellate Procedure, *amicus* states that it has no parent corporation and issues no stock, thus no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES............................................................................... i

CERTIFICATE PURSUANT TO CIRCUIT RULE 29(D) ...................... ii

CORPORATE DISCLOSURE STATEMENT ........................................ iii

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY ..........................................................................................ix

INTEREST OF *AMICUS CURIAE* ......................................................1

SUMMARY OF ARGUMENT................................................................1

ARGUMENT .........................................................................................2

   I.   Conducting judicial disciplinary proceedings in the dark undermines public confidence in our judiciary...............................2

   II.  The Judicial Conduct and Disability Act of 1980 was intended to boost public confidence in the judicial complaint process, but it falls short of that goal ...........................................................8

   III. Key to public confidence in the judiciary is the free and open public access to inherently adjudicatory procedures....................11

   IV. The Common Law and the First Amendment guarantee the right to open access to judicial proceedings...................................14

   V.  The common law and First Amendment guarantees for open proceedings should apply to administrative proceedings such as this one ......................................................................................18

   VI. Allowing the adjudicator to determine what documents can and cannot be accessed, despite the accused judge's consent, is inconsistent with the idea of open access .................................20

CONCLUSION......................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Marshall,*
212 Kan. 595 (1973) ..............................................................18

*Cowley v. Pulsifer,*
137 Mass. 392 (1884)............................................................ 3

*Dhiab v. Trump,*
852 F.3d 1087 (D.C. Cir. 2017).......................................14, 17

*Doe v. Del Rio,*
241 F.R.D. 154 (S.D.N.Y. 2006)..........................................22

*Ex parte Drawbaugh,*
2 App.D.C. 404 (1894) ...........................................................14

*Fitzgerald v. Hampton,*
467 F.2d 755 (D.C. Cir. 1972)........................................18, 19

*Gannett Co. v. DePasquale,*
443 U.S. 368 (1979) ...........................................................8, 16

*Globe Newspaper Co. v. Superior Court,*
457 U.S. 596 (1982) .............................................14, 15, 16, 21

*Hardaway v. D.C. Hous. Auth.,*
843 F.3d 973 (D.C. Cir. 2016)..............................................23

*In re Hearst Newspapers, L.L.C.,*
641 F.3d 168 (5th Cir. 2011) ................................................18

*In re Oliver,*
333 U.S. 257 (1948) ...................................................3, 14, 17

*In re Sealed Case,*
931 F.3d 92 (D.C. Cir. 2019)..............................20, 21, 22, 23

*Nixon v. Warner Commc'ns, Inc.,*
435 U.S. 589 (1978) ..............................................................14

*Press-Enter. Co. v. Superior Court,*
   478 U.S. 1 (1986) ..................................................... 14, 15, 17

*Publicker Indus., Inc. v. Cohen,*
   733 F.2d 1059 (3d Cir. 1984) .......................................... 16

*Richmond Newspapers, Inc. v. Virginia,*
   448 U.S. 555 (1980) ............................................. 2, 8, 17, 21

*Sealed Plaintiff v. Sealed Defendant,*
   537 F.3d 185 (2d Cir. 2008) ........................................... 21

*The Trial of John Lilburne,*
   4 How. St.Tr. 1270 (1649) ............................................. 12

*United Press Associations v. Valente,*
   123 N.E.2d 777 (N.Y. Ct. App. 1954) ............................. 11, 12

*United States v. Cianfrani,*
   573 F.2d 835 (3d Cir. 1978) ............................................ 8

*United States v. Gecas,*
   120 F.3d 1419 (11th Cir. 1997) ........................................ 12

*Washington Legal Found. v. U.S. Sentencing Comm'n,*
   89 F.3d 897 (D.C. Cir. 1996) .......................................... 20

*Washington Post v. Robinson,*
   935 F.2d 282 (D.C. Cir. 1991) ......................................... 15

**Statutes**

28 U.S.C. § 359(b) ....................................................... 10

28 U.S.C. § 360(a) ........................................................ 9

28 U.S.C. § 360(b) ....................................................... 10

Frame of Government of Pennsylvania (1682) ....................... 13

Judicial Conduct and Disability Act of 1980, Pub. L. 96–458, 94
   Stat. 2035 (codified as amended at 28 U.S.C. §§ 351–364) .................. 8

The Charter or Fundamental Laws, of West New Jersey, Agreed
   Upon-1676 ............................................................................12

**Other Authorities**

1 J. Bentham, *Rationale of Judicial Evidence* (1827) ..........................3, 9

1 Simon Greenleaf, *A Treatise on the Law of Evidence* (16th ed.
   1899) ....................................................................................13

2 E. Coke, *Institutes of the Laws of England* (6th ed. 1681) ..................11

Francis Newton Thorpe, *The Federal and State Constitutions
   Colonial Charters, and Other Organic Laws of the States,
   Territories, and Colonies Now or Heretofore Forming the United
   States of America* (1909)......................................................13

Heidi Kitrosser, *Secrecy in the Immigration Courts and Beyond:
   Considering the Right to Know in the Administrative State*, 39
   Harv. C.R.-C.L. L. Rev. 95 (2004) ........................................19

Hugh C. Hansen, *There's No Excuse. 39 Years of Judicial
   Excellence Rewarded with Degrading Judicial Abuse*, Fordham
   IP Institute...........................................................................3, 4

John P. Sahl, *Secret Discipline in the Federal Courts- Democratic
   Values and Judicial Integrity at Stake*, 70 Notre Dame L. Rev.
   193 (1994) .........................................................................8, 9, 10

Judge Paul Michel, *Judge Newman's Suspension by the CAFC
   Has Marred Public Faith in the Federal Judiciary*, IP Watchdog
   (Dec. 2, 2024) .........................................................................4

*Letter from Gregory Dolin to The Honorable Kimberly A. Moore*
   (June 28, 2024) .....................................................................4, 6

Report & Recommendation of the Special Committee, *In Re
   Complaint No. 23-90015* (July 24, 2024) ..............................7

Response to the Special Committee's Report & Recommendation
   of July 31, 2024, *In re Complaint No. 23-90015* (Aug. 14, 2024).......... 4

The Committee On Communications And Media Law Of The
Association Of The Bar Of & The City Of New York, *"If It
Walks, Talks and Squawks . . . ." the First Amendment Right of
Access to Administrative Adjudications: A Position Paper*, 23
Cardozo Arts & Ent. L.J. 21 (2005)................................... 15, 18, 19, 20

*The Hon. Pauline Newman v. The Hon. Kimberly A. Moore, et al.*,
New Civil Liberties Alliance .............................................................. 7

## Rules

Rules for Judicial-Conduct and Judicial-Disability Proceedings
Rule 13 cmt .......................................................................................... 5

# GLOSSARY

JCDA.................Judicial Conduct and Disability Act of 1980

## INTEREST OF *AMICUS* CURIAE[1]

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—to formulate and promote free-market policy in the states. The Buckeye Institute accomplishes its mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policies, and marketing those policy solutions for implementation in Ohio and replication across the country. The Buckeye Institute works to restrain governmental overreach at all levels of government. In fulfillment of that purpose, The Buckeye Institute files lawsuits and submits amicus briefs. The Buckeye Institute is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. section 501(c)(3).

## SUMMARY OF THE ARGUMENT

Public confidence in the judiciary is the backbone of the judicial system. That is why the Founders insulated the judiciary from the other political branches and required impeachment as the sole means of

---

[1] Pursuant to Rule 29(a), The Buckeye Institute states that all parties have given consent to file this amicus brief. Further, no counsel for any party has authored this brief in whole or in part and no person other than the amicus has made any monetary contribution to this brief's preparation or submission.

removing a federal judge. However, the public cannot be confident in the judiciary or its disciplinary proceedings if those proceedings continue behind closed doors. Because of this, the Founders and the courts have understood the importance of open judicial proceedings. This right has been protected under the common law and the First Amendment. Where proceedings risk limiting an individual's rights and—like a judicial disciplinary proceeding—risk confidence in the judiciary, those proceedings should be open to the public.

## ARGUMENT

### I. Conducting judicial disciplinary proceedings in the dark undermines public confidence in our judiciary.

Judicial independence necessitates that the public has confidence that our judges will act in a fair, impartial, and competent manner. Judges need to be accountable to maintain the public faith in our systems. "[O]pen trials are bulwarks of our free and democratic government: public access to court proceedings is one of the numerous 'checks and balances' of our system, because 'contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.'" *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 592 (1980) (Brennan, J., concurring in the judgment) (quoting *In re*

*Oliver*, 333 U.S. 257, 270 (1948)). And "[w]ithout publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account." *In re Oliver*, 333 U.S. at 271 (quoting 1 J. Bentham, *Rationale of Judicial Evidence* 524 (1827)). Thus,

> [i]t is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should *always* act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes *as to the mode in which a public duty is performed.*

*Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884) (Holmes, J.) (emphasis added).

This case illustrates the improper secrecy used throughout judicial disciplinary proceedings. Judge Newman reportedly explained it this way: "The Judicial Council of the Federal Circuit removed me from all new appeals, in secret proceedings." Hugh C. Hansen, *There's No Excuse. 39 Years of Judicial Excellence Rewarded with Degrading Judicial Abuse*, Fordham IP Institute, https://fordhamipinstitute.com/theres-no-excuse-39-years-of-judicial-excellence-rewarded-with-degrading-judicial-abuse/ (last visited Dec. 9, 2024). Without an open proceeding, we can never know if there is an adequate trial-like proceeding. Indeed,

an open proceeding is the very crux of a trial-like proceeding. "Normally, one would assume the chief judge's motivations are proper: simply to protect the court and litigants before it. But the mere appearance of bias is regarded as being just as harmful to justice as actual bias." Judge Paul Michel, *Judge Newman's Suspension by the CAFC Has Marred Public Faith in the Federal Judiciary*, IP Watchdog (Dec. 2, 2024), https://tinyurl.com/marred-public-faith-judiciary. And without open proceedings, the appearance of bias cannot be refuted. Secrecy breeds even more problems. Judge Newman asserts that accusations against her were "based on a collection of anonymous defamatory" statements. *See* Hansen, *supra*. These proceedings are legal proceedings, not sloppy press reporting. It seems unlikely that a court would allow evidence to be proffered against a defendant based on anonymous testimony in a non-secret proceeding.

Judge Newman's counsel requested public access to her hearings. *Letter from Gregory Dolin to The Honorable Kimberly A. Moore* (June 28, 2024), https://tinyurl.com/3excxkkc ("June 28 letter"); *see also* Response to the Special Committee's Report & Recommendation of July 31, 2024 at 13 n.3, *In re Complaint No. 23-90015* (Aug. 14, 2024) (noting that "Judge

Newman requested the release of *all* materials that do not impact "confidentiality *interests of the complainant or of witnesses*"). The commentary for Rule 23 of the Rules for Judicial-Conduct and Judicial Disability Proceedings states that "[o]nce the subject judge has consented to the disclosure of confidential materials related to a complaint, the chief judge ordinarily will refuse consent only to the extent necessary to protect the confidentiality interests of the complainant or of witnesses." Even though the committee's proceedings are customarily disclosed if the accused judge so requests, with Judge Newman's request to make the secret proceedings public, the Chief Judge—Judge Newman's chief accuser—refused.

> Indeed, at one point, the committee issued two orders, and
>
> [t]he first order ("Gag Order") was in effect a gag order threatening Judge Newman and her counsel with sanctions should any of them publicize the ongoing investigation. The order intimated that even if Judge Newman were to agree to disclose the materials pursuant to Rule 23(b)(7) of the Conduct Rules, Chief Judge Moore would withhold her consent for the same.

JA15 at ¶ 33. While there was some cooperation later on in the process, as noted in the June 28 letter, despite two requests for the release of certain documents, neither Judge Moore nor the Committee authorized

the release of the requested documents "—nor even so much as acknowledged the requests." June 28 letter at 1.

Judge Newman's initial complaint in the district court included Count IV, which asserted a First Amendment claim. JA22–JA23 at ¶¶ 57–61. Judge Newman later dropped Count IV in her Amended Complaint because the committee agreed to release some of the information. Appellant's Opening Br. at 16 n.6. But that neither cured the fundamental problem nor was it the end of the secrecy. "After the count was dropped, the Committee again became recalcitrant about releasing its orders or Judge Newman's submissions . . . ." *Id*. at 16–17 n.6. And "the Committee has refused to release its latest orders . . . ." *Id*. at 17 n.6. And even now the public does not know the full scope of why the Committee has denied Judge Newman her right to pursue her profession and provide competent judging to litigants. Indeed, Judge Newman has had to redact her filings in this appeal and submit the Appendix under seal. Defendants-Appellees have "threatened [Judge Newman] and her attorneys with unspecified sanctions if any portion of the documents contained in that volume were made publicly available." Motion to Unseal at 2. And "[t]he Defendants-Appellees have issued their

orders under seal and have required Judge Newman, contrary to her own wishes, to keep her submissions to the Special Committee secret as well." *Id.* at 3. Judge Newman has now filed a Motion to Unseal—which this court should grant. *See generally id.* As Judge Newman asserts, the Committee's imposition of secrecy "violates the First Amendment's right to petition for redress of grievances and the basic norms of due process of law." *Id.* at 3.

Despite the public's great interest in the proceeding, *see The Hon. Pauline Newman v. The Hon. Kimberly A. Moore, et al.*, New Civil Liberties Alliance, https://nclalegal.org/case/re-complaint-against-circuit-judge-pauline-newman/ (last visited Dec. 5, 2024) (listing several media stories regarding the case), the Committee has not fully released the documents that should be public. Even more disturbing is the Committee's denigration of Judge Newman's integrity, claiming it has "concerns about Judge Newman's inability to remember and adhere to confidentiality requirements," Report & Recommendation of the Special Committee at 18 n.3, *In Re Complaint No. 23-90015* (July 24, 2024).

"Public confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in

conclusive terms to the public, with the record supporting the court's decision sealed from public view." *Gannett Co. v. DePasquale*, 443 U.S. 368, 429 (1979) (Blackmun, J., concurring in part and dissenting in part) (quoting *United States v. Cianfrani*, 573 F.2d 835, 851 (3d Cir. 1978))."Public access is essential, therefore, if trial adjudication is to achieve the objective of maintaining public confidence in the administration of justice." *Richmond Newspapers, Inc.*, 448 U.S. at 595 (Brennan, J., concurring in the judgment) (citing *Gannett Co.*, 443 U.S. at 428–29 (Blackmun, J., concurring and dissenting)). But here, public access continues to be denied—eliminating any public confidence in the disciplinary proceedings.

## II. The Judicial Conduct and Disability Act of 1980 was intended to boost public confidence in the judicial complaint process, but it falls short of that goal.

Prior to the enactment of the Judicial Conduct and Disability Act of 1980 ("JCDA"), Pub. L. 96–458, 94 Stat. 2035 (codified as amended at 28 U.S.C. §§ 351–364), informal internal discussions were the only means of enforcing judicial misconduct, short of impeachment and removal. John P. Sahl, *Secret Discipline in the Federal Courts- Democratic Values and Judicial Integrity at Stake*, 70 Notre Dame L. Rev. 193, 208 (1994). "In

the absence of formal disciplinary mechanisms, peer influence played a key role in deterring misconduct or preventing its recurrence." *Id.* And even though Congress established the judicial councils in 1939, which "were confronted with a full 'gamut of problematic behavior,'" the judicial councils "rarely issued orders dealing with misconduct." *Id.* at 210. Given the continued behind-closed-doors actions of the judiciary, Congress enacted the JCDA to address concerns about the informal and secret resolution of judicial complaints. *Id.* at 208. Yet, the JCDA allows for—and in some instances, requires—secrecy.

Under the JCDA, subject to limited exceptions, there is a blanket prohibition on the disclosure "by any person in any proceeding" of "all papers, documents, and records of proceedings related to [judicial conduct and disability] investigations . . . ." 28 U.S.C. § 360(a). These documents may be disclosed if

> (1) the judicial council of the circuit *in its discretion* releases a copy of a report of a special committee . . . to the complainant whose complaint initiated the investigation by that special committee and to the judge whose conduct is the subject of the complaint;
>
> (2) the judicial council of the circuit, the Judicial Conference of the United States, or the Senate or the House of Representatives by resolution, releases any such material

which is believed necessary to an impeachment investigation or trial of a judge under article I of the Constitution; or

(3) such disclosure is authorized in writing by the judge who is the subject of the complaint *and* by the chief judge of the circuit, the Chief Justice, or the chairman of the standing committee . . . .

*Id.* (emphasis added). The JCDA also requires

[e]ach written order to implement any action under section 354(a)(1)(C), which is issued by a judicial council, the Judicial Conference, or the standing committee . . . [to] be made available to the public through the appropriate clerk's office of the court of appeals for the circuit. Unless contrary to the interests of justice, each such order shall be accompanied by written reasons therefor.

28 U.S.C. § 360(b).

In addition to the near total ban on disclosure, the JCDA prohibits granting any person "the right to intervene or to appear as amicus curiae in any proceeding before a judicial council or the Judicial Conference." 28 U.S.C. § 359(b). As one commenter noted, this "broad prohibition may hinder the ability of the accused judge and the complainant to present their strongest cases by enlisting the assistance of third parties. It also effectively denies the judicial council, the Conference, and arguably, the chief judges, the benefits of such assistance." Sahl, *supra*, at 223–224.

Given the continued hiding of the ball under the JCDA, the public

is not much more informed about the inner workings of the judiciary than it was before the JCDA was enacted.

## III. Key to public confidence in the judiciary is the free and open public access to inherently adjudicatory procedures.

Open access to the judiciary "stems from the deep roots of the common law" and was established long before this Nation. *United Press Associations v. Valente*, 123 N.E.2d 777, 786 (N.Y. Ct. App. 1954) (Frossel, J., dissenting). The public's right to observe judicial proceedings is not unlike the right of an accused defendant to a public trial. *Id.* (Frossel, J., dissenting). "There is a strong suggestion of this public right concept in Sir Edward Coke's analysis of the phrase 'In curia domini regis', as used in Statutum de Marleberge enacted in the year 1267, fifty-two years after Magna Charta." *Id.* (Frossel, J., dissenting) (citations omitted). Coke noted that "[t]hese words are of great importance, for all causes ought to be heard, ordered, and determined before the judges of the kings courts openly in the kings courts, whether all persons may resort." 2 E. Coke, *Institutes of the Laws of England* 103 (6th ed. 1681).

In the early 1600s, civil rights activist John Lilburne was imprisoned by the English Court of Star Chamber for his refusal to plead to an unknown charge. *See United States v. Gecas*, 120 F.3d 1419, 1450

(11th Cir. 1997). Linburne's imprisonment continued until he acquiesced to the court's demands. In 1649, at his trial for treason, Lilburne exclaimed "[t]hat by the laws of this land all courts of justice always ought to be free and open for all sorts of peaceable people to see, behold and hear, and have free access unto." *The Trial of John Lilburne*, 4 How. St.Tr. 1270, 1273–1274 (1649).

These ideals, naturally, made their way to the colonies. During that same decade, the Massachusetts Bay Colony's General Court embraced the open court principle in the Massachusetts Body of Liberties: "Every man whether Inhabitant or forreiner, free or not free shall have libertie to come to any publique Court, Councell, or Towne meeting." *See United Press Associations*, 123 N.E.2d at 786 (Frossel, J., dissenting). The 1676 Charter or the Fundamental Laws of New Jersey stated that

> in all publick courts of justice for tryals of causes, civil or criminal, any person or persons, inhabitants of the said Province may freely come into, and attend the said courts, and hear and be present, at all or any such tryals as shall be there had or passed, that justice may not be done in a corner nor in any covert.

The Charter or Fundamental Laws, of West New Jersey, Agreed Upon-1676, *reprinted in* 5 Francis Newton Thorpe, *The Federal and State Constitutions Colonial Charters, and Other Organic Laws of the States,*

*Territories, and Colonies Now or Heretofore Forming the United States of America* 2551 (1909). In 1682, William Penn's Frame of Government of Pennsylvania explicitly stated that "all courts shall be open, and justice shall neither be sold, denied nor delayed." *Id.* at 3060. The Constitutions of Vermont 1777, Chapter II, Section XXIII, Kentucky 1792, Article XII, Section 13, and Tennessee 1796, Article XI, Section 17, contained similar provisions. *See generally id.* In old England, "the inspection and exemplification of the records of the King's courts [was] the common right of the subject." 1 Simon Greenleaf, *A Treatise on the Law of Evidence* 623–624 (16th ed. 1899). "The exercise of the right does not appear to have been restrained, until the reign of Charles II [in the mid-1600s] . . . ." *Id.* At that time, the courts restricted this right for felony indictments if not properly supported, apparently to reduce an increase in malicious prosecutions. *Id.*

> But in the United States, no regulation of this kind is known to have been expressly made; *and any limitation of the right to a copy of a judicial record or paper, when applied for by any person having an interest in it, would probably be deemed repugnant to the genius of American institutions.*

*Id.* (emphasis added).

## IV. The Common Law and the First Amendment guarantee the right to open access to judicial proceedings.

Today, there continues to be a common law right to access judicial proceedings and documents, including judicial records. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). *See also id.* at n.8 ("This common-law right has been recognized in the courts of the District of Columbia since at least 1894.") (citing *Ex parte Drawbaugh*, 2 App.D.C. 404 (1894)). "This nation's accepted practice of guaranteeing a public trial to an accused has its roots in our English common law heritage." *In re Oliver*, 333 U.S. at 266. And the First Amendment guarantees the press and the public a qualified right of access to attend and observe criminal proceedings. *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 9 (1986); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603 (1982). "Every circuit to consider the issue has concluded that the qualified First Amendment right of public access applies to civil as well as criminal proceedings." *Dhiab v. Trump*, 852 F.3d 1087, 1099 (D.C. Cir. 2017) (Rogers, J., concurring in part and concurring in the judgment).

This Court has explained, consistent with the Supreme Court's determinations, that "[t]he first amendment guarantees the press and the public a general right of access to court proceedings and court

documents unless there are compelling reasons demonstrating why it cannot be observed." *Washington Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991). Indeed, this public access "serves an important function of monitoring prosecutorial or judicial misconduct." *Id.* at 288 (citing *Press-Enter. Co.*, 478 U.S. at 8). And because

> "a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," the Supreme Court held that a qualified right of access to information about government functions is "implicit" in the First Amendment; just as the right to travel, the right of privacy and the right to be presumed innocent are implicit in other provisions of the Bill of Rights. In short, the Supreme Court has lodged the public right of access squarely in the First Amendment.

The Committee On Communications And Media Law Of The Association Of The Bar Of & The City Of New York, *"If It Walks, Talks and Squawks . . . ." the First Amendment Right of Access to Administrative Adjudications: A Position Paper*, 23 Cardozo Arts & Ent. L.J. 21, 40 (2005) (*"If It Walks, Talks and Squawks"*) (quoting *Globe Newspaper*, 457 U.S. at 604).

These same values apply to non-criminal court proceedings. "Indeed, many of the advantages of public criminal trials are equally applicable in the civil trial context. . . . [I]n some civil cases the public interest in access, and the salutary effect of publicity, may be as strong

as, or stronger than, in most criminal cases." *Gannett Co.*, 443 U.S. at

387 n.15. The Third Circuit conducted a "review [of] the English and

American legal authorities to determine whether they reveal a

corresponding presumption of openness inhering in the civil trial which

'plays a particularly significant role in the functioning of the judicial

process and the government as a whole.'" *Publicker Indus., Inc. v. Cohen*,

733 F.2d 1059, 1068 (3d Cir. 1984) (quoting *Globe Newspaper*, 457 U.S. at

606). The court noted that

> For many centuries, both civil and criminal trials have
> traditionally been open to the public. As early as 1685, Sir
> John Hawles commented that open proceedings were
> necessary so "that truth may be discovered in civil *as well as*
> criminal matters" (emphasis added). Remarks upon Mr.
> Cornish's Trial, 11 How.St.Tr. 455, 460. English commentators
> also assumed that the common-law rule was that the public
> could attend civil and criminal trials without distinguishing
> between the two.

*Id.* at 1067 (quoting *Gannett*, 443 U.S. at 386). After an extensive

historical analysis, the court concluded, and held, "that the 'First

Amendment embraces a right of access to [civil] trials . . . to ensure that

this constitutionally protected 'discussion of governmental affairs' is an

informed one." *Id.* at 1070. The Supreme Court has explained that the

access right extends to any judicial proceeding where there is a "tradition

of accessibility" and "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. Co.*, 478 U.S. at 8. The First Amendment guarantees the "rights to speak and to publish concerning what takes place at a trial." *Richmond Newspapers, Inc.*, 448 U.S. at 576–77. The then-Chief Justice Burger noted that "historically both civil and criminal trials have been presumptively open." *Id.* at 580 n.17. "By its terms, the experience and logic test does not limit the right of access to criminal proceedings. *Every circuit to consider the issue has concluded that the qualified First Amendment right of public access applies to civil as well as criminal proceedings.*" *Dhiab v. Trump*, 852 F.3d 1087, 1098–99 (D.C. Cir. 2017) (emphasis added).

Additionally, the Supreme Court has recognized that

> In view of this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public, the Fourteenth Amendment's guarantee that no one shall be deprived of his liberty without due process of law means at least that an accused cannot be thus sentenced to prison.

*In re Oliver*, 333 U.S. at 273. This Court has also noted the interplay between the Due Process Clause and open access: "That we regard an 'open or public hearing' to be a fundamental principle of fair play inherent

in our judicial process cannot be seriously challenged." *Fitzgerald v. Hampton*, 467 F.2d 755, 764 (D.C. Cir. 1972). *Accord Adams v. Marshall*, 212 Kan. 595, 601 (1973) ("The concept that trials and judicatory hearings be open to the public gaze is inherent in our idea of due process."). "[I]n refusing to give the press and public notice and an opportunity to be heard before" before closing off a proceeding, *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 175 (5th Cir. 2011), the JCDA deprives Judge Newman and the public of due process. *See* also Motion to Unseal at 9 ("Judge Newman contends that these documents reinforce her argument that the disciplinary proceedings against her have been marred by prejudice and violated Due Process of Law.").

## V. The common law and First Amendment guarantees for open proceedings should apply to administrative proceedings such as this one.

"The First Amendment has long been held to impose limits on all branches of government, not just the Judicial Branch. First Amendment restrictions and obligations are routinely applied to the Executive Branch in a variety of contexts." *If It Walks, Talks and Squawks*, *supra*, at 40–41. "Lower courts have consistently construed the access principles established in *Richmond Newspapers* to extend beyond Article III

criminal proceedings." *Id.* at 44. They have applied the *Richmond Newspapers* analysis "to adjudications and other types of proceedings conducted by the Executive Branch (including hearings on mine safety and presidential press conferences), to legislative hearings and to certain state administrative proceedings." *Id.* Further, "[j]urists and scholars alike have recognized that quasi-adjudications generally derive their normative legitimacy from the promise of fairness and restraint in decision-making" Heidi Kitrosser, *Secrecy in the Immigration Courts and Beyond: Considering the Right to Know in the Administrative State*, 39 Harv. C.R.-C.L. L. Rev. 95, 154 (2004).

Here we have an adjudicatory proceeding in the judicial branch. While the statutory judicial discipline process may be a hybrid enforcement mechanism, it is no less of an adjudication of a person's rights than a criminal proceeding and no less critical to the rights of a person than a civil case. *See Fitzgerald*, 467 F.2d at 766 ("We can only conclude that these administrative proceedings are of a quasi-judicial character . . . [l]ikewise, we are satisfied that due process requires that the Fitzgerald hearing be open to the press and public."). The accused is just as deserving of constitutional protections as in any other

adjudicative setting. Indeed, other courts have allowed access to administrative proceedings and records. *If it Walks, Talks and Squawks*, *supra*, at 50.

Today, as it has long been, the public has an interest in open access to adjudicatory decision-making. This open and public access is key to public confidence in the judiciary.

## VI. Allowing the adjudicator to determine what documents can and cannot be accessed, despite the accused judge's consent, is inconsistent with the idea of open access.

Federal courts are no strangers to protecting privacy interests—when it is necessary. But that is the exception, not the rule. When determining whether sensitive information—such as a party's or witness' name or contact information—should be released, the federal courts properly start with the notion that information should be publicly available. *See In re Sealed Case*, 931 F.3d 92, 96 (D.C. Cir. 2019) ("There is, of course, a presumption in favor of disclosure, which stems from the 'general public interest in the openness of governmental processes.'") (quoting *Washington Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 899 (D.C. Cir. 1996)). But, cognizant of the privacy interests at stake, they have balanced "the litigant's legitimate interest in anonymity

against countervailing interests in full disclosure" to determine if the privacy interest outweighs the presumption of openness. *Id.* (citing *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008)). The government's justification for denying access to court proceedings "must be a weighty one." *Globe*, 457 U.S. at 606. *See also Richmond Newspapers, Inc.*, 448 U.S. at 588 (Brennan, J., concurring in the judgment) ("An assertion of the prerogative to gather information must accordingly be assayed by considering the information sought and the opposing interests invaded.").

The JDCA, on the other hand, takes the opposite approach. It begins with the notion that all documents, except for some final opinions, should not be publicly available. It then allows for a few narrow exceptions. Despite the general secrecy provisions, the JCDA does allow accused judges to request the release of investigation documents. It does not, however, require the request to be granted, unless the chief judge— here the one leading the investigation and adjudication—approves the release of the investigation-related documents.

The JCDA's approach is improper. Instead, as is consistent with the right to open and public hearings and traditional notions of fair play and

justice, judicial disciplinary proceedings should start with the presumption of openness and follow the approach taken by federal courts of weighing privacy interests against that presumption.

"In order to ensure the balance is appropriately struck, courts have endorsed various multi-factor tests involving as many as ten non-exhaustive factors." *In re Sealed Case*, 931 F.3d at 97 (citations omitted). "Some factors are 'specific aspects of a plaintiff's potential privacy interests' or the weight to be given those interests, but others 'go more to the weight of the countervailing interest in open judicial proceedings.'" *Id.* (quoting *Doe v. Del Rio*, 241 F.R.D. 154, 158 (S.D.N.Y. 2006)). While this Court has not settled on any set of factors for determining when a case should proceed anonymously, it has noted five factors that "serve well as guideposts from which a court ought to begin its analysis." *Id.* Those factors are:

> [1] whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature;

> [2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically,

to innocent non-parties;

[3] the ages of the persons whose privacy interests are sought to be protected;

[4] whether the action is against a governmental or private party; and, relatedly,

[5] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id.* And, when it comes to sealing court documents, this Court has

set forth six factors "that might act to overcome [the] presumption" [of openness]:

(1) the need for public access to the documents at issue;

(2) the extent of previous public access to the documents;

(3) the fact that someone has objected to disclosure, and the identity of that person;

(4) the strength of any property and privacy interests asserted;

(5) the possibility of prejudice to those opposing disclosure; and

(6) the purposes for which the documents were introduced during the judicial proceedings.

*Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 980 (D.C. Cir. 2016) (citations omitted).

The judge adjudicating this matter, who was also the complainant, has not attempted to satisfy any of the above elements for keeping the

proceedings or other information secret. Instead, the chief judge and the JCDA presume that these elements are met—or are irrelevant—and that the proceedings should remain confidential. It took Judge Newman filing this case and requesting that this Court release the documents to have these elements reviewed. "A full release of the documents will allow the public to see for itself whether Defendants- Appellees or Judge Newman is correct. If Defendant-Appellees' orders are legally justifiable, their release will not only not prejudice them, but it will actually bolster their position." Motion to Unseal at 9.

Even though the judiciary's claim of a privacy interest is significantly reduced when the accused consents to the release of the documents, the JCDA still puts secrecy over the public's right to access. This is not only inconsistent with the JCDA's purpose of formalizing the complaint process to provide some—but very limited—public access, but it is inconsistent with hundreds of years of open access to the judiciary so that the public can be confident that its inner workings are fair, and how the judiciary handles other privacy concerns.

## CONCLUSION

As the court considers this matter, it should recognize the

unfairness of the underlying procedure and that the disciplinary proceedings did not follow the common law and First Amendment requirements for an open adjudicatory process. Thus, the Court should find in favor of Judge Newman on the merits and on her motion to unseal the joint appendix.

Respectfully submitted,

 _/s/ David C. Tryon_
David C. Tryon
   *Counsel of Record*
Alex M. Certo
The Buckeye Institute
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
D.Tryon@BuckeyeInstitute.org

December 12, 2024

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. Rule 29(a)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,091 words.

This document complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Century Schoolbook.

 /s/ *David C. Tryon*
David C. Tryon
*Attorney of record for*
*The Buckeye Institute*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing amicus brief was served on all counsel of record via the Court's electronic filing system this 12th day of December 2024.

Respectfully submitted,

 /s/ *David C. Tryon*
David C. Tryon
*Attorney of record for*
*The Buckeye Institute*