ORAL ARGUMENT NOT YET SCHEDULED

**CASE NO. 24-5173**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

HON. PAULINE NEWMAN,

Plaintiff-Appellant,

v.

HON. KIMBERLY A. MOORE, *et al.*,

Defendants-Appellees,

———————————————

On Appeal from the United States District Court
for the District of Columbia
Case No. 23-cv-01334 (CRC)

———————————————

**BRIEF OF *AMICI CURIAE* MANHATTAN INSTITUTE,
HON. DEAN PINKERT, AND PROFESSORS STEVE CHARNOVITZ,
ROCHELLE DREYFUSS, BRIAN DEAN ABRAMSON,
ANDREW C. MICHAELS, HUGH HANSEN, AND HOWARD KNOPF
SUPPORTING PLAINTIFF-APPELLANT AND REVERSAL**

———————————————

Ilya Shapiro
  *Counsel of Record*
Tim Rosenberger
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

December 12, 2024

## COMBINED CERTIFICATES

### Certificate as to Parties, Rulings, and Related Cases

Per Circuit Rule 28, counsel for *amici* certifies as follows: All parties, intervenors, and *amici* that have appeared in this Court are listed in the Appellant's Brief. The rulings at issue and related cases also appear in the Appellant's Brief.

### Certificate as to Circuit Rule 29(d)

*Amici* have conferred with other known *amici*, and with Appellant's counsel, and have determined that their perspective on the meaning and application of the Judicial Conduct and Disability Act of 1980 is unique, as is their experience with the Federal Circuit's particular areas of jurisdiction. For example, Commissioner Pinkert's extensive government service and work on accountability frameworks offer insights into institutional trust, while Prof. Charnovitz's scholarship on governance provides a considered view on safeguarding procedural integrity in judicial systems. Prof. Abramson is a leading expert on vaccine law, while Prof. Hansen is internationally renowned for his work on intellectual property.

### Corporate Disclosure Statement

The Manhattan Institute has no parent companies, subsidiaries, or affiliates, and does not issue public shares. All parties consented to the filing of this brief.

December 12, 2024                    /s/ *Ilya Shapiro*
                                     Ilya Shapiro
                                     Counsel to *Amici Curiae*

# TABLE OF CONTENTS

COMBINED CERTIFICATES ................................................................. i

TABLE OF AUTHORITIES.................................................................. iii

GLOSSARY .......................................................................................v

INTEREST OF *AMICI CURIAE* ...........................................................1

SUMMARY OF ARGUMENT...............................................................3

ARGUMENT .....................................................................................4

I.  THE JUDICIAL CONDUCT AND DISABILITY ACT PROTECTS
    JUDICIAL INTEGRITY THROUGH PROCEDURAL SAFEGUARDS...........5

II. THIS CASE IGNORES THOSE SAFEGUARDS...............................8

    A. Transferring Cases Eases Internal Circuit Tensions......................12

    B. Transferring Cases Also Preserves the Public Trust.....................13

III. RETIRED FEDERAL CIRCUIT JUDGE PAUL MICHEL RECENTLY
     CONFIRMED OUR READING OF THE SITUATION ............................15

CONCLUSION ..................................................................................17

CERTIFICATE OF COMPLIANCE .......................................................18

CERTIFICATE OF SERVICE ..............................................................17

# TABLE OF AUTHORITIES

**Cases**

*Chandler v. Jud. Council of Tenth Cir. of U.S.,* 398 U.S. 74 (1970)..........................6

*In re Charge of Jud. Misconduct*, 613 F.2d 768 (9th Cir. 1980)............................6, 8

*In re Charges of Jud. Misconduct*, 769 F.3d 762 (D.C. Cir. 2014)................... 12, 13

*In re Charge of Jud. Misconduct Nos. 21-90142 and 21-90143*
(2d Cir. Jud. Council Dec. 22, 2021) ...........................................................14

*In re Complaint No. 17-90118* (2d Cir. Jud. Council Feb. 5, 2018) .......................14

*In re Complaints of Jud. Misconduct*, 9 F.3d 1562 (U.S. Jud. Conf. 1993) ..............8

*In re Complaint of Jud. Misconduct,* 425 F.3d 1179 (9th Cir. 2005)........................6

*In re Complaint of Jud. Misconduct*, 575 F.3d 279 (3d Cir. 2009).....................8, 15

*In re Complaints Under the Judicial Conduct and Disability Act,*
*Nos. 10-18-90038 through 10-18-90112* (10th Cir. Jud. Council 2022) ..............14

*In re Jud. Misconduct*, 664 F.3d 332 (U.S. Jud. Conf. 2011) .................................10

*In re Jud. Misconduct*, 747 F.3d 869 (U.S. Jud. Conf. 2014) .............................8, 15

*In re Jud. Misconduct J.C. Nos. 03-20-90043 and 03-20-90044*
(Jud. Coun. Third Cir. 2021).................................................................. 12–13

*In re Memorandum of Decision of Jud. Conf. Comm. on Jud. Conduct*
*& Disability,* 517 F.3d 563 (U.S. Jud. Conf. 2008)..................................8, 11

*McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords.*
*of Jud. Conf. of U.S.,* 264 F.3d 52 (D.C. Cir. 2001). ................................5, 11

*United States v. Claiborne*, 727 F.2d 842 (9th Cir. 1984).........................................5

**Statutes**

28 U.S.C. § 352 ......................................................................................................7

28 U.S.C. § 353 ....................................................................................................10

28 U.S.C. § 354 .................................................................................................7, 10

28 U.S.C. § 358 ......................................................................................................9

**Rules**

Illustrative Rule 25(a) ...........................................................................11

Illustrative Rule 26 ..............................................................................11

**Treatises**

32 Am. Jur. 2d Federal Courts § 38 ......................................................10

**Other Authorities**

125 Cong. Rec. 30,084 (1979). ...............................................................7

Arthur D. Hellman, *An Unfinished Dialogue: Congress, the Judiciary,*
    *and the Rules for Federal Judicial Misconduct Proceedings*,
    32 Geo. J. Legal Ethics 341 (2019). ...................................6, 7, 11

*Complaints Against Judges,* U.S. Cts. (2024)........................................10

H.R. 6330, 96th Cong. (1980)..................................................................7

Letter from Chief Justice Roberts, U.S. Supreme Court,
    to Judge T. Tymkovich, Cir. Judge for the Tenth Cir. (Oct. 10, 2018) ..........13

Jeffrey N. Barr & Thomas E. Willging, *Decentralized Self-Regulation,*
    *Accountability, and Judicial Independence Under the Federal Judicial*
    *Conduct and Disability Act of 1980*, 142 U. Pa. L. Rev. 25 (1993). 7–8, 9–10

Lara A. Bazelon, *Putting the Mice in Charge of the Cheese:*
    *Why Federal Judges Cannot Always Be Trusted to Police Themselves*
    *and What Congress Can Do About It*, 97 Ky. L.J. 439 (2009).......................9

Paul Michel, *Judge Newman's Suspension by the CAFC Has Marred Public*
    *Faith in the Federal Judiciary*, IP Watchdog, Dec. 2, 2024................... 15–16

The Federalist No. 78 (Alexander Hamilton) ...........................................5

The Judicial Conduct and Disability Act Study Committee,
    *Implementation of the Judicial Conduct and Disability Act of 1980:*
    *A Report to the Chief Justice* (2006) .................................9, 10, 12

**Glossary**

The Act – The Judicial Conduct and Disability Act of 1980

Illustrative Rules – Rules for Judicial Conduct and Judicial-Disability Proceedings

*Implementation of the Judicial Conduct and Disability Act of 1980: A Report to the Chief Justice* (2006) – "Breyer Report"

The **Manhattan Institute** (MI) is a nonprofit policy research foundation whose mission is to develop and disseminate ideas that foster individual responsibility and agency across multiple dimensions. To that end, it has sponsored scholarship and filed briefs opposing violations of constitutionally protected liberties. MI has a particular interest in defending an independent judiciary that is the backbone of the rule of law upon which our nation's flourishing depends.

**Dean Pinkert** is an international trade and human rights consultant, whose projects range from labor practices in U.S.-facing supply chains to trade remedies and intellectual property. After a lengthy period of government service and private law practice—which included ten years as a commissioner (and two as vice chair) at the U.S. International Trade Commission—he joined Corporate Accountability Lab in 2021 as special advisor and established his own firm in 2023. Pinkert's extensive government service and work on accountability frameworks offer valuable insights into maintaining institutional trust and transparency.

**Steve Charnovitz** teaches at the George Washington University Law School and writes on international trade, foreign relations law, and environmental sustainability. Before becoming an academic, he acquired deep experience in the

---

[1] All parties consented to the filing of this brief. No party's counsel authored any part of this brief and no person other than *amici* made a monetary contribution to fund its preparation or submission.

public sector. Prof. Charnovitz's scholarship on governance and institutional accountability provides a unique perspective on procedural integrity. He is a member of the American Law Institute.

**Rochelle Dreyfuss** is a professor of law emerita at NYU School of Law. She clerked for Chief Judge Wilfred Feinberg of the Second Circuit and Chief Justice Warren Burger of the Supreme Court. Prof. Dreyfuss is a member of the American Law Institute and an adviser on its Restatement Third of Conflicts of Law project. She has also been a consultant to the Federal Courts Study Committee. She is widely published in the field of patent law and, as a long-time scholar of the Federal Circuit, has an interest in that court's integrity in particular.

**Brian Dean Abramson** is a leading expert on vaccine law—for which the Federal Circuit bears unique national responsibility—and a member of the board of directors of the National Vaccine Law Association. He also teaches the subject at Florida International University and the University of Houston, and is the primary author of *Vaccine, Vaccination, and Immunization Law*, the field's leading treatise. Abramson authored the vaccine-injury-claims chapter of Matthew H. Solomson's *Court of Federal Claims: Jurisdiction, Practice, and Procedure*. He clerked for Judge Newman, as well as for Judge Susan Braden of the Court of Federal Claims.

**Andrew C. Michaels** is an associate professor of law at the University of Houston Law Center, where he specializes in intellectual property. Before academia,

he practiced primarily as a patent litigator, including before the Federal Circuit. He served as a law clerk to Judge Newman from 2010 to 2012.

**Hugh Hansen** is a professor of law emeritus at Fordham Law School, with a long career that included clerking for two federal judges and serving as a federal prosecutor in the Southern District of New York. He was multiple times named "One of the 50 most influential people in IP in the world" by *Managing IP* magazine. Former Chief Judge Paul Michel of the Federal Circuit gave Prof. Hansen an award for contributing to the legal community's understanding of international IP law.

**Howard Knopf** is a Canadian retired lawyer, scholar, and expert in intellectual property law. He was on the faculty of the Fordham Law School Annual Intellectual Property Conference for 17 years, along with Judge Newman and many other acclaimed academics, judges, and practitioners. Prof. Knopf was a pioneer in the judicial education movement in Canada.

*Amici* seek to assist the Court in addressing the challenges posed by this case in a manner that upholds judicial independence and integrity.

## SUMMARY OF ARGUMENT

The judiciary's legitimacy relies on its ability to resolve disputes impartially and maintain public confidence in its integrity. When internal tensions or heightened public scrutiny arise, structural safeguards—such as transferring a judicial

misconduct case to another circuit—are essential to ensure that disciplinary proceedings are both impartial and perceived as fair.

Here, the allegations against Judge Newman highlight precisely the type of circumstances that demand such precautions. Internal tensions within the Federal Circuit and significant public attention to the complaint create a risk of impropriety or the appearance of bias if the case were to remain within the circuit. Transferring the case to another circuit could help preserve public confidence in the judiciary's independence and demonstrate adherence to the principles underlying the Judicial Conduct and Disability Act of 1980.

Accordingly, the Court should exercise its authority to ensure an impartial adjudication here by reversing the judgment below and declare that the current proceeding against Judge Newman fails to meet constitutional or statutory standards.

## ARGUMENT

The judiciary's legitimacy depends on impartial adjudication of misconduct complaints, particularly when internal conflicts or public scrutiny jeopardize confidence in the process. Despite limited codification of the judiciary's informal processes, history and case law suggest that in proceedings solely regarding an alleged disability, a judge should not be tried by her colleagues—especially when those colleagues are that judge's accusers. Where a judicial complaint against a judge highlights internal tension in a circuit, it should be transferred to another circuit as a

structural prophylactic. Those same precautions should be taken when a complaint triggers publicity such that the court's integrity may be questioned if the matter is handled internally. Given the unprecedented and exceptional circumstances here, a transfer out of the Federal Circuit was the appropriate procedure from the start.

## I.  THE JUDICIAL CONDUCT AND DISABILITY ACT PROTECTS JUDICIAL INTEGRITY THROUGH PROCEDURAL SAFEGUARDS

For centuries, impeachment stood as the sole mechanism for disciplining federal judges. *United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir. 1984); *see also McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.,* 264 F.3d 52, 66 (D.C. Cir. 2001). This remedy remained exclusive for good reason. *McBryde,* 264 F.3d at 66. Concerns surrounding overreach by the various branches of government were evident from the founding of the country – with particular emphasis on the inherent weakness and necessary insulation the judiciary required from its sister-powers. *Id.* (explaining the judiciary's need for freedom from coercion or influence by the other branches). Designed to act as a bulwark against the legislative authority of Congress and as a protector of the Constitution, the limitations were placed on rival powers to ensure the judiciary's independence. The Federalist No. 78 (Hamilton). But the judiciary's role highlights another important risk—one of an internal nature—that threatens to pierce any armor the founders sought to protect it with; as the guardian of the constitution, the judiciary's integrity must remain beyond reproach. *See id.*

Institutional integrity is central to the judiciary's longstanding independence. *See id.* Even today, impeachment for good cause remains the only legal remedy through which a federal judge may be removed. *See In re Complaint of Jud. Misconduct,* 425 F.3d 1179, 1183 (9th Cir. 2005) (Kozinski, J., dissenting). Still, judges' past conduct—which may fall short of the impeachment standard but nonetheless reflect poorly—has shown that other methods of relief must be available to ensure that the integrity of the judiciary remains intact. *In re Charge of Jud. Misconduct*, 613 F.2d 768, 769 (9th Cir. 1980) (highlighting how the role of the judicial council is to provide administrative remedies in the absence of judicial relief). Historically, internal and informal rules have served this purpose, including judicial councils capable of reprimanding judges at the circuit level. As the Supreme Court has noted, these rules were "reasonable, proper, and necessary." *Chandler v. Jud. Council of Tenth Cir. of U. S.,* 398 U.S. 74, 85 (1970). But, and especially considering Watergate, were they enough? *See* Arthur D. Hellman, *An Unfinished Dialogue: Congress, the Judiciary, and the Rules for Federal Judicial Misconduct Proceedings*, 32 Geo. J. Legal Ethics 341, 374 (2019).

This question circulated among legal scholars and legislators. Substantive action was taken in 1978 when the Judicial Tenure Act was first proposed in the Senate. *Id.* While certain aspects of the proposed act were ultimately removed, the text that was signed into law established the Judicial Conduct and Disability

Commission and a Court on Judicial Conduct and Disability. 125 Cong. Rec. 30,084 (1979). With this law came the ability to effectively discipline federal judges for conduct unbecoming or that reflected poorly on the integrity on the institution.

And who was to wield this new authority? The judiciary itself. Hellman, *An Unfinished Dialogue,* at 347-51. Wary of potential conflicts of interest within the judiciary as well as concerns about the overall effectiveness, Congressional House members opted to compromise and include measures that ensured judges whose conduct was the subject of inquiry received some due process. *See* H.R. 6330, 96th Cong. (1980). The passed legislation, known as the Judicial Conduct and Disability Act of 1980 (the "Act"), mandated that an initial complaint against a federal judge would be first evaluated for substance by the chief judge of the circuit, who, in the event the complaint alleges facts in dispute, must appoint a special committee to investigate whether dismissal of the complaint is appropriate. 28 U.S.C. § 352(a). The committee upon its conclusion then must submit a detailed report to the circuit's Judicial Council, which reviews the findings and issues a reprimand of the judge if warranted. 28 U.S.C. § 354.

The Act was designed to provide structure to the informal and "flexible" administrative process the circuits were already using. Jeffrey N. Barr & Thomas E. Willging, *Decentralized Self-Regulation, Accountability, and Judicial Independence Under the Federal Judicial Conduct and Disability Act of 1980*, 142 U. Pa. L. Rev.

25, 138 (1993). Case law indicates that the Act has been interpreted as "forward-looking and not punitive." *In re Complaints of Jud. Misconduct*, 9 F.3d 1562, 1566 (U.S. Jud. Conf. 1993) (citation omitted). Proceedings under the Act are "inquisitorial and administrative" rather than "adversarial." *In re Memorandum of Decision of Jud. Conf. Comm. on Jud. Conduct & Disability,* 517 F.3d 563, 567 (U.S. Jud. Conf. 2008). They are adversarial "only to the extent that they may be initiated by complaint and usually allow interested parties some opportunity to present their respective view of the events in question." *Id*.

After examining the records of several proceedings, it becomes evident that the concept of decentralized judicial self-regulation is in full effect. *See generally, In re Complaints of Jud. Misconduct*, 9 F.3d 1562; *In re Charge of Jud. Misconduct*, 613 F.2d 768; Barr and Willging, *Decentralized Self-Regulation,* at 52 (providing statistics showing how many judicial council proceedings had taken place). There is a model structure that ensures the due process rights of the subject judge, equally protecting those rights along with the institutional integrity of the judiciary as a whole. *See*, *e.g.*, *In re Jud. Misconduct*, 747 F.3d 869, 869 (U.S. Jud. Conf. 2014); *In re Complaint of Jud. Misconduct*, 575 F.3d 279, 280 (3d Cir. 2009).

## II. THIS CASE IGNORES THOSE SAFEGUARDS

Once the Judicial Conduct and Disability Act of 1980 was enacted, Congress vested in the judiciary the authority to implement internal procedural rules for

administering the Act. 28 U.S.C. § 358. Starting in 1986, the Judicial Conference drafted a set of Rules for Judicial Conduct and Judicial-Disability Proceedings (the "Illustrative Rules") designed to provide a mandatory and nationally uniform governing structure to the procedural aspects of judicial conduct and disability proceedings. Lara A. Bazelon, *Putting the Mice in Charge of the Cheese: Why Federal Judges Cannot Always Be Trusted to Police Themselves and What Congress Can Do About It*, 97 Ky. L.J. 439, 452 (2009). With the most recent Illustrative Rules promulgated in 2019, the judges who interpret the Act's statutory language turn to these rules for guidance in uniformly applying the prescribed processes. *Id*.

Slight differences can be found among the circuits regarding the Act's implementation, but most applications are strikingly similar. *See* Barr and Willging, *Decentralized Self-Regulation,* at 35-36 (showing one example where circuits differ in how they follow the Illustrative Rules' procedures). Commonly, complaints are filed against judges by convicted criminal defendants or other litigants, with the rarest types of complaints originating from other court officials, at an average of only one complaint per year. The Judicial Conduct and Disability Act Study Committee, *Implementation of the Judicial Conduct and Disability Act of 1980: A Report to the Chief Justice,* 22 (2006) [hereinafter the "Breyer Report"].

In most circuits, when a complaint is filed against a specific judge, it is initially reviewed by that clerk for conformity. Barr and Willging, *Decentralized*

*Self-Regulation,* at 36. The clerk will also identify any recusal problems that are apparent from a cursory review of the complaint and advise the chief judge as to the severity of the issue. *Id.* at 35. If the chief judge decides that there is no basis for mandatory recusal under Illustrative Rule 25, he or she may initiate a closer review of the complaint to see if it warrants further action. *Id.* As outlined in the Breyer Report, many complaints are dismissed as frivolous. *See* Breyer Report at 26-29.

If the chief judge determines that the complaint has merit, he or she assembles a special committee tasked with further investigating the allegations. *Id.* at 29. The special committee consists of the chief judge and an equal number of district and circuit judges from that circuit. 28 U.S.C. § 353. Complaints reaching this stage are rare, with only 25 out of 1,363 complaints in 2023 being referred to a special committee. *Complaints Against Judges,* U.S. Cts. (2024). After the special committee convenes and conducts its investigation, it will submit a final report to the judicial council with a recommendation for further action. 28 U.S.C. § 353(c).

Finally, the complaint will be retained by the judicial council for final review. Although the council can recommend impeachment for an Article III judge, in most instances its chosen course of action even for significant misconduct is far less severe, typically amounting to a public reprimand or asking for voluntary retirement. 28 U.S.C. § 354(b)(2); 32 Am. Jur. 2d Federal Courts § 38; *see also In re Jud. Misconduct*, 664 F.3d 332, 340 (U.S. Jud. Conf. 2011) (addressing the public

reprimand of a judge as a consequence of misconduct while leaving the door open to recommending impeachment should the judge change his retirement plans); *In re Memorandum of Decision of Jud. Conf. Comm.*, 517 F.3d at 569 (affirming the judicial council's public-reprimand order).

Although the process for evaluating and sanctioning judicial misconduct may appear straightforward, there are structural concerns that give pause. Hellman, *An Unfinished Dialogue,* at 389. As the Breyer Report suggests, the process for judicial discipline is built on the presumption of good-faith action by the investigating judges. In the vast majority of cases, this presumption is true. But it also highlights a concern: good faith is a critical element because the chief judge acts as detective, prosecutor, and arbiter for the accused through the entire procedure. *See McBryde* 264 F.3d at 308 (describing a constitutional challenge to the Act because it combines charging, prosecutorial, and adjudicative functions into one role).

Given this potential for misconceived actions against a particular judge serving on the same circuit, the rules provide for the safeguard of transfer to another circuit. For example, the chief judge or judicial council can request that the case be transferred to another circuit. Illustrative Rule 26. Chief judges also have the power to recuse themselves if they feel it is necessary to do so. Illustrative Rule 25(a); *see also* Hellman, *An Unfinished Dialogue,* at 389. These precautions have sometimes been used, but they largely remain within the discretion of the chief judge.

History provides the best examples for a closer examination as to when these precautions help to alleviate the Act's inherent structural concerns. To wit, there have been many noted instances where judicial misconduct cases have been transferred to another circuit's judicial council. *See*, *e.g.*, *In re Charges of Jud. Misconduct*, 769 F.3d 762, 763 (D.C. Cir. 2014) (evaluation and dismiss of a complaint against Fifth Circuit Judge Edith Jones). Although the Breyer Report states that use of this precautionary mechanism should not be a regular occurrence, the report and prominent case law suggests that a transfer may be appropriate when a complaint, especially one that has gained significant public attention, creates a threat to public confidence in the judiciary's integrity if disposed of locally. *See* Breyer Report at 116. And where the complaint is subject to or results from possible internal tension within the circuit, Rule 26's transfer mechanism provides some respite. *Id.*

## A. Transferring Cases Eases Internal Circuit Tensions

Internal tension within a circuit has indeed been a trigger for Rule 26's transfer mechanism. Such internal tension was apparent where an internal court administrator submitted a complaint against an unnamed judge within the same circuit. *See*, *e.g., In re Jud. Misconduct J.C. Nos. 03-20-90043 and 03-20-90044*, 2 (Jud. Coun. Third Cir. 2021). Upon being notified of the complaint against him, the subject judge submitted a request to transfer the case to another circuit's judicial council for adjudication. *Id.* at 3. Given the potential impact of the internal tension,

this request was granted and the complaint was transferred to the Third Circuit, where it was ultimately dismissed. *Id.* at 29. And in the case of Judge Jones referenced *supra*, where the complaint alleged that she made improper remarks in a lecture at the University of Pennsylvania Law School, the "highly visible" nature of the allegations and the fact that they concerned the conduct of a fellow member of the Fifth Circuit's Judicial Council, transfer to another circuit was requested and granted. *In re Charges of Jud. Misconduct*, 769 F.3d at 763.

## B. Transferring Cases Also Preserves the Public Trust

Where an investigation or determination by the subject judge's own circuit may cause the public to give pause in their opinion on the integrity of the judicial disciplinary system, a transfer under Rule 26 may be appropriate. In perhaps the highest-profile such instance in modern times, 83 judicial-misconduct complaints against D.C. Circuit Judge Brett Kavanagh were transferred from the D.C. Circuit's judicial council to the Tenth Circuit's judicial council. *See* Letter from Chief Justice Roberts, U.S. Supreme Court, to Judge T. Tymkovich, Cir. Judge for the Tenth Cir. (Oct. 10, 2018) (effecting the transfer of complaints filed against then-Judge Kavanaugh's Supreme Court confirmation process). While these unfounded complaints were ultimately dismissed—as those against Judge Newman should be— the transfer was deemed appropriate given the "exceptional circumstances" of the publicity of their allegations, as well as the D.C. Circuit's desire to avoid any

perception of impropriety for being the arbiter of their colleague's fate. *In re Complaints Under the Judicial Conduct and Disability Act, Nos. 10-18-90038 through 10-18-90112* (10th Cir. Jud. Council 2022), at 3.

That perception of impropriety is a strong motivator. When the Ninth Circuit identified a series of viable complaints alleging sexual misconduct on the part of then-Judge Alex Kozinski, it requested a transfer of the complaints to the Second Circuit for further investigation. *In re Complaint No. 17-90118*, at 1 (2d Cir. Jud. Council Feb. 5, 2018). The allegations submitted by Judge Kozinski's former law clerks initiated a firestorm of media coverage that resulted in "exceptional circumstances" such that the chief judge of the Ninth Circuit determined that a transfer was necessary to preserve the confidence and impartiality of the process. *Id.*

The precedent in this area suggests that transfers for independent review are common in instances where public confidence and the perception of impartiality are in jeopardy. To cite some further examples:

1.     When a complaint surfaced against Chief Judge William Pryor of the Eleventh Circuit, it was transferred to the Second Circuit within a month. *In re Charge of Jud. Misconduct Nos. 21-90142 and 21-90143,* at 1 (2d Cir. Jud. Council December 22, 2021). Central to Judge Pryor's case was that to properly adjudicate the complaint, an examination of disputed facts involving Judge Pryor's personal decision-making by his fellow circuit judges would be warranted. *Id.*

2.    In a separate complaint against Judge Kozinski alleging that he maintained a publicly accessible website featuring sexually explicit materials, the Ninth Circuit transferred the complaint to the Third Circuit within eight days of public disclosure of the allegations and the court's reception of the complaint. *In re Complaint of Jud. Misconduct*, 575 F.3d at 280. This transfer was motivated in part by widespread coverage in the *L.A. Times* and a desire to mitigate any perceived bias in determining the accuracy of the complaints. *Id.*

3.    And when Chief Judge Boyce Martin of the Sixth Circuit identified himself as the subject judge of a complaint regarding travel expenses, the case was immediately transferred to the Second Circuit's Judicial Council. *In re Jud. Misconduct*, 747 F.3d at 869.

The timely request and approval of transfer in each of these cases shows that judicial councils are sensitive to public pressure. They react quickly by transferring cases that could give the appearance of bias if handled locally.

## III.    RETIRED FEDERAL CIRCUIT JUDGE PAUL MICHEL RECENTLY CONFIRMED OUR READING OF THE SITUATION

Right before Judge Newman filed her opening brief in this appeal, one of the most distinguished jurists ever to sit on the Federal Circuit wrote an opinion piece that crystallizes the issues at play here. Paul Michel, *Judge Newman's Suspension by the CAFC Has Marred Public Faith in the Federal Judiciary*, IP Watchdog, Dec. 2, 2024, https://tinyurl.com/ywvyapku. Judge Michel was a Federal Circuit judge from

1988 to 2010 and its chief judge from 2004 until his retirement. He raises timely

concerns that should be taken seriously, and his argument is worth quoting in detail:

> Normally, one would assume the chief judge's motivations are proper: simply to protect the court and litigants before it. But the mere appearance of bias is regarded as being just as harmful to justice as actual bias. Given Judge Newman's accounts of their interactions, at least the appearance of bias against her by the chief judge is hard to dismiss. . . .
>
> Given the chief judge's apparent animus against Judge Newman, how can she herself be regarded as an impartial adjudicator? Even the impartiality of the other judges may be questioned if, like the staff, they were perhaps fearful of adverse consequences if they failed to support the wishes of the chief judge.
>
> No one, I suggest, can confidently untangle these diametrically opposing versions of the truth without a trial-like proceeding. And, so far, that has been repeatedly denied by all the external authorities who have looked at this case.
>
> Finally, all should be able to agree that the disputed facts should be decided by a neutral body. Such neutrality must be beyond question for the sake of faith in the courts by litigants and the public alike. That, after all, is the basis of judicial recusals. Yet requests by Judge Newman to transfer the case to another circuit have all been rejected. That alone is troubling. . . .
>
> Getting the facts straight always lies at the heart of doing justice. In this case, however, the relevant facts have yet to be established and verified. In its brief filed in the district court, the Federal Circuit wrote that all the disability charges were "moot", removing these charges from the district court. Yet, Judge Newman was not returned to judicial service, and she has now been "suspended" for a second year, on the same charge of "failure to cooperate."
>
> Judges from around the country anxiously ask me regarding the actions taken against Judge Newman: "What's going on with the Federal Circuit?" Is it not time for some outside authority to intervene and to end this impasse before it further undermines the credibility of the Federal Circuit, and potentially the entire judiciary?

*Id*.

Judge Michel is exactly right in raising issues both of Judge Newman's due process rights and the harm being done to the judiciary, and especially to the Federal Circuit. *Amici* are in strong agreement that it is time for a court with the relevant competence and jurisdiction—this Court—to intervene to end the impasse by declaring that due process has been violated and thus the necessity of transferring this disability proceeding to a circuit that is uninvolved in the underlying dispute. That move would obviate any concerns about impartiality arising from internal tensions within the Federal Circuit and begin to remedy the damage being done to the rule of law by Judge Newman's arbitrary suspension.

## CONCLUSION

For these reasons, this Court should reverse the court below and render a judgment indicating a need to transfer the underlying proceedings to another circuit.

Respectfully submitted,

December 12, 2024

*/s/ Ilya Shapiro*
Ilya Shapiro
Tim Rosenberger
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 4,145 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as determined by the word counting feature of the software (Microsoft Office 365) used to prepare this brief.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman.

Dated: December 12, 2024

/s/ *Ilya Shapiro*
Counsel for *Amici Curiae*


## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2024, I electronically filed the above with the Clerk of Court using the CM/ECF system which will send notification of this filing to counsel for all parties.

/s/ *Ilya Shapiro*
Counsel for *Amici Curiae*